# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

GEORGE CHESNEY; VIRGIL MAINES; )
WILLIAM GADDIS; DEBRA BURNUM; )
PATRICIA CORDELL; JAMES G. WORLEY; )
JEWEL H. FRANCIS; DONALD W. SIMON; )   CASE NO. 3:09-CV-09
and BARBARA M. PHILLIPS, )
)
        Plaintiffs, )
)
   v. )
)
TENNESSEE VALLEY AUTHORITY; )
GEOSYNTEC CONSULTANTS, INC.; and )
WORLEYPARSONS CORPORATION )
)
        Defendants. )
)

## CONSOLIDATED CLASS ACTION COMPLAINT

## I.    INTRODUCTION

1.    Plaintiffs, on behalf of themselves and those similarly situated, file this Consolidated Class Action Complaint (regarding Complaints filed in this Court at 3:09-cv-9, 3:09-cv-14 and 3:09-cv-114) against Defendants, Tennessee Valley Authority ("TVA"), Geosyntec Consultants, Inc. ("Geosyntec"), and WorleyParsons Corporation ("Parsons").

2.    On behalf of themselves and members of the proposed Property Classes, all Plaintiffs seek monetary damages suffered as a result of the Defendants' conduct which caused or resulted in a massive coal ash spill on December 22, 2008. Plaintiffs George Chesney, Virgil Maines, Patricia Cordell, and Donald Simon also seek the establishment of a fund by Defendants for medical monitoring of members of the proposed Resident Class or in the alternative, the establishment of a supervised medical monitoring program.

3.      In the early morning hours of December 22, 2008, an unlined, 40-acre coal ash dredge cell impoundment at TVA's Kingston Fossil Plant (commonly known as the Kingston Steam Plant, Kingston Fossil Plant, or "KIF") along the banks of the Emory River near where it joins the Clinch River (hereafter, "the impoundment") ruptured, discharging coal ash slurry that the TVA had been storing there for decades.

4.      TVA initially stated, inaccurately, that the spill involved "only" about 300 million gallons of coal ash sludge and that it was completely contained.

5.      In fact, as TVA later admitted, more than 1 billion gallons of coal ash sludge burst out of the impoundment and poured out into the surrounding landscape and into the Emory River, the Clinch River and Watts Bar Reservoir ("the 12/22 disaster").

6.      As a result of the 12/22 disaster, coal ash sludge flooded or subsequently migrated into the nearby waterways, including the Emory, Clinch and Tennessee Rivers, the Watts Bar Reservoir, as well as the surrounding environment.

7.      The pollution continues to move through the water and air, and via mechanical means, and continues to cause further contamination.

8.      The impact of 12/22 disaster is enormous.  According to officials from the United States Environmental Protection Agency, it is the worst environmental disaster of its type.

9.      Coal waste contains corrosive, carcinogenic, radioactive, hazardous, and/or toxic materials, including lead, mercury, arsenic, thallium, beryllium, boron, cadmium, chromium, manganese, molybdenum, nickel, selenium, and zinc.

10.     Upon information and belief, TVA dumped coal ash and related wastes containing massive amounts of metals into the impoundment, including in just one year: 45,000 pounds of arsenic, 86,000 pounds of chromium, 129,000 pounds of copper, 49,000 pounds of lead,

235 pounds of mercury, 72,000 pounds of nickel, 8,000 pounds of selenium, and 115,000 pounds of zinc.

11.     TVA's data from 2003 shows, among other elements and compounds, arsenic concentrations in the subject KIF coal ash sludge waste as high as 450 mg/kg.

12.     Upon information and belief, the coal ash sludge contains particulate matter and/or fine particles, including significant percentages which are below 10 microns and also appreciable percentages which are below 2.5 microns.

13.     Upon information and belief, the coal ash sludge is being and is capable of being aerosolized and perpetually carried in the air.

14.     Upon information and belief, according to the EPA, airborne pollutants measuring less than 10 microns or micrometers, and especially those measuring below 2.5 microns or micrometers, are unhealthy to breathe and have been associated with premature mortality and other serious health effects, including, but not limited to, conditions, disorders or diseases of the lungs and/or the pulmonary system.

15.     The acts and/or omissions of Defendants resulted in the 12/22 disaster and caused Plaintiffs and Class Members to be repeatedly exposed to the toxic and hazardous substances contained in the coal ash sludge.

16.     TVA, which owned, maintained, operated and inspected the impoundment, bears responsibility for the disaster.

17.     Geosyntec and Worley Parson were professional engineering contractors of TVA, who knew or should have known that the impoundment was unsafe and likely to fail, and they too bear responsibility for the disaster.

18.     In 2003, TVA considered alternatives for short and long term ash disposal.  The most comprehensive of these alternatives that would provide a "global fix" was estimated to cost TVA $25 million.

19.     TVA's internal documents show that this alternative was rejected because of "High Cost."

20.     Other global fixes considered and rejected by TVA included the construction of a synthetic liner, or construction of a vibrating beam cutoff wall around the total perimeter of the impoundment.  These fixes would have cost as little as $5 million.

21.     Again, TVA's documents show that it considered the drawback to these alternatives to be the "High Cost."

22.     In 2005, TVA engineers implemented trench drains in an attempt to fix the problem of seeping from the impoundment.  Nevertheless, the next year, there was a mudslide on the front side slope of the holding pond.

23.     In November 2006, TVA noted that the impoundment was demonstrating excessive seepage.  In response, TVA installed more drainage systems to try to avoid the problem.

24.     In 2007, upon information and belief, engineers warned TVA to stop adding material to the impoundment, but TVA ignored all warnings.

25.     In 2008, the year of the disaster, inspections showed that the impoundment was seeping.

26.     In 2008, TVA earned over $10 billion in revenue.

27.     Also in 2008, TVA raised its rates for customers to purchase electricity by 20%, the biggest rate increase in three decades.

28.      In that same year, TVA paid its CEO, Tom Kilgore, over $2 million in compensation.

29.      TVA did not, however, implement any of the fixes that it had considered earlier in 2003 that would have prevented the 12/22 disaster.  Instead, TVA continued to rely on less costly, "band-aid" measures and the impoundment continued to experience telling failures of which Defendants were aware or reasonably should have been aware.

30.      On December 28, 2008, TVA's CEO admitted that it would stop using this type of impoundment in the future because using the same design would not be the right thing to do.

31.      Upon information and belief, TVA is not taking steps to safeguard the community from further damage through the remediation process.  In fact, upon information and belief, TVA has returned a portion of the coal ash sludge to the failed impoundment, raising concerns regarding a repeat of the 12/22 disaster and/or continued contamination of the environment.

32.      Plaintiffs allege that Defendants damaged their property, trespassed, and caused a nuisance by spilling and/or allowing the spilling of coal ash sludge onto their property, into their water supply, and/or throughout their community, and then causing or allowing the continued migration of the coal ash sludge onto their property, into their water supply, and throughout their community.  Plaintiffs also allege that Defendants acted with reckless, willful and wanton disregard for the health and safety of Plaintiffs and their community.

33.      Plaintiffs further allege that Defendants misrepresented the safety of the failed impoundment to state and federal agencies and the public; knew or should have known that the impoundment was likely to fail; failed to take the requisite steps to safeguard Plaintiffs and the public both before, during, and after the 12/22 disaster; failed to appropriately mitigate the

effects of the spill once the rupture took place; and, have caused and continue to cause additional damage through TVA's so-called "remediation" activities

34.     As a result of Defendants' wrongful actions, Plaintiffs' and the Property Class Members' property has been physically marred, contaminated, stigmatized and/or rendered valueless or drastically reduced in value, either permanently or temporarily.

35.     By this action, Plaintiffs and the Classes seek relief for the extensive harm they experienced as a direct result of Defendants' knowing and reckless action and inaction. Plaintiffs seek, *inter alia*, compensatory damages, injunctive relief, punitive damages, and attorneys' fees and costs.

36.     As a result of the 12/22 disaster and Defendants' conduct, the quiet use and enjoyment of Plaintiffs' and Property Class Members' real properties and surroundings has been substantially diminished or destroyed.

37.     TVA's remedial activities, including, among other things, the extensive and excessive blasting of rock from nearby quarries, hauling of coal ash sludge waste and other wastes and debris, and dredging in the Emory River, has interfered with the full use and enjoyment of their property.

38.     Accordingly, this suit seeks monetary damages for the loss of use and/or enjoyment suffered by Plaintiffs and Property Class Members.

39.     As a result of the 12/22 disaster and the Defendants' conduct, the actual and/or rental value of properties owned by Plaintiffs and Property Class Members has been substantially diminished, if not wholly destroyed.

40.     Accordingly, this suit also seeks monetary damages for diminution of property and/or rental values of Plaintiffs' and Property Class Members' real property.

41.     Upon information and belief, exposure to hazardous and toxic coal ash sludge as a result of the 12/22 disaster places Plaintiffs George Chesney, Virgil Maines, Patricia Cordell and Donald Simon, and members of the Resident Class, at a significant and substantially increased risk, relative to that of an unexposed population, of developing one or more serious illnesses, injuries or diseases, including, but not limited to: damage to their respiratory system, pulmonary system, skin, gastrointestinal system, neurologic system, cardiac system, vascular system (including blood), immune system, or worsening of pre-existing symptoms, conditions and/or injuries.

42.     Plaintiffs George Chesney, Virgil Maines, Patricia Cordell, and Donald Simon thus seek an order requiring the establishment of a health assessment and medical monitoring trust fund by Defendants, or alternatively, the establishment of a supervised medical monitoring program, so that they and Resident Class Members can adequately protect their health into the future and to respond to and treat any resulting present and future diseases, conditions or illnesses.

43.     The release of the coal ash sludge, which is a solid waste as defined in the federal Solid Waste Disposal Act and/or Resource Conservation and Recovery Act ("RCRA") and Tennessee state law, constitutes a reckless, intentional and/or illegal disposal of solid waste on the properties of Plaintiffs and others similarly situated, and in publicly used areas, including navigable waterways.

44.     The impoundment and/or continued impoundment of coal ash sludge waste at KIF is an illegal, open dump of solid waste in violation of state and/or federal law, including RCRA.

45.     Furthermore, TVA's release of the coal ash sludge and/or other wastes also violates other federal environmental laws, including the Clean Water Act, and Tennessee state law, including the Tennessee Water Quality Control Act.

## II.     JURISDICTION.

46.     Plaintiffs are owners of residential property in the vicinity of the TVA KIF facility.

47.     This Court has original federal question jurisdiction over claims against TVA pursuant to 28 U.S.C. §§ 1331, 1337.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to Plaintiffs' and Class Members' claims occurred in this District and a substantial part of property that is the subject of the action is situated in this District.  TVA has substantial contacts in the Eastern District of Tennessee, as its principal executive offices are located in Knoxville.  TVA's Kingston Fossil Plant is located in the city of Kingston in Roane County, Tennessee, and is thus located within the geographical boundary of the Eastern District of Tennessee.  Geosyntec and WorleyParsons also conduct substantial business in this District, and maintain offices in this District.

## III.    PARTIES.

48.     Plaintiff George Chesney owns real property located at 423 Emory River Road, Harriman, TN 37748, where he resides.

49.     Plaintiff Virgil Maines owns real property located at 2155 Sugar Grove Valley Road, Harriman, TN 37748, where he resides.

50.     Plaintiff William Gaddis owns real property located at 1216 Cove Road, Kingston, TN 37763, where he resides.

51.     Plaintiff Debra Burnum owns real property located at 461 Rockwood Ferry Road, Ten Mile, TN 37880, where she resides.

52.     Plaintiff Patricia Cordell owns real property at 1346 Swan Pond Circle Road, Harriman, TN 37748, where she resides.

53.     Plaintiff James G. Worley owns real property at 2345 Sugar Grove Valley Road, Harriman, TN 37748, where he resides.

54.     Plaintiff Jewel H. Francis owns property at 132 Island Lane, Kingston, TN 37763, where she resides.

55.     Plaintiff Barbara M. Phillips owns property at 224 Blue Herron Way, Ten Mile, TN 37880, where she resides.

56.     Plaintiff Donald W. Simon owns real property at 113 Osprey Way, Harriman, TN 37748, where he resides.

57.     Plaintiffs and Property Class Members they seek to represent have been harmed by diminution in their property value and/or rental value as a result of Defendants' conduct, and by loss of the enjoyment and use of their property and surroundings.

58.     Plaintiffs George Chesney, Virgil Maines, Patricia Cordell, and Donald Simon, and members of the Resident Class they seek to represent have been exposed to toxic coal ash and seek health assessments and medical monitoring.  Plaintiffs have suffered a cognizable injury in that the exposure has lead directly to an increased risk of future harm compared with those individuals who have not been exposed and their injuries can be redressed by medical monitoring.

59.     TVA owns and operates the Kingston Fossil Plant in or near Kingston, Tennessee. Its headquarters are located at 400 W. Summit Hill Drive, Knoxville, Tennessee  37902.

60.     TVA is a wholly owned federal corporation created under an Act of Congress.  Its principal place of business is in Knoxville, Tennessee.

61.     TVA is the largest power producer in the United States.  TVA generates electricity by burning coal in 11 fossil-powered plants, including the Kingston Fossil Plant.

62.     At all times material hereto, TVA's operation of its coal-fired power plants and associated facilities, including KIF, was and is a commercial function and not a governmental operation.

63.     Geosyntec Consulting, Inc. ("Geosyntec") is a corporation engaged in the practice of professional or civil engineering and associated professional services, with main offices in Atlanta, Georgia, as well as business offices at 2240 Sutherland Avenue, Suite 107, Knoxville, Tennessee 37919.

64.     Geosyntec conducts substantial business in Tennessee, including in Roane County.

65.     At all times material hereto, Geosyntec, was and/or is a private professional or civil engineering consultant hired by and working on behalf of TVA with regard to the KIF facility, including the design, inspection, maintenance, repair and operation of its impoundments and dredge cells between at least 2004 and 2007.

66.     At all relevant times, Geosyntec acted individually, and/or by and through its employees, agents, principals, officers, directors, designees and/or workers.

67.     WorleyParsons Corporation, individually and as successor in interest to Parsons E & C Corporation ("Parsons"), is a corporation engaged in the practice of professional or civil engineering and associated professional services, with its main office in Australia, as well as business offices at 633 Chestnut Street, Suite 400, Chattanooga, Tennessee 37450-0400.

68.     WorleyParsons is the successor in interest to Parsons E & C Corporation, including with regard to all assets and liabilities of Parsons E & C Corporation.

69.     WorleyParsons conducts substantial business in Tennessee, including in Roane County, as did Parsons E & C Corporation.

70.     At all times material hereto, Parsons E & C Corporation was a private professional or civil engineering consultant hired by and working on behalf of TVA with regard to the design, inspection, maintenance, repair and/or operation of the KIF facility, and its impoundments and dredge cells in at least 2004 and 2005.

71.     At all times pertinent hereto, Parsons acted individually, and/or by and through its employees, agents, principals, officers, directors, designees and/or workers.

## IV.     FACTUAL ASSERTIONS

### A.     TVA and the History of the Failed Impoundment.

72.     The TVA Kingston Fossil Plant is a 1,600 megawatt, coal-fired power plant, with a business address at or near 714 Swan Pond Road in Harriman, Tennessee.

73.     TVA is in the business of generating electricity for sale by burning coal.

74.     TVA's KIF facility burns approximately 14,000 tons of coal per day in the course of its business.

75.     The KIF plant has nine coal fired units with a maximum generating capacity of approximately 1,600 Megawatts, making it one of TVA's largest coal burning facilities.

76.     The KIF facility is located near the confluence of the Clinch and Emory Rivers (and includes Watts Bar Lake and Watts Bar Reservoir), approximately one mile northwest of Kingston, Tennessee.

77.     TVA is the owner and operator of the facility.

78.     The KIF facility was constructed in the early 1950s, and is believed to have initiated operations around 1952.

79.     Coal ash is created from the coal burning process, and includes fly ash and bottom ash ("coal ash").  Coal ash can be stored in dry or wet form.  At all relevant times, TVA stored coal ash at the Kingston facility in wet form by adding water, creating coal ash sludge.

80.     A dredge cell is the ash disposal area that contains settled ash from the main ash and stilling ponds.  Coal ash from the plant is sluiced as a watery mixture to the main ash pond where it settles to the bottom and water from the top is pumped into the stilling pond where more solids settle out.  The settled solids are then dredged from the bottom of the stilling and ash ponds and placed in the dredge cell to further solidify.

81.     Before 12/22, the impoundment contained approximately 9.4 million cubic yards of coal ash sludge.  The coal ash sludge occupied approximately 98 acres, and rose 60-65 feet above the Emory River, which flows into the Clinch River and then into the Tennessee River.

82.     Fly ash is the non-combustible mineral components or compounds contained in the coal burned to produce electricity, and is comprised of various heavy metal contaminants, including arsenic, as well as other toxic and/or hazardous substances or contaminants such as polycyclic aromatic hydrocarbons ("PAHs") and those others listed in the paragraph(s) above.

83.     Bottom ash is the non-combustible mineral components or compounds contained in the coal burned to produce electricity that typically come out of the bottom of the combustion chamber that burns the coal.  Bottom ash is a porous material.  It contains the same hazardous contaminants as fly ash.

84.     The bottom ash, which is not as fine a particulate as fly ash, was used by TVA to construct dikes at KIF as the dredge cell surface impoundments for the coal ash sludge waste were built or raised.

85.     Fly ash and bottom ash, particularly the heavy metals therein, do not biodegrade or evaporate, but must be removed after the coal combustion process and safely and legally stored or disposed.

86.     The constituents of fly ash and bottom ash are toxic, hazardous substances that can and do produce adverse health effects and damage to property if not properly stored and controlled.

87.     According to TVA's *Operations Manual, Dredge Cell Lateral Expansion*, *Tennessee Valley Authority, Kingston Fossil Plant*, dated June 7, 2004, and revised March 24, 2006 and May 5, 2006 (whose content was written, contributed, recommended and/or approved by Defendants and/or their respective engineers), the design of ash handling operations and the actual ash handling operations at KIF were based on application of engineering principles.

88.     Representations made by and/or approved by TVA, Geosyntec, and/or Parsons, that the ash would consolidate in the dredge cells or was adequately consolidating, were known or should reasonably have been known by Defendants to be incorrect, false, or a misrepresentation at the time the representations were made, were learned, and/or should reasonably have been learned by Defendants.

89.     Despite having knowledge of the incorrect, false, and/or misleading representations regarding consolidation of the ash waste in KIF's impoundment, TVA, Geosyntec, and/or Parsons did not disclose this fact to the Tennessee Department of

Environment and Conservation ("TDEC") or other regulatory bodies, as they were required to do.

90.     On September 26, 2000, the TDEC Division of Solid Waste Management, in apparent reliance upon representations by Defendants that the ash would or was adequately consolidating, approved the Defendants' request to treat the KIF dredge cells as a Class II landfill for the disposal of ash wastes, despite the fact that significant liquid contaminated water remained mixed with the ash and added to the impoundment on an ongoing and continuous basis.

91.     Consequently, Defendants continued with their coal ash sludge impoundment designs, recommendations, and/or operations despite the fact that the EPA and/or the State of Tennessee had long ago restricted liquid waste disposal practices in landfills because of known problems and dangers of resulting failed consolidation, seepage, surface and ground water discharge, slope instability, and resulting hazardous substance release.

92.     Upon information and belief, no Environmental Impact Statement was ever prepared or published regarding the creation of this "Class II Landfill" at KIF in 2000 or its lateral expansion in 2006.

93.     The Environmental Impacts of this disposal area at KIF were never properly and prudently considered, analyzed, evaluated and/or approved by Defendants, nor were alternative plans for the disposal of ash or coal ash sludge waste from KIF properly considered, analyzed, evaluated and/or approved by Defendants.

94.     The failure and refusal by Defendants to comply with, recommend compliance with or require compliance with NEPA precluded TDEC, EPA, and the public (including Plaintiffs and others similarly situated) from a proper, prudent and responsible opportunity to

review and consider the deleterious impact of surface impoundments built on top of vertically expanding landfills over another old surface impoundment at KIF.

95.     The disposal plan and impoundment were created, operated, repaired and/or maintained by Defendants, despite the fact the impoundment was never properly designed as an engineered landfill.

96.     The main or predominant root causes of the exterior dike failure at KIF include the buildup of water within and beneath the KIF ash dredge cell and the failure of Defendants to design and maintain the dredge cell properly, including implementing corrective measures to prevent the disaster.

97.     Water was primarily introduced into the dredge cells at KIF via the dredging process and precipitation (*i.e.,* rain, snow, etc.), although minor secondary sources of water intrusion (*i.e.,* from dust control efforts) also existed.

98.     Based on the KIF dredge cell and/or impoundment design, the water was retained within the ash, and this retained water exerted pressure on the exterior dredge cell dikes.

99.     Defendants knew or reasonably should have known of the dangers and hazards associated with this basic and obvious engineering principle, especially given TVA's experience with and responsibility for its hydroelectric dams.

100.    Ultimately, the obvious and known pressure from the buildup of water caused the KIF exterior dike failures.

101.    Because most of the KIF dredge cells were saturated when the dikes failed, most of the waste material became liquefied (*i.e.* coal ash sludge waste) and slid onto surrounding properties and into waterways.

102.    Federal and state agencies restricted liquid disposal in landfills decades ago due to the proven and well known engineering and environmental hazards associated with liquid waste disposal practices in landfills and resulting instability, seepage, surface and groundwater contamination.

103.    TVA was required to request a waiver from TDEC to sluice the ash material into the ash pond and dredge cell areas.

104.    TDEC approved the waiver around 1992 (and possibly later) largely based on the errant representations by Defendants regarding, among other things, the alleged consolidation of the coal ash sludge in the KIF impoundment.

105.    United States Geological Survey topographic maps indicate that the ash disposal area at KIF was originally physically sited in Watts Bar Lake.  This indicates that all or most of the exterior dike bases were and are physically located within saturated conditions.  The saturated conditions were noted by TVA's consultants, including Geosyntec and/or Parsons, during the vertical expansion design in or about 2004.

106.    In contrast to the representations made in the body of the report, Appendix G of the TVA 2004 *Operations Manual Dredge Cell Lateral Expansion* indicates that ash "has **remained apparently loose** despite years of being under the existing ash overburden" and "**liquefies under even slight vibration.**"

107.    Indeed, the geotechnical parameters of the ash material (*i.e.,* coal ash sludge waste) and construction materials used in the exterior dredge cell dikes at KIF over time were in fact highly variable, but Defendants ignored this fact despite having actual or constructive knowledge of it.

108.     From an engineering standpoint, the highly variable parameters of the KIF coal ash sludge waste and dike material constituted a significant construction concern and hazard that made it easily foreseeable to Defendants well before December 22, 2008, that additional failures of the impoundment could and would occur.

109.     Nevertheless, Defendants ignored this easily foreseeable reality and failed to timely, properly, and adequately advise TDEC and other regulatory bodies of the associated hazards and dangers of the TVA impoundment or to make alternative disposal plans, all contrary to applicable engineering or other duties or standards of care.

110.     In a report on the repair of the 2003 KIF blowout, consultants reported that they "did not anticipate local anomalies."  Incredibly, this conclusion was reached and accepted by Defendants without any timely, proper, or adequate investigation or analysis by Defendants of the underlying causes of the blowout, in breach of professional engineering duties or standards as well as of other duties of care owed to the public, including Plaintiffs and Class Members.

111.     On or about December 22, 2003, an engineering recommendation was made to design and/or install impoundment liners at KIF to avoid leakage, spillage, blowouts and/or other release of the coal ash sludge.  TVA did not accept this recommendation and it was never put into effect.

112.     Thereafter, during the 2004-2006 lateral expansion design of the impoundment at KIF by and/or with the approval of Defendants, contrary to applicable engineering or other duties or standards of care, the ranges of the geotechnical parameters were outlined inappropriately by Defendants to TDEC and/or other regulatory bodies, in that average parameter values were used as opposed to the highly variable geotechnical parameters known to Defendants.

113.     This and other representations by Defendants caused TDEC and other regulatory bodies to believe and conclude that the KIF impoundment was sound and safe from an engineering standpoint, and thus posed no threat of failure.

114.     However, the highly variable geotechnical parameters provided preferential pathways in the KIF exterior dikes (*i.e.,* the water would find the easiest material to flow through and escape, and thereby force as much water as possible through this porous material).  This was even identified by TVA's consultant, Geosyntec, during the investigation of another localized failure or blowout at KIF in 2006, when it reported "zones of variable material observed …. result[s] in preferential flow paths and wet areas."

115.     It was the clear and unmistakable duty of the professional engineers who were involved in the slope stability work at KIF to immediately, and without delay, fully reevaluate the "landfill" design upon finding that preferential flow paths were indeed present.  They failed to do so.

116.     By these very serious failures, Defendants breached professional engineering duties or standards as well as other duties of care owed to the public including Plaintiffs and Class Members.

117.     Additional obvious early warning signs that the water and coal ash sludge buildup within the KIF disposal impoundment area, in combination with the above observed conditions and 2003 and 2006 dike blowouts, would likely cause more dike mound failures at KIF, were identified before the 12/22 disaster.  Specifically, the following items were noted:

        a.       Seeps (areas where water is flowing through the exterior dike at specific locations) were repeatedly identified at KIF by TVA, Geosyntec and/or Parsons, along the northern and/or northeastern exterior dikes in annual inspection reports from the years 2000

through 2008. Some of these seeps were professionally repaired, while others were apparently addressed by plant personnel. One seep of note in the 2008 Annual Ash Pond Dike Stability Inspection Report was quoted to have been "known since the early 1980s". Wet spots and areas of erosion were also noted by Defendants on the exterior dikes in October 2008, two months before the 12/22 disaster.

b.     Repair of the November 2003 blowout was completed and/or approved by TVA, Geosyntec, and/or Parsons in late 2005/early 2006; however, a "localized failure occurred very near the 2003 failure" around November 2006. According to the 2008 Annual Ash Pond Dike Stability Inspection Report, the cause of the 2003 blowout and 2006 localized failure were a result of "inadequate internal drainage…and infiltration of surface water on the existing dike benches." Ponding water on the dike benches was also noted by TVA, Geosyntec, and/or Parsons in several of the annual inspection reports, including the 2008 Inspection Report.

c.     The 2008 Annual Ash Pond Dike Stability Inspection Report indicated that previous wintertime preventative measures were recommended in 2007 to reduce water levels in the dredge cells "in an attempt to avoid another blow out [of the exterior dike]." This indicated that TVA, Geosyntec, and/or Parsons knew normal water levels within the ponds/cells were causing structural integrity issues with the dikes during the wintertime months.

d.     It is well known that water mound failures tend to occur in eastern states in cool months because there is minimal evaporation and maximum infiltration during the cool months. Nonetheless, Defendants continued to allow additional ash wastes and water to be pumped into the KIF impoundment during the late fall and winter of 2007 and 2008.

e.     A 20 feet long by 2 feet deep eroded area was noted by Defendants in an "interim" dredge cell slope.  The eroded area is further engineering evidence of a failure to maintain operations so that impoundment design and integrity are assured.

f.     An eroded and washed out area was noted by Defendants at the "north end of the dredge cells" in the 2008 inspection, two months before the 12/22 disaster.  This eroded and washed out area was recommended by Defendants to be repaired.

g.     A "wet spot" was also noted by Defendants at the toe of the KIF Cell 2 dike.  This wet spot was estimated to be 4 feet by 4 feet, and located in the area of an old under-drain.  The wet spot was recommended by TVA, Geosyntec, and/or Parsons to be closely monitored for worsening conditions, as opposed to being immediately and properly repaired and addressed as it should have been.

h.     Despite whatever analyses were performed by and/or accepted by Defendants, they failed to take into account critical and pre-existing engineered elements and components concerning the impoundment when analyzing present conditions and problems, and making recommendations as to the inspection, maintenance, repair, and/or operation of the KIF impoundment.

118.     Investigations by Defendant, Geosyntec, revealed seeps at the KIF impoundment, and Geosyntec reported them to TVA in the 2007 and 2008 annual inspections, indicating that prior repairs failed to address the underlying integrity problem being made increasingly worse as TVA continued to pile on ash material.

119.     Consequently, there were at least two very obvious, fundamental issues that Defendants should have identified and timely, properly, and adequately addressed that would have prevented the 12/22 disaster:

  a.  First, the existing conditions of the KIF impoundment disposal area, specifically the types of material used in the exterior dikes and the water mounds within the dredge cells, should have triggered Defendants to design and/or redesign the dredge cells as a true surface impoundment or a dry landfill.

  b.  Second, the seeps occurring throughout the facility and the repeat blowouts and failures in the northern dike indicated an immediate need for full and proper containment of the ash material as well as the need to discontinue use or introduction of water into the impoundment.

  120. Furthermore, some of the repairs undertaken by and/or made at the recommendation of Defendants, directly contributed to and/or significantly increased the risk of the disaster, because the addition of more and more under-drains, some of which undoubtedly were placed in or near preferential water paths, increased water movement velocity, thereby increasing the likelihood of further ash blowouts.

  121. Indeed, Defendant Parson's 2009 inspection report regarding an inspection of the KIF impoundments in October 2008, specifically noted that the monitoring wells "showed water pressure above the dike slope" indicating that the repairs for the 2003 and 2006 blowouts were not adequately functioning and that the excess water pressure threatened the dike's integrity.

  122. Defendants observed seeps at KIF in the 2007 and 2008 annual inspections and prior thereto.  Consequently, they knew and/or should have known that the repairs being made would not and did not adequately address the integrity problems which were only being exacerbated as increasing amounts of coal ash sludge waste and water were introduced into the dredge cell area.

123.    At no time did Defendants notify or advise TDEC, other regulatory bodies, or the public, including Plaintiffs and Class Members, of this increasing, unlawful and continuous discharge, even after August, 2008, when TVA's NPDES discharge permit had expired.

124.    Despite all of the problems, hazards and dangers known to Defendants and/or their respective engineers, they continued to pump or allow the continuation of pumping of ash wastes and water into the KIF impoundment.

125.    This resulted in the continued piling of the unstable, wet coal ash sludge waste to a point where there was a water column of over seventy (70) feet in height.

126.    All civil engineers with degrees from accredited institutions are trained to know that water pressure is a direct function of water column height, yet Defendants clearly ignored or discounted this reality as it related to the function, stability and safety of the KIF coal ash sludge waste impoundments.

127.    Despite the fact that Defendants knew or should have known that the KIF impoundment presented a grave danger of immediate failure and the potential for a catastrophic release of the coal ash sludge, the Defendants failed or refused to timely, adequately and properly design, redesign, inspect, repair, maintain or operate the KIF coal ash sludge impoundment.

128.    The NPDES permit for the KIF impoundment facility expired on August 31, 2008.

129.    The NPDES permit had not been reviewed and renewed by TDEC as of the time of the 12/22 disaster, and has not been as of the filing of this Complaint.

130.    Accordingly, TVA is currently illegally releasing and/or storing regulated pollutants, coal ash sludge, and other wastes at the KIF impoundment.

### B.  **The 12/22 Disaster and Resulting Contamination.**

131.    In the early morning hours of December 22, 2008, the impoundment ruptured. According to the latest information, of the 9.4 million cubic yards of coal ash sludge in the impoundment, 57% of it, or 5.4 billion cubic yards (equivalent to 1 billion gallons), spilled out.

132.    The deluge of coal ash sludge completely destroyed at least three homes, directly damaged at least forty-two other properties, and covered approximately 300 acres of land and tow inlets of the Emory River.

133.    Upon information and belief, in some parts of these 300 covered acres, stacks of ash and sludge stood in large, dark mounds, some taller than a one-story house.

134.    Many waterfront properties along the Emory River, the Clinch River, the Tennessee River, and in Watts Bar Lake have coal ash sludge residue on their shores.

135.    Following the rupture of the impoundment, black sludge spread and contaminated the Emory, Clinch, Tennessee Rivers, and Watts Bar Lake.

136.    Each of those bodies of water has been contaminated with toxic chemicals, making large parts of them unfit for swimming and other recreational activities.

137.    The 12/22 disaster suffocated significant aquatic life in rivers, exterminating fish, frogs, and snapping turtles as it moved downstream toward the Tennessee River.  Pets and livestock belonging to the residents exposed to the sludge have also died as a result of exposure to the sludge.  It is likely that for years after the disaster, miles of river will remain mostly lifeless.

138.    Tests on the sludge itself showed unsafe levels of arsenic and vanadium, and elevated levels of other metals found in coal, including mercury, magnesium, selenium, sodium, cobalt and manganese.

139.    Within a week of the disaster, on December 28, 2008, the United States Environmental Protection Agency reported that several heavy metals were present in concentrations above drinking water standards in water near the disaster. Arsenic was found in "very high" concentrations.

140.    On January 2, 2009, testing of river water and ash showed concentrations of eight metals exceeding safe drinking water levels at sites near the disaster, one half-mile from the KIF and two miles from the KIF. Levels of arsenic, lead, chromium and other metals were found at 2 to 300 times higher than drinking water standards. At the site two miles from the disaster, arsenic was at 35 times the drinking water limit.

141.    News reports the following day, on January 3, 2009, reported arsenic levels at 149 times the federal safe drinking water limit in the Emory River just downstream from the KIF.

142.    Independent testing by an associate professor of biology at Appalachian State University found arsenic levels thirty times or higher than the safety standard.

143.    More recent testing conducted by Plaintiffs' experts in December 2009, and reported to EPA and TDEC, shows arsenic levels remain at least 3 to 5 times or higher than the safety standard, even miles downstream from the disaster.

144.    Ash continues to be located in the water as far south as Watts Bar Dam.

145.    As a result of Defendants' conduct, Plaintiffs' and Property Class Members have lost the use and enjoyment of their property. In a desire to avoid exposure to the toxic waste, they no longer fully utilize their homes, yards, property, and surrounding public access areas.

146.    The 12/22 disaster and associated release of the coal ash sludge waste onto Plaintiffs' property and into the environment, including nearby waterways, has placed an

indelible, undesirable stigma upon their property, resulted in diminished, if not destroyed, property value and/or rental value.

147. Plaintiffs Chesney, Maines, Cordell, and Simon, and Resident Class Members have been placed at a significantly and substantially increased risk, relative to that of an unexposed population, of developing and/or have developed serious bodily injuries. As a result, health assessments and medical monitoring are required to detect the presence of, or confirm the absence of, such adverse health effects arising from exposure to the toxic coal ash sludge.

**C.** **Remediation.**

148. Defendants were and are under a legal duty to immediately remediate and/or abate and/or clean up releases of the coal ash sludge that remains in, on or around or migrating to the residential and recreation areas, navigable waterways and/or other waterways impacted by the disaster and to prevent further illegal releases or discharges of toxic and/or hazardous sludge and solid waste.

149. On January 12, 2009, TDEC issued an order finding that TVA had violated the Tennessee Water Quality Control Act and was liable for the releases of the coal ash sludge.

150. TDEC issued an order requiring TVA to submit a Corrective Action Plan.

151. It is essential that any Corrective Action Plan regarding the KIF impoundment and/or the 12/22 disaster appropriately and completely takes into account the negligence, recklessness, and breaches of engineering and regulatory standards and judgment by Defendants which led to the ash slide.

152. The Corrective Action Plan and clean-up activities include closure areas and recreational advisory areas on the Emory River, which further disrupts Plaintiffs' and Property Class Members' ability to use and enjoy their property and surroundings.

153.     The clean-up activities include trucking materials to and from the disaster area in an attempt to stabilize the ash and move it for disposal. This increased truck traffic contributes to noise and further inconvenience to Plaintiffs and interferes with their use and enjoyment of property and surroundings.

154.     The clean-up activities include rail car shipments of the ash from the spill area to a landfill in Perry County, Alabama.  The increased rail traffic contributes to noise and further inconvenience to Plaintiffs and interferes with their use and enjoyment of property and surroundings.

155.     The clean-up activities are projected to last until at until at least 2013, causing further continued disruption to Plaintiffs' use and enjoyment of property and surroundings.

156.     A complete clean-up of the disaster is virtually impossible.

157.     Even after five years of clean-up activities, the 12/22 disaster and clean-up will leave an indelible, undesirable stigma upon Plaintiffs' and Class Members' property, resulting in diminished, if not destroyed, property value and/or rental value.

## V.     CLASS ALLEGATIONS

158.     Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated members of three proposed plaintiff Classes pursuant to Federal Rule of Civil Procedure 23.

159.      This action satisfies the numerosity, adequacy, typicality and commonality requirements of Rule 23(a), and the predominance and superiority requirements of Rule 23(b)(3). Alternatively, with respect to the request for a supervised medical monitoring program, the requirements of Rule 23(b)(2) are met because Defendants have acted and/or refused to act on grounds generally applicable to the Resident and/or Property Damage Classes, making

appropriate declaratory and injunctive relief with respect to Plaintiffs and the Resident and/or

Property Damage Classes as a whole.

160.   This action may present issues appropriate for Rule 23(c)(4) certification.

161.   This action may also implicate Rule 23(b)(1) certification as to any Defendant

whose assets or insurance may prove to constitute a limited fund.

162.   The action is brought on behalf of three proposed classes:

**Property Damage Class One:**

Those persons owning real property within the boundaries outlined
in red in the map attached as Exhibit A.

**Property Damage Class Two:**

Those persons owning real property on Watts Bar Lake downstream
from Emory River Mile 0.0 to the Watts Bar Dam, including waterfront
property and property situated within 2 lots inland thereof, and/or
property having deeded water access to same. Also included in this class
are all persons owning real property on the eastern and southern
shoreline of the Clinch River from Clinch River Mile 5.5 to the
confluence of the Emory and Clinch Rivers, including waterfront
property and property situated within 2 lots inland thereof and/or
property having deeded water access to same.

**Resident Class:**

Those persons residing within the geographical boundaries of
Property Damage Class One on December 22, 2008.

163.   Excluded from the Classes are:  (1) TVA, any entity or division in which TVA

has a controlling interest, and its/their legal representatives, officers, directors, assigns and

successors; (2) Geosyntec, any entity or division in which Geosyntec has a controlling interest,

and its/their legal representatives, officers, directors, assigns and successors; (3) Parsons, any

entity or division in which Parsons has a controlling interest, and its/their legal representatives,

officers, directors, assigns and successors; and (4) the judge to whom this case is assigned, his

staff, and any member of the judge's immediate family.

### A. Numerosity

164.    On information and belief, the Classes consist of well over hundreds of property owners and/or residents who have been legally injured by the disaster, making joinder impracticable.

### B. Typicality

165.    The claims of the representative Plaintiffs are typical of the claims of the Classes they seek to represent in that the representative Plaintiffs, like all Class Members, have suffered adverse effects proximately caused by the 12/22 disaster.

166.    Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all respective Class Members.

### C. Adequacy

167.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes they seek to represent.

168.    Plaintiffs have retained counsel with substantial experience in prosecuting environmental, mass tort and complex class actions, including actions involving environmental contamination and, specifically, coal ash disasters.

169.    Plaintiffs and their counsel are committed to prosecuting this action vigorously and have the financial resources to do so.  Neither Plaintiffs nor their counsel have interests adverse to those of the Classes.

### D. Commonality and Predominance of Common Issues

170.    There are numerous questions of law and fact common to all Class Members, and those questions predominate over any questions that may affect only individual Class Members. Defendants subjected Plaintiffs and Class Members to the same unlawful conduct.

171.     The predominant, common questions include the following:

a.     Whether TVA's maintenance of the Kingston facility constitutes an ultrahazardous activity;

b.     Whether Defendants were negligent in the design, inspection, repair, and/or maintenance of the impoundment;

c.     Whether Defendants knew or should have known of the risk of the failure of the impoundment;

d.     Whether Defendants acted maliciously or with reckless disregard with regard to the risk of the disaster;

e.     Whether Defendants should have warned residents neighboring the Kingston facility of the risk of a spill and resulting environmental contamination;

f.     Whether the 12/22 disaster constitutes a negligent trespass upon the Plaintiffs' and the Class Members' properties;

g.     Whether the 12/22 disaster constitutes a nuisance upon Plaintiffs' and the Class Members' properties;

h.     Whether TVA violated the Tennessee Safe Water Drinking Act, and any permits issued pursuant to the Act;

i.     Whether TVA violated the Clean Water Act, and any permits issued pursuant to the Act;

j.     Whether TVA violated the Resource Conservation and Recovery Act of 1976 ("RCRA"), Subtitle D, 42 U.S.C. § 6901, *et seq.*, and any permits issued pursuant to the Act;

k.      Whether TVA violated the Federal Dam Safety Act and Federal Emergency Management Agency ("FEMA") dam safety procedures;

l.      Whether TVA violated the Tennessee Hazardous Waste Management Act of 1977, and any permits issued pursuant to the Act;

m.      Whether TVA violated the Tennessee Solid Waste Disposal Act, and any permits issued pursuant to the Act;

n.      Whether TVA violated the Tennessee Air Quality Act, and any permits issued pursuant to the Act;

o.      Whether TVA violated any other state or federal laws; and

p.      Whether Defendants should be liable for damages and future health assessments and medical monitoring costs.

## E.     **Superiority**

172.    Absent class treatment, Plaintiffs and members of the Classes will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct.

173.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Without a class action, individual Class Members would face burdensome litigation expenses, deterring them from bringing suit or adequately protecting their rights.  Because of the ratio of the economic value of the individual Class Members' claims in comparison to the high litigation costs in complex environmental mass torts such as this, few could likely seek their rightful legal recourse.  Absent a class action, Class Members would continue to incur harm without remedy.

174.    The consideration of common questions of fact and law will conserve judicial resources and promote a fair and consistent resolution of these claims.

175.     Any difficulties in management of this case as a class action are outweighed by the benefits of a class action with respect to efficiently and fairly disposing of common issues of law and fact as to the large number of litigants.

176.     The Plaintiffs also request certification under Rule 23(c)(4) on appropriate common issues of fact or law.

177.     To the extent the Court declines to grant class certification under Rule 23, Plaintiffs request that the Court proceed under Rule 42(a)(1)-(3) to join for trial common questions of law or fact, in which trial those within the foregoing class definitions may appear and participate as parties to avoid unnecessary cost of delay in the adjudication of common issues.

## COUNT I
## Trespass (TVA only)

178.     The allegations in all preceding paragraphs are incorporated by reference as though fully set forth here.

179.     TVA's conduct and the resulting events as described in detail in this Complaint, including but not limited to, the activities surrounding the so-called remediation of the Plaintiffs' and Property Class Members' properties, amounted to intentional intrusions on the properties.

180.     TVA entered or intruded on the property of Plaintiffs and Property Class Members without privilege, permission, invitation, or justification.

181.     TVA's entry or intrusion onto the Plaintiffs' and Property Class Members' properties interfered with their right of exclusive possession of their property.

182.     The entry or intrusion onto Plaintiffs' and Property Class Members' properties interfered with and continues to interfere with their exclusive possession and/or control of their

property and caused, and continues to cause, harm to Plaintiffs' and Property Class Members' properties.

183. As a direct and proximate result of TVA's trespass, Plaintiffs and Property Class Members have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, property damage, diminution of value of real estate and/or the rental value, and loss of enjoyment of real property.

184. TVA's wanton or reckless conduct, as described herein, entitles Plaintiffs and Property Class Members to punitive damages.

## COUNT II
## Negligence (All Defendants)

185. The allegations in all previous paragraphs are incorporated by reference as though fully set forth here.

186. Defendants owed a duty to all Plaintiffs and Class Members to exercise reasonable care in the construction, inspection, repair and maintenance of the coal ash impoundment.

187. At all times material hereto, Plaintiffs and Class Members were direct, intended and/or third party beneficiaries of the engineering and other recommendations, designs, repairs, maintenance, inspection, work and/or other services provided or which should have been provided by TVA, Geosyntec, and/or Parsons regarding the KIF dredge cells and impoundments.

188. Defendants had a heightened duty of care to all Plaintiffs and Class Members because of the great danger associated with the storage of coal ash.

189. Defendants breached that duty when they failed to take appropriate steps to ensure the safety and integrity of the impoundment and to ensure that it did not break and contaminate the surrounding area with toxic coal ash sludge.

190.     As a direct and proximate result of Defendants' failure to take appropriate steps to ensure the safety of the impoundment, Plaintiffs and Property Class Members have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, property damage, diminution of value of real estate and/or rental value, and loss of enjoyment of real property.

191.     As a direct and proximate result of Defendants' failure to take appropriate steps to ensure the safety of the impoundment, Plaintiffs Chesney, Maines, Cordell, and Simon, and the Resident Class Members have been exposed to toxic substances that significantly and substantially increased the risk of injury or illness relevant to that of an unexposed population. Therefore, the Court should order Defendants to establish a fund for the costs of monitoring the Resident Class Members' health, or alternatively, establish a supervised medical monitoring program funded by Defendants.

### COUNT III
### Gross Negligence (All Defendants)

192.     The allegations in all preceding paragraphs are incorporated by reference as though fully set forth here.

193.     Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in the construction and maintenance of the impoundment and the storage of hazardous waste therein.

194.     Defendants had a heightened duty of care to Plaintiffs and Class Members because of the great danger associated with the storage of the toxic coal ash.

195.     Defendants breached their legal duty to Plaintiffs and Class Members, failed to exercise reasonable care, and acted with reckless, willful, and wanton disregard for the health and safety of others, including Plaintiffs and Class Members, in the construction, inspection,

repair and maintenance of the coal ash impoundment. Defendants also breached their duty by failing to report, analyze, and remedy the increased outflow from the impoundment which signaled the impending disaster; by failing to warn of the disaster once it had begun; by failing to mitigate the harm by taking effective action to stop the spread of the sludge; by failing to effectively remediate the health hazard caused by the disaster; and by causing further damage to property and the environment during sludge removal.

196.    Defendants knew or should have known that their wanton or reckless conduct would foreseeably result in the disaster, causing damage to the properties of persons in the area affected by the disaster.

197.    As a direct and proximate result of Defendants' wanton or reckless conduct, Plaintiffs and Class Members have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, property damage, diminution of value of real estate and/or rental value, and loss of enjoyment of real property.

198.    As a direct and proximate result of Defendants' failure to take appropriate steps to ensure the safety of the impoundment, Plaintiffs Chesney, Maines, Cordell, and Simon, and the Resident Class Members have been exposed to toxic substances that significantly and substantially increase their risk of injury or illness relevant to that of the unexposed population. Therefore, the Court should order Defendants to establish a fund for the costs of monitoring the Resident Class Members' health or, in the alternative, establish a supervised medical monitoring program funded by Defendants.

199.    Defendants' wanton or reckless conduct, as described herein, entitles Plaintiffs and Class Members to punitive damages.

## COUNT IV
## Strict Liability (TVA Only)

200.    The allegations in all preceding paragraphs are incorporated by reference as though fully set forth here.

201.    TVA's storage of toxic waste in the impoundment for decades was an abnormally dangerous and ultrahazardous activity—one which necessarily involves a risk of serious harm to the person, land or chattels of others which cannot be eliminated by the exercise of the utmost care and is not a matter of common usage.

202.    It was inappropriate for the TVA's conduct to take place where it did.

203.    TVA's conduct was uncommon or not a matter of common usage, particularly under the circumstances.

204.    Even in the exercise of due care (which was not present here), the KIF dredge cells and/or impoundments were ultrahazardous.

205.    TVA is strictly liable to Plaintiffs and Class Members for all damages having resulted from the 12/22 disaster.

206.    As a direct and proximate result of TVA's abnormally dangerous and ultrahazardous activity, Plaintiffs and Class Members have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, property damage, diminution of value of real estate and/or rental value, and loss of enjoyment of real property.

## COUNT V
## Nuisance (All Defendants)

207.    The allegations in all preceding paragraphs are incorporated by reference as though fully set forth here.

208.     TVA's conduct has directly and proximately resulted in continuing and unreasonable interference with the use and enjoyment of properties owned by Plaintiffs and Property Class Members and constitutes a nuisance.

209.     TVA's use of its property to maintain a poorly designed, constructed and maintained coal ash impoundment was unreasonable.

210.     As a direct and proximate result of Defendants' conduct, Plaintiffs and Property Class Members have suffered legal injury and damages in an amount to be proven at trial, including, but not limited to, real and personal property damage, diminution of value of real estate and/or rental value, and loss of enjoyment of real property.

## COUNT VI
## Negligence *Per Se* (TVA Only)

211.     The allegations in all preceding paragraphs are incorporated by reference as though fully set forth here.

212.     TVA's conduct with regard to the generation, processing, storage and disposal of coal ash is governed by numerous state and federal laws and permits issued under the authority of these laws.  TVA had a duty to comply with and/or assure the compliance with those State and Federal environmental laws and regulations including, but not limited to, the Tennessee Water Quality Control Act, T.C.A. § 69-3-101, *et seq.*; the Tennessee Solid Waste Disposal Act, T.C.A. § 68-211-102, *et seq.*; the Tennessee Safe Drinking Water Act, T.C.A. § 68-221-702, *et seq.*; the Tennessee Air Quality Act, T.C.A. § 68-201-101, *et seq.*; the Federal Clean Water Act, 33 U.S.C. § 1251, *et seq.*; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*; and the Federal Dam Safety Act and FEMA dam safety procedures.

213.     These laws and permits create statutory standards that are intended to protect and benefit Plaintiffs and the Class Members.

214.     TVA's violations of these statutory standards constitute negligence *per se* under Tennessee law.

215.     As a direct and proximate result of TVA's unreasonable use of its property, Plaintiffs and Property Class Members have suffered legal injury and damages in an amount to be proven at trial, including, but not limited to, real and personal property damage, diminution of value of real estate and/or rental value, and loss of enjoyment of real property.

## COUNT VII
## Injunctive Relief (TVA Only)

216.     The allegations in all preceding paragraphs are incorporated by reference as though fully set forth here.

217.     In light of the acts, omissions and/or misconduct of TVA, as described above, Plaintiffs plead in the alternative that there is no adequate remedy at law, and that they are entitled to injunctive or equitable relief in addition to damages.

**WHEREFORE**, Plaintiffs, individually and on behalf of those others similarly situated, respectfully request that this Court:

1.     Certify this action as a class action with Plaintiffs as the representatives of the described classes;

2.     Appoint Plaintiffs' undersigned counsel as counsel for the Classes;

3.     Issue an Order that TVA, must immediately cease and desist from operating and/or remediating the KIF dredge cells and/or impoundments unless it has fully demonstrated that it can operate the facilities in a safe, responsible, prudent and proper manner so as to prevent any subsequent or further releases of coal ash sludge waste and/or other wastes that would in the future harm Plaintiffs and Class Members;

4.     Issue an Order precluding TVA from introducing any further liquids into the KIF

dredge cells and impoundments;

5.      Issue an Order requiring TVA to place liners in and around the KIF dredge cells and impoundments;

6.      Issue an Order requiring Defendants to either fund medical monitoring of Plaintiffs Chesney, Maines, Cordell, and Simon and the proposed Resident Class Members, or to issue an Order establishing and maintaining jurisdiction over a medical monitoring program, conducted under this Court's supervision or that of its designee, funded by the Defendants, to identify whether the proposed Resident Class Members have suffered physical and/or psychological injury, harm, disease or illness, and to monitor them for development of such injuries in the future as a result of their exposure to the coal ash sludge waste;.

7.      Award and enter judgment for compensatory damages (including also treble damages where applicable) in favor of Plaintiffs and the proposed Class Members and against Defendants, in an amount that fairly compensates Plaintiffs and the proposed Class Members for their various damages and losses, together with interest and costs;

8.      Award and enter judgment for punitive damages in favor of Plaintiffs and the proposed Class Members and against Defendants, in an amount that justly punishes Defendants for their reckless, intentional, willful and/or wanton conduct;

9.      Award reasonable attorney fees and reimbursement of costs; and,

10.      Award and/or allow Plaintiffs and the proposed Class Members such other and further relief as the Court deems just and equitable under the circumstances.

Respectfully submitted,

Dated: July 13, 2010

/s/ *Gary A. Davis*
Gary A. Davis (BPR No. 009766)
James S. Whitlock (*pro hac vice*)
Gary A. Davis & Associates
P.O. Box 649
61 North Andrews Avenue
Hot Springs, NC 28743
Telephone: 828-622-0044

/s/ *A. Brantley Fry*
Jere L. Beasley (*pro hac vice*)
Rhon E. Jones (*pro hac vice*)
David B. Byrne, III (*pro hac vice*)
John E. Tomlinson (*pro hac vice*)
A. Brantley Fry (*pro hac vice*)
Beasley, Allen, Crow, Methvin,
Portis, and Miles, P.C.
Post Office Box 4160
Montgomery, AL 36104
Telephone: 334-269-2343

/s/ *Elizabeth A. Alexander*
Elizabeth A. Alexander (BPR No. 019273)
Mark P. Chalos (BPR No. 19328)
Lieff, Cabraser, Heimann & Bernstein, LLP
150 Fourth Avenue North
Suite 1650
Nashville, TN 37219
Telephone: (615) 313-9000

Elizabeth J. Cabraser (*pro hac vice*)
Lieff, Cabraser, Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000

/s/ *Paul D. Brandes*
Paul D. Brandes (*pro hac vice*)
Peter Villari ((*pro hac vice*)
Villari, Brandes & Kline, P.C.
8 Tower Bridge, Suite 400
161 Washington Street
Conshohocken, PA 19428
Telephone: (610) 729-2900

ATTORNEYS FOR PLAINTIFFS AND THE CLASS

## CERTIFICATE OF SERVICE VIA ECF

I hereby certify that on July 13, 2010, a copy of the foregoing Consolidated Class Action Complaint was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's electronic filing system.

*/s/ A. Brantley Fry*
A. Brantley Fry