UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

GEORGE CHESNEY, *et al.*,          )
                                   )
          Plaintiffs,              )
                                   )
v.                                 )          No.:  3:09-CV-09
                                   )                (VARLAN/GUYTON)
TENNESSEE VALLEY AUTHORITY, *et al.*,  )
                                   )
          Defendants.              )

## MEMORANDUM OPINION AND ORDER

This civil action is before the Court on the Joint Motion to Dismiss for Lack of

Subject Matter Jurisdiction or Failure to State a Claim or, in the Alternative, for Summary

Judgment [Doc. 203],[1] filed by defendants WorleyParsons Corporation ("WorleyParsons")

and Geosyntec Consultants, Inc. ("Geosyntec") (also referred to collectively as

"defendants").  In the motion, defendants move to dismiss the consolidated class action

complaint for lack of subject matter jurisdiction or for failure to state a claim, pursuant to

Rule 12(b)(1) or Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Alternatively,

defendants move for summary judgment on grounds that there is no genuine issue as to any

material fact and defendants are entitled to judgment as a matter of law, pursuant to Rule

56(c) of the Federal Rules of Civil Procedure.  Plaintiffs have responded in opposition [Doc.

225], and defendants have filed a reply [Doc. 240] to that response.  For the reasons set forth

---

[1]Unless otherwise specified, all docket entry notations are numbered according to the docket
entry sheet in *Chesney, et al. v. TVA, et al.*, Case No. 3:09-CV-09.

herein, defendants' motion will be granted and WorleyParsons and Geosyntec will be dismissed from this case.

## I.    Relevant Facts and Procedural Background

This case arises out of the December 22, 2008 failure of a coal ash containment dike at the Tennessee Valley Authority's ("TVA's") Kingston Fossil Plant (the "KIF plant"), located in Roane County, Tennessee.  Plaintiffs are owners of residential property in the vicinity of the KIF plant [Doc. 185, ¶ 46].  TVA, a federal corporate agency and instrumentality created by Congress and existing pursuant to the Tennessee Valley Authority Act of 1933 (the "TVA Act"), 16 U.S.C. § 831, owns and operates the KIF plant [*Id.*, ¶¶ 59-61, 77].  WorleyParsons and Geosyntec are professional engineering contractors [*Id.*, ¶¶ 17, 63-70].  Both provided engineering consultant services and/or advice to TVA, WorleyParsons from about 2004 through 2005, and Geosyntec from about 2004 through 2007 [*Id.*].[2]

The KIF plant is a coal-fired electricity generation plant located on a peninsula at the confluence of the Clinch and Emory River embayments of the Watts Bar Reservoir in Roane County, Tennessee.  The KIF plant produced coal ash, a byproduct of when coal is burned for electricity generation.  Swan Pond, consisting of a main ash pond, a dredged ash disposal area, and a stilling pool, is located immediately north of the peninsula and served as the

_____

[2]More than fifty cases related to the December 2008 incident at the KIF plant are pending.

disposal site for the coal ash byproduct produced at the KIF plant.[3]  Coal ash produced at the

KIF plant was transported to the main ash pond as slurry through two sluice channels, one

for coarser bottom ash and one for finer fly ash.  When the slurry flowed through the sluice

channels, the coarser bottom ash settled to the bottom.  Sluice channels then removed the

coarse bottom ash through mechanical means.  The coarse bottom ash was then used for dike

construction.  The finer fly ash flowed through the sluice channels and into the main ash

pond where it was dredged, normally by hydraulic means, and deposited into the ash disposal

area, which was further divided into dredge cells by internal dikes.  Excess water in the

dredged ash disposal area drained back to the main ash pond and then to the stilling pool.

The excess water flowed through the discharge channel, into the KIF plant's water intake

channel, and into the Watts Bar Reservoir.  Excess water also seeped down through the finer

fly ash in the dredge cells and into the groundwater, which transported it into the Watts Bar

Reservoir [Doc. 185, ¶¶ 16, 59, 72-110].[4]

In November 2003, a "blowout" occurred in a containment dike on one side of the

dredged cell area [Doc. 185, ¶¶ 110-11, 117(b)].  Following the blowout, TVA suspended

---

[3]*See also Auchard, et al. v. TVA*, Case No. 3:09-CV-54 (hereinafter "*Auchard*"), Doc. 44-1, pp. 155-76 (citing *TVA's Operations Manual Dredge Cell Lateral Expansion, Tennessee Valley Authority Kingston Fossil Plant*, revised on July 28, 2006); *Long, et al. v. TVA, et al.*, Case No. 3:09-CV-114 (hereinafter, "*Long*"), Doc. 140-3, pp. 19-20.

[4]Additional facts regarding the KIF plant, the coal ash disposal system, and the December 2008 failure of the containment dike may be found at *Mays v. TVA*, 699 F. Supp. 2d 991, 995-1000 (E.D. Tenn. 2010) (citing *The Watts Bar Project, Technical Report, No. 9*, published by TVA in 1949 and *The Kingston Steam Plant, Technical Report No. 34*, published by TVA in 1965).  *See also Auchard*, Doc. 44-1, pp. 93-103, 155-176.

dredging operations in the existing cells [*Id.*]. In 2004, TVA retained WorleyParsons[5] to determine the cause of the November 2003 blowout and to evaluate alternatives for the continued disposal of coal ash [*Id.*, ¶117(a)-(b), (g); *Auchard*, Doc. 43, ¶ 3]. WorleyParsons also conducted an engineering stability analysis of the dredge cell area and the adjoining main coal ash pond for TVA [*Id.*, ¶ 112, 117(b); *Auchard*, Doc. 43, ¶ 4]. In June 2004, WorleyParsons reported the results of the stability analysis to TVA, including a recommendation to improve drainage in the ash ponds [*Long*, Doc. 140-3, pp. 19-20]. TVA used WorleyParsons's work to support its June 2004 application to the Tennessee Department of Environment and Conservation (the "TDEC") for a modification of TVA's Class II Landfill Permit (the "Landfill Permit") for the KIF plant [*Auchard*, Doc. 43, ¶¶ 4-5; *Auchard*, Doc. 44-1, pp. 114, 105]. The TDEC approved TVA's proposed modification of the Landfill Permit on September 12, 2006 [*Auchard*, Doc. 44-1, pp. 140, 242]. In 2004, TVA retained Geosyntec to conduct a peer review of WorleyParsons' work, including the stability analysis and the associated recommendations [Doc. 185, ¶¶ 110-11, 117(b); *Auchard*, Doc. 43, ¶¶ 3-5; *Auchard*, Doc. 82-2, p. 11]. In a report to TVA, Geosyntec recommended an additional evaluation of bottom drainage alternatives for the KIF plant [*Long*, Doc. 140-3, p. 20].

---

[5]Prior to 2004, WorleyParsons was known as Parsons E&C [*see* Doc. 204, p. 3 n.1]. In 2004, Parsons E&C became part of WorleyParsons [*See id.*]. For clarity, the Court will refer only to WorleyParsons when discussing this defendant.

In 2004, TVA directed a project team consisting of TVA personnel, WorleyParsons, and Geosyntec [*Auchard*, Doc. 44-2, pp. 68-69]. This team reviewed existing data, performed site investigation and parallel seepage calculations, and ran seepage calculation models [*Id.*]. After the review, the team concluded that "the cause of the [November 2003] failure was piping and excessive seepage." [*Id.*, p. 69]. To "fix" the problem, the team proposed installing an additional trench drainage system [*Id.*]. After the "fix" was installed, TVA resumed normal dredging operations on November 10, 2005 [*Auchard*, Doc. 43-1; *Auchard*, Doc. 82-2, p. 11]. WorleyParsons and Geosyntec assert that neither defendant performed the actual repair work [*see Auchard*, Doc. 43-1].

In November 2006, another blowout occurred at the same location as the November 2003 blowout [Doc. 185, ¶ 117(b); *Auchard*, Doc. 43, ¶ 6]. Following this blowout, TVA ceased dredging into the cells until April 9, 2007 [Doc. 185, ¶ 117(b); *Auchard*, Doc. 43, ¶ 6]. TVA retained Geosyntec to investigate the November 2006 blowout, to determine its cause, and to develop alternatives addressing seepage and disposal of the coal ash [Doc. 185, ¶ 117(b); *Auchard*, Doc. 43, ¶ 6; *Auchard*, Doc. 44-2, pp. 74-75]. After evaluating the alternatives identified by Geosyntec, TVA implemented localized toe drain improvements with additional monitoring, maintenance, and surface water improvements [*Auchard*, Doc. 43, ¶ 6; *Auchard*, Doc. 44-2, p. 76]. Normal dredging operations resumed in 2008 in accordance with the modified Landfill Permit [*Auchard*, Doc. 43, ¶¶ 6, 7; *Auchard*, Doc. 44-2, p. 12].

On December 22, 2008, a coal ash containment dike at the KIF plant failed [Doc. 185, ¶¶ 5-6, 132-35]. As a result of the dike failure, approximately 5.4 million cubic yards of coal ash sludge spilled from the 84-acre containment area of the KIF plant to an adjacent area of about 300 acres, consisting of primarily the Watts Bar Reservoir, the Clinch and Emory Rivers, and government and privately owned shoreline properties [*Auchard*, Doc. 44, pp. 4-5; *Auchard*, Doc. 82, p. 12].

Following the coal ash spill, seven cases were filed against TVA. In the complaints, the plaintiffs allege that they reside, own property, and/or own businesses within the area of the coal ash spill. *See Mays v. TVA*, 699 F. Supp. 2d 991, 1000-04 (E.D. Tenn. 2010). While not identical, the complaints contain similar tort-law causes of action against TVA. *Mays*, 699 F. Supp. 2d at 1000-04. Several of the plaintiffs also assert inverse condemnation claims. *Id.* On April 17, 2009, TVA filed motions to dismiss or for summary judgment in those seven cases, asserting that the federal discretionary function doctrine applies to TVA and requires dismissal or summary judgment of all the plaintiffs' tort claims [Doc. 46]. *Id.* at 1003-04. On March 26, 2010, the Court issued an opinion granting in part and denying in part TVA's motions for summary judgment [Doc. 148]. *Id.* at 1033. The Court granted the motions to the extent the plaintiffs' allegations pertain to TVA's removal and remediation conduct and to TVA's discretionary conduct. *Id.* at 1033. The Court denied the motions to the extent the plaintiffs' allegations pertain to TVA's non-discretionary conduct. *Id.*

It is now more than two years since the coal ash spill. Since the filing of the initial seven cases, more than fifty separate cases have been filed against TVA relating to the spill.

Plaintiffs in this case were initially the plaintiffs in three of the first seven cases filed against TVA: *Blanchard, et al. v. TVA*, Case No. 3:09-CV-09, *Giltnane, et al. v. TVA*, Case No. 3:09-CV-14, and *Long, et al. v. TVA, et al.*, Case No. 3:09-CV-114. On February 25, 2010, these plaintiffs moved to consolidate their cases for all purposes, including discovery, class certification issues, and trial [*see* Doc. 133]. Plaintiffs also requested that the Court allow them to file consolidated complaint [*see id.*]. The Court granted plaintiffs' requests [Doc. 183], and, on July 13, 2010, plaintiffs filed the consolidated class action complaint (the "complaint") [Doc. 185].

In the complaint, plaintiffs assert negligence, gross negligence, and nuisance claims against TVA, WorleyParsons, and Geosyntec, and trespass, strict liability, negligence per se, and injunctive relief claims against TVA [Doc. 185, ¶¶ 178-217]. All plaintiffs seek monetary damages and several plaintiffs seek the establishment of a medical monitoring fund or a supervised medical monitoring program [*Id.*, ¶ 2]. Plaintiffs also seek to represent three proposed classes, two property damage classes and a resident class [*Id.*, ¶ 162]. The factual allegations and claims in the complaint are substantially similar to those brought in the other cases filed against TVA concerning the coal ash spill. One notable difference, however, is that plaintiffs in this case have brought suit against WorleyParsons and Geosyntec in addition to TVA.[6] No other plaintiff has, at present, asserted claims against these defendants.[7]

---

[6] Only the *Long* plaintiffs initially named WorleyParsons and Geosyntec as defendants [*see Long*, Doc. 2].

[7] All other cases name TVA as the sole defendant. Several plaintiffs have filed motions for leave to amend their complaints to include claims against WorleyParsons and Geosyntec. WorleyParsons and Geosyntec oppose these motions.

On August 12, 2010, WorleyParsons and Geosyntec filed the instant motion to dismiss for lack of subject matter jurisdiction or failure to state a claim, or, in the alternative, for summary judgment [Doc. 203]. In the motion, defendants assert that plaintiffs' claims against them should be dismissed for lack of subject matter jurisdiction because the engineering consultant advice and services they provided to TVA fall within the areas TVA is entitled to discretionary function immunity. Defendants assert that they are entitled to share in TVA's immunity based on the doctrine of derivative sovereign immunity. Defendants also assert that the complaint fails to allege sufficiently definite and plausible claims and fails to state claims for which relief may be granted. Alternatively, defendants assert that they are entitled to dismissal or summary judgment because plaintiffs' nuisance, negligence, and gross negligence claims are deficient as a matter of law. Plaintiffs have responded in opposition to all defendants' requests [Doc. 225]. Defendants have filed a reply [Doc. 240] to that response.

## II.     Standard of Review

A party may move to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). When a defendant challenges subject matter jurisdiction in a motion brought pursuant to Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction to survive the motion. *Moir v. Greater Cleveland Reg'l Transit. Auth.*, 895 F.2d 266, 269 (6th Cir. 1990). If the plaintiff fails to meet this burden, the motion to dismiss must be granted. *Moir*, 895 F.2d at 269; *Madison-Hughes v. Shalala*, 80 F.3d 1121, 1130 (6th Cir. 1996). In consideration of a motion brought pursuant to Rule 12(b)(1), a court

8

may review extra-complaint evidence and resolve factual disputes. *See Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 915-16 (6th Cir. 1986). "Moreover, on the question of subject matter jurisdiction[,] the court is not limited to jurisdictional allegations of the complaint but may properly consider whatever evidence is submitted for the limited purpose of ascertaining whether subject matter jurisdiction exists." *Pryor Oil Co., Inc. v. United States*, 299 F. Supp. 2d 804, 807 (E.D. Tenn. 2003) (citing *Rogers*, 798 F.2d at 915-16) (other citations omitted).

## III.    Analysis

### A.    The Discretionary Function Doctrine

As a general matter, the United States as sovereign is immune from suit except under certain limited circumstances in which it has waived that immunity. *See United States v. Mitchell*, 445 U.S. 535, 538 (1980). With the passage of the Federal Tort Claims Act (the "FTCA"), the United States waived its immunity to tort suits under certain conditions and subject to the exceptions set forth in the FTCA. 28 U.S.C. § 2674 ("The United States shall be liable . . . [for] tort claims, in the same manner and to the same extent as a private individual under like circumstances . . . ."); *id.* § 2680 (setting forth exceptions). One such exception is the discretionary function doctrine, which provides that the waiver of sovereign immunity by the United States does not extend to:

> Any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

*Id.* § 2680(a).

The FTCA also explicitly excludes independent contractors from its scope.

> [T]he term "Federal agency" includes the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, *but does not include any contractor with the United States.*

> "Employee of the government" includes (1) officers or employees of any federal agency, members of the military or navy forces . . . members of the National Guard . . . and persons acting on behalf of a federal agency in an official capacity . . . and (2) any officer or employee of a Federal public defender organization[.]

28 U.S.C. § 2671 (emphasis added). The FTCA is also limited to "civil actions on claims *against the United States*, for money damages, . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of *any employee of the Government* while acting within the scope of his office or employment[.]" *Id.* § 1346(b)(1) (emphasis added).

In the Court's previous opinion concerning the discretionary function doctrine and its application to this litigation, the Court determined that TVA is entitled to immunity for certain allegations made by plaintiffs. The Court found that this immunity extends to plaintiffs' allegations regarding TVA's design and construction plans for the KIF plant, TVA's decision to keep in operation the wet coal ash disposal system, and TVA's post-spill clean-up, removal, and remediation conduct. *Mays*, 699 F. Supp. at 1033.[8] The Court also

---

[8]"[T]he Court recognizes that several of Plaintiffs' claims encompass allegations that TVA should have converted the Swan Pond facility to a dry coal ash disposal system, that TVA should have constructed the Swan Pond facilities in a different manner, or that the policies and procedures TVA had in place were improper. If these claims were Plaintiffs' sole claims against TVA, then the discretionary function [doctrine] might very well shield TVA from all liability." *Mays*, 699 F. Supp. 2d at 1021.

found that TVA is entitled to immunity under the discretionary function doctrine for plaintiffs' allegations as to what policies and procedures would govern coal ash disposal at the KIF plant, and TVA's modifications, repairs, and changes to the KIF plant and the surrounding impoundments. *Id.* at 1019.[9] Finally, the Court determined that TVA is not entitled to immunity under the discretionary function doctrine for plaintiffs' allegations pertaining to the following nondiscretionary conduct and decisions by TVA:

> [N]egligent failure to inform or train TVA personnel in its policies and procedures for coal ash operations and management; negligent or inadequate performance by TVA personnel of polices and procedures; negligence in the construction and implementation of approved design and construction plans for the KIF plant and its surrounding impoundments; and negligent maintenance allegations.

*Id.* at 1021-22.[10]

Notwithstanding the exclusion of independent contractors from the scope of the FTCA, defendants argue that they are entitled to derivative sovereign immunity based on TVA's immunity under the discretionary function doctrine. Defendants assert that derivative

---

[9]"In the years prior to the coal ash spill, TVA made a policy decision, grounded in considerations of public policy, to have a wet coal ash storage and disposal facility. In conjunction with this overarching policy decision, TVA made a series of policy decisions regarding where to locate the coal ash disposal facilities and the design and construction of the facilities. TVA also made policy decisions after the Swan Pond facilities were in operation as to what polices and procedures would govern the coal ash disposal, decisions such as whether to implement modifications or changes to the facilities and whether to continue disposing of the coal ash with a wet storage system. Several of Plaintiffs' tort claims, however, challenge conduct apart from these policy decisions." *Mays*, 699 F. Supp. 2d at 1019.

[10]"Neglect, ignoring policies and procedures, failing to implement corrective measures or modifications under those policies, or the failure to have in place any policies and procedures governing coal ash disposal, are not the type of decisions or conduct protected by the discretionary function doctrine." *Mays*, 699 F. Supp. 2d at 1020.

sovereign immunity shields them from liability for their work and advice to TVA in connection with those areas in which TVA is entitled to discretionary function immunity. As support for their position, defendants rely primarily on *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18 (1940) and *Ackerson v. Bean Dredging, LLC*, 589 F.3d 196 (5th Cir. 2009). Defendants assert that plaintiffs have alleged errors and/or omissions by WorleyParsons and Geosyntec in precisely the areas in which this Court has determined TVA is entitled to immunity. Alternatively, defendants assert that they would be entitled to immunity pursuant to the government contractor defense of *Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988).

In response, plaintiffs contend that defendants are not entitled to derivative sovereign immunity under either *Yearsley* or *Ackerson*. Plaintiffs also contend that defendants have failed to demonstrate any entitlement to immunity based on the government contractor defense of *Boyle*. Plaintiffs also argue that they have alleged nondiscretionary conduct by defendants that falls outside the discretionary conduct the Court determined was shielded by the discretionary function doctrine and thus, even if this Court applies *Yearsley* and *Ackerson* or *Boyle* to the facts of this case, WorleyParsons and Geosyntec remain liable.

### B.     *Yearsley* **and** *Boyle*

In *Yearsley*, the U. S. Supreme Court considered whether a contractor that constructed dikes in the Missouri River pursuant to a contract with the federal government could be held liable for a taking of private property when the construction of the dikes produced artificial erosion and washed away part of the plaintiffs' riverside property. 309 U.S. at 19-20. The Supreme Court first noted that it was undisputed that the federal government had authorized

and directed the project and that the contract to build the dikes was authorized by an act of Congress. *Id.* The Supreme Court then concluded that the contractor could not be held liable for a Fifth Amendment taking under those facts, reasoning that when:

> [A]uthority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will.

*Id.* at 20-21. The Supreme Court observed, however,

> Where an agent or officer of the Government purporting to act on its behalf has been held to be liable for his conduct causing injury to another, the ground of liability has been found to be either that he exceeded his authority or that it was not validly conferred.

*Id.* at 21. The actual holding of *Yearsley* is narrow, stating that "in the case of a taking by the Government of private property for public use . . . the remedy to obtain compensation from the Government is as comprehensive as the requirement of the Constitution, and hence it excludes liability of the Government's representatives lawfully acting on its behalf in relation to the taking." *Id.* at 22.

Defendants assert that *Yearsley* controls the analysis of the alleged liability of WorleyParsons and Geosyntec because the facts of this case concern the same issue—work performed by private contractors engaged in a public works project for the federal government. Defendants assert that *Yearsley* makes clear that if the federal government would not be held liable in performing challenged work, a contractor cannot be liable for performing the same work. Defendants acknowledge that the U. S. Court of Appeals for the Sixth Circuit has rarely applied *Yearsley* in the context of derivative sovereign immunity.

They assert, however, that the Sixth Circuit has discussed the principles underlying *Yearsley* in its discussions of contractors engaged in government work and that the relevant case law suggests that the Sixth Circuit would apply derivative sovereign immunity to this case.[11]

Defendants also point to *Bennett v. MIS Corp.*, a recent case from the Sixth Circuit which discusses the government contractor immunity defense of *Boyle* and also refers to *Yearsley*. 607 F.3d 1076, 1084 (6th Cir. 2010). While the *Bennett* court did not ultimately reach the issue of whether to apply the government contractor immunity defense of *Boyle* or the derivative sovereign immunity of *Yearsley*, the *Bennett* court's analysis is instructive, especially given the lack of Sixth Circuit authority on this issue. Because an understanding of *Boyle* is important to an understanding of *Bennett*, and because the government contractor defense of *Boyle* has also been asserted by defendants as grounds for immunity, the Court first turns to *Boyle*.

The plaintiff in *Boyle* was the father of a U.S. Marine helicopter copilot who drowned when his helicopter crashed off the coast of the United States. 487 U.S. at 502. The plaintiff sued the defendant, a contractor which had built the helicopter for the federal government. *Id.* The plaintiff argued that the contractor was liable under state tort law for a defective design of the escape-hatch handle in the helicopter. *Id.* at 503. In the course of deciding

---

[11]*See, e.g., Young v. DHL Airlines, Inc.*, No. 98-6265, 1999 WL 777438, 191 F.3d 454 (Table), at *1 (6th Cir. Sept. 21, 1999) (citing *Yearsley* for the proposition that the plaintiffs "must look to the County, as the owner and operator of the airport, for compensation"); *Lenoir v. Potters Creek Watershed Dist.*, 586 F.2d 1081 (6th Cir. 1978) (citing *Yearsley*, among other cases, for the proposition that "Congress has made the Court of Claims the exclusive and adequate forum for the Fifth Amendment claims, at least those over $10,000").

"when a contractor providing military equipment to the Federal Government can be held liable under state tort law for injury caused by a design defect[,]" *id.* at 502, the Supreme Court considered whether the plaintiff's state law tort claims were preempted, despite the absence of federal legislation specifically immunizing government contractors. *Id.* Drawing on "federal common law," the Supreme Court noted that in a few cases involving "uniquely federal interests," a state law is preempted and replaced, where necessary, by federal law if a "significant conflict" exists between an identifiable federal policy or interest and the operation of state law, or if the application of a state law would frustrate specific objectives of federal legislation. *Id.* at 504, 507.

Applying this two-step inquiry to the plaintiff's claim to determine whether his state law tort claims were preempted, the Supreme Court identified the "unique[] federal interest" as "the civil liabilities arising out of the performance of federal procurement contracts." *Boyle*, 487 U.S. at 506. In doing so, the Supreme Court cited approvingly to *Yearsley*, noting that *Yearsley* found that if a contractor's authority to carry out a project was validly conferred and the project was within the constitutional power of Congress, the contractor cannot be liable for executing the government's will. *Id.* (citing *Yearsley*, 309 U.S. at 20-21). The Supreme Court then observed that the federal interest justifying the holding in *Yearsley*—the contractor's performance of a government contract—also applies to procurement contracts like the contract in *Boyle*. *Id.* The Supreme Court then determined that the state law at issue imposed a duty of care on the contractor which conflicted with the duty imposed by the contractor's contract with the federal government. *Id.* at 509.

The Supreme Court next turned to whether this conflict between the state tort law and the duty imposed by the contractor's contract with the federal government was "significant." *Boyle*, 487 U.S. at 508. After noting with some hesitation that conflicts between state tort law and areas of uniquely federal interests could always be deemed "significant," the Supreme Court found a limiting principle in the discretionary function exception to the FTCA. *Id.* at 511; *see* 28 U.S.C. § 2680(a). The Supreme Court stated that the decisions and conduct of the government in *Boyle*—the selection of the appropriate design for military equipment—was a discretionary function since the decision involved "not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations[.]" *Boyle*, 487 U.S. at 511. Ultimately, the Supreme Court concluded that state tort law imposing liability for design defects in military equipment is preempted when:

> (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Id.* at 512.

In *Bennett*, the Sixth Circuit case, the court considered the *Boyle* defense in the context of federal officer removal jurisdiction under 28 U.S.C. § 1442(a)(1), the federal removal statute that requires a defendant to show a "colorable" federal defense for purposes of removal. 607 F.3d at 1088-89. In the removal petition, the defendant asserted that it was immune from liability under the government contractor immunity defense of *Boyle*. *Id.* at

1089.  The *Bennett* court discussed the *Boyle* defense, along with the plaintiff's position that

the *Boyle* defense only applied to military contracts and that the defense was not "colorable"

because the case involved the performance of a non-military contract.  *Id.* at 1088.  The

*Bennett* court noted that the issue of whether the *Boyle* defense applies in a non-military

context was "an issue of first impression" for the circuit and thus, the court looked to other

circuits for guidance, noting that some circuits had limited the defense to military contexts,

while others had not.  *Id.* at 1089-90 (citing cases).  After considering the relevant cases, the

*Bennett* court concluded that "it is at least plausible that the government contractor defense

could apply outside the military procurement contract context because the Supreme Court

noted that the origins of the defense, at least in part, were based upon a case that immunized

a private contractor from liability arising out of its performance of a public works project."

*Id.* at 1090.  The *Bennett* court then cited to *Yearsley* as one of the "origins" for the *Boyle*

defense.  *Id.*

   An earlier Sixth Circuit case that provides some guidance on how this circuit might

apply *Yearsley* is *Gulf Refining Co. v. Mark C. Walker & Son Co.*, 124 F.2d 420, 422 (6th

Cir. 1942).  In *Gulf Refining*, the plaintiff, a property owner in Shelby County, Tennessee,

brought suit pursuant to the Federal Control Act, 33 U.S.C. § 701c, for the alleged negligence

of Shelby County and contractors for the federal government in the building of levees on the

plaintiff's land.  124 F.2d at 422.  In a suit between the plaintiff and a subcontractor,

originally filed in state court and removed to federal court, the jury returned a verdict against

the subcontractor based on negligent performance of a contract.  *Id.*  The subcontractor

appealed, arguing that the district court had erred in failing to grant its motion for peremptory instructions based upon lack of substantial evidence of negligence. *Id.*

The *Gulf Refining* court, applying Tennessee law but also citing *Yearsley*, began its analysis by stating that "[t]here is no substantial controversy with respect to the legal principles applicable to the issues presented[,]" and the plaintiff "concedes that a contractor or subcontractor doing work for the government in accordance with its requirements is not liable to a third person for its incidental effect upon his property, and that there is no presumption of negligence." *Gulf Refining*, 124 F.2d at 425. The *Gulf Refining* court also noted that there was no dispute that "immunity does not extend to liability for damage which results from the contractor's negligence[,]" and found that the "issue therefore resolves itself upon the principal question . . . [of] . . . whether there was substantial proof of [the subcontractor's] negligence." *Id.* Upon review of the evidence, the *Gulf Refining* court found no substantial evidence of the subcontractor's negligence and concluded that the district court had erred in failing to direct a verdict for the subcontractor. *Id.* at 426.

Along with the citation to *Yearsley*, the *Gulf Refining* court also cited *Chattanooga & Tennessee River Power Co. v. Lawson*, a Tennessee Supreme Court case involving a takings claim where the defendant was a contractor for the United States doing improvement work on the Tennessee River. 201 S.W. 165 (Tenn. 1918). When completed, the improvement became the property of the United States. *Chattanooga & Tennessee River Power*, 201 S.W. at 168. The Tennessee Supreme Court found that the contractor was "guilty of no negligence, having performed the work strictly in accord with specifications

furnished to it by its employer." *Id.* at 168-69. The Tennessee Supreme Court also noted that "the liability of [the contractor] must be measured by that of the United States. While the United States is liable for the taking of private property, and under its laws can be sued therefor, and for the incidental damages connected therewith involved in the taking . . . it cannot be sued for mere consequential damages." *Id.* at 169.

The reasoning underlying the holding of *Gulf Refining* and *Chattanooga & Tennessee River Power* was also evoked in *Green v. ICI America, Inc.*, a case in which the plaintiff sued to recover damages from the defendant, a contractor, for the alleged creation and maintenance of a nuisance at a plant installed by the U. S. Army but operated by the contractor. 362 F. Supp. 1263, 1264 (E.D. Tenn. 1973). The contractor moved for summary judgment, arguing that it was entitled to share in the sovereign immunity of the federal government and which was accorded to a contractor working for the government who performs the contract in a non-negligent manner, according to the government's specifications, and at the direction of government officials. *Green*, 362 F. Supp. at 1264. The *Green* court agreed, finding that the project had a high degree of government supervision, that the project was performed on government property, and that under Tennessee law, there was "no doubt that the defendant is entitled to share the sovereign

immunity of the United States." *Id.* at 1266. The *Green* court cited to *Yearsley*, *Chattanooga & Tennessee River Power,* and *Gulf Refining*. *Id.* at 1264-66.[12]

The Fourth Circuit and the Fifth Circuit have considered the derivative sovereign immunity discussed in *Yearsley* and the government contractor defense discussed in *Boyle* and have noted the common federal interest relevant to each. In *Ackerson*, a case from the Fifth Circuit, the plaintiffs brought suit against the United States and government contractors alleging that dredging activities conducted near the Mississippi River Gulf Outlet had caused an amplification of a storm surge in the New Orleans region. 589 F.3d at 204. The contractors argued that they were entitled to immunity under *Yearsley* and the plaintiffs responded that *Yearsley* did not apply because the contractors had not shown an agency relationship with the government. *Id.* at 204. The Fifth Circuit disagreed that *Yearsley* required a contractor defendant engaged in a public-works project to establish an agency relationship with the government and, after observing that the facts of the case were similar to the facts of *Yearlsey*, and because the "Supreme Court has not abrogated or overturned *Yearsley*, and the Court's most recent reference to that decision was a favorable citation in *Boyle*[,]" found that the applicability of *Yearsley* was established on the face of the plaintiffs' complaint. *Id.* at 206-07. The *Ackerson* court also noted that:

---

[12]The *Green* court also cited to *Ernst v. Gen. Refractories Co.*, 202 F.2d 485 (6th Cir. 1953), a short decision from the Sixth Circuit affirming the judgment of a Kentucky district court that the relocation and construction of a highway was the official act of the state government by virtue of its contract with the contractor and thus, any damage to the plaintiff's property resulting from the contractor's work and not based on any alleged negligence by the contractor, was not chargeable to the contractor. *Green*, 362 F. Supp. at 1266 (citing *Ernst*, 202 F.2d 485).

Both [*Yearsley* and *Ackerson*] involve public-works projects. In both cases, the actions causing the alleged harm were taken pursuant to contracts with the federal government that were for the purpose of furthering projects authorized by Congress. And in both cases, the plaintiffs did not allege that the contractor defendant "exceeded his authority or that it was not validly conferred."

*Id.* (citing *Yearsley*, 309 U.S. at 21).

In *Butters v. Vance Inter., Inc.*, the Fourth Circuit cited *Yearsley* as exemplifying "well-settled law that contractors and common law agents acting within the scope of their employment for the United States have derivative sovereign immunity." 225 F.3d 462, 466 (4th Cir. 2000). In line with this interpretation of *Yearsley*, the *Butters* court extended derivative sovereign immunity under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602-1611, to a private contractor for following the commands of a foreign sovereign, Saudi Arabia. *Butters*, 255 F.3d at 466; *see also In re KBR, Inc.*, – F. Supp. 2d —, No. RWT 09MD2083, 2010 WL 3543460, at *12, n.7 (D.Md. Sept. 8, 2010) (considering and distinguishing between the "derivative sovereign immunity" of *Yearsley* and the "preemption-based government contractor defense embraced in *Boyle*[,]" when the plaintiffs had sued a contractor for injuries sustained from exposure to contaminants allegedly caused by the contractor's treatment of water and waste disposal at military bases in Iraq and Afghanistan and noting that while the two immunities often reach the same result, the facts of the cases are different and the "semantic distinction between the two may be significant" for purposes of a court's jurisdiction).

In reviewing the facts and rationales of the previously discussed cases with the facts of this case, the Court finds the relevant case law to indicate that an analysis of this case applying the derivative sovereign immunity of *Yearsley* and *Ackerman* is appropriate. As the Sixth Circuit acknowledged in *Bennett*, the derivative immunity of *Yearsley* and the government contractor defense of *Boyle* address the same federal interest of a contractor's performance of a government contract, *Bennett*, 607 F.3d at 1090, yet the facts of the cases show that the context in which the immunities apply is different. *See Yearsley*, 309 U.S. at 20-21; *Boyle*, 487 U.S. at 506. Unlike in *Boyle*, WorleyParsons and Geosyntec were not manufacturing a product or an item pursuant to government specifications or a government design. *See, e.g., Boyle*, 487 U.S. at 506-12 (involving a government-designed helicopter); *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1153 (6th Cir. 1995) (applying *Boyle* and involving a government-designed helicopter); *Carley v. Wheeled Coach*, 991 F.2d 1117, 1124-25 (3d Cir. 1993) (applying *Boyle* and involving the manufacture of a government-designed ambulance); *Johnson v. Grumman Corp.*, 806 F. Supp. 212, 217 (W.D. Wis. 1992) (applying *Boyle* and involving the manufacturer of government-designed postal vehicles). WorleyParsons and Geosyntec were, however, retained by TVA as engineering consultants to provide advice and services regarding the KIF plant. It follows that, because the issues implicated by public works projects are different than the issues implicated by a product or item designed by the government and manufactured by independent contractors, *Yearsley* and *Boyle* necessitate different approaches to contractor immunity, despite the shared federal interests. *Ackerson*, 589 F.3d at 205 ("The application of the contractor defense in the

22

context of military-equipment manufacturers is an area of law that has since been arguably distinguished from the general *Yearsley* defense in [*Boyle*] and its progeny.").  Explicit language in *Boyle* also indicates that the Supreme Court intended to limit the government contractor defense to facts similar to those in *Boyle*.  487 U.S. at 505 n.1 ("Justice Brennan's dissent misreads our discussion here to 'intimat[e] that the immunity [of federal officials] . . . might extend . . . [to] nongovernment employees' such as a Government contractor.  But we do not address this issue, as it is not before us." (internal citation omitted)).  Finally, as stated in *Bennett*, whether *Boyle* is applicable in a non-military context is an issue of first impression for this circuit and this Court declines to extend *Boyle*, a case involving a military procurement contract, to a non-military context involving contracts for a public-works project.  Accordingly, the Court concludes that *Yearsley* and the derivative sovereign immunity discussed therein is the appropriate analysis to apply in this case.

### C.    Derivative Sovereign Immunity and this Case

Under *Yearsley* and its progeny, a government contractor will not be liable when the authority to carry out the project was validly conferred and was within the constitutional power of Congress.  *Yearsley*, 309 U.S. at 20-21; *Ackerson*, 589 F.3d at 206-07.  A government contractor purporting to act on the government's behalf will be held liable, however, when the grounds for liability are that the contractor either exceeded his or her authority or that the authority was not validly conferred.  *Yearsley*, 309 U.S. at 21.  Thus, a key premise of *Yearsley*, and one that has been reiterated by courts in and outside the Sixth Circuit, is that the contractor was following the sovereign's directives.  *Id.* at 20-21; *Bennett*,

607 F.3d at 1090; *Gulf Refining*, 124 F.2d at 425; *Green*, 362 F. Supp. at 1264; *Ackerson*, 589 F.3d at 206-07. While *Yearsley* established that an independent contractor performing governmental functions pursuant to contractually delegated authority will not be liable in tort to third parties, it also established that an agent or officer of the government purporting to act on its behalf, but in actuality exceeding the contractor's authority, shall be liable for conduct that causes injury to another. *Yearsley*, 309 U.S. at 21. Thus, *Yearsley* makes clear that a contractor will qualify for derivative sovereign immunity *only* if the contractor executed the will of the government and did not exceed its authority.

WorleyParsons and Geosyntec assert that they are entitled to derivative sovereign immunity under *Yearsley* because they were contractors retained by TVA, an instrumentality of the federal government, for work on a project conducted pursuant to proper Congressional authorization. WorleyParsons and Geosyntec assert that there are no allegations that either defendant failed to perform the contracts with TVA, performed outside the scope of the contracts, or that TVA refused to accept work related to the contracts. Defendants assert that plaintiffs' allegations demonstrate that WorleyParsons and Geosyntec reported all studies, analyses, and recommendations to TVA, and that TVA had the ultimate authority to determine which, if any, of defendants' advice and recommendations to follow and implement. Defendants also assert that WorleyParsons and Geosyntec did not make any misrepresentations to TVA regarding any work or studies done for TVA. Defendants assert that plaintiffs' allegations against WorleyParsons and Geosyntec are in "precisely" the areas in which this Court has determined TVA is entitled to immunity under the discretionary

function doctrine, including allegations pertaining to design, construction, and modification of the KIF plant, repairs, "fixes," and "band-aids" implemented at the KIF plant, allegations pertaining to TVA's decisions on coal ash storage, and allegations involving TVA's decision and to keep in operation the wet coal ash storage system.

Plaintiffs contend that WorleyParsons and Geosyntec's activities with respect to the KIF plant do not constitute a governmental function or a "uniquely federal interest" but were actions taken pursuant to TVA's commercial function [Doc. 185, ¶ 62]. Plaintiffs assert that WorleyParsons and Geosyntec were neither authorized by Congress nor executing its will in their work for TVA [Doc. 225, p. 22]. Plaintiffs also assert that the challenged conduct does not fall within the discretionary function doctrine because WorleyParsons and Geosyntec were "actively involved in the use, maintenance, and upkeep of the KIF facilities, including the 'due care' related activities recognized by this Court as not being subject to discretionary function immunity." [*Id.*, p. 16]. Plaintiffs also assert that WorleyParsons and Geosyntec violated professional engineering standards and knew or should have known that the wet coal ash system at the KIF plant was unsafe and likely to fail [Doc. 185, ¶ 17].

The TVA Act designates TVA as "an instrumentality and agency" of the United States. *Hill v. United States Dep't of Labor*, 65 F.3d 1331, 1333 (6th Cir. 1995); *see* 16 U.S.C. § 831. The Supreme Court, federal appellate courts, Congress, and the executive branch have likewise recognized TVA's status as a federal agency within its various roles and functions. *See Mays*, 699 F. Supp. 2d at 1005 (giving cases, statutes, and executive acts that have recognized TVA's status as a federal agency). The TVA Act specifically

authorizes TVA "[t]o produce, distribute, and sell electric power," 16 U.S.C. § 831d(l), and authorizes TVA to operate and manage properties in furtherance of the purposes of the TVA Act, *see id.* § 831c(f)-(j). This Court has also determined that TVA's conduct relating to its power production purpose and function—conduct encompassing the conduct challenged in this case—is a governmental function because Congress made the governmental choice of authorizing TVA to provide communities with various types of electric power. *Mays*, 699 F. Supp. 2d at 1009-10; *see also Ashwander v. TVA*, 297 U.S. 288 (1936). Given the foregoing, and because "[s]uch conduct in a federally created agency and instrumentality—the exercise of a statutorily authorized purpose—constitutes the exercise of a 'governmental function[,]'" *Mays*, 699 F. Supp. 2d at 1009, the Court disagrees with plaintiffs that TVA's decisions and conduct pertaining to its power production function are not subject to protection under the discretionary function doctrine.

Plaintiffs have asserted that TVA owns, operates, maintains, and inspects the KIF plant [Doc. 185, ¶¶ 16, 59, 77, 79]. Plaintiffs have also asserted that WorleyParsons and Geosyntec were contractors retained by TVA to provide engineering and consulting services and advice to TVA in connection with the design, inspection, maintenance, repair, and operation of the wet coal ash disposal system at the KIF plant [*Id.*, ¶¶ 63-70]. Plaintiffs have not disputed that TVA had the authority, pursuant to an act of Congress, to own and operate the plant for electric power purposes [*Id.*, ¶¶ 60, 61, 72, 73, 77]. Plaintiffs have not disputed that Congress had the constitutional authority to delegate to TVA the authority to produce electricity by way of coal-fired plants or to maintain electricity-production facilities.

Plaintiffs have also not disputed that TVA had the authority to award contracts to WorleyParsons and Geosyntec for work on various projects at the KIF plant. Finally, plaintiffs have not disputed that WorleyParsons and Geosyntec's contracts with TVA were for a function TVA was authorized to perform—the production of coal-fired electricity and the maintenance of a coal ash storage and disposal system [*Id.*, ¶¶ 60, 61, 72, 73, 77].

Accordingly, the Court does not agree that WorleyParsons and Geosyntec were not authorized by the government or were not executing the government's will through defendants' contracts and work for TVA. There is no allegation that Congress lacked the authority to give TVA the power to produce electricity, no allegation that TVA lacked the authority to engage in electric power production through coal-fired plants at the KIF plant, no allegation that TVA lacked the authority to retain WorleyParsons and Geosyntec for consulting and other services, and no allegation that either defendant exceeded the authority TVA gave to each under those contracts. Thus, the Court finds that WorleyParsons and Geosyntec had "validly conferred" authority to perform work at the KIF plant. *See Yearsley*, 309 U.S. at 21.

According to plaintiffs, WorleyParsons and Geosyntec were "hired by and working on behalf of TVA with regard to the KIF facility, including the design, inspection, maintenance, repair, and operation of its impoundments and dredge cells[.]" [Doc. 185, ¶¶ 65-71]. Also according to plaintiffs, WorleyParsons and Geosyntec knew about the risks and hazards associated with the "construction, build-up, and material properties of the KIF coal ash impoundment, but negligently failed to follow well-established engineering standards."

[Doc. 225, pp. 5-6; Doc. 185, ¶¶ 17, 99-130; Doc. 226-1, pp. 2-6]. Specifically, plaintiffs allege that WorleyParsons and Geosyntec: failed to adequately advocate and insure that TVA stopped adding wet coal ash material to the coal ash disposal facilities despite evidence of problems; acquiesced to TVA's decisions not to follow substantive recommendations which would have made the KIF plant safer; misrepresented safety issues; failed to inform or disclose to relevant agencies the risks and hazards associated with the impoundment's construction, build-up, and materials; recommended and implemented low-cost "fixes" and "band-aids" which exacerbated risks; and failed to investigate the underlying causes of the blowouts despite evidence of "red flags." [Doc. 185, ¶ 17, 99-130; Doc. 226-1, pp. 2-6].

WorleyParsons and Geosyntec assert that these allegations are in precisely the areas in which TVA is entitled to immunity under the discretionary function doctrine and if TVA would not be liable for such conduct, defendants cannot be held liable for performing the same work.

In the Court's previous opinion concerning the extent of TVA's immunity under the discretionary function doctrine, the Court stated that:

> In the years prior to the coal ash spill, TVA made a policy decision, grounded in considerations of public policy, to have a wet coal ash storage and disposal facility. In conjunction with this overarching policy decision, TVA made a series of policy decisions regarding where to locate the coal ash disposal facilities and the design and construction of the facilities. TVA also made policy decisions after the Swan Pond facilities were in operation as to what polices and procedures would govern the coal ash disposal, decisions such as whether to implement modifications or changes to the facilities and whether to continue disposing of the coal ash with a wet storage system. Several of

28

> Plaintiffs' tort claims, however, challenge conduct apart from these
> policy decisions.

*Mays*, 699 F. Supp. 2d at 1019, 1022. As the opinion explained, TVA's policy decisions are

protected by the discretionary function doctrine. There is no dispute that TVA, as owner and

operator of the KIF plant, had the ultimate authority to make the final determinations

regarding the policy decisions described above—decisions regarding design and

construction, which, if any, repairs, modifications, or changes to implement at the plant, the

design and construction of such changes, what policies and procedures should govern the

operation, management, and oversight of the KIF plant and its wet coal ash disposal system,

and whether to continue operating the KIF plant and the wet coal ash disposal system.

In the course of making these policy decisions, TVA drew, in part, upon the work,

studies, advice, and recommendations of WorleyParsons and Geosyntec. While plaintiffs

have couched their allegations against WorleyParsons and Geosyntec in terms of defendants'

failure to exercise due care, failure to follow engineering best practices, and failure to

advocate or recommend different or "safer" manners of design, redesign, modifications,

fixes, and coal ash disposal methods, such allegations clearly challenge the policy decisions

by TVA that are protected by the discretionary function doctrine. The selection of an

appropriate design, appropriate modifications or fixes, and appropriate policies and

procedures for coal ash disposal, are decisions involving not merely engineering analysis, but

judgment as to the balancing of many technical, budgetary, corporate, and even social

considerations, including the need for and level of electric power production, costs, safety

factors, and environmental considerations and developments. While defendants'
recommendations and TVA's ultimate decisions may have resulted in designs, repairs, or
operational policies and procedures that were not comprehensive or were otherwise
inappropriate, "[e]ven the negligent failure of a discretionary government policymaker to
consider all relevant aspects of a subject matter under consideration does not vitiate the
discretionary character of the decision that is made." *Myslakowski v. United States*, 806 F.2d
94, 97 (6th Cir. 1986), *cert. denied*, 480 U.S. 948 (1987).

The Court has thoroughly reviewed the allegations in the complaint and in the related
pleadings. In doing so, the Court cannot conclude that plaintiffs' allegations against
WorleyParsons and Geosyntec encompass conduct apart from the design of the KIF plant,
its redesign and expansions, the corrective measures and repairs taken or not taken, and
TVA's ash handling and disposal policies, procedures, and operations. While plaintiffs have
alleged a lack of "due care" and negligent conduct by defendants in these areas, such
allegations challenge the substance and wisdom of the recommendations by WorleyParsons
and Geosyntec that went into TVA's actual discretionary policy decisions.

Further, and as indicated below, plaintiffs' "due care" and negligence allegations are
not the type of allegations described by the Court in its previous opinion as the type which
may survive the discretionary function doctrine:

> [O]nce TVA determined and implemented the policy decision to have
> a coal ash storage facility at Swan Pond, TVA had an obligation to
> continue and pursue that policy decision in a non-negligent manner.
> Following or acting pursuant to such policies and procedures was not
> a matter of discretion–the issues raised by Plaintiffs' claims in these

cases are not solely questions of social wisdom, but also of negligence, not questions of political or economic practicability, but of due care. To this end, *the Court recognizes that several of Plaintiffs' claims encompass allegations that TVA should have converted the Swan Pond facility to a dry coal ash disposal system, that TVA should have constructed the Swan Pond facilities in a different manner, or that the policies and procedures TVA had in place were improper. If these were Plaintiffs' sole claims against TVA, then the discretionary function [doctrine] might very well shield TVA from all liability.*

The Court also stated that:

[S]everal of Plaintiff's tort claims fall within the category of cases which address the actual implementation of a particular policy decision that is itself protected by the discretionary function doctrine. That is, once a government agency makes a policy decision protected by the discretionary function doctrine, the agency must then proceed with care in the implementation of that decision.

*Mays*, 699 F. Supp. 2d at 1019. Plaintiffs' allegations against WorleyParsons and Geosyntec do not reach conduct involving the implementation of TVA's policy decisions but fall within the types of allegations this Court found are protected by the discretionary function doctrine—allegations that TVA (and WorleyParsons and Geosyntec) *should* have designed and constructed the KIF plant differently, *should* have changed the wet coal ash disposal method, *should* have modified or repaired the facilities in different ways, or *should* have implemented different policies and procedures.

Thus, the Court agrees with Geosyntec and WorleyParsons that plaintiffs' allegations against these defendants fall within those areas to which the Court has determined that TVA is entitled to immunity under the discretionary function doctrine. Accordingly, under *Yearsley*, if TVA would not be liable for the challenged conduct and/or decisions, Geosyntec

31

and WorleyParsons cannot be held liable for their conduct in regard to the same challenged conduct and/or decisions. Defendants, Geosyntec and WorleyParsons, are therefore, entitled to derivative sovereign immunity and dismissed from this case for lack of subject matter jurisdiction.

## IV.    Conclusion

For the reasons stated above, defendants' Joint Motion to Dismiss for Lack of Subject Matter Jurisdiction or Failure to State a Claim or, in the Alternative, for Summary Judgment [Doc. 203] is **GRANTED** because Geosytnec and WorleyParsons are entitled to derivative sovereign immunity. Accordingly, all plaintiffs' claims against Geosytnec and WorleyParsons are **DISMISSED** and these defendants are **DISMISSED** from this case.

IT IS SO ORDERED.


s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE