```
1           IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF TENNESSEE
2      NORTHERN DIVISION, AT KNOXVILLE, TENNESSEE

3   George Chesney, Jot Raymond,           :
    Anita Auchard, Lee Scofield,           :
4   James Campbell, et., al.,              : VOLUME I
              Plaintiffs,                  :
5   Vs.                                    : CV
                                           : 3-09-09
6   Tennessee Valley Authority             : 3-09-48
                                           : 3-09-54
7            Defendant,                    : 3-09-64
                                           : 3-09-517
8
            Transcript of trial proceedings before the
9   Honorable Thomas A. Varlan on September 19, 2011.

10
                    ON BEHALF OF THE PLAINTIFFS:
11                  Jeff Friedman
                    Gary A. Davis
12                  David B. Byrne, III
                    Paul D. Brandes
13                  Elizabeth A. Alexander
                    A. Brantley Fry
14                  Joanne M. McLaren
                    Jeff Matt Conn
15                  L. Jeffrey Hagood
                    Wayne A. Ritchie, III
16                  Todd Monday
                    Attorneys at Law
17
                    ON BEHALF OF THE DEFENDANT:
18                  Edwin Small
                    Elizabeth Ward
19                  Brent Marquand
                    James Chase
20                  David Ayiffe
                    Mark Anstoetter
21                  Peter Shea
                    Attorneys at Law
22
                    Jolene Owen, R.P.R.
23              800 Market Street, Suite 131
                    P.O. Box 2201
24              Knoxville, Tennessee, 37901
                    (865) 384-6585
25

                            1
```

```
 1                          I N D E X
      Examinations                                         Page
 2     CHRISTOPHER BUTTRAM                                    54
       (Exhibit No. D-538 was marked for identification.)    57
 3     (Exhibit No. P-4559 was marked for identification.)   69
       (Exhibits P-189, 6044, 6045, 6043 for identification.) 75
 4     (Exhibits P-189, 6044, 6045, 6043, 538 in evidence.)  78
       (Exhibit No. P-187 was marked for identification.)    91
 5     (Exhibit No. P-187 was received in evidence           91
       (Exhibit No. P-188 was marked for identification.)    92
 6     (Exhibit No. P-188 was received in evidence           93
       (Exhibits P-180, 181, 182 for identification.)       107
 7     (Exhibit No. P-191 was received in evidence          107
       (Exhibit No. P-179 was marked for identification.)   107
 8     (Exhibit No. P-179 was received in evidence          108
       (Exhibit No. P-183, 193 for identification.)         111
 9     (Exhibit No. P-183 was received in evidence          113
       (Exhibit No. P-180 was received in evidence          123
10     (Exhibit No. P-181 was received in evidence          126
       (Exhibit No. P-1484 was marked for identification.)  136
11     (Exhibit Nos. P-186, 1552 for identification.)       141
       (Exhibit Nos. P-186, 1552 were received in evidence.) 141
12     (Exhibits P-3609, 606, 1585 for identification.)     154
       (Exhibit No. P-606 was received in evidence          155
13     (Exhibit No. P-1585 was received in evidence         157
       (Exhibit No. P-3609 was received in evidence         158
14     (Exhibit Nos. P-1555, 1584 for identification.)      163
       (Exhibit Nos. P-3610, 3611 for identification.)      167
15     (Exhibit Nos. P-1584, 1555 were received in evidence.) 168
       (Exhibit Nos. P-3610, 3611 were received in evidence.) 169
16     (Exhibit No. P-196 was marked for identification.)   169
       (Exhibit No. P-2894 was marked for identification.)  172
17     (Exhibit No. P-185 was marked for identification.)   174
       (Exhibit Nos. P-196, 2894 were received in evidence.) 175
18     (Exhibit No. P-185 was received in evidence          175
       CROSS EXAMINATION                                    175
19     (Exhibit No. D-193 was received in evidence          179
       (Exhibit No. D-34 was marked for identification.)    181
20     (Exhibit No. D-34 was received in evidence           183
       REDIRECT EXAMINATION                                 188
21

22

23

24

25
```

2

1              THE COURT:  Thank you.  Good morning

2  everyone.  I know we are kind of crowded this morning.

3  I hope everyone who wants to be inside the courtroom has

4  been able to find accommodations.

5              We have handled various preliminary

6  matters on Thursday of last week.  We are ready for

7  opening statements this week.

8              Since I know we have some plaintiffs and

9  some media and other interested observers, I know there

10  has been some confusion because we have this the

11  September cases, we have the November cases, we have

12  Phase 1, we have Phase 2.  It might for everyone's

13  benefit and counsel in these cases, if we have a

14  different prospective.  This is Phase 1 or the liability

15  phase of the September group of cases represented ably

16  by all of the individuals attorneys in the courtroom

17  today.

18              We have a second set of cases that were

19  filed after, basically after all of these cases that we

20  have scheduled for a separate trial in November.  The

21  November trial is not Phase 2 or damages phase of these

22  cases.  The November trials are separate, or cases

23  separate from those for which we are in the courtroom

24  today.  As the attorneys in those cases know, after we

25  finish this case I plan to sit down with them, obviously

3

1   as well as with the TVA attorneys, and talk about

2   potentially whether certain evidence from this case will

3   be used in that case and so on and so forth.   In

4   November we have scheduled a separate group of cases

5   that were filed sometime after these initial cases.

6           Both the September, what I am calling the

7   September trial, i.e., these cases and the November

8   cases are Phase 1 or a liability phase.  The Court since

9   these are bench trials, the Court pursuant to our

10  federal rules is then required to take the matters under

11  advisement and issue findings of fact and conclusions of

12  law.  Like a jury, we don't come back and announce

13  verdict for plaintiff or defendant.  After this trial is

14  over and the November trials are over, the parties will

15  have the opportunity to order the transcript, submit

16  post-trial briefs and revisions to their submitted

17  proposed findings of fact and conclusions of law.  That

18  will all be done.

19          The bottom line is it will be sometime

20  next year before decisions will actually be rendered by

21  the Court on the Phase 1 portions of both the September

22  cases and the November cases.

23          Then again, depending on the Court's

24  ruling on Phase 1, if these cases were to proceed to

25  Phase 2, you know, those would be scheduled accordingly.

4

1  That Phase 2 is the damages phase both for these cases

2  as necessary, as well as for the November cases as

3  necessary.

4         Any, did I get that right, counsel?

5         MR. SMALL:  Yes, Your Honor.

6         THE COURT:  All right.  Okay.  With that

7  being said, we are ready to proceed, unless there is any

8  preliminary, unless there are any preliminary matters,

9  we are ready to proceed with opening statements in the

10 cases pending before the court.

11        I believe, Mr. Friedman, you will render

12 opening statement on behalf of all of the plaintiffs?

13        MR. FRIEDMAN:  Yes, Your Honor, may it

14 please the Court.

15        Your Honor, on the early morning hours of

16 December 22nd, 2008, life would change for hundreds of

17 families in Kingston, Tennessee.  When the dikes at the

18 Kingston facility came crashing down in an instant, the

19 lakeside and recreation and retirement community of

20 Kingston, Tennessee overnight and in an instant became

21 an environmental cleanup site.  The damage was a

22 tragedy, the likes of which this state and this nation

23 has never seen.

24        The real tragedy besides the damage that

25 was caused is that what happened out there on December

1  22nd, 2008, was one hundred percent avoidable, was one

2  hundred percent preventable and was one hundred percent

3  a man-made disaster caused by the TVA as a direct result

4  of their negligent conduct.

5          Your Honor, I am one of the attorneys

6  representing the many families of people who were

7  damaged out there.  Together we are here today to begin

8  the Phase 1 of the trial to prove that the TVA's

9  nondiscretionary conduct, that is, conduct for which

10  they are not immune from liability, was a substantial

11  factor in causing the coal ash disaster in Kingston.

12          We believe, Your Honor, that the evidence

13  will show that the TVA was negligently failing to train

14  and inform its personnel on the applicable coal ash

15  policies and procedures in force and effect at the time.

16          We believe the evidence will show that the

17  TVA was negligent and inadequate in failing to inform

18  its personnel of the applicable policies and procedures.

19          We believe the evidence will also show

20  that the TVA was negligent in the actual construction

21  and building of the dikes that failed and that they were

22  not built as designed and instructed.

23          Lastly, we believe that the evidence will

24  clearly show that the TVA was negligent in failing to

25  perform needed and necessary maintenance.

6

1        Now, our case is a little bit unusual from
2   a lot of civil cases in that we intend to prove our case
3   using nearly one hundred percent of the evidence created
4   and supplied by the defendant, TVA.  We are going to do
5   that by admitting TVA's own documents, using testimony
6   from their witnesses, bringing their reports and the
7   testimony from the Tennessee Valley Authority Inspector
8   General and his office.  We intend to introduce the TVA
9   Board-authorized investigation by McKenna, Long and we
10  also plan to prove our case through the Tennessee Valley
11  Authority's own admissions, their public statements,
12  their conduct and even their pleadings, and, then, Your
13  Honor, we intend to wrap all this up by offering expert
14  testimony by Dr. Dan Marks and Mr. Gary Brown.
15        To understand how all this evidence is
16  going to fit together we would like to take just a
17  minute, if it pleases the Court, to talk about the basic
18  background that's in interplay here.
19        The Kingston plant was built in the 1950s.
20  At the time it was designed and built to be the largest
21  coal burning electrical producing plant in America.  It
22  was a huge plant.  It consumes vast amounts of coal;
23  14,000 tons per day of coal burned out there.  That's a
24  lot of coal.
25        More importantly for our case, that's a

7

1    lot of coal ash.

2              They had to put it somewhere.  They mixed

3    it with water and they pumped it originally into an old

4    pond.  That went on for years.  The pond got filled up.

5    Afterwards they encircled it with dikes, which they

6    called a containment facility.  Then after more years

7    the dikes filled up.

8              By the mid eighties the impoundment that

9    held the ash, it was almost full.  They didn't know

10   where to go.  Someone at TVA had the idea to build dikes

11   on top of dikes, to go vertical and to build a structure

12   to hold eventually billions of gallons of coal sludge.

13   They did not use concrete, they did not use steel, but

14   they used coal ash, wet soggy coal ash, to contain other

15   coal ash.

16             Eventually nearly ten stories high an 84

17   acre containment facility not unlike building a pyramid,

18   but this pyramid was built without any support other

19   than what was out there from the coal ash.

20             There were problems with it, problems that

21   were brought time and time again to the TVA's attention.

22   Finally these problems grew to such a point that on

23   December 22nd of 2008 it came crashing down.  1.2

24   billion gallons of coal sludge escaped with force, not

25   just seeping out, but with force sufficient enough to

8

1   create a 50 foot high wave of sludge.  It took out

2   roads, power lines, railroad tracks, houses, boat docks,

3   all in an instant with such force and with such

4   repercussions that it was the largest environmental

5   disaster in history in Tennessee and America at the time

6   it happened.

7           The disaster was shocking to everyone who

8   heard about it.  Shocking to the public.

9           The people living around the facility

10  didn't know what was happening.  They thought it was an

11  earthquake or a natural disaster.

12          The TVA had warnings and reasons to

13  believe that what happened on December 22nd, would

14  eventually occur.  The first of these signs and where it

15  is most apparent is TVA's negligent failure to train and

16  inform its people on the policies that were in place to

17  prevent the December disaster.

18          In discussing what we believe the evidence

19  will show concerning the TVA's negligent failure to

20  inform and train its personnel, we would like to start

21  at perhaps the most obvious point in the chain of

22  failure and that is an Annual Ash Pond Dike Stability

23  Inspection that took place in October of 2008.  This

24  inspection took place just two months before the

25  disaster.  It took place pursuant to rules created by

1    the TVA to take a comprehensive stability inspection

2    every year to be taken and be undertaken by qualified

3    and trained engineers.

4              The author of the report, who told the

5    office of the TVA Inspector General that he was the lead

6    engineer on the report, was a man by the name of Chris

7    Buttram.  He offered the report, he signed it on behalf

8    of TVA and he accepted the responsibility of putting

9    together this comprehensive timely informative stability

10   and inspection report.

11             Now, you have heard the requirements.  Let

12   us tell you what we expect the evidence to show about

13   this report.  The stability inspection of October 20th,

14   2008, was authored by an engineer who had never seen a

15   coal ash facility before.  Never been to one.  He had

16   never when on a dike.  He never designed one.  He had

17   never seen any plans for a dike.  He didn't know any

18   rules, any regulations, any policies.  All he was told

19   was to be there, to show up on the day in question,

20   October 20th.

21             When he got there he didn't know what to

22   do.  He didn't know why he was there and he didn't know

23   whether or not what he was doing was even important even

24   after the inspection was over.

25             He met two other employees, a Mr. Albright

10

1  and Mr. Dotson.  The team progressed and walked around

2  the dikes.  They had no designated leader.  They simply

3  handed Mr. Buttram an old report from the year before

4  and said here, take this, make some notes.

5          The two men who accompanied Mr. Buttram

6  did not consider themselves to be his teacher or

7  instructors.  One of the men, the man who wrote the

8  prior year's stability inspection, said he wasn't even

9  there to inspect at all and he considered the Annual Ash

10  Pond Dike Stability Inspection report to be a misnomer

11  because that's not what it was at all to him.

12          They testified that these three men got

13  there about mid-morning.  They walked around for about

14  an hour and then they broke for lunch.  Took an hour and

15  a half lunch break and then came back approximately two

16  more hours and all left before the end of daylight.

17          We believe that the evidence will show

18  that a competent trained engineer or group of engineers

19  would take days to perform the stability inspection to

20  comply with what had to be done out there.  As a result,

21  this exercise that the men went on on October 20th

22  instead of being one of the last best chances for TVA to

23  avoid disaster was an event punctuated by untrained,

24  unqualified, untimely and incompetent work.

25          The mistakes that took place in the

1  October inspection are critical here because pictures
2  were made out there at the time.  Pictures that after
3  they were taken were sent to a computer, a desktop
4  computer, and never looked at until after the disaster.
5  Those pictures identified certain things that Mr. Dotson
6  referred to as "sloughs."

7           Now, there is a whole glossary of terms,
8  Your Honor, that we will use.  They are geotechnical
9  terms.  One of them that I have learned, and we believe
10  the evidence will show, is a term called "sloughs."
11  Those sloughs are areas where the side of the dikes give
12  out and slide down.

13           Mr. Dotson on his report he identified
14  example after example of sloughs.  He put those, he
15  corresponded the sloughs he saw with a GPS report and
16  pictures were also made.  Not all the sloughs pictures
17  were made, but some of them, and certainly crucial ones.
18  These sloughs took place at the precise point of failure
19  that is agreed to even by the TVA's own experts.

20           Sloughs are points where there is internal
21  erosion.  You see from the picture in front of us there
22  is no erosion above this slough.  That is the upward,
23  the top of the picture is the uphill side of the dike.

24           Then you get halfway down the dike and
25  suddenly there's a hole where water is forcing itself

1  through the dike and taking parts of the dike and

2  blowing it out.  There were pictures of these crucial

3  things that sat on Mr. Buttram's desk.  They sat there

4  for two months after the disaster.  Then they sat there

5  another month.

6          You see, we expect the evidence to show

7  that the stability inspection sat around for two months

8  after the inspection took place and then the disaster

9  occurred.  Then after the disaster occurred Mr. Buttram

10 was questioned on why wasn't the report done.  He told

11 the officers, the officers of the Inspector General's

12 Office, that he had started it, but in his deposition he

13 admitted they hadn't started it at the time of this

14 disaster.  It wasn't even put together.

15         In the report Mr. Buttram and his

16 colleagues wrote that the repairs to the dike, which

17 were the significant sloughs, should be repaired

18 immediately.  The testimony in the case is that these

19 sloughs should have been repaired immediately and they

20 wanted to get the attention of the maintenance people at

21 the facility, but they didn't.  The sloughs weren't

22 repaired.

23         In fact, when Mr. Buttram put this report

24 together and took pictures of the sloughs, the words

25 "repair immediately" was deleted from the report by the

13

1  TVA Media Relations Department.  The document was

2  sanitized and edited so the truth would not be known.

3                    Other things were seen, but ignored, in

4  October of 2008; drains broken, but not repaired, red

5  water seepage.  Red water is another term for water that

6  seeps through the dikes.  Polluted water is seeping

7  through the dikes and is tainted with the residue of

8  spent fossil fuels.  Documented, but not addressed.

9                    And a wet spot in the area of dike failure

10  was identified and again, not addressed.  A wet soft

11  spot indicating the dikes were soggy.

12                    To a trained professional all this

13  information was critical.  There was still time to act

14  in October of 2008 to prevent disaster, if these repairs

15  would have been made, if things would have taken place

16  in short order, but they weren't.  The dikes to a

17  trained professional -- we are going to put on evidence

18  to show that the dikes in the area of the failure were

19  in an advancing failure mode and the TVA's failure to

20  train inspectors to recognize the sign of failures, to

21  follow the rules and regulations, was a substantial

22  factor in the cause of the disaster of December 22nd,

23  2008.

24                    Secondly, Your Honor, one of the other

25  areas we intend to address is negligent or inadequate

14

1  performance by TVA personnel of TVA's policies and

2  procedures concerning coal ash.

3           One of the things that the TVA did do that

4  they were put on notice of in the 50 year history of the

5  Kingston facility is that you have got to control the

6  water on these dikes. These dikes are nothing but coal

7  ash, nothing but material piled on top of material. You

8  can't stack coal ash to be built like something you

9  build out of concrete or blocks or steel. You have to

10 stack this right. Water is the enemy. Water that is so

11 crucial to preserve and to establish life is the death

12 knell for these dikes that are built out at Kingston.

13 It causes external erosion, internal erosion, pressure

14 inside the dikes behind the walls, underneath them and

15 this pressure is working, never taking a day off, 365

16 days a year, 24 hours a day, seven days a week. The

17 pressure is there and it is growing. It is caused by

18 water and it has to be controlled.

19           As a matter of fact, in the early morning

20 hours following the disaster on December 22nd, while the

21 media was looking for seismic events and while the

22 Inspector General's Office was looking for a terrorist

23 event or some kind of someone attacking these dikes, the

24 TVA internally at four in the morning they knew what the

25 cause was. They knew where to look. They looked at

15

1   their well sites, their piezometers and their evidence

2   of water build up.  That evidence told them what they

3   already knew.  You let dikes get too big, too much water

4   behind them, too soggy, and with such force of that

5   water that was behind them, they literally liquified the

6   dike that blew out.  They turned it to liquid from all

7   the pressure.

8               How did TVA know at four in the morning

9   where to look and what the probable cause of the failure

10  was?  They know this because it had happened before.

11  Not on the same scale, but they had had what the TVA

12  refers to -- and this is the TVA's word.  They had

13  "blowouts;" dike blowouts in 2003 and 2006.  These are

14  blowouts out of the side of the dike that one of the TVA

15  witnesses said, described them as a volcanic event.

16              These blowouts also don't occur all the

17  time.  They only occur in the wet fall months.  Matter

18  of fact, both of the prior blowouts occurred in October.

19  They both occurred when water was building up behind the

20  dikes.

21              We are not just talking rainwater.  The

22  water that builds up behind the dikes -- let there be no

23  mistake that water is sluiced.  It is pumped there to

24  get the spent ash out of the coal burning facility and

25  into the containment.  They are pumping water in.  The

16

1   problem with the wet fall months is that there is no

2   evaporation going on and there is a lot of rainwater

3   adding to that.

4            As a result, these two blowouts and the

5   implications that those two prior blowouts brought with

6   them, TVA went to its contractors and they said, we got,

7   we can't have another one of these.  The results could

8   be catastrophic.  Their contractors put together, as a

9   result of the 2003 blowout and added to it following the

10  2006 blowout, an early warning system.

11           They drilled into the dikes and they put

12  pipes called piezometers.  These piezometers are put

13  inside the dikes to measure the water buildup because

14  you see, when the level of water exceeds the slope of

15  the dike you are approaching, by TVA's own rules and

16  regulations, are approaching failure, dike failure.

17           This early warning system was successful.

18  As a matter of fact, it was run for eight months by an

19  independent contractor for the TVA in 2006, and in 2007.

20  And what did the independent contractor tell them in the

21  fall of 2007 after they ran the early warning system?

22  The evidence will show that the contractor said, TVA,

23  you got to stop in the fall.  You got to stop sluicing

24  ash behind these dikes because you have a critical

25  buildup, a dangerous buildup.  It is recorded on their

17

1  data screen.

2         In 2007 an order was made based on the

3  information on the printouts on their screens and what

4  the independent contractor determined, the word went out

5  we have to stop pumping ash behind these dikes.  TVA

6  did.  They averted disaster.

7         Unfortunately, the independent contractor

8  handed off responsibilities for monitoring the water

9  levels to the TVA.

10         When the TVA took over the monitoring, we

11  believe the evidence will show that the monitoring

12  equipment fell into disrepair.  Piezometers and well

13  monitors were mowed down by tractors.  As many as half

14  of them were not in working order.  Data was ignored.

15  It was overlooked.  TVA had a strict policy to monitor

16  water buildup, but they didn't.  As a matter of fact, we

17  believe the evidence will show that in this early

18  warning system at the crucial time where the buildup was

19  occurring behind the north dike at the most vulnerable

20  location, no one was even looking at the buildup at the

21  three crucial points on the north dike, the point where

22  the dikes ultimately failed.

23         Thirdly, you can see the three monitoring

24  wells up on the screen right now.  These are monitoring

25  wells where seepage was often reported, red water

18

1   seepage.  That happens to be the point where the dike

2   failed, the north dike failed, the dredge cell dike

3   failed.

4               The man in charge monitoring those dikes

5   and inputting the data of the dikes is the same person

6   who is responsible for writing the stability analysis,

7   Mr. Buttram, who will testify he didn't even know

8   monitoring was going on on the north sides of the dikes.

9   He didn't even know.

10              Thirdly, we believe the evidence will show

11  that TVA was negligent in the construction and

12  implementation of approved design and construction

13  plans.

14              Your Honor, if I can back up just a

15  minute.  I have talked a lot about dikes and

16  geotechnical terms.  We believe the evidence in this

17  case will show, if I can use a metaphor, if the Court

18  will allow me that, building a dike is like building

19  character.  You have got to start with a strong

20  foundation.  You have got to build a core.  You have to

21  prepare or steel your character or dike to be prepared

22  to deal with hardship.  None of those things were done

23  in Kingston.

24              When the TVA decided to go upward, when

25  the original pond and the original containment facility

1    was filled up, when the decision was made to build dikes

2    on top of dikes, TVA's engineers warned that the

3    exterior dikes, the dikes surrounding the containment

4    facility, are not designed for additional interior loads

5    which may occur, as a result of the future dredging

6    operation.

7              The engineers with responsibility for

8    looking at this situation said these designs -- we are

9    not comfortable with going vertical.  By April of 1985

10   the Director of Engineering stated regarding raising

11   dredge cells, "as you are aware, these dikes were not

12   built according to drawings."

13             The Director of Engineering is sounding

14   and alarm right there.  These dikes, the foundation, the

15   strong foundation for everything you are doing going

16   upward were not built -- the TVA, Director of

17   Engineering pointed out to those building the dikes that

18   the dikes were not built with the proper factor of

19   safety.  The as-built factor of safety for the dikes was

20   approximately 1.2, plus or minus.  Now, keep in mind

21   that structural failure is 1.0.

22             The Director of Engineering said because

23   the dikes weren't built to start with, they have got a

24   factor of safety that is lower than 1.5, which is the

25   minimum industry standard.  If you are going to build on

20

 1    top of those dikes that weren't built to the minimum

 2    industry standard to start with, then you have to build

 3    them very very strictly in accordance with engineering

 4    drawings.

 5              The engineering drawings that are

 6    identified as Attachment C, which is the first plan for

 7    raising the dredge cells out of the ground, said you've

 8    got to build these new dikes that you are building on

 9    top of existing dikes with a 60 foot wide top.  You have

10    to build them out of compacted bottom ash, which is not

11    the same as fly ash which is a light ash.  You have to

12    get the ash from the very bottom and then you have to

13    compact that to build the dikes and then you have to

14    build them to a ratio of five feet of slope for every

15    one foot of elevation.

16              Well, the construction after those

17    instructions were done, that design was drawn, the

18    construction proceeded.  As the dikes were built and the

19    results were in it was determined that they weren't

20    built according to plans.  Instead of a 60-foot wide top

21    they had a 12-foot wide top.  Instead of being built

22    with compacted ash, they were built with weak

23    uncompacted fly ash.  They were too steep.  As a result,

24    these dikes didn't meet the minimum as-built factor of

25    safety.  The dikes were two narrow, too weak, too steep

21

1  with a reduced factor of safety and vulnerable to

2  crashing.

3              There was also a total lack of oversight,

4  as the facility went vertical.  The engineers, the same

5  engineers who said this is a problem, you can't deviate

6  from the drawings, didn't follow engineering to make

7  sure drawings were followed.  Small deviations became

8  large deviations.  Plans were eventually disregarded and

9  actually made obsolete.

10              On the one hand, while the TVA didn't

11  follow the plans they had and the engineers didn't

12  monitor to make sure the plans were followed, the people

13  building the dikes did not create what is termed

14  "as-built drawings."  As a result, there is no record of

15  the way these dikes were built, even as we stand here

16  today.  No official acknowledgment of the errors was

17  ever made.

18              All the public could see is that the dikes

19  were coming up out of the ground one story after the

20  other.  The people there around the plant had a false

21  sense of security that things were going to be done

22  right.  The people in the community trusting TVA as a

23  good corporate and government citizen, had no idea the

24  danger they were in and what was being done.

25              Compaction tests which are crucial from an

1    engineering standpoint to make sure you are getting the

2    right kind of basic stability in a dike, were not done.

3              The importance of proper construction is

4    well known to TVA's engineers.  You see, they had a

5    heads up.  The Engineering Department in 1975 contracted

6    out with a company by the name of Singleton Labs.

7    Singleton Labs went out and looked at the impoundment

8    facility and made some findings and put Engineering and

9    TVA on notice of that.  They said this.  "As ash fill

10   depth increases, the ash weakens.  Where the ash meets

11   the ground, it becomes soft.  You can expect --

12   Singleton Labs tells TVA -- you can expect significant

13   weakness with dikes built on the ash pond at some point

14   even approaching a liquid state."

15             Despite these findings Engineering allowed

16   the dikes to be built for a foundation for more dikes

17   and then the dikes that are built the evidence will show

18   one on top of another like a layer cake were

19   progressively built in disregard to the plans and

20   specifications that were established.

21             We believe the evidence will show that the

22   TVA was negligent in failing to build its dikes in

23   accordance with the plans and specifications and TVA was

24   negligent in failing to monitor and implement necessary

25   plans and specifications and these were significant

1   factors in the coal ash disaster.

2           The fourth thing we expect the evidence to

3   address is going to be failure to perform maintenance or

4   negligence in performing maintenance.  You see there is

5   a correlation, a direct correlation between building

6   dikes upward and the importance of good maintenance

7   practices.  Because as the dikes raised up out of the

8   ground and became taller and taller the pressure behind

9   the dikes increased as well.  The more water that is

10  contained in these vertical structures, also the more

11  pressure that is created against the walls.

12          Maintenance issues that were routinely

13  overlooked and even disregarded in the seventies and

14  eighties and nineties became dangerous components of

15  failure at this facility.  This facility growing to the

16  size of a nine or ten story building, the failure of the

17  dikes released an amount of coal ash that would fill

18  Neyland Stadium 16 times.  That's just what was

19  released.  There is another 16 times that amount that

20  was left out there that didn't flow into the rivers and

21  lakes.  But all that coal ash was building upon itself

22  creating pressure, pressure, pressure that never took a

23  day off.

24          To contain that pressure it takes a

25  commitment to maintenance, but the commitment wasn't

24

1    there.  You see there was a commitment to writing down

2    maintenance issues on paper, but as the Office of the

3    Inspector General at TVA found, those paper reports

4    became what the Inspector General referred to as "legacy

5    issues."

6              It's a curious term.  We asked about that

7    in discovery.  We learned that a legacy issue, as far as

8    maintenance is concerned, is something, a list kind of

9    like the list of chores my wife has for me.  It gets

10   longer and longer and I never scratch anything off.

11   These legacy issues are, examples of legacy issues by

12   the OIG were; found seepage, red water, signs of water

13   coming through the dikes, erosions, gullies, roughs,

14   rills, erosion on the outside and inside of the dikes,

15   tree growth.  Embankments that should never have a tree

16   on them had trees growing in them with root systems that

17   when you pull them out it weakens the dike itself and

18   when you cut the tree off the roots decay and

19   destabilize the dike.

20             Another example of failure to do

21   maintenance is the piezometers.  These are the things

22   that, these are the part of the early warning system

23   that are put inside the dikes to tell when the dikes are

24   getting too saturated.  They were mowed down by

25   tractors, knocked down, fallen into disrepair so they

1  weren't functional.

2          As the two independent investigating

3  bodies McKenna, Long and OIG looked at this found that

4  TVA had a problem with reporting maintenance issues that

5  were never acted upon and never repaired in a timely

6  manner.

7          Perhaps one of the best examples and one

8  we believe is going to be crucial in this case is

9  another term that is referred to by the TVA as

10  "ponding." Ponding in its simplest form is the creation

11  of water through either rain, but most notably through

12  pumping water behind the dikes. TVA's policies and

13  procedures and their engineers say you can't have

14  standing water build up behind the dredge cells. The

15  dredge cells at the very top of the nine story coal ash

16  facility, this pyramid, if you will, of coal ash, you

17  can't have water ponds building up on top of that

18  because they can't hold the weight. It causes mushy

19  dikes. It is the source of seepage. It is the source

20  of internal erosion and it is the source of the picture

21  that Mr. Buttram took at the point of the failure in

22  October of 2008, the sloughs. You have to do everything

23  you can to move the water off of these things. That was

24  not done.

25          As a matter of fact, in a photograph that

26

1 was taken on October 20th, 2008, just two months before

2 the catastrophe, this is the dike that failed under

3 extreme water pressure, ponding, that TVA by its own

4 rules and regulations is required to eliminate as soon

5 as possible.

6        TVA created specifications to avoid

7 surface water ponding.  They knew the ponding undermined

8 the dike stability and reduced the safety factor of the

9 dikes to a dangerous level.

10        These soft mushy dikes were recorded.  As

11 a matter of fact, in a haunting photograph that was just

12 days before the dike failure, a man out on the dikes

13 wrote to the TVA in an e-mail that these are the

14 "softest dikes I have ever been on."  This man was a

15 surveyor.  This picture that he gave the TVA shows him

16 sinking in the dikes almost to his waist.  Soft mushy

17 dikes take him down like quicksand.  And this man is not

18 even charged with responsibility for monitoring or

19 looking at the stability or maintenance of the dikes

20 asked the TVA, what is going on here?  What are these

21 things made of?  They are soft.  They are mushy.  Can

22 this possibly be right?  It is not the first warning

23 that TVA had.

24        TVA as a result of the blowouts that we

25 have talked about in '03 and '06 systemwide, started

27

1  back in 2003, we expect the evidence to show, what was

2  referred to as an "Ash Blitz." That is a catchy phrase

3  but what it really meant is we are going to get a group

4  of engineers and inspectors together and go facility to

5  facility to get a handle on these ash containment ponds.

6  They came out to Kingston and they tried to sound the

7  alarm and they set up some specific rules and gave some

8  specific instructions. This is in 2004.

9             A recurring theme of a warning to TVA was

10  watch for sloughing, watch for these situations where

11  you have slides, whole parts of earth come out of your

12  dikes. That's a dangerous sign. We believe the

13  evidence will show, when the testimony is in, and

14  evidence that sloughs are recognized by those familiar

15  with earthen dams, that when you see them, a dike

16  failure could follow in weeks and months in short order.

17  Sloughs is not just a geotechnical term to be ignored.

18             The Ash Blitz also said you got lower

19  dikes there at Kingston that are saturated. That means

20  you are not draining the dikes properly. Water is

21  coming out in places it shouldn't be. You have soft

22  dikes. You have red water seepage. As a matter of

23  fact, the Ash Blitz concluded of all the facilities in

24  the TVA system, Kingston had the most problem with red

25  water seeps, tainted water from spent coal ash coming

28

1   out of the dikes where it shouldn't come out indicating

2   instability and a lack of structure.

3               The problems cited in the Ash Blitz of

4   2004 we are going to have evidence to show, testimony

5   from TVA, that these items were not addressed.

6   Necessary maintenance was not done.  The same thing

7   holds true for the annual inspections, these legacy

8   problems we talked about earlier.

9               There was a problem with writing

10  documentation down that pertained to maintenance

11  problems that the inspectors who looked at this failure

12  termed "siloing."  Siloing is a group of people or a

13  person within TVA reporting a problem and not sharing it

14  with maintenance or others who are required to address

15  it, as a result of TVA's policies and procedures.

16              An example of that, we expect the evidence

17  to show that TVA was required to do annual seepage

18  inspections, or actually quarterly seepage inspections.

19  These reports were to be turned over to TDEC.  They were

20  required all through the nineties and certainty after

21  the turn of century up until the time of the failure.

22  This crucial seepage information in these reports were

23  never provided to the engineers who were required to

24  inspect the dikes who could reconcile the information

25  and do something about it.  Instead as the Office of the

29

1    Inspector General found, this crucial information on

2    maintenance issues was siloed and not distributed and

3    not given to the people who needed it and who had a

4    chance to do something about it.

5              Now, we have talked -- you see at the very

6    end of the bullet points from the McKenna, Long report.

7    They talk about silo responsibility and poor

8    communication.  The red water reports are a good

9    example.

10              As a matter of fact, the evidence will

11   show when these engineers were out there in October of

12   2008 just before, just two months before the dike

13   failed, that they didn't have this crucial information

14   about the location of red water seeps.  They were left

15   on their own to find it, to find out the seeps in this

16   84 acre containment area on their own in a short period

17   of time.

18              McKenna, Long also reported to the Board

19   of Directors at TVA that inspections just like we have

20   talked about were nothing but form over substance,

21   inconsistent oversight, lack of clarity, complete lack

22   of standardization, training and metrics and the design

23   of the dikes in the drawings for construction were not

24   followed.

25              THE COURT:  What was the date of this

                              30

1    report?

2            MR. FRIEDMAN:  The McKenna, Long report.

3    The McKenna, Long report came after the failure.  The

4    Ash Blitz that there was a genesis of many of these

5    findings came in 2004.

6            Your Honor, I want to change gears, if the

7    Court will allow, and talk a little bit about what we

8    expect the evidence to show concerning expert testimony.

9    We believe expert testimony is going to be a crucial

10   part of this case.  The plaintiffs will offer expert

11   testimony in the person of Mr. Brown and Dr. Marks.

12   We'll talk about what we expect their evidence to be in

13   just a minute.

14           If I can briefly digress to say that the

15   plaintiff's two experts will be countered by a defense

16   expert by the name of Mr. William Walton or Bill Walton

17   -- not to be confused with the basketball player and now

18   the sports announcer.

19           Mr. Walton, his introduction to this case

20   is important.  We believe the evidence on that is going

21   to be crucial in taking that into account.

22           The evidence in the case, we'll call the

23   President and CEO, Tom Kilgore, to establish this is,

24   that he made a promise to Congress and the Senate

25   following this disaster that TVA would get to the bottom

31

1   of this.  They would find out what the actual cause was,

2   what rules were violated, who was responsible for the

3   disaster, and, if necessary, heads would roll.

4           Now, we believe the evidence will also

5   show that not one person within TVA has been ever, has

6   been held accountable for this disaster.  There's a

7   reason for that.  Because after Mr. Kilgore made his

8   promise to the Senate and the Congress the ratepayers of

9   TVA and the taxpayers of the United States of America he

10  turned the task over to his lawyers.

11          What the lawyers did is to follow a

12  litigation strategy.  They hired Mr. William Walton and

13  they hired Mr. Walton under very very strict conditions.

14  This is what they told him.  Do whatever you need to do.

15  You have got unlimited budget.  Test whatever you need

16  to test, but do not under any circumstances blame any

17  individual at TVA, don't make any criticism of TVA,

18  don't make any finding of fault against the TVA, and

19  strictly find a mode of failure that doesn't have

20  anything to do with assigning fault against the TVA.

21          You know what he did.  He did just what

22  they told them.  He charged them $3.2 million and

23  continued with additional contracts now approaching

24  possibly $4 million.  What he did was just what he

25  promised he would do in his prospectus or just what he

32

1  promised he would do to TVA when he got started.  In his

2  proposal he said I will come up with a mechanism of

3  failure that he calls a slimes layer.  This slimes

4  lawyer is a magical layer that caused the dikes, these

5  massive structures, to slide and allow 1.2 billion

6  gallons of sludge to escape, rupture and liquify.

7              What has the Office of General Counsel

8  said about that?  Well, they said it's a litigation

9  strategy.  It says that it was done as a resulted of the

10  tightly circumscribed requirements.  It was a conscious

11  decision to present the public with only one of the

12  facts that supported an absence of liability, not one of

13  the facts, but only facts that supported an absence of

14  liability for TVA.

15             Just like Mr. Walton said in his

16  deposition, he reached a predetermined result and as a

17  result the Office of Inspector General of the Tennessee

18  Valley Authority classified his work as suspect.

19             The TVA has instead of going out and

20  getting another expert, they have continued to stick

21  with him.  He is the person we believe they will call at

22  trial to support their defense.

23             On the other hand, we have two expert

24  witnesses we are very proud to present; Mr. Gary Brown.

25  Mr. Brown is going to testify because, Your Honor, the

33

1    Kingston Coal Ash Facility is permitted and documented

2    as a landfill.  Mr. Brown is an expert on solid waste,

3    hazardous waste, landfill design, construction and

4    operation and most importantly regulation.  He has had

5    30 years of environmental engineering experience and he

6    has dealt with landfill and containment issues all over

7    the eastern United States.

8                His testimony we believe is going to be

9    that TVA committed numerous violations of its own rules,

10   of its permits and its regulations which were

11   substantial factors in the failure of the dredge cells

12   and the disaster of December 22nd, 2008.

13               Secondly, Your Honor, the plaintiffs are

14   very proud to present the testimony of Dr. Dan Marks, a

15   geotechnical engineer with 40 years of experience and

16   training.  He has been a professor of civil engineering

17   at the University of Tennessee College of Engineering

18   for ten years.  He has served as a geotechnical

19   consultant over 30 years.  He was been a consultant to

20   the foundation of the largest building in Knoxville and

21   Nashville and parts north and south of here.

22               We believe he is going to testify that the

23   dredge cells were overloaded with excessive water and

24   high loads leading up to the disaster.  He is going to

25   testify that the TVA's improper maintenance, inadequate

34

1    construction, lack of proper operation, inspection and

2    maintenance caused and was a substantial factor in the

3    failure of the Kingston facility.

4              Your Honor, I promised I would be through

5    in close to an hour.  I am seeing my colleagues trying

6    to get my attention out of my peripheral vision.  With

7    that, I will try my best to wrap up.  We have a few, I

8    have a few other comments that I believe I would be

9    remiss if I did not address.

10             With the Court's indulgence, we want to

11   comment just briefly on what we expect the evidence to

12   be from TVA.  After all, this is a case made with TVA's

13   witnesses to discuss and get to the cause of the dike

14   failure out there that we believe was caused by TVA.

15             First, throughout this entire case TVA has

16   denied any liability.  The only thing they have admitted

17   is that this slimes layer which was the predetermined

18   creation of Mr. Walton was the cause.  They denied that

19   they made any bad choices, any bad decisions, that they

20   disregarded any warnings.  They have denied maintenance

21   issues, construction issues, training issues, denied

22   failing to follow policies and procedures.  They have

23   denied everything.

24             Then we have engaged in the most extensive

25   motion practice that I in my 30 years have ever seen.

1    We have gone through three summary judgments.  With Your

2    Honor's guidance you have told us how this case should

3    be tried and we are committed to following that.

4              What we expect the evidence to show

5    concerning TVA now, Your Honor, is that on the eve of

6    trial, the eve of trial in no more than a footnote in

7    the TVA's proposed findings of fact the first time, the

8    TVA as said, all right as the mountains of evidence

9    against us has collected and as the testimony has

10   increased, as the pressure increases, you know, after

11   Your Honor has issued an order saying that they are

12   immune for discretionary conduct they have stepped up to

13   the bar and for the first time admitted and they do not

14   contest the causes of the spill are a result of TVA's

15   bad decision making and bad policies for all these

16   years.  The first public admission of that wrongdoing.

17             We do not believe that this strategy will

18   work and this evidence will carry the day.  Here is why.

19   Instead of being able to try to blame poor decisions and

20   poor policies that were created in the sixties and

21   seventies we believe those same policies were not bad

22   decisions, but they were warnings.  They were

23   information, part of the tribal knowledge to TVA of you

24   have got problems with your dikes.  As a matter of fact,

25   the evidence is going to show that the John Sevier

36

1    Electric Facility in the 1970s the dike failed, it came

2    crashing down.  TVA had knowledge of that.  They had

3    knowledge that you have to build these right, have to

4    maintain them right and you have got to monitor them.

5            We believe the efforts to blame poor

6    decision making on people who are no longer here will

7    fail.

8            Now, in closing, the plaintiffs will work

9    diligently to move the case along, as Your Honor

10   expects, and to cooperate and do everything humanly

11   possible we can.  We, as the Court has recognized, we

12   have a tremendous obligation to our clients, the

13   families out there in Kingston.  We intend to carry our

14   burden and meet our responsibilities, Your Honor.

15           We know that based on what Your Honor has

16   said and the findings of this Court all the plaintiffs

17   have to do is prove that one element, just one element

18   of nondiscretionary conduct being a substantial factor

19   in the coal ash disaster is sufficient to carry our

20   burden.  We believe we will put on substantial evidence

21   of not just one element but all four elements that each

22   one of these standing alone created a substantial

23   contributing factor to the disaster.

24           That is why at the close of the evidence

25   we are going to ask for a plaintiff's verdict because of

37

1  the TVA's negligent failure to inform and train its

2  personnel.  Because of the TVA's negligent and

3  inadequate performance of its policies and procedures,

4  because of the negligence in construction in following

5  the design parameters for the dikes and because of the

6  negligent maintenance that followed.

7              That is also why at the close of the

8  evidence, Your Honor, we will ask the Court for

9  permission to stand here before Your Honor at the end of

10  the evidence and to request a verdict on behalf of the

11  plaintiffs.

12              Thank you.

13              THE COURT:  Thank you, Mr. Friedman.

14              Mr. Small, opening statement on behalf of

15  defendant, TVA.

16              MR. SMALL:  I am Edwin Small of the

17  Knoxville bar.  I am here representing, of course, the

18  Tennessee Valley Authority.  I have someone in the

19  courtroom I would like to take a moment to introduce the

20  Court to, someone the Court has not previously met, is

21  TVA Senior Vice President Bob Deacy.  He, among other

22  things, is from our Fossil Organization and responsible

23  for the Kingston cleanup work.  He is with us today as

24  the agency representative.

25              THE COURT:  Good morning.

38

1    MR. SMALL:  It goes without saying that

2  the presentation that Mr. Friedman just made we did not

3  have access to it until we just saw it with the Court.

4  There are a number of things in it that we will object

5  to, and, of course, it is not into evidence yet, those

6  various matter he referred to.  That same thing applies

7  to the exhibits I will use in my opening statement.

8  They will be only three, Your Honor.

9    This case, as I think about it, is more

10  like an airplane crash than anything else I can think

11  of.  Why do I say that?  This case is sort of like an

12  airplane crash where an airplane is flying along and

13  there are some internal cracks in the wings that you

14  can't see right at the root of the wings.  Those

15  internal cracks cause that airplane to fall out of the

16  sky because the wings fall off.

17    Now, before that plane took off that day

18  the pilots did their normal walk-around inspection and

19  there were a number of things that you could see about

20  that airplane that were later criticized in the press

21  and by various people; the paint was faded, the exterior

22  was dirty, the cabin was not vacuumed, the tires were

23  worn, but the problem with all that, Your Honor, is that

24  those things didn't cause that crash.  That crash was

25  caused by the internal cracks in the wings.

39

1               As to that matter, the airline had sent it

2    back to the manufacture and sent it back to Boeing the

3    month before and said we want you to x-ray the wings and

4    make sure that they are good for another hundred

5    thousand hours.  Boeing x-rayed the wings and told the

6    airline, yes, the wings look good.  They are good for

7    another hundred thousand hours.

8               Now, why is that like this case, Your

9    Honor?  That is like this case because in 2004 TVA

10   instead of sitting in a silo, as some would suggest,

11   went to an outside contractor, Parsons, known in this

12   case as Worley Parsons, went to Parsons and said we have

13   had a problem on the west dike with a blowout and we are

14   trying to figure out what to do.  We want you to take a

15   look at these facilities -- and I am talking about these

16   facilities in Kingston, not ash facilities at other

17   plants.  We want you to look at these facilities at

18   Kingston and tell us whether or not we can continue

19   building them up.

20              So this outside contractor came in and

21   looked and TVA told them -- of course, we quoted from

22   them at our proposed findings and conclusions.  I think

23   the memorandums will come in as evidence in the case.

24              The assignment of Parsons was, based on

25   this analysis it will be determined whether the dredge

40

1   cells can continue to be utilized, as presently

2   constructed, or whether modifications will be required

3   to allow the dredge cells to continue to be operated

4   beyond its existing height.

5           Parsons looked at everything, Your Honor.

6   Parsons looked at the fact that the Kingston ash

7   facilities were put in this shallow area of Watts Bar

8   Reservoir.  Parsons looked at the whole history of the

9   facilities.  They looked at the Singleton studies

10  mentioned by Mr. Friedman.  They had their own

11  subsurface borings done in 2004.

12          They evaluated the entire facility, the

13  dredge cell facility in particular, and what did they

14  say?  At that point in time the dredge cell facility was

15  at elevation 810.  As you hear us talk about elevations,

16  Your Honor, we are, of course, referring to topographic

17  elevations that come off a lot of engineering drawings.

18  Topographic maps generally refers to elevation above sea

19  level.

20          The dredge cells were at elevation 810.

21  What did Parsons say?  Parsons said, well, we have

22  looked at it.  We have looked at the entire history.  We

23  have gone down and looked at the subsurface.  We think

24  that you can continue building it up to elevation 868.

25  You can continue building up the dredge cells another 58

41

1  feet.  We think that they are "likely to be stable

2  during any phase of construction and after completion of

3  construction, including during the occurrence of a

4  design seismic event."

5           Your Honor, an outside contractor came in,

6  took a look at the entire history of the facility, took

7  a look at the current maintenance of the facility at

8  elevation 810 and said you're good.  Keep on building up

9  to elevation 868.  And what happened?  Ten feet later at

10 elevation 820, the structure failed.

11          The structure failed, as Mr. Friedman

12 said, because the load was too much for the foundation.

13 In hindsight you can look at it and say, well, yes, that

14 is obvious, and it is.

15          TVA didn't admit that for the first time

16 in Footnote 3 of its proposed findings and conclusions.

17 TVA has not contested that since the summer of 2009 when

18 the AECOM report came out and said that same thing.

19 That the buildup was too much for the foundation

20 conditions and it failed.

21          One question that was raised near the end

22 of Mr. Friedman's opening, and I think the evidence will

23 show this very clearly, is TVA retained AECOM to

24 determine what happened, not why.  There is a big

25 difference between "what," especially in a geotechnical

42

1  situation like this, and "why" which involves a lot of

2  finger pointing and fault and can we find somebody to

3  blame.

4            What happened is important because until

5  you determine what happened, Your Honor, you can't even

6  begin hardly with why.

7            Back to my airplane example.  As we all

8  know from common experience, when there is an airplane

9  crash the first thing people do is they start

10  speculating about the cause and people speculate about

11  things that didn't have anything to do with it and it

12  will get press coverage and it will get widespread

13  attention, maybe that the plane took off even though the

14  weather forecast was bad, maybe the plane took off even

15  though the tires were worn, various things.  Until the

16  National Transportation Safety Board determines maybe a

17  year later that the cause of the crash was the internal

18  wing cracks, all that speculation amounts to nothing.

19            Later on after the year's past and the

20  true cause comes out you are way down the pike and all

21  those stories about, gosh, the airline engaged in bad

22  maintenance in a number of ways no one remembers that

23  none of those things caused this accident, and that is

24  what this case more than anything is about today.

25            Now, in a geotechnical situation, or any

43

1    technical situation, the question of what's important --

2    when Mr. Walton testifies I believe you will hear him

3    testify he is often called in to determine what happened

4    in a geotechnical forensic type investigation and he is

5    called in to make that determination, Your Honor, not to

6    testify in litigation.

7              Your Honor will hear Mr. Walton has never

8    ever testified in court before, either state or Federal

9    Court.  He has testified in a few, very few,

10   arbitrations, but his court business is geotechnical

11   engineering.  When he is called in to do a forensic

12   analysis or analysis of what happened, it's done so that

13   they can figure out what needs to be done to save a very

14   expensive project.

15             The key point is what happened, because

16   until they figure out what happened, they cannot fix the

17   foundations and enable the project to go forward.

18   That's what he is doing here, Your Honor, coming in to

19   figure out what happened.  Once you figure out what

20   happened, then you can assess the whys.

21             TVA is proud of what it did in the scope

22   of the investigation.  It's the right way to do it.  You

23   will hear the evidence about what versus why and the

24   reasons for that.

25             One thing I want to call the Court's

44

1  attention to are the two large aerial photographs we

2  have put up.  One shows the facilities before the

3  failure, the one on the left.  The one on the right

4  shows the facilities after the failure, shows the ash

5  spill and basically to the north.

6           I want to caution the Court that as we go

7  through the evidence you will hear people say various

8  things about locations.  You will hear people say

9  various things about directions.  It is going to be

10 confusing because you can see that the facility -- as

11 you can see from the facility here, the ash pond itself

12 is canted.  It is not directly north south.  So some

13 people call that dike there the north dike, some people

14 call it the east dike.  It's actually oriented, I

15 suppose, so it is northeast.  In general in this case we

16 are going to refer to it as the north dike.

17          Most of the forensic documents involving

18 what happened refer to it as at north dike.  However,

19 some pre-failure documents refer to it as the east dike

20 because of the way the facilities are canted.

21          If we don't make that clear during the

22 reception of evidence, Your Honor, we would welcome

23 interruption to make it clear.  I don't want there to be

24 any confusion about what dike a witness is talking

25 about.

45

1          The dike over on the Swan Pond Road side I
2     just highlighted with an arrow, we'll refer to it as the
3     west dike or Swan Pond Road dike.  It's the dike
4     Mr. Friedman made a reference to we had two blowouts,
5     one in '03 and one in '06.  To my knowledge there is no
6     allegation from the experts that had anything to do with
7     the December, 2008, failure over on the north dike.

8          The other thing I would call the Court's
9     attention to is that on the north side -- before I go to
10    that let me say one other thing.  Your Honor, down here
11    where I am currently showing my fingernail, there is a
12    dike that you would think we would call the south dike.
13    There is actually materials in the record that call that
14    the north dike.  That is because at one time, as this
15    facility developed over the years, that was the north
16    dike.  Again, please, we welcome any clarification from
17    the Court, as a witness is talking, about which specific
18    dike because it is going to get confusing at times.

19         Let's talk about the north dike just a
20    minute.  This schematic comes from the AECOM report.  I
21    am putting it up right now just as a general orientation
22    matter to just alert the Court to what we think the
23    evidence will show.

24         This is the north dike.  This is looking
25    west.  Now, when I say it's the north dike, I suppose I

46

1    really should say it is the north dikes.  What you have

2    here is you have Swan Pond slew over on the right-hand

3    side, and, of course, just north of that you have got,

4    you have a road.

5              Coming from the slew the next thing you

6    run into is Dike C.  Now, we call that Dike C, we call

7    it the northern most perimeter dike.  The concept is on

8    the drawing that we showed there earlier there's a dike

9    that's out there that is the very northern most dike.

10   It's a lower level dike.  It is called Dike C.  As you

11   can see, it is really built in three stages.

12             Stages are sometimes labeled A, B, C, D.

13   Sometimes some of the evidence may come in and be

14   confusing because it's not Dike C, it's Stage C that is

15   being referred to.  Again, anytime there is confusion,

16   we welcome a question.

17             Dike C, as you can see, has a level area

18   about 200 feet wide before the dikes start up again.

19   You can see there is a, they are labeled A, B, C, C1,

20   C2, C3, D1, D2.  That is about what it looked like at

21   the time of failure with the D2 dike being an

22   approximate elevation 820.

23             Now, these stages here refer to upstream

24   construction.  It's another term the Court will hear.

25   What that refers to is the dike isn't built like -- and

47

1   I suppose when you start off on something like this you

2   think, gosh, the thing is built and then you put the

3   whatever you are storing behind it like a traditional

4   dam.  That's not true here.  What happens here is the

5   structure itself, the dike itself is built up in stages

6   and here those stages are labeled letters.  As the ash

7   that's inside it is loaded higher and higher, it's an

8   ongoing construction process.

9               Now, the white material, of course,

10  represents the ash fill that was inside there.  You can

11  see up at the top there is a blue indication near the

12  Cell 2 level indicating some water at the top of the

13  cell.

14              The important thing about that, Your

15  Honor, is the evidence will show, one, that 1985

16  memorandum that discussed Dike C out there and the fact

17  that there was some issues with Dike C was taken into

18  account and because of that about a decade later when

19  they actually designed what we might call the interior

20  dike or upper dike on the north side, that's the yellow

21  here, it was offset or inset 200 feet in order to not to

22  put additional load on Dike C.

23              The evidence will show the issues

24  identified in the mid eighties with Dike C were taken

25  into account, as opposed to not.

48

1           Another thing, Your Honor, when this

2    interior dike was actually designed in the mid nineties

3    design drawings called for specific slopes and so forth.

4    The evidence will show that those drawings from the mid

5    nineties, those design drawings were closely conformed

6    to.  How will that be shown?  That will be shown because

7    TVA went out and did as-built surveys.  When you overlay

8    the as-built surveys on top of the mid ninety design

9    drawings, you will see that the construction was as

10   designed, not the other way around.

11           TVA does manage, the evidence will show,

12   the water in the dredge cell.  Up there in the schematic

13   that I show right now you can see there's a little bit

14   of blue at the very edge of the Cell 2 area.  That's

15   also known was a rim ditch.  There was a photograph

16   Mr. Friedman put up that he indicated had been taken on

17   October 20, 2008, just 60 days before the failure.  He

18   said it showed a lot of water in the dredge cell.

19           It looked like there was a large canal, if

20   you will, flowing around the outer perimeter of the

21   dredge cell.  There was.  That term for that is rim

22   ditch and the operation of the dredge cell is such that

23   the dredging is put in at towards the south end of the

24   dredge cell, that rim ditch is maintained around the

25   parameter of the dredge cell to cause water to flow to

49

1  the spillway gate where the water is decanted out of the
2  dredge cell.  That is done in a very purposeful manner
3  in accordance with TVA's normal operations, Your Honor.
4  You will see that picture later and the whole rim ditch
5  decanting process will be explained.
6              The softest dikes photograph that
7  Mr. Friedman showed you is something else you will see
8  in the evidence.  There's no question but what that
9  happened.  It didn't happen anywhere close to the dike
10  that failed.
11             If you look back at the original
12  pre-failure geometry of the dike facilities, you recall
13  what I call the north dike is where the failure point
14  occurred.  They were building new dikes in this general
15  area here and in that general area there as part of that
16  new dike construction they encountered some soft areas
17  in connection with brand new construction.  No one
18  asserts that had anything to do with the December, 2008,
19  dike failure.  As a matter of fact, that incident did
20  occur.
21             The Ash Blitz of 2004 was something else
22  that you will hear about in the evidence.  Instead of
23  showing that TVA didn't care about the dikes, it shows
24  just the opposite.  It shows that TVA did care about the
25  dikes.  TVA witness Steve Ball will testify the Blitz

1    occurred.  It occurred at not only Kingston but other

2    ash facilities all over the TVA system.  They wanted to

3    make sure that the ash facilities were being properly

4    maintained.  They identified various things at various

5    facilities that needed work.  The things that needed

6    work at Kingston and those other facilities were

7    followed up on.  Mr. Ball will testify to that and I

8    think satisfy any concerns the Court may have.

9              Red water seepage.  The word seepage may

10   be a misnomer here.  What do I mean by that?  You are

11   going to hear a lot of people use the word seepage.

12   Seepage means different things to different people.

13             These dikes have drains.  Some people call

14   them French drains, some people call them underdrains,

15   some people call them heel drains.  They are called lots

16   of things.  The basic principle is that there is black

17   plastic pipe, not much different than the Court may know

18   about from gutter downspouts or a French drain around

19   your home.  This black plastic pipe, as it goes around

20   the dredge cells inside the dikes themselves is slotted,

21   it takes in water.  Water that enters the dredge --

22   excuse me, water that enters the dike, goes into the

23   plastic pipe and then every so often there is another

24   pipe that takes off from that ring of slotted pipe and

25   goes to the outer surface of the dike.  On the outer

1   surface of the dike there are going to be various places

2   where you see water, wet spots.  The reason you see that

3   water, those wet spots is because the drain system that

4   is designed and constructed as part of this dike system

5   brings water to the surface and that is how it does it.

6           When it brings this water to the surface

7   because the water has a high iron content, it turns red.

8   That is about all I know about all we plan to present

9   evidence wise on that, Your Honor.  As to the technical

10  aspects of why it turns red, it has to do with chemical

11  reaction, exposure to oxygen and so forth.  The point is

12  that a red water seep is a matter of concern for

13  environmental purposes because of the color the water

14  and the chemical reaction that is taking place.  The

15  word "red water seep" may be referring not to a seep of

16  water through the dike, but rather to water that is

17  coming through the drain system and once it is exposed

18  to oxygen on the surface turns red and so you will see

19  what is referred to as a red water seep.  It may or may

20  not be an actual seep through the dike.  It may in fact

21  be a drain outlet.

22          We expect the Inspector General to testify

23  here, Your Honor, and when he testifies we expect that

24  he will testify that Mr. Walton, the engineer who did

25  the AECOM report, was a person determined by them to be

52

1    a professional not susceptible to any undue influence

2    and that he will also testify to that, nor did he find

3    any evidence of any effort by TVA management to

4    influence Mr. Walton's work.

5              Contrary to the implication of

6    Mr. Friedman's opening, Your Honor, we think the

7    evidence will show that TVA hired Mr. Walton, a literal

8    world renowned professional in this geotechnical area to

9    come here to East Tennessee and determine what happened

10   in order to go from there to make determinations about

11   why it happened to the extent you need to go further,

12   and, more importantly, to determine whether or not this

13   facility, this spot can be used to store ash that's

14   being recovered from the river and the slews where it

15   went.

16             It is important to know what happened

17   because if we are going to put that ash back where it

18   came from, we need to know that it is going to be okay.

19   Until we know what happened, you can't do the

20   engineering to make that okay.  That is what a classic

21   geotechnical engineer does when called in to look at a

22   disaster and try to figure out what happened.  That is

23   what happened here.  Mr. Walton's work is being used for

24   that very purpose, Your Honor.  It is not some

25   litigation only.

1        Your Honor, that is all I have.

2        THE COURT:  All right.  Thank you.  Since
3   we got started a little bit later, in lieu of a morning
4   break, if plaintiffs are ready to proceed, why don't
5   plaintiffs call their first witness.  We'll go about an
6   hour and take a normal lunch break.

7        Before you announce your first witness be
8   mindful this is a bench trial.  If people in the
9   audience or counsel or the parties need to quietly slip
10  out, go ahead and do so during while the trial evidence
11  is being presented.

12       MR. FRIEDMAN:  Plaintiffs would call Chris
13  Buttram.

14            CHRISTOPHER BUTTRAM
15  was first duly sworn and testified as follows:

16       COURTROOM DEPUTY:  Please state and spell
17  your name for the record.

18       THE WITNESS:  Chris Buttram, C-h-r-i-s
19  B-u-t-t-r-a-m.

20       MR. FRIEDMAN:  As a housekeeping matter,
21  we would like the record to reflect we are calling
22  Mr. Buttram as an adverse witness under Rule 608.

23       THE COURT:  You may proceed.

24            **DIRECT EXAMINATION**

25  BY MR. FRIEDMAN:

54

1      Q.   Hello, Mr. Buttram.

2      A.   Hello.

3      Q.   Can you please state your name for the record.

4      A.   My name is Chris Buttram.

5      Q.   Now, tell us what your job title was in 2008,

6  October of 2008 for TVA.

7      A.   In October of 2008 my job title at that time

8  was a Senior Civil Engineer in the Fossil Power

9  Engineering Group.

10     Q.   And let's by way of background let's talk just

11  a little bit about your education and your background.

12  If you would just walk us through your educational

13  background, please, Mr. Buttram.

14     A.   Yes, sir, I graduated from Tennessee Tech in

15  December of '99 with a BS in civil engineering.  After I

16  graduated from Tennessee Tech I began working at Mesa

17  Associates which is a consulting engineering firm.  My

18  roles there were developing and designing grading plans,

19  site plans, layout plans, erosion plans for substation

20  or substation expansions.  I did some structural

21  engineering work and foundation design.

22          I worked at Mesa until August of 2005 and then

23  I went to Thompson Engineering.  I worked at Thompson

24  Engineering approximately two years.  Thompson

25  Engineering was another consulting engineering firm.

1    They did a lot of construction and engineering and

2    inspection.  I just was an associate engineer there,

3    kind of watching what the inspectors did and everything.

4             In that time between Mesa and Thompson I

5    acquired my Professional Engineering License in 2004.  I

6    also acquired my MBA at the University of Tennessee,

7    Chattanooga.

8             After leaving Thompson Engineering I went and

9    worked for Stantec which is also Neill & Gunter.  I

10   worked there for about a year and then joined TVA in the

11   year of 2008, approximately June of 2008.

12        Q.   Mr. Buttram, you went to work for the TVA in

13   the summer of 2008, is that right?

14        A.   Yes, sir, that's correct.

15        Q.   You remember what month you started?

16        A.   It was toward the end of June.

17        Q.   Now, in October of 2008 you did some work in

18   Kingston, didn't you?

19        A.   Yes, sir.  That was the time of my inspection.

20        Q.   And I believe you performed or you

21   participated in performing a stability inspection there?

22        A.   It was a visual inspection.

23        Q.   Did you participate in performing at Annual

24   Ash Pond Dike Stability Inspection of the Kingston

25   facility in 2008?

56

1       A.   That was the title given to the inspection.

2  The inspection was actually a visual inspection of

3  observing the features out there.  No stability analysis

4  was done for this type of inspection.

5       Q.   We can agree that although the document you

6  did was entitled the Annual Ash Pond Dike Stability

7  Inspection, you didn't do a true stability inspection

8  did you?

9       A.   That's correct, sir.

10      Q.   Now, did you see before you went out there to

11  do your stability inspection any TVA rules or

12  regulations?

13      A.   I was not given any rules or regulations on

14  these inspections.  It was a considered to have an

15  on-the-job type training for the inspection.

16      Q.   All right.  We'll get into that in just a

17  minute.  I am just talking about rules and regulations.

18  I want to show you, if I may, I would like to present

19  the witness with Plaintiff's Trial Exhibit 538 entitled

20  TVA Division of Engineering Design, Engineering

21  Procedure.  Do you have that in front of you?

22              (Exhibit No. D-538 was marked for

23                  identification.)

24      A.   Yes, sir, I do.

25      Q.   Have you ever seen the document that is in

57

1  front of you before?

2      A.   I had not seen this document at the time of

3  the inspection.  Since then I have come to see it.

4      Q.   All right.  Let's cover a couple of things.

5  The inspection took place in October of 2008, right?

6      A.   Yes, sir.

7      Q.   And you hadn't seen Exhibit 538 at that time,

8  right?

9      A.   I had not seen this document at that time.

10     Q.   You wrote your inspection up I believe

11 sometime after that after the coal ash disaster occurred

12 on December 22nd, 2008.  At some point after that you

13 wrote your stability report up, right?

14     A.   Yes, sir.

15     Q.   And at that time you wrote your stability

16 report up, had you seen Exhibit 538?

17     A.   I had not seen this document at the time I

18 wrote the report.

19     Q.   Now, you remember you have actually given two

20 depositions in this case.  As a matter of fact, that's

21 where I first met you and reacquainted myself during the

22 course of your depositions.  At those times had you seen

23 this engineering procedure?

24     A.   I do not recall having seen these at that

25 time.

58

1    Q.   I believe your testimony, if I got it right,

2  was that you heard a reference to them, but you had

3  never seen them, these procedures?

4    A.   Yes, sir, that would be my recollection.

5    Q.   If you would, can you tell the Court when was

6  the first time you saw these engineering procedures.

7    A.   The first time that I would have seen these

8  procedures would have been I guess a couple of weeks

9  ago.

10    Q.   And I don't want to get into any

11  attorney/client privilege matters.  Was that in your

12  preparation to be here in court today?

13    A.   Yes, sir, that was in preparation.

14    Q.   If you would, turn to the third page of the

15  document, please, sir.  Are you there with me?

16    A.   Yes, sir, I am there.

17    Q.   Paragraph 1.0, Purpose and Scope.  This it

18  says "EP."  What does EP mean?

19    A.   I believe that stands for engineering

20  procedure.

21    Q.   It describes "responsibilities of EN DES."

22  What does that mean?

23    A.   To my knowledge that would be Engineering

24  Design.

25    Q.   "Division of Power Production.  For the

59

1  inspection and maintenance of ash disposal areas and

2  coal fired power plants." Did I read that right? We

3  all know that Kingston is a coal fired power plant,

4  right?

5      A.  Yes, sir.

6      Q.  Do these procedures since they have come to

7  your attention now, do you know whether or not they

8  would have applied to your inspection that you conducted

9  in October?

10             MR. MARQUAND: Object to speculation, Your

11  Honor.

12             MR. FRIEDMAN: I haven't even got the

13  question out. Let me see if I can rephrase that.

14             THE COURT: Thank you.

15  BY MR. FRIEDMAN:

16      Q.  Do you know, Mr. Buttram, whether or not these

17  policies and procedures applied to your inspection that

18  you performed at Kingston in 2008?

19      A.  After learning about this and reviewing it it

20  looks as if we had been following fairly close to what

21  these inspections apply.

22      Q.  Listen to my question, Mr. Buttram. Do you

23  know if they applied? Did you even know if they applied

24  at the time you did the inspection?

25      A.  At the time -- as I have stated, at the time

60

1  of the inspection I didn't know of these, of this

2  document.  No, I wouldn't have known that it applied.

3      Q.  Right.  Sitting here today do you know or do

4  you have or have you heard that these policies would

5  have applied back then, had you known about it?

6                  MR. MARQUAND:  Object to hearsay.

7                  THE COURT:  That is probably a valid

8  objection to part of your question.  I will sustain the

9  objection.

10  BY MR. FRIEDMAN:

11      Q.  Do you know whether this policy applied based

12  on your personal knowledge, on what you have learned?

13      A.  I'm just trying to understand your question.

14      Q.  Sitting here today, as you sit here today,

15  have you learned that these are the policies that

16  applied to the annual inspections?

17      A.  No, sir, I do not believe that I knew that

18  these applied to the annual inspections at that time.

19      Q.  You didn't know at that time.  Do you know

20  that now, that they applied?

21      A.  No, sir, these do not at this time apply to

22  our annual inspections.

23      Q.  So your annual inspection procedures have

24  changed since December of 2008, is that what you are

25  telling me?

1      A.   Yes, since 2008 our procedures have changed.

2  We have developed -- not knowing of these procedures, we

3  have developed new ones to follow.

4      Q.   Following the disaster you all developed new

5  procedures, right?  Is that what you are telling me?

6      A.   Yes, sir.

7      Q.   Okay.  As far as the old procedures, this

8  exhibit you have in your hand, 538, do you know that

9  this, I know you didn't know about it at the time.  Have

10 you since learned these were the procedures that were in

11 effect at the time of your inspection in October of

12 2008?

13     A.   No, sir, I didn't know, I can't say that I

14 know these were in effect at that time.

15     Q.   Go to paragraph 6.0.  Would you read that into

16 the record, please.

17     A.   "Inspections by P production plant operating

18 personnel.  Since visits by EN DES representatives are

19 necessarily infrequent, reliance is placed on plant

20 operating personnel who regularly work around the ash

21 disposal areas to call attention to abnormal conditions.

22 Regularly scheduled inspections will be made by plant

23 operating personnel, as outlined in Section 8.0.  Any

24 abnormal conditions will be reported to EN DES

25 immediately."

1    Q.   If you back up to 3.0 or 4.0, "scheduling

2   inspections.   To coordinate the annual joint inspections

3   EN DES and P PRO will exchange proposed inspection

4   schedule around the first of August each year, with

5   revised schedule to follow."   Did I read that correctly?

6    A.   Yes, sir.

7    Q.   Did you ever, in looking back turn the page --

8   you see detailed instructions on pages 2, 3, 4, 5, and

9   6.  Had anyone ever gone over, I know you had never seen

10  these procedures, but had anyone ever gone over before

11  your inspection in substance the procedures that are

12  outlined in Exhibit 538 with you?

13   A.   No, sir.  This exact procedure wasn't given in

14  detail, but on the write-up there before it was

15  discussed the procedure we would follow.

16   Q.   Let's talk about the procedure that you

17  followed there.  The inspection in October of 2008 was

18  your very first one?

19   A.   Yes, sir.

20   Q.   You had never had any similar inspections

21  before that one?

22   A.   No, sir, no similar inspections for these type

23  of facilities, yes.

24   Q.   You had never had any prior knowledge of any

25  type concerning ways to go about doing the inspection,

63

1  right?

2      A.   I had my background knowledge in engineering.

3  I had several training courses in erosion.  I knew how

4  to inspect or to look for erosion type things.  I didn't

5  have any prior knowledge of this facility or how TVA in

6  general did their inspection.

7      Q.   You didn't have any discussion with anyone at

8  TVA on how the inspection would be done, did you?

9      A.    Well, I rode up with Jamey Dotson.  We

10  discussed how the inspection would go.  When we met with

11  John Albright before we started the inspection, we

12  talked about what we would do and how we would handle

13  the inspection.

14      Q.   Did they ever give you any criteria or

15  standards about how the inspection would be conducted?

16      A.   No written standards.

17      Q.   Did they ever explain any rules or regulations

18  that applied?

19      A.   They didn't mention any written rules or any

20  regulations.

21      Q.   At the time you went up there, did you know

22  what an ash pond was?

23      A.   I had heard of them.  I didn't know, I hadn't

24  ever seen one.  I couldn't place a picture with what I

25  heard about them.

1      Q.   The day before did you know what you were

2  going to be doing?

3      A.   No, sir, the day before I didn't know exactly

4  what would be completely done on the inspection.

5      Q.   Is it your testimony that you rode up from

6  Chattanooga on the morning of the inspection with one of

7  the people who accompanied you on the inspection?

8      A.   I rode up from Chattanooga on the morning of

9  the inspection.

10     Q.   With who?

11     A.   Jamey Dotson, and met John Albright at the

12  plant.

13     Q.   Didn't you tell us that you met Mr. Dotson at

14  Kingston?

15     A.   No, sir.  I do not believe I did.  I met

16  Mr. Albright.

17     Q.   All right.  Okay.  Did Mr. Dotson come in his

18  own car and leave ahead of you?

19     A.   Mr. Dotson did leave the inspection after we

20  inspected the dredge cells and ash disposal facilities,

21  Mr. Dotson went on to do some of his other work.  I rode

22  back with Mr. Albright.

23     Q.   You caught another ride back?

24     A.   Yes, sir.

25     Q.   That's what I misunderstood.  So you rode up

65

1  from Chattanooga with Mr. Dotson and you rode back with

2  Mr. Albright?

3      A.  That's correct.

4      Q.  Dotson left the inspection process early

5  because he had some other work to do, is that right?

6      A.  Not necessarily early.  He inspected the areas

7  he wanted to inspect with us.  When we went to the other

8  facilities that he wasn't going to be involved with, at

9  that time, yes, he left.

10     Q.  He didn't need to be there?

11     A.  Yes.

12     Q.  You are aware from your other work in

13  engineering what "best practices" are aren't you?

14     A.  Yes, sir.

15     Q.  Tell the Court what best practices are.

16     A.  Best practices would just be to use the

17  standards and research that may have been done before

18  the function or design that you are working on to make

19  sure that you have developed or given your, used the

20  best knowledge to your, you know, to develop that

21  design.

22     Q.  Did you follow best practices in the

23  inspection that went on out there in October of 2008?

24     A.  Yes.  To my knowledge, we used the best

25  practices that were known for a visual inspection for

66

1    that type of facility.

2        Q.  How do you know that you used the best

3    practices, if you don't know any practices that applied

4    out there?

5        A.  I was with Mr. Albright who had done several

6    of these inspections, Mr. Dotson who had done some of

7    these inspections.  I was relying on their knowledge to

8    help me understand what was going on, plus all my prior

9    experience that I had maybe not necessarily for these

10   type of facilities, but the experience I had learned

11   that I had gained from my engineering work and from

12   training that would help me to inspect visually these

13   facilities.

14       Q.  Let's talk about that just a minute.  You had

15   not inspected a dike for TVA or anyone else before that

16   October 20th date of 2008, correct?

17       A.  Yes, sir.

18       Q.  You had no training on embankment stability

19   had you?

20       A.  I wasn't out there to check for stability.

21       Q.  I am not trying to argue with you.  Just

22   listen to my question.  You had no training on

23   embankment stability had you?

24       A.  I had no training on embankment stability, but

25   I don't get the reference for that question because we

1    were visually observing which you would be observing for

2    erosion and I could, you know, based on my engineering

3    knowledge I know if erosion is severe enough that it

4    can --

5         Q.   Fair enough.  You didn't have any training on

6    embankment stability, but you didn't think you needed

7    any, is that what you are telling me?

8         A.   Not for this visual inspection.

9         Q.   You had no training on dike stability either,

10   did you?

11        A.   No, sir.

12        Q.   You didn't have any training on how to conduct

13   an embankment inspection, did you?  Other than what you

14   were orally told as you walked around.  You had no

15   pretraining?

16        A.   That is why I was there, to get my training

17   from the people that were with me.

18        Q.   Mr. Buttram, did you tell the Office of

19   Inspector General that you were the lead engineer on

20   this inspection?

21        A.   No, sir, I do not recall that.

22        Q.   If you told them that, that would be

23   incorrect?  Is that right?

24        A.   Yes, sir.

25        Q.   Let me show you then the reference that I

                              68

1   would like to ask you about.  If you would, this is for

2   impeachment purposes, pull up Exhibit 4559.  I want you

3   to go to the second paragraph.  The first sentence --

4           I guess I want to identify this first for the

5   record.  It has your name there, James Chris Buttram,

6   Civil Engineering, Tennessee Valley Authority.  Do you

7   remember giving a statement to investigators Joseph Bohr

8   and Chris Allen on July 8th, 2009 at the Inspectors

9   General's Office.  Do you remember giving them a

10  statement, sir?

11                  (Exhibit No. P-4559 was marked for

12                  identification.)

13      A.  I remember having an interview with them, yes.

14      Q.  And they asked you questions, right?

15      A.  They did ask questions.

16      Q.  And you gave answers?

17      A.  That is correct.

18      Q.  You tried your best to give them truthful

19  answers?

20      A.  Yes, sir.

21      Q.  And you, as a matter of fact, you were told

22  before you were interviewed that this was part of an

23  inspection they were doing on the coal ash disaster that

24  occurred on December 22nd, 2008, right?

25      A.  Yes, sir.

69

1      Q.   And they, did they caution you anything about

2   your responses and how you were being interviewed by

3   government agents as a lead in to giving this statement?

4      A.   I can't recall.

5      Q.   You knew it was a serious matter though,

6   didn't you?

7      A.   Yes, sir, I knew it was serious.

8      Q.   And if you pull the second full paragraph up.

9   "TVA hired Buttram in June of 2008."  That's correct,

10  isn't it?

11            MR. MARQUAND:  Objection.  This is

12  hearsay.  It hasn't been established as a statement.

13  This is somebody else's notes.

14            MR. FRIEDMAN:  I am offering it to refresh

15  the witness.

16            MR. MARQUAND:  I object, Your Honor.

17  Counsel indicated it was for --

18            THE COURT:  Respond to the objection.

19            MR. FRIEDMAN:  I am referring, first of

20  all, to set a predicate to refresh the witness'

21  recollection.  After establishing a proper predicate, I

22  may or may not offer it.  At least, we are calling this

23  witness as an adverse witness.  We have the ability to

24  either refresh this recollection under the rule or to

25  use it for impeachment which we would use both methods

70

1    right you, now, Your Honor.

2              MR. MARQUAND:  I misunderstood.  I thought

3    counsel said he was offering it for impeachment.  If he

4    is offering it to refresh his recollection, there needs

5    to be some kind of foundation established.

6              THE COURT:  I believe there has been some.

7    I will overrule the objection.

8    BY MR. FRIEDMAN:

9         Q.   The second sentence of the second paragraph.

10   I will read this.  Make sure I get it right.  "He was

11   the lead engineer for the most recent inspection of the

12   Kingston Fossil Plant KIF ash containment pond."  Did I

13   read that correctly?

14        A.   Yes, sir, you read that correctly.

15        Q.   Did you tell the Inspector General

16   investigators that you were the lead engineer for the

17   most recent inspection?

18        A.   No, sir, I do not remember telling them that I

19   was lead inspector for this inspection.

20        Q.   If you, if they have, if they got that

21   information it wasn't from you?

22        A.   No, sir.

23        Q.   Do you dispute that you were the lead

24   engineer?

25        A.   Yes, sir.  I do.

                            71

1     Q.  Who was the lead engineer?

2     A.  I don't know who would be the lead engineer.

3 I was there with Mr. Albright to follow along and learn

4 how those inspections were done.

5     Q.  You don't know who the lead engineer on the

6 inspection was, if it wasn't you?

7     A.  I would say it would be Mr. Albright.

8     Q.  All right.  You believe Mr. Albright was the

9 lead engineer?  Is that right?

10    A.  Yes, sir.

11    Q.  But yet Mr. Albright did not author the final

12 inspection report, did he?

13    A.  No, sir, he didn't author the report.  That

14 doesn't necessarily mean that is the lead engineer.

15    Q.  Okay.  Let me ask you another question about

16 this document while I have it up.  I want to talk about

17 what you were trained to do and what you actually did

18 out there.

19       Now, at the time you were out there you have

20 already told us you had no knowledge of any written

21 standards, right?

22    A.  Yes, sir.

23    Q.  And you never read any TVA rules or

24 regulations for conducting a comprehensive Annual Ash

25 Pond Dike Stability Inspection?

72

1    A.   Yes, sir, at that time I had not.

2    Q.   Did anyone tell you while you were out there

3  that the title of the inspection that you were

4  performing, the Annual Ash Pond Dike Stability

5  Inspection was wrong?  You said this title of the

6  inspection is a misnomer or is incorrect.  When did you

7  first learn that?

8    A.   That would have been sometime after the

9  writing of the report.

10   Q.   So when you wrote the report you thought you

11 were writing an Annual Ash Pond Dike Stability Annual

12 Inspection Report, right?

13   A.   I knew I was writing a report on the

14 inspection.  I didn't really reference to the title of

15 it.

16   Q.   Your name is right on the front page.

17   A.   That's just the title it had always been

18 given.

19   Q.   So you ignored the title?

20   A.   Not necessarily I ignored it.  That's the

21 title that it had been given prior.  I was following --

22 I had no need to ask why it would need to be changed at

23 that time.

24   Q.   Very good.  The only document you had been

25 given for this annual inspection you provided at the

73

1  time you got there, right?

2      A.   I can't remember if it was provided at the

3  time.  I believe I printed it off and had it myself.

4      Q.   Did you review it beforehand?

5      A.   I looked at it on the way up, on that day on

6  the way up to the fossil plant.

7      Q.   Now, let me go through a couple of

8  housekeeping things, if I may, with you very quickly.

9  On the day you were out there I believe that yourself as

10  well as Mr. Dotson took pictures, correct?

11      A.   Yes, sir.

12      Q.   And correct me, if I am wrong.  Didn't

13  Mr. Albright take some pictures as well?

14      A.   He might have taken a couple.

15      Q.   At the time the inspection was going on on

16  that day on October 20th, Mr. Dotson also had a GPS,

17  right?

18      A.   Yes, sir, he had a hand-held GPS.

19      Q.   A hand-held GPS.  That GPS, if I understand

20  what you told us in the deposition, is that it was a GPS

21  where he could enter way points or positions and put a

22  short description with those, correct?

23      A.   That's correct.

24      Q.   And following the inspection you were provided

25  with Mr. Dotson's way points or GPS information,

74

1   correct?

2       A.   Yes, sir.

3       Q.   And all three sets of photographs.

4       A.   There were two sets of photographs.   There was

5   one camera used between Mr. Albright and myself.

6   Mr. Dotson had a camera.

7       Q.   Thank you for clearing that up.   There are

8   three people taking pictures, but only two cameras being

9   used?

10      A.   That is correct.

11      Q.   I want to ask you to go to Plaintiff's

12  Exhibits 189, 6044, 6045 and 6043 and I want you, if you

13  would, to identify those documents and we'll offer those

14  as soon as we have identified them.   Exhibit 189 is in

15  front of the there and should be one of the first one

16  following 538.   It's a document and e-mail from Jamey

17  Dotson to you dated Monday, October 27th, 2008.

18              (Exhibit Nos. P-189, 6044, 6045

19               and 6043 were marked for

20               identification.)

21      A.   189, correct?

22      Q.   Yes, 189.   Are those the way points and

23  descriptions that Mr. Dotson sent to you following the

24  inspection?

25      A.   Yes, sir, these are the way points that

75

1  Mr. Dotson sent to me following the inspection.

2  Q. One week after the inspection, according to

3  the date of 189.

4  Then we have the three sets of photographs. I

5  will tell you, for the record, 6044 has 20 pictures.

6  They have time and date stamps on them. I believe that

7  from your prior testimony that these date stamped

8  pictures are those pictures taken by Mr. Dotson. Can

9  you identify those, 6044? There is 20 pages and some of

10  the pages have multiple pictures. I believe those were

11  introduced in your deposition.

12  A. Yes, sir, these would be photographs taken

13  from Mr. Dotson's camera.

14  Q. 6045 is a document that has additional

15  pictures with it. I believe they may be mixed with some

16  of yours, but for the sake of making sure we have all of

17  the pictures that you took out there that day, we offer

18  6045, a 23 page document with some multiple pictures on

19  each page based on the way they were produced to us. Do

20  you recognize those, Mr. Dotson (sic)?

21  A. I see the ones taken by Mr. Dotson. I don't

22  see the ones that would have been taken from the camera

23  that I had.

24  Q. Those might be in 6043. Those do not have

25  time stamps on the pictures.

1          THE COURT:  Let me clarify what you are

2    seeking to introduce; 6043, 6044 and 6045 and the e-mail

3    document -- what was the number of that one, again?

4          MR. FRIEDMAN:  189.

5          THE COURT:  Are you asking to introduce

6    that one as well at this time?

7          MR. FRIEDMAN:  Yes, Your Honor.

8          THE COURT:  List the numbers gain.  Is

9    there any objection to those documents by TVA?

10          MR. MARQUAND:  No objection to 189.  We

11   have not had an opportunity to review 6043, 44 and or

12   45.  We were notified this morning of the Plaintiff's

13   Exhibit numbers.  If the witness says those are the

14   pictures taken that day, we don't object.

15          THE COURT:  We'll let Mr. Buttram review

16   them.

17          MR. FRIEDMAN:  They are all deposition

18   exhibits.

19          THE COURT:  Once he has reviewed them --

20   let's see if he can identify them.

21          THE WITNESS:  6043 has two sets, the

22   pictures that would have been taken by Mr. Albright or

23   myself and then photos from Mr. Dotson's camera as well.

24          MR. FRIEDMAN:  We offer, at this time we

25   also offer the policies and procedures that I questioned

77

1   the witness on, Plaintiff's Exhibit 538.

2              THE COURT:  Mr. Buttram, can you identify

3   the pictures in 6044 and 6045 as well, as pictures taken

4   by you or others during the inspection?

5              THE WITNESS:  Yes, Your Honor.  These were

6   photos taken by Mr. Dotson in 6044.

7              THE COURT:  Thank you.  The Court will

8   introduce or admit into evidence plaintiff's 6043, 6044

9   and 6045.  Any objection to plaintiff's 538, which are

10  the engineering procedures discussed earlier?

11             MR. MARQUAND:  No objection.

12             THE COURT:  The Court will also admit

13  plaintiff's 538 and plaintiff's 189.  I may have already

14  said that.

15             (Exhibit Nos. P-189, 6044, 6045,

16             6043, 538 were received in

17             evidence.)

18  BY MR. FRIEDMAN:

19      Q.   Let's see if we can agree on some terms as we

20  discuss what happened out there at the time of the

21  inspection.  You had printed off an old report that was

22  the report from 2008, the Annual Ash Pond Dike Stability

23  Inspection Report, right?

24      A.   Yes, sir.

25      Q.   And you had that on the drive up from

78

1  Chattanooga to Kingston and you believe you read over

2  it, is that right?

3       A.  Yes, sir, that's correct.

4       Q.  And you used that old report to make notes on,

5  right?

6       A.  Yes, sir.

7       Q.  After you all started your walk around the

8  facility.  Would that be correct?

9       A.  Yes, sir, that's correct.

10      Q.  And did you discuss any geotechnical terms

11 either before or during the inspection?

12      A.  We didn't discuss the meanings of any

13 geotechnical terms during the inspection.

14      Q.  Any geotechnical terms that you used, you had

15 your own idea of what those meant?

16      A.  Yes, sir, I had the idea of what I thought

17 they meant and also if they were used by Mr. Dotson or

18 Mr. Albright, after we would discuss certain areas that

19 we were looking at.

20      Q.  For example, we have talked about here in

21 opening statements the term "seep."  Seep, tell the

22 Court what your understanding of seep was at the time

23 you were out there.

24      A.  At the time I was out there my understanding

25 was that seep was just where water has moved through the

79

1    material that is within the impoundment and then travels

2    in through the dike and may exit out either at the toe

3    or mid slope of the dike.

4         Q.  Did you have an understanding of what a "wet

5    spot" was, as it related to the dikes?

6         A.  At that time I didn't have a full

7    understanding of what a wet spot was.  I knew that that

8    was just the general description to be given for an area

9    that was wet.  There was no flowing water.

10        Q.  Do you know whether or not a wet spot was

11   something to be concerned about?

12        A.  I knew that we would -- if we noticed a wet

13   spot, we would mark it down, but then we would also

14   notify others there at the plant so they could continue

15   to monitor it to see if it either disappeared, dried up

16   or was to get larger.  That way they could notify us in

17   that case.

18        Q.  At the time of your inspection you didn't know

19   the difference between a seep and a wet spot, if there

20   was any difference, did you?  Did you, sir?

21        A.  At the time of the inspection I would say, no.

22   During the inspection discussing with Mr. Albright and

23   Mr. Dotson, I would have discovered what the differences

24   would have been.

25        Q.  I want to show you page 104 of your

80

1    deposition.  You should have your deposition right

2    there.  I want to show you I asked you a question.  --

3    first of all I asked, I want to ask you this.  Do you

4    know what a permit violation would be as you, at the

5    time you inspected those dikes -- do you know if you saw

6    something that would have been a violation of TVA's

7    permits or any rules and regulations?

8        A.  At that time I wouldn't have known what exact

9    permit violations would be.

10       Q.  All right.  So you gave us a definition of a

11   seep.  Then I asked you.  "Do you know what the

12   difference is between a wet spot and a seep?"  There at

13   line 22.  Would you read your answer to the Court.

14            MR. MARQUAND:  Objection.  This isn't

15   proper impeachment.  He hasn't asked him the question.

16   I don't understand.  It isn't inconsistent.  It's not

17   impeachment.  Why are we reading the deposition?

18            MR. FRIEDMAN:  I asked his witness if he

19   knew the difference between a wet spot and a seep.  He

20   said an answer that was equivocal.  In his deposition he

21   clearly said he didn't know the difference.  I was just

22   trying to --

23            THE COURT:  I will allow you to ask on

24   this point with that explanation.  You might move the

25   page up a little bit on the screen.  The question is

81

 1  simply do you recall giving his answer at your

 2  deposition?

 3              THE WITNESS:  Yes, sir, I recall giving

 4  this answer.

 5  BY MR. FRIEDMAN:

 6      Q.  So you don't know the difference or you didn't

 7  know at the time of the inspection the difference

 8  between a wet spot and a seep, did you?

 9      A.  I said I didn't know at time of the inspection

10  -- that I didn't know the difference between, but I had

11  Mr. Albright there to help explain so I would learn the

12  difference.

13      Q.  Are you telling us he explained it to you?

14      A.  We had discussions, yes, sir.

15      Q.  You are saying he explained the difference

16  between a wet spot and a seep, sir?  At your deposition

17  you said you didn't know.

18      A.  Yes, sir, I said I didn't know.  It doesn't go

19  any further than that.

20      Q.  I am not trying to parse words with you.  If

21  you didn't know at your deposition, your deposition was

22  taken in June of 2009.  You didn't know at the time of

23  your deposition the difference between a wet spot and a

24  seep.  Based on the natural order of things, you

25  wouldn't have known in October 2008 either, would you?

1      A.   Yes, sir, at the time of the inspection I did

2   not know the difference between the wet spot and seep.

3      Q.   And didn't know if that was important or not,

4   did you?

5      A.   Before the inspection I wouldn't have known if

6   it was important, yes, sir, but I had Mr. Albright there

7   to help me understand.

8      Q.   Did he tell you it was important?

9      A.   Yes, sir, as part of the training we would

10  discuss and collaborate, as we would see things.

11     Q.   Did he tell you a seep was important?

12     A.   I can't recall if he exactly said a seep was

13  important.  Yes, that is something we would mark down to

14  notify that it was there so we could monitor it and have

15  plant personnel notify them so they could continually

16  monitor it.

17     Q.   Have you ever heard the term before the

18  inspection of a "slough" before?

19     A.   No, sir, I can't say that I heard the term

20  "slough" before the inspection.

21     Q.   Now, just to make sure we are on the same page

22  because at times the word is written differently on the

23  reports.  I believe you handwrote it once using the

24  spellings s-l-u-f-f, but isn't it is also spelled

25  s-l-o-u-g-h.

83

1       A.   I have seen it spelled both ways.

2       Q.   Either spelling you and I are communicating

3  talking about the same thing, right?  Whether you spell

4  it your way or another.  Either one of those two ways we

5  are talking about the same thing, right?

6       A.   In terms of the word, yes, sir.

7       Q.   Now, let's go on.  Now we tried to the spell

8  the word a couple of different ways.  Let's talk about

9  what it means.  What is a slough?

10      A.   I have heard the term "slough" used in many

11 different ways.  I believe it's based on the opinion of

12 the person using it.

13      Q.   How would you use it?

14      A.   I would use the term slough just as in general

15 cases of erosion, if you had an erosion gully or

16 something, your sides could be sloughing off into the

17 erosion gully.  You might have a small area of topsoil

18 or something that had not had any vegetation on it yet

19 and it had sloughed off a little bit.

20      Q.   Does slough, was slough explained to you at

21 the time of the inspection as an area of material moving

22 out and downward from the dike?

23      A.   I can't recall exactly at that time what it

24 was explained to me as.

25      Q.   What is your understanding of what a slough is

84

1  then?  What did you understand it to be, when you were

2  out there?

3      A.  Just as I explained it.  I would have seen

4  that the erosion areas that we had seen that some of the

5  sides were sloughing off.  This would have come from

6  discussion with Mr. Albright and Mr. Dotson.  I would

7  have just picked up on the terms they were using at that

8  time.

9      Q.  Were you told that slough was something that

10  was important to note in an inspection?

11      A.  I can't recall if it was exactly explained

12  that it was important to note, but we would have noted,

13  yes, that if we had seen an area that was sloughed off

14  that it would need some maintenance repair to it.

15      Q.  During the time of your inspection were the

16  terms "seep, wet spot, slough" ever associated or

17  explained to you as being potentially related to dike

18  failure?

19      A.  No, sir.  They were never explained in that

20  way.

21      Q.  Going back to Exhibit 189 that was provided to

22  you after the inspection by Mr. Albright, if you will

23  turn to the third page of Mr. Dotson's GPS points that

24  he gave to you.  I believe your testimony, and prior you

25  explained that the way points 20 through 30 pertain to

85

1   the GPS points that Mr. Dotson marked on October 20th,

2   2008, the time of your all's inspection out there.  Do

3   you remember that?

4        A.   Looking at the third page it is hard to tell

5   in reference to which numbers since the row numbers

6   don't match with the exact way point number that can be

7   seen on sheet 2.  I think they are off by one.

8        Q.   So, some --

9        A.   Yes, way point numbers 20 through 30 would be

10  the numbers, but looking at Sheet 3 you can't use

11  numbers 20 through 30 there.

12       Q.   I am not going to try to get into reconciling

13  way points or GPS points right now.  Looking only on

14  Page 3 of Exhibit 189, those ten points right there were

15  points that you know from your personal knowledge that

16  Mr. Dotson inputed during your October, 2008

17  inspection, right?

18       A.   Yes, sir, that's correct.

19       Q.   And if you would, I want you to go through the

20  list beginning with 20 and going through 30 and tell the

21  Court how many times Mr. Dotson mentions the word

22  "slough."  There is one at 20, there is one at 23, I

23  believe there is one at 26, and one at 27.  Do you see

24  that?

25       A.   Yes, sir, I see that.

86

1      Q.   Did you ever discuss Mr. Dotson's finding of

2   sloughs, as he reported on his GPS, with him?

3      A.   I can't recall at that time if that word was

4   used, as he was entering it into his GPS.

5      Q.   Did you discuss it with him at that time or

6   any time?

7      A.   I can't remember it being discussed at that

8   time or any time immediately after the discussion, no,

9   sir.  It has been discussed since between now and then.

10      Q.   You discussed it with Mr. Dotson?

11      A.   Just in general discussions, yes, afterwards.

12      Q.   When is the first time you discussed it with

13   him?  It was after your report was written, right?

14      A.   That would probably have been the first time,

15   yes, sir.  I can't say when.

16      Q.   It would have been after your report was

17   written?

18      A.   Yes, sir.

19      Q.   Let's see -- I apologize if I am not moving

20   through this at a faster pace.  This is important.  I

21   might be a little nervous.  You probably are nervous

22   too.  Let's see if we can agree on some dates, okay.  We

23   know you were out there October 20th, 2008, right?

24      A.   Yes, sir.

25      Q.   We know the dike failure was on December 22nd,

1    2008, correct?

2        A.   Yes, sir.

3        Q.   And we know from the point in time you made

4    your inspection up to the point of the dike failure you

5    did not write your report, did you?

6        A.   Yes, sir, that's correct, the report was

7    written after the dike failure.

8        Q.   Now, at the time of the dike failure the

9    photographs, those exhibits 6044, 6045 and 6043 -- I am

10   sorry I read those out of order.  It would be 43, 44,

11   45 -- you had those in your possession or on your

12   computer?

13       A.   Yes, sir, they were either on my computer or

14   on the TVA server.

15       Q.   Fair enough.  Also you had the way points and

16   the descriptions from Mr. Dotson that have been

17   identified and we have talked about Exhibit 189,

18   correct?

19       A.   Yes, sir, that's correct.

20       Q.   Now, nobody kept you from writing your report

21   up sooner, did they?

22       A.   No specific person said -- no, that was me

23   prioritizing the workload that I had at that time.

24       Q.   Sure.  You prioritized, you never were given a

25   due date at some point in the future.  You prioritized

88

1  and by December 232nd you just had not gotten around to

2  it.  Fair enough?

3      A.  I had begun to write my report before the

4  failure had happened, or I was prepping.

5      Q.  Excuse me?

6      A.  As I stated before, the preparation began the

7  weekend before the failure.  Then I was to be out of

8  town on a railroad inspection the next week.  I had

9  began gathering documents to start the writing of the

10 report.

11     Q.  When did you start working on your report?  I

12 am confused.

13     A.  It would have been the Friday before the

14 failure.

15     Q.  And you didn't finish?

16     A.  I said I had been gathering reference

17 information.  I was pulling together all of the

18 information that I had at my disposal.

19     Q.  What information were you pulling together

20 besides the photographs?

21     A.  I had the photographs.  I had the way points

22 that I inputted into and AutoCAD drawing.

23     Q.  And what else?

24     A.  That was -- and my notes.

25     Q.  When we talk about your notes just a minute --

89

1  I don't want to belabor this.  I believe the record will

2  show that following the coal ash disaster on the 22nd

3  you couldn't find your notes, could you?  Is that right?

4      A.  At the time I began to write the report after

5  the failure, I could not locate my notes.

6      Q.  And you had your handwritten notes there at

7  your office in Chattanooga right before the dike

8  failure?

9      A.  Before the failure I had the notes in my

10  cubical.

11      Q.  Afterwards when you went back to start writing

12  your report, you couldn't find them?

13      A.  Yes, sir.  After the failure had happened and

14  everything it had been asked, people had been asked to

15  look at, you know, they looked at my notes and

16  everything.  They had been misplaced.

17      Q.  At the time you actually wrote your report you

18  did it without the benefit of your notes, right?

19      A.  I did it without the benefit of my notes.  I

20  had Mr. Albright's notes.

21      Q.  I am not saying you didn't have any notes.  I

22  am saying you didn't have yours, right?

23      A.  Yes, sir, that's correct.

24      Q.  And did you make that known to the people

25  there that you worked with that you didn't have your

90

1   notes, when you were doing the report?

2       A.   Yes, sir.

3       Q.   And you relied on other notes from

4   Mr. Albright and Mr. Dotson, is that right?

5       A.   Yes, sir, as well as the pictures.

6       Q.   As well as the pictures.  Okay.  Then, we were

7   actually, your notes were found I believe sometime in

8   2009.  I will show you Plaintiff's Exhibit 187, if you

9   would pull that out.  This is a cover letter I believe

10  where your notes were forwarded to us.

11              (Exhibit No. P-187 was marked for

12              identification.)

13      Q.   Do you have Exhibit 187 there in front of you?

14      A.   Yes, sir, I do.

15              MR. FRIEDMAN:  Offer Plaintiff's Exhibit

16  187.

17              MR. MARQUAND:  No objection, Your Honor.

18              THE COURT:  So admitted.

19              (Exhibit No. P-187 was received in

20              evidence.)

21  BY MR. FRIEDMAN:

22      Q.   According to this your notes were found in an

23  empty cubical, is that right?

24      A.   It was a cubical that had reference documents.

25  There was no person sitting in it at that time.

91

1    Q.   Those notes were found sometime around the

2 December of 2009 time period.  Would that be consistent

3 with your recollection?

4    A.   Yes, sir.

5    Q.   And your actual notes would be Exhibit 188.

6 Can you identify Exhibit 188 as the actual notes you

7 made on October 20th, 2008?

8              (Exhibit No. P-188 was marked for

9              identification.)

10             MR. FRIEDMAN:  For the record, Exhibit 188

11 has a cover sheet dated January 31, 2008.  From

12 Mr. Barry Kimsey, the manager of Engineering Design

13 Services and attaches a copy of a preceding year, 2008

14 stability report.  Do you recognize that?

15   A.   Yes, sir.

16   Q.   And do you see your notes, your handwritten

17 notes on this document that would be there in the last

18 two or three pages of the document?

19   A.   Yes, sir, I see my notes on the sketch, and

20 the sketch it would be the second to the last page of

21 the document, the third to the last page of this

22 document.

23   Q.   And then if you flip to the very last page you

24 see --

25   A.   Yes, sir, some other notes on the back of a

92

1  page.

2     Q.   Since we didn't copy on the back of the page

3  that is attached -- this is your writing, the notes that

4  you made at the inspection?

5     A.   Yes, sir.

6          MR. FRIEDMAN:   Offer Plaintiff's 188, Your

7  Honor.

8          MR. MARQUAND:   No objection, Your Honor.

9          THE COURT:   Thank you.  So admitted.

10         (Exhibit No. P-188 was received in

11         evidence.)

12  BY MR. FRIEDMAN:

13     Q.   Now, you said on your way to Kingston that you

14  had a chance to review this report, this stability

15  report.  I want to ask you a couple of things on the

16  report to see if these things, if you read them while

17  you were going up there.  If you look at the -- if you

18  look at Page 5 of the report.  Are you there with me?

19     A.   Yes, sir.

20     Q.   Do you see on Page 5 midway down there is a

21  paragraph that says, "Since last year's inspection ash

22  was dredged into Cells 1, 2 and 3 to such levels that

23  the divider dikes for Cell 3 were buried and now there

24  are only two large dredge cells, 1 and 2."  Did I read

25  that right?

1      A.   Yes.

2      Q.   Then it goes on to say, "Dredging was stopped

3  in mid November of 2007 based on recommendations from

4  EDS and Geosyntec consultants.  This preventative

5  measure was taken to reduce water levels in the dredge

6  cell throughout the winter months in an attempt to avoid

7  another blowout."  Did I read that correctly?

8      A.   Yes, sir.

9      Q.   Was it brought to your attention that the year

10  before you were up there that dredging was stopped to

11  avoid another blowout?

12      A.   I don't recall it being discussed.

13      Q.   Did you read this written record and did you

14  know what it meant?

15      A.   Yes, sir.  As I said, I read over this.  I

16  can't say that I picked out everything.

17      Q.   Well, you know what dredging is, don't you?

18      A.   Yes, sir.

19      Q.   Did you know it at the time of your inspection

20  in October of '08?

21      A.   Yes, sir.

22      Q.   Tell the Court what dredging is.

23      A.   Dredging is just a way of undercutting in

24  water by the use of a pump.  You use water and as you

25  were cutting underneath in the water the soil or

94

1  whatever to try to get the pond, or it can be used at

2  varying given places.  Here at the ash pond they would

3  be trying to lower the bottom level of the ash pond so

4  it could receive more ash.  It would be done by a boat.

5  They would pump the ash with water over into the dredge

6  cell.

7      Q.  That's a way to put more ash into the dredge

8  cells or containment cells, correct?

9      A.  Yes, sir.

10     Q.  And dredging, when you went out there in

11  October of 2008, was it ongoing or was it stopped?

12     A.  Dredging was ongoing at that time.

13     Q.  Now, at that point in time in the year had it

14  been raining?  Had it been wet?

15     A.  I do not recall any rain at this time.  I

16  can't say that it hadn't been before or after.

17     Q.  Was there any question in your mind as to why

18  dredging was going on in the fall of 2008, when it had

19  been halted in the fall of 2007?

20     A.  At that time, sir, no, none of this was

21  discussed.

22     Q.  It wasn't discussed.  Okay.  You knew what a

23  "blowout" was, though, didn't you?

24     A.  I was aware of the blowouts, yes, sir.

25     Q.  How did you become aware of the blowouts?

95

1    A.   I became aware of the blowouts when I took

2  over receiving the -- there is some drive-point

3  piezometers and well points along the west side of

4  Dredge Cell A.  Around August I took over the monitoring

5  using the program developed by Geosyntec.  I would

6  receive the raw data from TVA Environmental Engineering

7  monthly.  As some background information for why those

8  drive-point piezometers were there, I had been given

9  some background information on blowouts.

10    Q.   Were you told that those well points and that

11  data that you were inputting beginning in July or August

12  of 2008 was to help prevent blowouts from occurring?

13    A.   I knew they were used to monitor the

14  groundwater level, which before they had made the

15  repairs and everything the groundwater leveled had risen

16  up and had caused some piping and the blowouts in that

17  area.  They were used just to help to monitor the

18  groundwater level to see if it was still rising in that

19  area.

20    Q.   Did you pay attention to groundwater levels,

21  when you were there in October of 2008?

22    A.   Yes, sir, we looked at the -- as we were

23  walking along the west side of the dredge cell, we

24  looked in the area of the piezometers and everything to

25  see if they were, if there were any broken at the time

96

1   or -- but as to you can't, you have to have the proper
2   equipment to actually check the piezometers and
3   everything.  No, we were not out there to check the
4   groundwater level itself.

5       Q.  You did not have the equipment in this
6   inspection to check groundwater levels, did you?

7       A.  That was not the purpose of that inspection.
8   We had somebody that was monthly grabbing the
9   groundwater data.

10      Q.  If you wanted to, if you wanted to say we need
11  to check in this stability inspection we are doing right
12  now we need to check groundwater levels, you didn't have
13  what you needed to do it, did you?

14              MR. MARQUAND:  Objection.  Asked and
15  answered.

16              THE COURT:  He may have answered.  Did you
17  have the equipment to do so, if you wanted to?

18              THE WITNESS:  No Your Honor, we didn't
19  have the equipment there because we were not there to do
20  a stability inspection.  It was just a visual
21  inspection.

22              THE COURT:  Thank you.  Let's go ahead and
23  stop right here.  We'll take our lunch break.  Why don't
24  we reconvene at 1:30.

25              (Off the record.)

1          (Back on the record.)

2          THE COURT:  Thank you.  Good afternoon

3   everyone.  You may continue Mr. Friedman.

4          MR. FRIEDMAN:  May it please the Court.

5          Good afternoon, Mr. Buttram.

6   BY MR. FRIEDMAN:

7      Q.   We were talking about a number of things.  To

8   try to put some context into where we are going to begin

9   and pick up this afternoon let's go back to that day on

10  October 20th, 2008, during your inspection.

11         Now, we have offered and have been admitted

12  into evidence three stacks of photographs.  I want to

13  use the exhibit, let's go with Exhibit 6045.  The reason

14  I am doing that is I will tell you ahead of time is to

15  set a time sequence for the day.

16         You all drove up from Chattanooga to Kingston.

17  We have already talked about that.  When you got there

18  you all started walking around the dikes, correct?

19     A.   Yes, sir, that's correct.

20     Q.   And I know you didn't start using your camera

21  the minute you opened up the door of your vehicle, but

22  at some point in close proximity to when you all got

23  there and started your inspection would you agree that

24  you started taking pictures?

25     A.   Yes, sir, that would be correct.

98

1      Q.    All right.  I believe the camera you used did

2   not have a time stamp on it, but the camera that

3   Mr. Dotson used did have a time stamp on it, didn't it?

4      A.    Yes, Mr. Dotson's camera did have a time

5   stamp.

6      Q.    I believe you testified previously that you

7   believe the time stamp on Mr. Dotson's camera was

8   accurate?

9      A.    Yes, sir, to my knowledge it was accurate.

10     Q.    And based on, we went over this in deposition.

11  I am not making this a trick question.  You correct me

12  if this is wrong.  Looking at the date stamp, date and

13  time stamps of the photograph, our first time stamped

14  photograph at least from Mr. Buttram -- excuse me you

15  are Mr. Buttram -- from Mr. Dotson's photographs was

16  around the area of 10:41.  I will tell you these

17  photographs do not have, they are not in time order.

18          I believe we have a bate stamp for the time

19  that is 277787 of Exhibit 6043.  This is a time stamp

20  from October 20th, 2008.  You can see it on your screen,

21  sir.

22     A.    Yes, sir.

23     Q.    It will save you some time.  I am not going to

24  begin to ask you here today with your limited time to go

25  back in and check all of the bate stamp numbers or all

99

1  of the time stamp numbers, but if I represent to you

2  that was the earliest one that we have been able to put

3  our hands on from a time stamp, would that be consistent

4  in your recollection about the time that you started

5  taking photographs that day?

6      A.  Yes, sir, to my recollection that would be

7  around the first time with the first picture.

8      Q.  Again, I am not doing this to surprise you.  I

9  believe we went over it in your deposition.  I think the

10  last photograph of the morning session was, had a time

11  stamp on it of 11:46.  I think that is represented by

12  bate stamped number 277821.  If I represented to you

13  that was the latest date time stamp we have before you

14  broke for lunch, would you agree, like you agreed with

15  me in your deposition, that is about the time in the

16  ordinary of course things about that time you would take

17  a lunch hour or lunch break?

18      A.  Yes, sir, I could agree that was near the time

19  we would have broke for lunch.

20      Q.  And then did the three of you go to lunch

21  together; Mr. Albright, Mr. Dotson and yourself?

22      A.  Yes, sir.

23      Q.  And did you eat there on site or go off site

24  or do you remember?

25      A.  We went off site.

1      Q.   And you got back and the first picture we have

2  from after lunch is around 277821 is the bate stamp

3  number of the same exhibit.  I think it will show a

4  military time stamp of 13:28.  I know because you told

5  me you are familiar with military time.

6      A.   Yes, sir.

7      Q.   And if you translate 13:28 to civilian time,

8  what would that be, about 1:30?

9      A.   Yes, sir, that would be around 1:30.

10     Q.   Would that be consistent with around the time

11  you all started back in after your lunch hour on October

12  20th, 2008?

13     A.   From my recollection that would have been

14  close to the time we returned, yes, sir.

15     Q.   And the last time that we have is 16:33.  I

16  believe that is around what, 4:30, 16:33.  Would it be

17  around 4:30?

18     A.   Yes, sir, that's correct.

19     Q.   Would that be about the time that you recall

20  Mr. Dotson stopping to take pictures?

21     A.   Yes, sir.

22     Q.   Now, you continued after Mr. Dotson left to

23  take a few photographs, if I recall your testimony

24  correctly.

25     A.   Yes, sir, Mr. Albright and myself continued to

1  inspect some of the other facilities.

2      Q.   When you all left out there on the 20th -- do

3  you recall what day of the week that was, by the way?  I

4  am not trying to make this a memory test.  I am just

5  asking.

6      A.   No, sir, I can't recall which day it was.

7      Q.   But you all left -- I believe you told me you

8  all still had daylight at the time you all left?

9      A.   To the best of my recollection there was some

10  daylight left, yes, sir.

11      Q.   And you didn't look at your watch to see what

12  time you left that day, did you?

13      A.   I can't recall if I did or not.

14      Q.   The best evidence though that we have at least

15  was when Mr. Dotson was out there is from the time stamp

16  photographs, do you agree?

17      A.   Yes, sir.

18      Q.   Did you feel like you had enough time to do

19  what you needed to do out there?  I guess that was your

20  first one.  You wouldn't know one way or the other would

21  you?

22      A.   Yes, sir, we inspected everywhere.  I felt

23  like we had given it enough time.

24      Q.   You didn't feel like they rushed you out of

25  there, did you?

1    A.   No, sir, we walked everywhere.

2    Q.   I believe you said you walked the entire dike

3  twice?

4    A.   We walked the lower area around and then came

5  back on the upper benches.

6    Q.   So would that mean you did two circles around

7  the facility?

8    A.   For the most part, yes, sir.

9    Q.   84 acre containment area?  Does that sound

10  right?

11    A.   I am not sure exactly the acreage that it was.

12    Q.   Did you all walk a fairly brisk pace?

13    A.   We didn't walk together.  We spread out to

14  cover.

15    Q.   That is one of the things I wanted to cover.

16  Mr. Dotson walked ahead of you all, didn't he?

17    A.   I don't recall him walking ahead of us.  He

18  was walking apart from us so there would be some

19  occasions where he would go take pictures of other

20  places.

21    Q.   Did you all spread out so you could cover more

22  area?  Is that what you were doing?

23    A.   Yes, sir, we spread out so we could instead of

24  all of us walking in one group we would all walk on a

25  different bench level.  When somebody would find

103

1    something, we would collaborate and discuss it.

2         Q.   And you knew that Mr. Dotson took pictures of

3    things on this own?

4         A.   Yes, sir.  I was aware of that.

5         Q.   Now, let me ask you this.  We'll get into the

6    actual reports and things.  This is a very basic

7    question.  I want to ask you, did you know at the time

8    you were doing that inspection whether or not it was

9    important for anything?

10        A.   Yes, sir, I was from my prior experience with

11   certain things that I had gained from experience just

12   from engineering, my engineering background and other

13   jobs I have worked at, I was aware of how to spot

14   certain erosion.  You know, I understand what water

15   erosion gullies and rills are and that you need

16   vegetation in areas, you know, to make sure that the

17   soil doesn't erode.  I was very aware of that.  Then

18   Mr. Albright and Mr. Dotson before we started the

19   inspection had given me some basic background on things

20   to look for.

21        Q.   So you knew you were going out there to look

22   for things.  Did you have any idea on whether or not

23   anybody was going to be depending on you to do that

24   report that came out of your inspection?

25        A.   I am not sure I follow that question, sir.

1  Q.  I asked you in your deposition do you have any

2  idea of whether or not there was any importance to what

3  you were doing out there?

4  A.  Yes, sir, I knew we needed to visually inspect

5  these, to write the report to provide to the plants so

6  any maintenance things that needed to be spotted would

7  be done or if there was anything that needed to be

8  monitored, if we found anything that needed to be

9  monitored, we would locate that.

10  Q.  Did you have any idea that you were looking

11  for the potential for signs that the dikes were failing?

12  A.  I mean, as a visual inspection, I didn't know

13  that, but I would, you know, that is just something that

14  I would say goes with the visual inspection.  You would

15  look for signs of no matter the significance of the

16  area, you know, whether it was small or bad, you are

17  going to be looking for those type things.

18  Q.  And if you found something out there that was

19  of importance, was it your understanding that you were

20  to bring that to the attention of the people at the

21  plant or in maintenance?

22  A.  Any maintenance type issues we found, yes,

23  sir, they were placed in the recommendations of the

24  report.  Having Mr. Dotson along who was the Program

25  Manager of the Byproducts Disposal, that was his part of

105

1    his job function was that area.  He was there as well.

2    It would be noted to him and he would know it as well as

3    what was listed into the inspection report.

4         Q.   Here is my question.  Did you have any

5    understanding that you had a responsibility, as an

6    engineer, if you saw something that had to be addressed

7    that you had to bring it to the attention of the plant?

8         A.   Yes, sir, I knew that as we were going along

9    with the inspection Mr. Albright -- they would, they had

10   given me the understanding that we weren't just going to

11   wait until the report was written.  If anything of big

12   significance was noted, we could discuss it with the

13   plant.

14        Q.   And it would be dealt with immediately, if it

15   was important?

16        A.   Yes, sir.

17        Q.   Now, I want to, at this point in time we are

18   going to offer exhibit, Plaintiff's Exhibit 191, which

19   is your final Annual Ash Pond Dike Stability Inspection

20   dated January 12th, 2009, along with four drafts of the

21   report and the four drafts include Exhibit Numbers 179,

22   180, 181 and 182, and as we are admitting those can you

23   please pull your copies out, Mr. Buttram, so you have

24   them in that folder?

25                   THE COURT:  Any objection to those

                            106

1  documents?

2  MR. MARQUAND: I have no objection to the

3  final report. Again, we don't have the plaintiff's

4  exhibits. We weren't provided copies this morning, the

5  numbers until this morning. We have not had a chance to

6  look at these before, the previous drafts.

7  THE COURT: We'll admit at this point

8  Plaintiff's 191 and then subject to identification by

9  this witness at that time we'll introduce the drafts.

10  (Exhibit Nos. P-180, 181, 182 were

11  marked for identification.)

12  (Exhibit No. P-191 was received in

13  evidence.)

14  BY MR. FRIEDMAN:

15  Q.  Mr. Buttram, would you get out Exhibit 179,

16  please. Tell us when you have that in front of you.

17  (Exhibit No. P-179 was marked for

18  identification.)

19  A.  Yes, sir, I have it in front of me now.

20  Q.  All right. Would you examine this and confirm

21  for the Court whether or not this is your first draft

22  that you did of an Annual Ash Pond Dike Stability

23  Inspection for 2009 that was conducted in October of

24  2008 and prepared in final copy in January of 2009. The

25  only question I have pending is do you recognize it,

107

1    Mr. Buttram?

2          A.    Yes, sir, sir, I recognize this as a --

3                   MR. FRIEDMAN:    Offer Plaintiff's Exhibit

4    179.

5                   THE COURT:    So admitted.

6                   (Exhibit No. P-179 was received in

7                   evidence.)

8    BY MR. FRIEDMAN:

9          Q.    If you would, would you turn to Page 6 of your

10   draft report.  Are you there?

11         A.    Yes, I am there.

12         Q.    Do you see pictures, Figure numbers 12 and 13?

13         A.    Yes, sir, I see those figures.

14         Q.    Those are, you have them labeled "washout on

15   dike bench."  Did I read that correctly?

16         A.    Yes, sir, you did.

17         Q.    Does the text above the photographs, is that a

18   commentary on the photographs below?

19         A.    Yes, some of the commentary above is for those

20   figures below.

21         Q.    Is the highlighted text referencing the two

22   photographs below?

23         A.    Yes, sir, the highlighted text does reference

24   those.

25         Q.    And would you read that text into the record,

108

1   please.

2       A.   "At the north end of the dredge cells one of

3   the lower dike benches has an area that has eroded and

4   washed out.  See figures 12 and 3 below.  This area

5   should be repaired immediately by filling with clay in 6

6   inch lifts and compacting."

7       Q.   Those are pictures that were taken, were they

8   not, by Mr. Dotson and as included in Exhibit 6045, part

9   of Exhibit 6045 is part of his time stamped photographs.

10  I guess my only question would be -- and I withdraw that

11  and make it more concise.

12          Do you recall that these are pictures that

13  Mr. Dotson took at the time of the October inspection

14  and e-mailed to you?

15      A.   Yes, sir, these would have been pictures that

16  Mr. Dotson took.

17      Q.   At the same time he e-mailed you the pictures

18  in exhibit, Plaintiff's Exhibit 198, didn't he?

19              THE COURT:  You mean 189?

20              MR. FRIEDMAN:  I am dyslexic, Your Honor.

21  Thank you, Exhibit 189.

22      Q.   I apologize, Mr. Buttram.  This is complicated

23  enough.  This is Exhibit 189, third page.

24      A.   Yes, sir, these are the way points that

25  Mr. Dotson e-mail me.

109

1    Q.   If you remember this morning I asked you to

2    look at those and count with me all of the references of

3    slough that he made.  I want to ask you if there is a

4    correlation between these ten GPS points and one or both

5    of the pictures that are included in your first draft of

6    your report?

7        A.   Yes, sir, one of these does correlate to it.

8    Without the map I produced, it's hard for me to know

9    which one.

10   Q.   Well, okay.  Let's go back and get us some

11   history of this.  When you were preparing to do your

12   reports, you took Mr. Dotson's GPS points and attempted

13   to place those on a map using a program called AutoCAD.

14   Did I say that correctly?

15       A.   Yes, sir.

16   Q.   And by doing that that would allow you to

17   correspond Mr. Dotson's input that are right there as

18   part of 189 with the photographs that were taken, is

19   that correct?

20       A.   It would give me the approximate location of

21   these way points to help me reference where they were on

22   the dredge cell.  That way I could place pictures, if

23   needed, with these way points.

24   Q.   We do know that the pictures from your own

25   report were taken on the north dredge cell, correct?

110

1        A.   Yes, sir, that is correct.

2        Q.   And do you know from your experience and

3   knowledge that that was the area of the dredge cell that

4   failed and collapsed on December 22, 2008?

5        A.   Yes, sir, I have heard that that is the area

6   that is in question.

7        Q.   You know that because you were out there

8   involved in part of the aftermath, right?  You saw that

9   area with your own eyes.  It is gone?

10       A.   Yes, sir, correct.

11       Q.   I am not trying to play cute with you.  You

12   know that area where this photograph is taken, 12 and

13   13, that was part of area that was blown out, right?

14       A.   Yes, sir, that is part of the area that is not

15   there any more, correct.

16       Q.   Now, I am not the engineer of this group, as I

17   have probably proven to you already, but if you would be

18   so kind as to look at Plaintiff's Exhibits 183 and 193

19   and if you would, be so kind to do that, if you will set

20   them side by side and before you begin talking about

21   them I want you to think to yourself first whether you

22   can identify them.  I believe you talked about them in

23   your deposition.  Do you recognize those?

24                (Exhibit No. P-183, 193 were

25                marked for identification.)

111

1    A.   Yes, sir, I recognize these.

2    Q.   What, for the record is Exhibit 183?

3    A.   183 is just a general sketch of the Kingston

4  Fossil Plant ash disposal area.  It is not to scale

5  drawing or anything.  It is just a general sketch to

6  kind of give somebody reference to where they are.

7    Q.   Did you prepare this or have anything to do

8  with this exhibit?

9    A.   No, sir, I just utilized it in my inspection

10  report.  I referenced the drawing sketch itself.  I did

11  not produce it.  I added the drawing and the picture

12  labels.

13    Q.   Let's talk about how did you go about adding

14  those numbers that are on Exhibit 183?

15    A.   From the pictures that were taken by either

16  myself or Mr. Dotson that were used in the report there

17  is a note on there that shows the picture number which

18  references the figure number within the report.  The

19  arrow is just kind of pointing to the general location

20  and the view that the picture was taken from.

21    Q.   Can you show us from this Exhibit 183 where

22  the pictures on your report identified as Figures 12 and

23  13 are located?

24    A.   Those figures would be right there in that

25  area (indicating).

112

1    Q.   As a matter of fact, the circles that have 12

2  and 13 on them, they correspond with the photographs

3  that are in the report, correct?

4    A.   Yes, sir, that's correct.

5        MR. FRIEDMAN:  Plaintiffs offer Exhibit

6  183.

7        MR. MARQUAND:  No objection, Your Honor.

8        THE COURT:  So admitted.

9        (Exhibit No. P-183 was received in

10       evidence.)

11   Q.   While you still have that up, I'm going to ask

12 you to compare them.  Did you tell us that you

13 recognized Exhibit 349?

14   A.   Yes, sir, I recognize this exhibit.

15   Q.   You were asked to, you were asked I believe at

16 your deposition whether or not that corresponded, those

17 points on Exhibit 349 corresponded with the way points

18 that are identified by Mr. Dotson.  Do you agree that

19 they do?

20   A.   Yes, I believe I agree they are close in

21 proximity to the way points.

22   Q.   And what is the reference?

23   A.   But this is not a map that I produced.

24   Q.   But it is a map that you are able to identify

25 because it's a photograph and aerial photograph, right?

113

1     A.   Yes, sir.

2     Q.   And, you know, that is a good point,

3  Mr. Buttram.  I am not asking you especially with

4  respect to Exhibit 349 to testify to any degree of

5  engineering certainty that these way points are

6  identical matches to the references of the way points

7  that are identified in Plaintiff's Exhibit 189, okay.  I

8  preface it by this.  As a general proposition, I believe

9  you have already responded to my question that those

10  points on Exhibit 189 correspond -- I was holding this

11  sideways, Your Honor.  I covered up with my own fingers

12  the proper number.  This color Google map you have is

13  Exhibit 193.  It has a deposition sticker on it too.

14          Now that I have killed all my momentum, let's

15  go back and try to pick this up.  The way points on

16  Exhibit 193, they generally match, which is the point I

17  was trying to make, Mr. Dotson's way points, don't they?

18     A.   Yes, sir.

19     Q.   And if you look, those way points at position

20  23, that corresponds with the picture number Figures 12

21  and 13 from your report, doesn't it?

22     A.   I think, as I stated in my deposition, with

23  the way these, the labelling is on this drawing it is

24  hard to tell what is corresponding to which opinion as

25  it is shown on this.

114

1      Q.  Fair enough.  Would you agree with me,

2  Mr. Buttram, that Mr. Dotson's references, specifically

3  points 23 and 24 -- or I will take them one at a time.

4  Specifically 23 corresponds with the photographs that

5  you have in your report, Figures 12 and 13?

6      A.  Yes, sir, I believe that's correct.

7      Q.  And Mr. Dotson refers to those figures in 12

8  and 13 as a slough, doesn't he?

9      A.  "Slough road washout."

10      Q.  Now, you did not use those terms in your

11  report, did you?

12      A.  I believe I used "washout."

13      Q.  Okay.  You used "washout," but you didn't use

14  the term "slough"?

15      A.  That's correct.

16      Q.  Who told you to leave the term "slough" off

17  your final report, if anyone?

18      A.  At the time of writing the report I discussed

19  things with Mr. Albright.  I can't say that anybody told

20  me to leave the word "slough" out.

21      Q.  You told us that you discussed it with

22  Mr. Albright, but you never discussed it with

23  Mr. Dotson, did you?

24      A.  No, sir.

25      Q.  You got Mr. Dotson, the man who wrote the

115

1  prior report, calling it a slough, the man whose report

2  you were writing on to issue your report referring to a

3  picture as a slough, but for some reason that I am not

4  clear on, it was decided to leave it off the

5  description?

6      A.   Yes, sir, when you are out on inspections you

7  see things and note things down.  When you go back you

8  think about these things.  As Mr. Albright and I were

9  looking back through the pictures and everything, this

10 shows an erosion washout with maybe the sides are

11 sloughing a little bit.

12     Q.   If we can pull those pictures 12 and 13, if we

13 can pull those up again, I would like to follow up on

14 that.  It's Exhibit 179.  Now, the view on the left-hand

15 side is the view looking up slope, right?  According to

16 your figure there?

17     A.   Yes, sir, that's correct.

18     Q.   And you see the ground, the area where my

19 finger touched and where that arrow was presented, you

20 see that above the gully feature right there or what I,

21 what Mr. Dotson referred to as a slough?

22     A.   I see the washout area, yes, sir.

23     Q.   And up above it it looks like there is

24 undisturbed area, doesn't it?  You see up above it going

25 to the crest of the dike?

116

1        A.    That would be the next slope going up, sir.

2        Q.    The next slope.  There is no gully on that

3   next slope going up, is there?

4        A.    From this picture, no, sir.

5        Q.    It certainly doesn't look like it, would you

6   agree?

7        A.    Yes, sir.

8        Q.    So, whatever is causing that washout, as you

9   call it, or slough, as Mr. Dotson referred to it, it is

10  beginning right there in the middle of the dike, isn't

11  it?

12       A.    It looks like it's beginning at the crest and

13  you will notice in my report there were other areas

14  where benches had either silted up and they were

15  overflowing off the side.  This is a case where it has

16  rained and the bench may be not be sloping back in

17  toward the toe or the next level so it is washing over.

18       Q.    So thought this was created by a rain event?

19       A.    Yes, sir.

20       Q.    As you look downward on the side the slide

21  right beside it, it gradually disappears as far as the

22  indention.  Would you agree with that?

23       A.    The clarity of these pictures is hard.  I

24  believe there is some that is, it does follow down in

25  there.

1      Q.   It follows for a while and then it goes back

2   to what I would say a disturbed state.  Can you agree

3   with that?  Looking down at the bottom of the picture.

4   On the right-hand side viewing downward.  The top of the

5   picture viewing downward would be actually the bottom of

6   the hill or the bottom of the embankment, correct?

7      A.   Yes, sir, you are looking down the slope.

8      Q.   And as you go down the slope the gully gently

9   eases out, or the slough, right?

10     A.   Yes, sir, the washout, it does ease out.

11  There is more rills -- from the clarity of this picture

12  you would probably see rills.

13     Q.   When you saw that picture, did you see signs

14  of water coming through the dike?

15     A.   At the time of the inspection in the front of

16  this picture, there are no signs of water coming

17  through.

18     Q.   You just saw the indention there?

19     A.   Yes, sir.

20     Q.   Now, the conclusion that was reached, even

21  though you didn't agree with the term being a slough,

22  the conclusion that was reached here is that this needed

23  to be repaired immediately, fair enough?  I mean, that

24  is the written word you have right there.  "This area

25  should be repaired immediately by filling with clay and

118

1 6 inch lifts and compacting." Did I read that

2 correctly?

3      A.   Yes, sir, that's correct.

4      Q.   That was the conclusion that you reached in

5 agreement with Mr. Albright, correct?

6      A.   In this draft, yes, sir, that's the conclusion

7 that was reached.

8      Q.   You are way ahead of me.  In this draft that

9 is what it says.  Let's look at Exhibit 180.  While you

10 are getting that out, I am going to ask you a question

11 that I think will be easy for you to answer.  We have

12 four drafts in successive order.  They begin with

13 Exhibit 179, and then they go to 180, 181 and 182, is

14 that right?  I think we have covered that.  You have the

15 four in front of you.

16           May I withdraw that question and ask another

17 one?

18                THE COURT:  Go ahead.

19 BY MR. FRIEDMAN:

20      Q.   Mr. Buttram, do you remember making several

21 drafts of your report before it was made final?

22      A.   Yes, I do remember making several drafts.

23      Q.   And the process, the exercise of actually

24 writing this report was done following the coal ash

25 disaster of December 22, 2008.  This is after the

119

1  disaster happens you are going about putting this report

2  together, right?

3      A.  Yes, sir, that is correct.  The report was

4  written after the disaster.

5      Q.  You knew before the disaster you were going to

6  be responsible or tasked with writing it?

7      A.  Yes, sir, that is correct.

8      Q.  As you went through it, it went through a

9  drafting process where you went through several drafts,

10  correct?

11     A.  Yes, I wrote the report.  Then I had a peer

12  review with Mr. Albright.  He reviewed it and then my

13  supervisor at the time, Barry Snider, reviewed the

14  report.

15     Q.  And as a result of that there are four drafts

16  before we get to the final.  I hope you have got those

17  in front of you, 179, 180, 181, 182.  We just talked

18  about 179.

19         I would like to ask you to go to 180 and tell

20  us if that is also a draft of the report, and one that

21  followed 179.

22     A.  Yes, sir, 180 would follow 179.

23     Q.  Now, in the order of things you do the first

24  draft and then you give the draft to your supervisor and

25  he checks it, right?

1    A.   I would have done a draft and I would have

2  given it to Mr. Albright.  That would not definitely be

3  significant to what these drafts represent.

4    Q.   Excuse me?

5    A.   The order of review doesn't necessarily

6  represent what these drafts here represent.

7    Q.   Okay.

8    A.   I did these, these drafts were tracked for my

9  knowledge so I would know what has changed from time to

10  time.  It doesn't correspond necessarily after a certain

11  someone's review.

12    Q.   Fine.  That's fair enough.  Who was the first

13  person who you gave your draft to look at?  Was that

14  Mr. Albright?

15    A.   That would have been Mr. Albright.

16    Q.   After we look at 179 let's look at 180 and

17  specifically I want you to go to page 6 where we are

18  talking about the washout on the dike bench that

19  Mr. Dotson referred to as a slough.

20    A.   Yes, sir, I am there.

21    Q.   Now, if we can, the language that was quoted

22  from 179 I believe it is the same.  You see that?

23        MR. MARQUAND:  We'll stipulate it's the

24  same.

25        MR. FRIEDMAN:  Thank you.

121

1 BY MR. FRIEDMAN:

2     Q.   That would read that "the area of the 12 and

3 13 needed to be repaired immediately," correct?

4     A.   Yes, sir, that's correct.

5     Q.   That would tell us in the logical order of

6 things that Mr. Albright agreed with your language for

7 the need for those immediate repairs correct?

8     A.   Yes, sir, and that is what I was referencing

9 to before.  This draft Exhibit 180 would have been after

10 Mr. Snider's review.

11     Q.   Mr. Snider or Mr. Albright --

12     A.   Mr. Snider.

13     Q.   So it wasn't what Mr. Albright reviewed?

14     A.   His edits may have come in 179 or I may have

15 done them.  That is what I am saying.  The track changes

16 were for my benefit as I did things.  I may have

17 overwritten some of the drafts after reviews.

18     Q.   I am not trying to stand on anything other

19 than to show Mr. Albright helped you write it,

20 Mr. Snider looked at it and then it went through another

21 step.  That is what I am trying to get at.  Media

22 Relations looked at your drafts, didn't they?

23     A.   Yes, sir, that's correct.

24              MR. FRIEDMAN:  I want to offer Plaintiff's

25 Exhibit 180.

                            122

1                THE COURT:  So admitted.

2                (Exhibit No. P-180 was received in

3                evidence.)

4    BY MR. FRIEDMAN:

5         Q.   I ask you to look at Exhibit 181.  If you

6    would identify this as another one of your drafts, sir.

7         A.   Yes, sir, this is another one of my drafts.

8         Q.   And if you look at Page 6, which would be the

9    same area we have looked at in the last two drafts, I

10   believe we will find a change in the language there.  In

11   the right-hand column you will see a program.  Can you

12   tell the Court what that is?  I call it a program.  It

13   is a document-changing feature.  Is that right?

14        A.   Yes, sir, it's just a function that you can

15   use within the program of Microsoft Word when you are

16   tracking changes.

17        Q.   You can track when a document is changed,

18   can't you?

19        A.   Yes, sir, that's correct.

20        Q.   And what is the word from Exhibit 181, page 6

21   that is deleted?

22        A.   That would be "immediately."

23        Q.   That was taken out by Media Relations, was it

24   not?

25        A.   No, sir.  That word was not taken out by Media

                              123

1  Relations.

2      Q.  You took it out?

3      A.  I reviewed any suggestions that came to this

4  report.

5      Q.  Media Relations suggested that it come out?

6      A.  Yes, sir.

7      Q.  Now, do you know and can you tell the Court

8  what experience in geotechnical inspections that TVA

9  Media Relations has?

10     A.  Sir, I am not aware that they had any.

11     Q.  Did TVA Media Relations have anything to do

12  with telling you what should or should not have been

13  done with regard to your inspections?

14     A.  As far as how we did the inspection, no, sir,

15  they did not provide any guidance.

16     Q.  Yet they were weighing in on what should go

17  into the final report or recommending what should go in

18  the final report?

19     A.  Yes, sir, we knew it was going to go to a

20  broader audience.  They reviewed the report.  I reviewed

21  all suggestions and didn't allow it to change the

22  substance.

23     Q.  And I know you told us that, I believe, in

24  your deposition.  Maybe I got it from the Inspector

25  General's interview.  You don't think taking out

124

1  "immediately" changed the substance of your report?

2      A.  At the time this report was submitted, no,

3  sir, I do not.

4      Q.  At the time you all were out there and you saw

5  this washout what Mr. Dotson believed to be a slough,

6  everybody was in agreement it needed to be repaired

7  immediately?

8      A.  Yes, sir.  As Mr. Dotson was part of the

9  Byproducts Disposal, he was aware it was there.

10     Q.  But it wasn't repaired, was it?

11     A.  I can't say if it was or not, sir.  I was not

12  told.

13     Q.  But you knew, based on your knowledge as an

14  engineer, that something like this didn't look good,

15  right?

16     A.  Just looking at the pictures, no, sir, it does

17  not look good.

18     Q.  And it needed to be repaired immediately,

19  right?

20     A.  Yes, sir, any type of erosion we would have

21  repaired.

22     Q.  But some erosion you put it's not a priority

23  thing.  A lot of times you didn't use the word

24  "immediately," but here you did and it wasn't done, was

25  it?

125

1      A.   Sir, I can't say if it was done or not.   I was

2  not told.

3      Q.   You do agree that it was your intention, along

4  with Mr. Albright, that it should have been done

5  immediately, right?

6      A.   Yes, it should have been repaired.

7      Q.   You told me in the deposition to you

8  immediately means right then as soon as possible, do you

9  agree with that?

10     A.   I would say immediately means as soon as

11  possible, yes, sir.

12     Q.   You knew that on October 20th, 2008, didn't

13  you?

14     A.   Yes, sir.   I knew this was there and that it

15  needed to be repaired as soon as possible.

16     Q.   No, immediately.   Immediately is the word you

17  used, right?

18     A.   Immediately is the word I used in the report,

19  yes, sir.

20            MR. FRIEDMAN:   Now, we offer Plaintiff's

21  Exhibit 181.   I want to go over one more with you.

22            THE COURT:   So admitted.

23            (Exhibit No. P-181 was received in

24            evidence.)

25  BY MR. FRIEDMAN:

126

1    Q.   This is Exhibit 182.  Can you identify that as
2    the final draft?  I believe this is the one, this is
3    different from the others because it has an executive
4    summary on the front.
5    A.   Yes, I recognize this as another draft of what
6    would have been the final.
7    Q.   And 182 does add the executive summary?
8    A.   Yes, sir.
9    Q.   Whose idea was it to add the executive
10   summary?
11   A.   TVA Media Relations.
12   Q.   When you were out there on that day in October
13   did you have any checklist to work off of?  In other
14   words, a list of things you needed to look for and check
15   off a list as you went?
16   A.   No, sir, I was not given any type of check
17   list.  I was with John Albright who had been on these
18   inspections.
19   Q.   Did Mr. Albright or Mr. Dotson have a
20   checklist?
21   A.   Not to my knowledge they did not.
22   Q.   Since the inspection has it come to your
23   attention there was a checklist?
24   A.   No, sir.
25   Q.   Never heard of that before?

127

1    A.   No, sir, I have not heard of a checklist.

2    Q.   There were other references for immediate

3 repairs that needed to, that you found during your

4 inspection that were included in your original report

5 that were removed at the recommendation of Media

6 Relations, weren't there?

7    A.   Yes.

8    Q.   I give you an example.  The photograph that

9 you took in your final report of the floating coal

10 ash -- I believe looking at your final report there is a

11 picture on Page 4.

12    A.   Yes, sir, that would be Figure 3.

13    Q.   Picture 3.  If you can bring that up.  This is

14 Exhibit 191, Picture 3.

15        Now, at the time you did your draft you

16 included that the floating ash from that pond needed to

17 be removed immediately, right?

18    A.   Initially in the report I had written it

19 needed to be removed immediately.

20    Q.   That was removed at the suggestion of Media

21 Relations?

22    A.   After the suggestion, yes, sir, I removed it

23 on my own accord.

24    Q.   And then there was another reference to

25 another area that you referred to as a washout.  If you

128

1  look at, if you will go back to your original draft

2  Exhibit 179, Page 5 of that.  There is a reference to a

3  washout, I believe.  You see where I am talking about?

4      A.  Page 4?

5      Q.  I believe it is Page 5.  No, it is -- I am

6  sorry it is Page 4.  I misspoke.  You see right there it

7  is I believe it is referencing Figure 8.  You see that?

8      A.  Yes, sir, that's correct.

9      Q.  Where was that picture taken?

10     A.  This picture was taken, if we could go to the

11 general sketch I could give -- it is taken off the

12 interim dredge cell on the east side.

13     Q.  Let's look at Exhibit 183.  We'll bring it up

14 on your screen, Mr. Buttram.  Does that help you?

15     A.  Yes, sir.

16     Q.  Tell us where, if you can, where Figure 8 or

17 Photograph 8 was taken, if you can point to that circle

18 for the Court.

19     A.  In that circle area there, which is on the

20 east side of the interim dredge cell.

21     Q.  That would be at an upper elevation, would it

22 not?

23     A.  It was going down the slope.  It was from a

24 down drain that they had there from an underdrain.

25     Q.  Your commentary in regards to that was "due to

129

1  extensive erosion in one area an erosion washout of two

2  feet wide by twenty feet long by two feet deep had

3  formed.  This area should be repaired immediately."  Did

4  I read that correctly?

5      A.  Yes, sir, you did.

6      Q.  And can you testify without having to go back

7  through the drafts as to whose recommendation that the

8  term "immediately" was removed?

9      A.  That came, that suggestion came at the same

10  time as the other reference to remove the word

11  "immediately."

12      Q.  Wouldn't it be a fair statement to say that

13  anything that you put in your report that had to do with

14  immediate action to make repairs to that dike the term

15  "immediately" was removed at the suggestion of Media

16  Relations?

17      A.  Yes, sir, I can say that the word

18  "immediately" was suggested to be removed.

19      Q.  All right.  Repeatedly as to anything that you

20  designated in your report for immediate action needed to

21  be taken out?

22      A.  Yes, sir, with regard to this came after the

23  spill.  The emphasis wasn't there any more.

24      Q.  Right.  The emphasis, but the emphasis was

25  there in October of 2008, now, wasn't it?

1      A.   Yes, sir, the proper people knew about it.

2      Q.   I believe you made the, you have either

3  testified or maybe told me that the whole purpose of

4  using the term "immediately" was to get the attention of

5  the people in maintenance, fair enough?

6      A.   That's correct.

7      Q.   You wanted to reach out to them and get their

8  attention, right?

9      A.   Yes.  As you were reading the report, you

10  would want to use words to emphasize certain things,

11  that's correct.

12      Q.   After placing this emphasis on that work that

13  needed to be done, let's go ahead and tell us what you

14  did to make sure that this immediate maintenance was

15  done.  You made it known to somebody, right?

16      A.   Yes, as I said, Jamey Dotson, who is part of

17  the Byproducts Disposal Group helped in maintaining

18  those dredge cells was there and knew about it.  We also

19  were dealing with James Settles that day and had

20  discussion.

21      Q.   You all sought out Mr. Settles, right?

22      A.   We ran into him on the day of the inspection.

23      Q.   You ran into him.  Okay.  Was it your

24  intention to make somebody at the plant know about these

25  maintenance items that needed to be addressed?

131

1     A.   Yes, sir, Mr. Dotson deals with them.  That

2  was in his area of his job, I believe.  He was a

3  Byproducts representative that day.

4     Q.   Who is Mr. Settles?  Tell the Court who is he

5  is.

6     A.   Mr. Settles, to my knowledge, was, I believe,

7  the field supervisor for the dredge cells.

8     Q.   Was he directed to make the repair, the

9  immediate repairs that are reflected on your reports

10 right then in October of, October 20th, 2008, while you

11 were present on the scene?

12    A.   I can't recall.

13    Q.   I guess that question may not have come out

14 right.  Did you communicate the information or was it

15 communicated in your presence to Mr. Settles that these

16 repairs are here and they need to be taken care of

17 immediately?

18    A.   We did communicate with him.  I can't recall

19 exactly the full discussion and what all was

20 communicated to him that day.

21    Q.   In substance was the information that is in

22 your report or your draft report, was that information

23 communicated to Mr. Settles?

24    A.   I can't say exactly all that information was

25 communicated to him.

132

1    Q.   What about the washout or slough on the north

2  dike that we started this point in the examination with.

3  Was that information imparted to Mr. Settles that it was

4  maintenance that needed to be taken care of immediately?

5    A.   As I said, I am not sure exactly what

6  communication was stated to him.

7    Q.   Other than your report, how was that

8  information to get to maintenance through Jamey Dotson?

9    A.   Mr. Dotson spoke, Mr. Dotson as part of the

10  Byproducts Group, his group would have been doing some

11  of those repairs.

12    Q.   Are you assuming he would have taken care of

13  it or do you know he was directed, as by yourself as the

14  engineer writing up this report, that this is

15  maintenance work that needs to be done?

16    A.   I can't say he was directed to do it, no, sir.

17    Q.   The fact is this was your first inspection,

18  you were just trying to learn it the best you could.

19  You weren't in a position to direct anybody to do

20  anything, were you, Mr. Buttram?

21    A.   I can't say I wasn't in a position to direct.

22  I would have discussed it with the people that it needed

23  to be discussed with.

24    Q.   But you didn't, did you?

25    A.   I can't say what all communication was done

133

1    that day.

2         Q.   The very next month TVA sent you out again as

3    a lead engineer for another dike inspection, didn't

4    they?

5         A.   Sir, I wasn't the lead engineer at Kingston.

6         Q.   No, no.  I am not, we have already gone

7    through that disagreement.  I am not talking about

8    Kingston now.

9         A.   You said "again."

10        Q.   Okay.  I apologize for my wording.  Let me try

11   it again.  You don't even need Mr. Marquand.  You are

12   getting pretty good at this.  I don't mean to make light

13   of it.

14             You did another inspection didn't you, a dike

15   inspection after Kingston, correct?

16        A.   Yes, sir, that's correct.

17        Q.   All right.  Were you the lead inspector on

18   that inspection?

19        A.   Yes, sir, I was the only representative

20   engineer from my group out there.  I would have been the

21   lead engineer for that.

22        Q.   And that took place less than a month after

23   the Kingston inspection?

24        A.   I can't recall exactly how long -- it was in

25   November, 2008.

                          134

1      Q.   You didn't have any, do additional study work

2  or training between the Kingston inspection and the

3  Tuscumbia inspection, right?

4      A.   Yes, sir, it was out at the Colbert Fossil

5  Plant.

6      Q.   Right out of Tuscumbia, Alabama, Colbert

7  County.  You didn't have any training since you did that

8  inspection in October at Kingston and the time that you

9  went to Colbert, correct?

10      A.   No, sir.  There was no extra training in

11  between those two inspections.

12      Q.   I don't mean extra training.  There wasn't any

13  other training, was there?

14      A.   No, sir.

15      Q.   Okay.  But yet you were the lead inspector on

16  that one?

17      A.   Yes, sir, I was the lead inspector.

18      Q.   Had you finished your report on the Colbert

19  inspection by the time of the disaster of December 22,

20  2008?

21      A.   No, sir.  That report hadn't been written

22  either.

23      Q.   I want you to look at Plaintiff's Exhibit

24  1484.  Before you say anything about it, I want you to

25  take a look at it and tell me if you can identify it.

135

1  Mr. Settles, have you ever seen Exhibit 1484 before?  I

2  mean, Mr. Buttram.  I am sorry.

3              (Exhibit No. P-1484 was marked for

4              identification.)

5      A.  I can't recall that I have seen this specific

6  exhibit, no, sir.

7      Q.  Okay.  I want to ask you this.  Have you

8  attended any safety seminars on evaluation on existing

9  dams?

10             MR. MARQUAND:  Objection, Your Honor.

11  This deals with matters post spill.  It deals with post

12  remedial measures and certainly isn't relevant in this

13  case.

14             MR. FRIEDMAN:  May I respond Your Honor?

15             THE COURT:  Yes.

16             MR. FRIEDMAN:  It is post spill.  It

17  happened after this spill.  We're offering it for

18  another purpose.  That would be feasibility,

19  availability of training.  For information purposes,

20  other than to show that this should have been done

21  before the inspection or before the October inspection,

22  just the fact that there's training available out there.

23             THE COURT:  I will sustain the objection

24  to the question as asked, but allow you to pursue

25  questioning along the lines that you suggested.

136

BY MR. FRIEDMAN:

Q.   From the time you were hired at TVA, I believe it was July of 2008, thereabouts, right?

A.   Roughly.  It was at the end of June, yes, sir.

Q.   June did you say?

A.   At the end of June.

Q.   Up until October of with 2008, were you ever given any training in examination of embankment dams?

A.   No, sir.  I never attended any training on embankment dams.

Q.   Were you ever given any training in emergency action planning, early warning systems, overtopping protections, repair or evaluation of earthen embankments?

A.   No, sir.

Q.   Did you ever attend any classes either within TVA or put on by a third party concerning stability inspections of ash pond dikes?

A.   No, sir, I had none prior to my first inspection.

Q.   Does TVA have any kind of recurrent training?

A.   Yes, sir, we have annual training that we go through.  As a PE I seek out continuing education that I have to keep up with to have my licenses.

Q.   As part of any of the work that you have done

137

1  at TVA, have you had any training whatsoever prior to

2  October or even December of 2008, for that matter, in

3  anything related to stability inspections or maintenance

4  of earthen embankments?

5      A.   No, sir.  In that respect I didn't have any

6  training from TVA.

7      Q.   Going back to the stability report that you

8  did -- I am talking about the final copy.  This one is

9  Exhibit 191.  If you go to the very back of it.  I don't

10  mean very back.  I want to talk about Page 11.  As you

11  get there, that is a list, is it not, of things to be

12  done pursuant to the annual inspection?

13      A.   Yes, sir, that would be the recommendations

14  page.

15      Q.   And the recommendation page, is that not a

16  summary of the actions -- I believe it would cover pages

17  11 and 12 of recommendations for instructions concerning

18  maintenance that result from your actual inspection in

19  this case, the October inspection.

20      A.   Yes, sir, these would be the recommendations

21  that came from, that were listed in the report itself

22  from the October inspection.

23      Q.   And if you knew one or more of the things that

24  are on the list had already been completed, they

25  wouldn't be on the recommendation list, would they?  Or

138

1   would they?

2        A.   I would say that they could since that's what

3   we had seen at the time of the inspection.

4        Q.   So there could be things on there that were

5   repaired already, but maybe not?  Or you have no way of

6   knowing?

7        A.   None -- this hasn't been discussed with

8   anybody what had been done at the time of writing this

9   report.

10        Q.   The report that you actually had out there on

11   October 20th of 2008, that is Exhibit 188, and your

12   notes appear on Exhibit 188 I believe on Page 9 of that.

13   It is on your screen, if you can follow along.

14        A.   Yes, sir.

15        Q.   The way you went about making this report

16   which is the final report that we have here that I have

17   been asking you about, Exhibit 191, is you simply took

18   this old inspection report and started writing on it,

19   right?  Or writing on portions of it?

20        A.   I used the old inspection report as a

21   template.

22        Q.   When you say used it as a template, you used

23   the '08 report as the basis of the '09 report, correct?

24        A.   I used it as a template so I would know so I

25   could follow the same format and everything.  Yes, there

139

1  was some pieces left in as historical references to the

2  report.

3      Q.   You left some of the actual language from

4  2008, or borrowed or left it in for reference to be

5  included in '09?

6      A.   Yes, sir.

7      Q.   All right.

8          Now, if you look to Page 11, excuse me, Page 8

9  on the recommendation pages of Exhibit 188.  How many of

10  those recommendations that were in existence on Page 8

11  of Exhibit 188 did you bring over and make again or

12  repeat on your final report, Exhibit 191.  Have you ever

13  stopped to compare those?

14      A.   No, sir, I don't know I have stopped to

15  compare them exactly.

16      Q.   Do you have a recollection of simply moving

17  action items or recommendations from the year 2008 over

18  and adopting them in the 2009 report?

19      A.   Yes, sir, some of the routine type

20  recommendations would have been used again.

21      Q.   And those would be things repeated year after

22  year from one report to the another, correct?

23      A.   Yes, sir, just to keep as a reminder to

24  continue doing those things.

25      Q.   I want to change gears, if I may, and ask you

1    about some of your other responsibilities that aren't

2    stability inspection related.  I believe your testimony

3    was you took over a program in July or August of 2008

4    where you would take over data input for water levels in

5    the dikes?

6         A.   I took over the responsibility of yes,

7    receiving the monitor data from TVA Environmental

8    Engineering.  I would receive it monthly.  Once

9    receiving it I would place it into the program that was

10   in an Excel spreadsheet created by Geosyntec.  Once that

11   data was entered, I would check to see what the levels

12   were in regard to the ground surface.

13        Q.   If you would, please, I want to ask you if you

14   would kindly look at Plaintiff's Exhibits 186 and 1552.

15   I ask you if you would identify those for the record.

16                  (Exhibit Nos. P-186, 1552 were

17                   marked for identification.)

18        A.   Exhibit 186 and Exhibit 1552 look to be the

19   roles and responsibilities that were created by me after

20   receiving this responsibility.  It was kind of our

21   action plan.

22                  MR. FRIEDMAN:  Offer Exhibits 186 and

23   1552, Your Honor.

24                  THE COURT:  So admitted.

25                  (Exhibit Nos. P-186, 1552 were

                              141

1                    received in evidence.)

2   BY MR. FRIEDMAN:

3        Q.   Did you say you created both of these?

4        A.   No, sir.  Well, yes, sir, I did.  Looking at

5   them now, 186 is the one that I produced.  I do not

6   remember adding the color representational graph that is

7   labeled on 1552.

8        Q.   Let's look at 186 first then, okay.

9        A.   Yes, sir.

10       Q.   This is a document that you created sometime

11  after you got there.  It would be what, August of '08?

12       A.   Yes, sir, it was around August of '08.

13       Q.   And would you read the first sentence into the

14  record.

15       A.   "In November of 2006 excessive seepage and

16  piping was discovered at the toe of the dike of Dredge

17  Cell 3."

18       Q.   And then it goes on, "to help with the

19  investigation and repair of the toe, 33 piezometers and

20  a dewatering well system were installed."  Did I read

21  that right?

22       A.   Yes, sir.

23       Q.   And the next sentence, I want to ask you about

24  this.  It says, "the piezometers and dewatering wells

25  were used to determine and monitor the groundwater level

                              142

1   at the time." Did I read that right?

2        A.   Yes, sir, that's correct.

3        Q.   Were piezometers and wells in place used by

4   the TVA in 2008 to monitor the buildup of water in

5   dikes?

6        A.   Can you restate that question?

7        Q.   I am asking if that sentence is correct. Were

8   the piezometers and dewatering wells used to determine

9   and monitor the groundwater levels at the time. Were

10  those used in 2008, when you took over the program, to

11  monitor water buildup in the dikes?

12       A.   This sentence comes from the background

13  information trying to explain the initial purpose of the

14  piezometers. Why they were put in was to help to

15  understand the groundwater level before they did the

16  repair in that area.

17       Q.   Okay.

18       A.   After the repair was over having that data,

19  having those piezometers there, they were just decided

20  to leave it in to have that data so that the groundwater

21  could be still be monitored and looked at.

22       Q.   Let's look at Exhibit 1552. How is Exhibit

23  1552 different, if at all, from Exhibit 186? Are these

24  the same or are they different? One has a date at the

25  bottom in the place of current contacts. 1552 has a

143

1  date of August 4th, 2008, and current contacts and has

2  yourself and Mr. Matt Williams, is that right?

3      A.   Yes, sir, on the last page it has Mr. Dotson.

4  1552 has the Kingston PEU was added and her contact

5  information as well.

6      Q.   186 had Jamey Dotson.  The second page of 1552

7  has some additional information, is that right?

8      A.   Yes, sir.

9      Q.   That is how they differ?

10     A.   Yes, sir.

11     Q.   Did you create both of these documents?

12     A.   No.  I was the initial creator of it.  I can't

13 be certain that I would have, but I think I would have

14 because I was in essence the owner.  I was asked to

15 create this so we could kind of have an action or roles

16 and responsibilities between the different TVA groups

17 that were using this data.

18     Q.   Let's look at the responsibilities outlined.

19 Under TVA Environmental Services under both documents it

20 says in the first bullet point that "TVA Environmental

21 Services is responsible for monitoring the wells and

22 piezometers on a monthly basis."  Did I read that right?

23     A.   Yes, sir.

24     Q.   Did TVA monitor the wells and piezometers at

25 Kingston on a monthly basis?

144

1      A.  To my knowledge, sir, yes, they did.

2      Q.  Did they monitor the wells and piezometers on

3  the north side of the dredge cell?

4      A.  My responsibilities were for the west side.  I

5  would receive -- the data I received was two

6  spreadsheets.  My role was to monitor the piezometers

7  and dewatering -- I received data for the piezometers

8  and dewatering well points for the west side.  That was

9  the data my responsibility was to monitor.

10     Q.  Mr. Buttram, do you know if anyone in the TVA

11 was responsible for monitoring the wells and piezometers

12 on the north side of the dredge cell, the place at the

13 dredge cell where the failure occurred in 2008?

14     A.  To my knowledge, sir --

15     Q.  At the time you were with TVA.

16     A.  No, sir, at the time I did not know that

17 anybody was responsible for monitoring those wells.

18     Q.  Did you know there were even any wells located

19 on the north side?

20     A.  From our inspection and pictures we had

21 pictures of the wells.  They were there.  They were

22 monitoring wells.  They weren't piezometers that we

23 used.  I knew those wells were there.  I didn't know the

24 function of them.

25     Q.  These rules and regulations they say they

145

1  don't differentiate between wells and piezometers, do

2  they?

3              MR. MARQUAND:  Objection.

4  Mischaracterization.  These aren't rules and

5  regulations.  This is a document the witness typed up.

6              MR. FRIEDMAN:  The witness testified these

7  are documents the witness typed up to outline

8  responsibilities.

9      A.   Yes, sir, it says --

10             THE COURT:  All right.  Well, I will

11  overrule the objection.  Mindful, this isn't a jury

12  trial, but the same in a bench trial questions of

13  counsel are not evidence.  The evidence comes from the

14  witness stand.  Go ahead.

15  BY MR. FRIEDMAN:

16      Q.   You did draft these outlined responsibilities,

17  didn't you?

18      A.   Yes, sir, as I said, these were if you read in

19  the background information the piping and seepage was

20  discovered at the Dredge Cell 3.  Dredge Cell 3 didn't

21  go to the north dike.  It was on the west.  These

22  piezometers and well points mentioned here were on the

23  best dike.  That is what the roles and responsibilities

24  were created for.

25      Q.   Are you telling the Court that the

146

1   responsibility to monitor wells and piezometers ended at

2   the west dike?

3        A.   To my knowledge, this is what I was given to

4   do.  Beyond that I do not know, sir.

5        Q.   And these responsibilities that you drafted in

6   these two exhibits, that only pertained to the west

7   dike, right, if I understand you correctly?

8        A.   These roles and responsibilities, yes, sir,

9   were corresponding with the monitoring on the west dike.

10       Q.   Mr. Buttram, point out for the Court where

11  either one of these documents limited responsibilities

12  to the west side.

13       A.   I believe with the background which references

14  the 33 piezometers and dewatering wells on the west

15  side.  I can't understand why we would give background

16  information for that and point the responsibility to the

17  other wells without mentioning them here.

18       Q.   You would have to have an understanding of the

19  background in order to understand the limitation you are

20  testifying about.  Is that what you are telling us?

21       A.   Yes, sir, and then if you also see it says for

22  more information you can see Geosyntec's report which

23  would outline the repairs and installation of these

24  piezometers that these roles and responsibilities are

25  outlined.

1      Q.   Did you ever read that report, Mr. Buttram,

2  that you are talking about, the Geosyntec's report?

3      A.   Yes, I went through it to give me some

4  background information on the reasons that these

5  piezometers and the dewatering well system was in place.

6      Q.   You weren't even provided with your own copy

7  of that, were you?

8      A.   No, sir, I didn't have any own copy.  I had

9  access to hard copies.

10     Q.   You just happened to see come information in

11  that, but never reviewed the whole report, did you?

12     A.   I can't say I reviewed the exact full report,

13  no, sir.  I did review the report.

14     Q.   Now, you weren't aware until you got out there

15  on the inspection in October of 2008 that there were

16  monitoring wells on the north side?

17     A.   I can't say that I knew that the data that I

18  received -- I received two sets of data.  I can't say

19  that the data that I received had the wells from the

20  north side, no, sir.

21     Q.   I appreciate that answer.  I was trying to

22  make my question a little more limited.  I know you say

23  you didn't know the data you received, that you were to

24  input -- maybe I tell you what.  Let me back up and try

25  to make a clear record on what you were doing.  You

148

1  would get data from Mr. Williams from time to time,

2  right?

3       A.   Yes, sir, on a monthly basis.

4       Q.   Who was Mr. Williams with?

5       A.   Mr. Williams was with the TVA Environmental

6  Engineering.

7       Q.   You would take that information and manually

8  yourself put it into a spreadsheet, electronic

9  spreadsheet, right?

10      A.   Yes, sir, it was a program within an Excel

11  spreadsheet that Geosyntec designed.

12      Q.   I have heard that referred to as a warning

13  system.  Have you ever heard that type description used

14  for the Geosyntec spreadsheet?

15      A.   No, sir, I haven't heard that description used

16  for it at all.

17      Q.   The information in the spreadsheet was put

18  there to let the people reviewing it know whether water

19  was building up behind the dikes or within the dikes,

20  correct?

21      A.   I think initially it was created to help them

22  understand the water flow while they were doing the

23  repairs, allow them to see if the water was being pulled

24  down low enough so they could start the repair not

25  underwater.  Then after they made the repair, it was

149

1    left in place to be used as monitoring.

2        Q.    And the repair you are talking about followed

3    the blowout that occurred in 2006, right?

4        A.    Yes, sir, that would be correct.

5        Q.    Okay.  You know this monitoring is going on to

6    provide information to avoid another similar blowout?

7        A.    I believe the information was used not just in

8    reference to that, but it was just data that was there

9    so you have the extra data that's continued to take it

10   and utilize it.

11       Q.    And you input that once a month into the

12   spreadsheet and it would come out on a graph?

13       A.    Yes, sir.

14       Q.    And it would have different arrows to show

15   whether or not water was building up too high within the

16   dikes?

17       A.    Yes, once I inputted the data, it would plot

18   out on a chart.

19       Q.    It was color coded so if you had a reading in

20   the red, what would that tell you?

21       A.    A reading in the red would mean that a

22   piezometer was showing water over the ground surface,

23   above the ground surface.

24       Q.    Now, let's talk about at the time going back

25   now with that background of you inputting data into the

                                    150

1  Geosyntec well monitoring and piezometer system.  Do you

2  remember seeing well points on the north side of the

3  dike, the dike that failed, the dredge cells that

4  failed, when you were out there on October 20th, 2008?

5      A.  Yes, sir, I saw the well points out there.

6      Q.  And one of the well points that you saw had

7  been closed off for the purpose of an inspection to take

8  place, right?

9      A.  Yes, sir.  A week before -- normally before

10 their monthly data gathering they would try to close the

11 valves on the dewatering wells.

12     Q.  You went and looked at a particular well on

13 the north side didn't you?

14     A.  As we were inspecting we came upon the wells,

15 one in particular.

16     Q.  If you would, I apologize.  Had you completed

17 your answer, sir?

18     A.  Yes, sir.

19     Q.  Tell the Court what you saw, when you looked

20 at the well that had been closed off for monitoring

21 purposes?

22     A.  The dewatering wells when you close the valve

23 they were allowed to drain freely down the slopes.  When

24 you closed their valves the water pressure would build

25 up and they would overflow out the top.  The dewatering

151

1  wells were used for that purpose of dewatering the area.

2  They were screened about 20 feet below which could cause

3  in some instances some artesian effect which is having a

4  water pocket under somewhat of an impermeable area.

5  These watering wells cannot be used to monitor the

6  groundwater surface.

7       Q.   What is phreatic pressure?

8       A.   Phreatic pressure?

9       Q.   Yes.

10      A.   Your phreatic surface is just the groundwater

11  surface you have flowing under the ground.

12      Q.   And a phreatic water level in the dikes would

13  tell you the level of the water that was in the dike,

14  within the dike, wouldn't it?  It would tell you how

15  high that is, correct?

16      A.   Yes, sir, could monitor that with certain

17  instruments of which we use the drive-point piezometers

18  out there, but we didn't use the well points.  It

19  specifically states on the program that I have that

20  these wells were not to be used for monitoring the

21  groundwater.

22      Q.   All right.  You are getting way ahead of me.

23  I'm trying to catch up with you now.  The piezometers

24  that you use, when those are overflowing, those tell you

25  that the phreatic surface or water within the dikes is.

152

1  When the piezometers are overflowing, it tells you you

2  are at a critical level, right?

3      A.  Yes, sir, if I saw a Piezometer overflowing I

4  would expect to be seeing it coming out the dike.  That

5  wasn't there.

6      Q.  I am not saying what you saw or didn't saw.  I

7  am trying to talk about in general terms what it means

8  when you have a piezometer which is pipe going down in

9  the ground built a certain way to let you measure water.

10 When you see that water coming out of it, it tells you

11 it's a warning that our phreatic level is approaching

12 saturation, correct?

13     A.  Yes, sir.

14     Q.  All right.  Now, from what I gather you don't

15 believe the same is true with respect to wells, is that

16 right?

17     A.  For these dewatering wells that were out

18 there, no, sir, I don't believe they were with that

19 respect.

20     Q.  But yet you all have listed wells to be

21 monitored on the two exhibits that you created, 1552 and

22 186, to be monitored on a monthly basis?

23     A.  Yes, sir, we had the instruments there.  We

24 went ahead to grab the extra data, but not to be used in

25 the sense of monitoring the groundwater level.

153

1    Q.   And the well point photo that you took, do you

2  recall where that was taken in your report?  We can get

3  that out, if we need to.  I want to make that clear on

4  the record.  Do you remember where that was?

5    A.   I can't recall exactly where along the west

6  dike it was.

7    Q.   It was on the west dike though?

8    A.   Yes, sir.

9    Q.   Now, to make the record clear, you didn't know

10  whether or not any data was being inputted from

11  monitoring wells on the north part of the dike, did you?

12    A.   From my role and responsibility in the

13  spreadsheet that Geosyntec created, that did not include

14  the monitoring wells on the north side.

15    Q.   I want to ask you if you would look at -- I

16  have a couple of housekeeping matters here before I

17  finish this line of questioning.  I would like to, if

18  you would, please, just take a minute and see if you can

19  identify Exhibits 3609, 606, and 1585.  Have you had a

20  chance to look at those?

21              (Exhibit Nos. P-3609, 606, 1585

22              were marked for identification.)

23    A.   Yes, sir, 3609, 606 and 1585?

24    Q.   Right.  Let's start with 606.  Can you

25  identify that for the record?

154

1    A.   Yes, sir, this would be the output you would

2  see after entering the raw data that is received from --

3    Q.   Offer Plaintiff's Exhibit 606, Your Honor.

4         MR. MARQUAND:  No objection.

5         THE COURT:  So admitted.

6         (Exhibit No. P-606 was received in

7         evidence.)

8  BY MR. FRIEDMAN:

9    Q.   Can you explain for us with the page that you

10 have there in front of you what this exhibit is and how

11 you use it as part of your duties at TVA?

12   A.   I wouldn't actually input data into the sheet

13 you see in front of you.  This is just the output that

14 is created from the data.  It reads information from

15 another worksheet in that spreadsheet.

16   Q.   After you manually put in data into the

17 program, this is one of the things that is produced?

18   A.   Yes, sir.

19   Q.   Can you identify Exhibit 1585 for the record.

20   A.   1585 looks to be a sheet with the directions.

21 It also has the worksheet tab of where the data, the raw

22 data would have been entered.

23   Q.   You would, this would be the program set up by

24 Geosyntec on which could electronically enter the

25 data provided to you by Mr. Williams, is that correct?

155

1    A.   Yes, sir, most of these pages I am familiar

2   with.   Some of them in the back -- just with not seeing

3   it all in one sheet, it's hard to tell if they are all

4   from that program.

5    Q.   If we printed it out, it would reach from one

6   side of the courtroom to the other.   We had to break it

7   up.   These are all data points that would be entered

8   manually, is that right?

9    A.   Yes, sir.

10    Q.   When you entered, for example, in the very

11   back of the exhibit if you would go to like the fourth

12   page from the back.   You see that spreadsheet.   You will

13   see entries.   There are entries on this sheet.   Many of

14   them would say, "dry."   Do you see that?

15    A.   Yes, sir.

16    Q.   Would you manually input a designation that

17   would say dry?

18    A.   Yes, sir, I would.   You have to put dry, if no

19   data was received from that piezometer.

20    Q.   Would that apply to a piezometer that was

21   broken, for example, that you got no data on?

22    A.   Yes.

23    Q.   Okay.   So you would be entering designations

24   as dry for piezometers that in actuality weren't

25   functioning?

1      A.   Yes, sir, for the program to work you had to

2 enter "dry," if no data was received for a piezometer.

3                MR. FRIEDMAN:  Offer Plaintiff's Exhibit

4 1585.

5                MR. MARQUAND:  No objection.

6                THE COURT:  So admitted.

7                (Exhibit No. P-1585 was received

8                in evidence.)

9 BY MR. FRIEDMAN:

10     Q.   Would you identify Plaintiff's Exhibit 3609

11 for the record, please.

12     A.   Did you want me to read it?

13     Q.   Would you identify it?

14     A.   This is an e-mail from Matt Williams from

15 November, it's the November, 2008 readings.

16     Q.   This would be the data in Exhibit 3609 that

17 you would enter into Exhibit 1585?

18     A.   Yes, sir, that is correct.

19                MR. FRIEDMAN:  Now, this exhibit which we

20 would offer, Plaintiff's Exhibit 3609, Your Honor.

21                THE COURT:  So admitted.

22                MR. MARQUAND:  Your Honor, he has only

23 identified the first page.  We ask -- there is two other

24 documents attached to that first page.  There has been

25 no identification of those documents.

157

1              THE COURT:  You want to identify those?

2    BY MR. FRIEDMAN:

3         Q.   Can you identify the information that is

4    contained in addition to the e-mail?

5         A.   These two Excel spreadsheets attached were the

6    raw data.  It was raw data that was sent to me.  I

7    utilized the KIF dredge cell piezometers I believe is

8    the ones I would input into the Geosyntec.

9         Q.   You received this and manually input it in

10   Exhibit 1585 in the ordinary course of your business and

11   responsibilities at TVA, correct?

12        A.   Yes, sir.

13             MR. FRIEDMAN:  Offer 3609 at this time.

14             MR. MARQUAND:  No objection.

15             THE COURT:  So admitted.

16             (Exhibit No. P-3609 was received

17             in evidence.)

18   BY MR. FRIEDMAN:

19        Q.   Let's look at the date on this exhibit.  It's

20   dated December 18th, 2008, is that right?

21        A.   Yes, sir, that is correct.

22        Q.   And that was provided to you by Matt Williams?

23        A.   Yes, sir.

24        Q.   Mr. Buttram, where were you on Thursday,

25   December 18th?  Were you working in the office then?

                          158

1      A.   I can't exactly recall, but to my knowledge I

2  should have been in the office.

3      Q.   Was this information provided to you late?

4      A.   I can't recall exactly the date I would

5  receive the monthly information.  I can't say that if it

6  was late how late it would have been.

7      Q.   It says here in the first line, "sorry for the

8  delay."  You see that?

9      A.   Yes, sir.

10      Q.   "I have been holding on this until Paul Smith

11  got another chance to investigate the site.  You will

12  notice several piezometers from the KIF piezometers and

13  well points that do not have any information and it says

14  (blacked out)."  Did I read that correctly?

15      A.   Yes, sir.

16      Q.   Does that help refresh your recollection as to

17  what was going on at the time?

18      A.   Somewhat, yes, sir.

19      Q.   Tell us what was going on then.

20      A.   Well, just by reading the e-mail they seem to

21  be late because they wanted to go back and get a better

22  understanding which ones were destroyed to keep better

23  track so we could get them repaired.

24      Q.   What did do you then when you received this

25  information?  Did you input it?

159

1    A.    The information for the destroyed --

2    Q.    Just the information that they did provide to

3    you?

4    A.    Yes, sir, I can't say I input it exactly that

5    day, but within a couple of days I would.

6    Q.    I am sorry.  I am not meaning to talk over

7    you.  I apologize.  Were you finished?  You said, I

8    think I heard you say you did it in a couple of days?

9    A.    I would try to do it within a couple of days,

10    yes, sir.

11    Q.    Do you know if you inputted this information

12    that is represented in Exhibit 3609 prior to the dike

13    failure on December 22, 2008?

14    A.    I can't recall if I input it before the dike

15    failure or not.

16    Q.    Did you do any type of analysis of the

17    information, when you put it in?

18    A.    No, sir, there is no analysis required beyond

19    inputting the data and checking the levels on the chart.

20    Q.    Did you during your time inputting data did

21    you ever have any red flags or have any points in the

22    red area showing that the dikes were saturated with

23    water?

24    A.    The time that I had entered it there were no

25    piezometers that entered into the red zone.

160

1    Q.   Mr. Buttram, why would anyone after the dike

2  failure and the disaster in December 22, 2008, why would

3  anyone want to go back in and alter the Geosyntec forms

4  that would tell you whether or not you had a reading in

5  the red?  Do you know?

6    A.   No, sir.  I am not sure.  I don't recall that

7  being done.

8    Q.   Well, why would you ask Geosyntec for the

9  password to their program so you could go back in and

10  mess with it or alter it?

11   A.   The well points that I have stated which were

12  not in regards to monitoring the water level, as can be

13  seen on the output, since they were showing in the red

14  just to add more clarity to the chart we wanted to

15  remove the well points.  Those well points could be

16  removed without a password.

17   Q.   Let's see if I got this right.  After the dike

18  failure on December 22, 2008, you were going back into

19  the spreadsheets trying to take out readings where your

20  wells were showing red or warnings, is that what you

21  were doing?

22   A.   No, sir, they were not showing warnings.  If

23  they had been showing warnings, I would have alerted the

24  people at the time.

25   Q.   They were showing wells in the red weren't

161

1    they?

2          A.   If we can go to Exhibit 606 I would like to

3    refer you to the note at the bottom.

4          Q.   Okay.  You can refer me to that.

5          A.   "Under the site specific condition the well

6    points may indicate equipotential levels higher than the

7    ground surface and should not be compared against the

8    water level thresholds, i.e., color of water level

9    legend."

10          These wells were screened 20 feet to 25 feet

11    in the ground to whereas the piezometers were screened 5

12    feet below grade surface.  This program was set up to

13    monitor the piezometers.  After the failure these well

14    points could make some of the readings hard to see for

15    the piezometers.  To get better clarity on the chart, we

16    took the well points out.

17          Q.   It wouldn't just make readings hard to see.

18    They would make the evidence hard to live with, wouldn't

19    they, Mr. Buttram?

20          A.   No, sir.

21          Q.   You had documents that said, Exhibits 1552 and

22    186, that said you are responsible for monitoring wells

23    and piezometers in a document you created.  Wells were

24    monitored and in fact you never thought to take them out

25    of your spreadsheet until after the disaster.  Then you

162

1  went and asked for Geosyntec to give you the password

2  that no one at TVA was supposed to have to go back and

3  change the evidence.  That is what happened, isn't it?

4      A.  No, sir.  I told you what happened.

5      Q.  Let me show you Exhibit 1584.  Do you recall

6  getting this e-mail?  While you are doing that, if you

7  would, look at Exhibit 1555.  1555 I believe comes first

8  in chronological order.  It is an e-mail to you from

9  Jamey Dotson dated Saturday January 3rd, 2009.

10          Now, at this point in time that was a hectic

11  time for your department following the dike disaster,

12  wasn't it, Mr. Buttram?

13                (Exhibit Nos. P-1555, P-1584 were

14                marked for identification.)

15      A.  Sorry.  I was reviewing the documents.

16      Q.  January 9th, or January 3rd, it's right after

17  the new year.  Of course, it follows the December dike

18  failure.  That was a very busy time for you in your

19  department, wasn't it?

20      A.  Yes, sir, it was.

21      Q.  You all had been working nonstop, weren't you?

22      A.  Yes, sir, we were working diligently to

23  remediate.

24      Q.  And you got an e-mail from Jamey Dotson to

25  tell you, "Chris, you still have one well point showing

163

1  in red in August of 2008.  Doesn't this need to be

2  removed?  I believe this should only show the well

3  points."

4          According to him he is writing to you about

5  taking out well points that are reading in red.  Is that

6  the way he's writing you?

7      A.   Sir, I cannot recall what this e-mail was

8  referring to at the time.  No, sir, I do not believe he

9  was asking me to remove anything.

10     Q.   "You still have one well point showing in the

11  red in August of 2008."  Do you remember taking out well

12  points that read, that indicated readings in the red?

13     A.   As I have explained already, the time that I

14  took out the well points was just to give clarity.  I do

15  not recall -- we didn't remove well points out of the

16  red just so there was nothing in the red.

17     Q.   Okay.  Whatever your motivation for doing it,

18  it was taken out.  Can we agree on that?

19     A.   No, sir, based on this e-mail I can't say I

20  took anything out from it.

21     Q.   Let's look at the next e-mail.  I think it

22  might help you.  That is an e-mail of a couple of days

23  later.  I guess at top of the sheet there as an e-mail

24  from you dated Thursday, January 8th, 2009 to

25  Mr. Richard Christian and a Ronald Hall.  Do you see

164

1  that?

2       A.   Yes, sir.

3       Q.   What are you providing, what form of

4  information are you providing to them?

5       A.   It looks like I am providing a spreadsheet, a

6  password for a spreadsheet.  I am not certain to what

7  extent this was for.

8       Q.   Well, if you look down under it it says,

9  "Hello, Chris."  This is from Geosyntec to you.  "The

10 password to unlock the groundwater monitoring sheet is

11 'geosyntec' typed in lower case.  You will also need to

12 unhide and unlock the three data calculation

13 spreadsheets."  You don't remember getting this from

14 Geosyntec?

15      A.   I do remember corresponding with them.  Yes, I

16 remember the e-mails.  I don't have a for sure

17 recollection of what this e-mail was intending.

18      Q.   And you have no idea what you were asking for

19 on January 7th, what you were asking for this password

20 for?

21      A.   Yes, sir, I knew why I needed the password.

22      Q.   Now we are getting somewhere.  You needed the

23 password to get into this program to take out the well

24 points, fair enough?

25      A.   Yes, sir.

165

1               MR. FRIEDMAN:  Your Honor, I may be

2    through if I can have a minute to confer.  Can we take

3    an afternoon break now?

4               THE COURT:  Why don't we take our

5    afternoon break then you can finish up if you need,

6    otherwise we'll come back with examination by the TVA.

7    We'll take our afternoon recess of 15 minutes.

8               (Off the record.)

9               (Back on the record.)

10              THE COURT:  Mr. Friedman, anything

11   further?

12              MR. FRIEDMAN:  I have a different line of

13   questioning and some housekeeping matters on exhibits,

14   may it please the Court.

15              I had clipped three exhibits together and

16   I believe Mr. Buttram looked at all three of them.  I

17   want the record to be clear.  I want to offer them.

18   Exhibit, Plaintiff's Exhibit 3609 was an e-mail dated

19   December 18th, 2008.  I questioned Mr. Buttram on the

20   information that was provided to him by Matt Williams.

21   The information that I had clipped to that e-mail is

22   actually two separate exhibit numbers.

23              If I may ask the witness to review those

24   and confirm that those are the information that was

25   provided to him by Mr. Williams along with the e-mail.

166

1    We would offer Exhibits 3610, and 3611.  I don't believe

2    there is objection to it.

3                    (Exhibit Nos. P-3610, 3611 were

4                    marked for identification.)

5                    MR. MARQUAND:  If the witness can identify

6    each one, that would be great.  We would not object at

7    that point.

8    BY MR. FRIEDMAN:

9        Q.   I guess what we need you to do is to look at

10   those two exhibits.  Can you find them?  They were

11   attached to the memo you were talking about, we were

12   discussing.  I believe they are attached.

13                   THE COURT:  It might be with 3609, if you

14   have 3609 pulled.

15                   THE WITNESS:  My 3609 only has three

16   copies of 3609 with just one sheet.

17   BY MR. FRIEDMAN:

18       Q.   Then if you would, please, look at 3610 and

19   3611.  I believe that was the information that

20   Mr. Williams forwarded.  We need you to confirm that, if

21   would, please, sir.

22                   Your Honor, while he's looking at that, the

23   plaintiffs would offer Exhibits 1555 and 1584.  Those

24   are the e-mails between Mr. Buttram and Mr. Dotson and

25   the representative of Geosyntec.

                              167

1          THE COURT:  1555 and 1584, any objection?

2          MR. MARQUAND:  No objection to 1584.  No

3   objection to 1555.

4          (Exhibit Nos. P-1584, 1555 were

5           received in evidence.)

6          THE COURT:  Both those are admitted.  Now

7   we are looking at 3610 and 3611.

8          THE WITNESS:  I cannot locate 3610 or

9   3611.

10  BY MR. FRIEDMAN:

11      Q.   Mr. Buttram, this Exhibit 3609, it does

12  reference that there are two attachments with it, does

13  it not, in the attachment portion of the e-mail?  You

14  see that?

15      A.   Yes, sir, that is correct.

16      Q.   And typically the attachments you would

17  receive would show up as the appearance of graphs?

18      A.   These attachments would have the raw data in

19  them, but they would have charts within the spreadsheets

20  as well.

21      Q.   Mr. Buttram, if you would, identify for the

22  record the two exhibits that have been handed you, 3610

23  and 3611.  Tell us if those are the two attachments that

24  accompanied the e-mail you received from Matt Williams

25  on December 18, 2008.

168

1    A.   These appear to be the attachments that I

2  received for the monthly reading of November, 2008.

3              MR. FRIEDMAN:  Thank you.

4              MR. MARQUAND:  No objection to 3610 or 11.

5              THE COURT:  So admitted.

6              (Exhibit Nos. P-3610, 3611 were

7              received in evidence.)

8  BY MR. FRIEDMAN:

9    Q.   Mr. Buttram, we have covered a lot of ground

10 today.  I am about to wrap up.  I need to ask you, if I

11 could, sir, do you remember speaking with a man who has

12 been identified as an expert in this case for TVA?  His

13 name is William Walton or Bill Walton.  Do you remember

14 speaking with him?

15   A.   Yes, sir, I have spoke with him.

16   Q.   And he has talked to you on occasions about

17 what you saw out there at the Kingston facility during

18 your October inspection, correct?

19   A.   Yes, sir.  We have had discussions on the

20 inspection.

21   Q.   And at one point Mr. Walton sent you an

22 e-mail, I believe, and if you would look at Exhibit 196

23 and tell us if that is the e-mail you received or a copy

24 of the e-mail you received from Mr. Walton.

25              (Exhibit No. P-196 was marked for

169

1                    identification.)

2          A.    Yes, sir.  I recall receiving this e-mail.

3          Q.    This is an e-mail dated Saturday, June 20th,

4    2009, from Mr. Bill Walton to yourself, Jamey Dotson,

5    and others at TVA, is that right?

6          A.    Yes, sir, that is correct.

7          Q.    And the subject of the e-mail is your October

8    2008 inspection, correct?

9          A.    Yes, sir.

10         Q.    And the subject of this e-mail is some

11   questions that TDEC had about the pictures from the

12   inspection, did I state that right?

13         A.    Yes, sir, that's correct.  There were I

14   believe two or three pictures they referenced.

15         Q.    Do you remember what pictures were referenced?

16         A.    No, sir, I believe there is an e-mail that

17   specifies the time stamp of which pictures they were

18   referring to.

19         Q.    The point of Mr. Walton's question to you in

20   this June 20th, 2009, e-mail that I would like to ask

21   you about is in the very last sentence beginning with

22   "again."  It says "again, we did not see from your

23   photos and inspection report that there was visible or

24   spoken evidence of slides, sloughs or subsidence."  Did

25   I read that correctly?

                              170

1      A.   Yes, sir.

2      Q.   And then if you turn the page of Exhibit 196

3   there is a follow-up e-mail to the group, the TVA group,

4   from Jamey Dotson asking "did anyone respond to Bill

5   Walton's inquiry?"  Do you see that?

6      A.   Yes, sir.

7      Q.   And following that you took it upon yourself

8   to call him to respond, remember?

9      A.   Yes, sir.

10      Q.   And if you turn the page, I guess if you turn

11   to the fourth page you see something from Mr. Snider.

12   Does that reference the photo that was the subject of

13   your conversation with Bill Walton?

14      A.   Yes, our conversation was a discussion of this

15   TDEC matter, his review of our report.

16      Q.   Did it involve any of the photographs from the

17   north dredge cell?

18      A.   The photos in the TDEC e-mail I don't believe

19   referenced any from the north dredge cell.

20      Q.   When Mr. Walton asked you and your group for

21   confirmation that there were no visible or spoken

22   evidence of slides, sloughs or subsidence, was his

23   question based on the photograph that is reflected here

24   pertaining only to the south side of the dike?

25      A.   Sorry, I can't recall the exact conversation,

1 what all photos were discussed. I know the three in

2 question here would have been discussed, but beyond that

3 I am not exactly for sure which photos in general were

4 discussed.

5     Q. If you turn the page you actually confirmed

6 for Mr. Walton his request, didn't you?

7     A. Yes, sir, based on our conversation.

8     Q. If you would, look at Exhibit 2894. That is

9 dated Monday, June 22nd, and you are telling the rest of

10 the people in your group that you just spoke with Bill

11 on the phone and you discussed his e-mail, right?

12                   (Exhibit No. P-2894 was marked for

13                   identification.)

14     A. Yes, sir.

15     Q. And did you confirm for him that on your

16 October inspection that your group did not see any

17 evidence of slides, sloughs or subsidence?

18     A. I can just go with what this e-mail says. I

19 mean, we had a conversation, of course. I can't recall

20 the exact what was said in that conversation. This

21 confirmation was based on a conversation we had. I

22 can't recall that conversation to this date.

23     Q. So you have no recollection of the substance

24 of the conversation?

25     A. Yes, sir.

172

1      Q.   All right.  There is and we know from Exhibit

2   189 and the way points that were recorded by Jamey

3   Dotson, there is at least four references to slough

4   conditions, referencing slough out there at the time of

5   your inspection.  One of the references to slough is as

6   to the north dike that collapsed, correct?

7      A.   Mr. Dotson does have the description of

8   slough.  I can't come confirm his definition of a

9   slough.

10      Q.   Because you all never went over a definition.

11   We understand all that.  The references are in the

12   document.  The point of my question is this.  Did you

13   ever make that information known to Mr. Walton at the

14   time he was making his inquiry here?

15      A.   Mr. Walton was welcome to all information out

16   there.  I can't say at this time we discussed these

17   points in general.

18      Q.   Now, when you, and I am wrapping his up, when

19   you first put your report together did you ever attempt

20   to make it appear that you had prepared your inspection

21   report for the stability of the Kingston dikes before

22   the failure of the dikes occurred?

23      A.   Could you state that again.  I am sorry.  I

24   misunderstood the question.

25      Q.   If you would, look at Plaintiff's Exhibit 185.

173

1  Do you recognize that page?

2              (Exhibit No. P-185 was marked for

3              identification.)

4        A.   Yes, sir, I do.

5        Q.   Read that statement into the record, please:

6        A.   "Subsequent to the inspection and the writing

7  of this report catastrophic failure at the north end of

8  the dredge cells occurred.  The cause of the failure is

9  currently under investigation."

10        Q.   Now, that statement is incorrect, isn't it?

11        A.   Yes, sir, that is an incorrect statement.

12        Q.   Who corrected it?

13        A.   After one of the reviews it was noted, found

14  that it was written in the wrong context.

15        Q.   Wrong context being you didn't write your

16  report until after the dike failure, did you?

17        A.   Correct.  The report was written after the

18  dike failure.

19              MR. FRIEDMAN:  Plaintiffs would offer

20  Exhibits 196 and 2894, representing the Walton memos.

21              THE COURT:  Any objection?

22              MR. MARQUAND:  No objection to 196.  I

23  didn't hear the other numbers.

24              THE COURT:  2894.

25              MR. FRIEDMAN:  2894.

174

1       MR. MARQUAND:  No objection to 2894.

2       THE COURT:  So admit both documents.

3       (Exhibit Nos. P-196, 2894 were

4       received in evidence.)

5       MR. FRIEDMAN:  The final exhibit is 166

6  which is a page from the draft -- 185, I apologize.

7       THE COURT:  185?

8       MR. FRIEDMAN:  Yes, Your Honor.

9       MR. MARQUAND:  No objection to Plaintiff's

10  Exhibit 185.

11       THE COURT:  So admitted.

12       (Exhibit No. P-185 was received in

13       evidence.)

14       MR. FRIEDMAN:  Nothing further, Your

15  Honor.

16       THE COURT:  Thank you, cross-examination.

17                    **CROSS EXAMINATION**

18       MR. MARQUAND:  May it please the Court,

19  Brent Marquand for defendant TVA.

20       THE COURT:  Thank you.  You may proceed.

21  BY MR. MARQUAND:

22     Q.  Mr. Buttram, you were asked about the July 8th

23  2009, interview that you participated in that was

24  conducted by two individuals from TVA's Office of

25  Inspector General.  Was there a transcript of that

175

1    interview?

2         A.   No, sir, not that I am aware.

3         Q.   Was it recorded?

4         A.   Not that I am aware of.

5         Q.   Were you provided a copy of a statement to

6    review?

7         A.   No, sir.

8         Q.   I would like to direct your attention to

9    Plaintiff's Exhibit I believe it's 189.  I believe

10   during your testimony you said there was some confusion

11   about some of the numbers.  189, can you tell us what it

12   is again, please?

13        A.   Yes, sir, if you look on the second page and

14   you look to the far left at the row of numbers --

15        Q.   Tell me, what is 189?

16        A.   189 is the way points that Jamey Dotson sent

17   to me after the inspection.

18        Q.   And Column A is what?

19        A.   Column A is the location and date.

20        Q.   And so rows, 2 through 20 are what location?

21        A.   Looking at the spreadsheet, they would be for

22   Widow's Creek.

23        Q.   Does that have anything to do with your

24   October 20th, 2008 inspection?

25        A.   No, sir, those way points would not be for

                              176

1    Kingston.

2       Q.   And which way points have anything to do with

3    the Kingston inspection?

4       A.   The Kingston inspection would be rows 21

5    through 30.

6       Q.   Were they designated as certain way point

7    numbers?

8       A.   Yes, sir, column B has the way point number.

9       Q.   So, way point number 20 is in which row?

10      A.   Way point 20 corresponds to row 21.

11      Q.   Is that the confusion you were taking about?

12      A.   Yes, sir, if you move to the next page there

13   is no way for me to tell if the row number specified on

14   page 3 were the actual way point numbers.

15      Q.   Row 20 is not a Kingston way point?

16      A.   If the row numbers correspond to each other,

17   yes, sir, row 20 would not be a Kingston way point.

18      Q.   Counsel asked you to count how many or

19   actually I think he asked you and said are there four

20   sloughs shown here on the Kingston way points, is that

21   correct?

22      A.   From what I recall, yes, sir.

23      Q.   Look at this and tell me.

24      A.   Yes, if row 20 is included, that would be.

25      Q.   I thought row 20 would be a Widow's Creek way

177

1   point?

2        A.   If row 20 is excluded, which it should be for

3   Widow's Creek, there would be three mentioned.

4        Q.   Now, I heard you say something about an

5   AutoCAD drawing with respect to these, right?

6        A.   Yes, sir, when I began preparing for my report

7   I tried to, I placed these way points on to an AutoCAD

8   drawing of the dredge cell to give me a reference of the

9   positioning of where these were located.

10        Q.   And I am going to show you a page out of

11   Plaintiff's Exhibit 192.  It's identified as TVK-278219.

12   Can you tell us what that page is?

13        A.   Yes, sir, that looks to be the AutoCAD drawing

14   which is a topographic map of the dredge cell that has

15   the way points plotted.

16        Q.   And how are the way points indicated on that

17   particular AutoCAD drawing?

18        A.   Way points are indicated by a circle with the

19   cross through it and it has the number and description

20   under it.

21        Q.   Did you add the circles during your

22   deposition?

23        A.   Yes, sir, the colored circles were added

24   during my deposition.

25        Q.   All right.

1          MR. MARQUAND:  Your Honor, we would tender

2    page TVK-278219 out of Plaintiff's Exhibit 192 at this

3    time.

4          THE COURT:  So admitted.

5          MR. FRIEDMAN:  No objection.

6          THE COURT:  So admitted.

7          MR. MARQUAND:  That should be TVA Exhibit

8    193.

9          (Exhibit No. D-193 was received in

10              evidence.)

11   BY MR. MARQUAND:

12        Q.   Mr. Buttram, when you wrote your report did

13   you identify in your report any of the places that

14   Mr. Dotson had noted in his way points as the sloughs?

15        A.   In my report none of the way points that

16   Mr. Dotson noted as sloughs, we didn't call them sloughs

17   in the inspection report.  They were noted in the report

18   as erosion areas.

19        Q.   You didn't call them sloughs?

20        A.   We didn't call them sloughs.

21        Q.   I show you what you have previously testified

22   to as Figure 8 in Plaintiff's Exhibit 191.  Is that one

23   of the areas that was noted by Mr. Dotson in his way

24   points as a slough?

25        A.   Yes, sir, that is one of the areas that was

179

1  noted as a slough.

2      Q.  What did you call it?

3      A.  I called it an erosion washout.

4      Q.  Did you have any training in erosion?

5      A.  Yes, sir, my engineering experience prior to

6  TVA at the other consulting firms that I worked at I

7  received several training classes on erosion and

8  sediment control, understanding water erosion, how it

9  was caused and what it would do.

10      Q.  Do you have any certifications in erosion?

11      A.  I received Level 1 and Level 2 Tennessee

12  Inspector certifications for erosion, GCI certification

13  in Alabama, also had a Georgia 1B certification in

14  Geogia, and also Thompson Engineering I at one time had

15  a license as a CPES which is a Certified Professional

16  Erosion and Sediment.

17      Q.  I believe in your report you identified this

18  as "erosion washout 2 feet by 20 feet long by two feet

19  deep," is that correct?

20      A.  Yes, sir, that is how it is stated in the

21  report.

22      Q.  When your report was peer reviewed by

23  Mr. Albright, did anyone disagree with your

24  characterization of that area as an area of erosion?

25      A.  No, sir, I don't recall anybody having any

1    problems with just calling that an erosion area.

2         Q.   Let me show you Page 7 of Plaintiff's 191.

3    Did you identify those as areas of erosion?

4         A.   Yes, sir, those areas were identified as just

5    an erosion washout.

6         Q.   Had Mr. Dotson identified those in his way

7    points as sloughs?

8         A.   Mr. Dotson identified it as a "slough road

9    washout."

10        Q.   And where in the area of the ash disposal

11   facility was that particular photograph taken?  Can you

12   point to it on this, on Plaintiff's Exhibit 193?

13        A.   I believe it was somewhere in this.

14        Q.   It was on the north dike?

15        A.   I was on the north dike in this general area

16   there.

17        Q.   Okay.  Counsel asked you about whether or not

18   there was erosion above or below this particular

19   washout.  I have here a photograph which is from TVA

20   Exhibit 34.  It is TVK-277812.  What is that area along

21   above the washout.  Can you tell us --

22                  (Exhibit No. D-34 was marked for

23                   identification.)

24        A.   That would be the bench.

25        Q.   For the Court, for all of us, what is a bench?

181

1      A.   As these facilities are raised upstream they

2  will create a bench level which is a flat/semiflat area

3  usually sloped in so it can drain without washing over

4  the sides.   These benches also allow vehicles to travel

5  upon them around the facility.

6      Q.   And I believe in your testimony that you said

7  that it was something about this bench or something

8  about the crest of this bench being tilted one way or

9  another.   Can you explain that, please?

10     A.   Yes, sir, for this erosion washout to happen,

11  the bench was not properly sloped back into the toe.   It

12  was sloped a little bit back out towards the outer

13  slope.

14     Q.   It was sloped down from the --

15     A.   I was sloped down, yes, sir, from the toe of

16  the upper slope there.   If any rain occurred, it would

17  all drain to this area and concentrate, which then would

18  cause this erosion washout.

19     Q.   Can we see the area where it is sloped down in

20  this particular photograph?

21     A.   It looks to be directly above that erosion

22  area there.

23          MR. MARQUAND:   Your Honor, we tender

24  TVK-277812, which is a part of TVA Exhibit 34.

25          MR. FRIEDMAN:   No objection.

182

1          THE COURT:  So admitted.

2          (Exhibit No. D-34 was received in

3          evidence.)

4   BY MR. MARQUAND:

5       Q.   Now, I am going to show you the photograph

6   looking the other direction on that particular feature.

7   It is TVK-277811 of TVA Exhibit 34.  Is that looking

8   down slope?

9       A.   The picture is looking up the slope.

10      Q.   Up the slope?

11      A.   It's further down.

12      Q.   I believe counsel asked you if you could see

13  the continuation of the erosion.  Can you see it in this

14  photograph?

15      A.   I can see where the water has washed down and

16  has turned the grass down some.  Directly from this

17  picture you can't see the full bottom of the slope.  You

18  can see how the erosion carries on down to about the mid

19  slope there.

20      Q.   Is there any doubt in your mind, when you saw

21  this feature, that this was erosion, as opposed to

22  subsidence or a slide?

23          MR. FRIEDMAN:  Objection to leading.

24          THE COURT:  I will sustain the objection.

25  BY MR. MARQUAND:

183

1    Q.   Did you see any evidence of any slides or

2    subsidence in your inspection?

3    A.   No, sir, there was no evidence of any slides

4    or sloughs out there.  Everything that we saw was mainly

5    erosion or where the water had concentrated and was

6    causing a little bit deeper erosion.

7    Q.   When you removed the word "immediately" from

8    the drafts of your report with respect to the different

9    features which you initially said should be repaired

10   immediately, did that change the substance of your

11   report?

12   A.   No, sir, I did not believe it changed the

13   substance of the report.  The word "immediately" at that

14   time was for emphasis and at the writing of this report

15   and submittal of it there was no emphasis for those

16   specific areas at that time.

17   Q.   Why not?

18   A.   Because the failure had happened and there

19   were other things being done at Kingston at that time.

20   These repairs and maintenance would not have been able

21   to be done.

22   Q.   I wanted to ask you about your report, Exhibit

23   191.  You were shown the very last page of it.  Can you

24   tell us what that is?

25   A.   Yes, sir.  That is a general sketch of the

184

1  area.  It is not to scale, but it is just used as a

2  reference.  It had been used in prior reports to show

3  the general location where photographs were taken during

4  the inspection report.

5       Q.  How accurate is this diagram with respect to

6  the accuracy of the locations of the photographs?

7       A.  The accuracy of this sketch is not very good

8  because it doesn't have any of the bench levels around

9  the dredge cell.  It has just kind of got some general

10  lines to kind of give the border areas of anything.

11  These pictures are in very approximate locations just to

12  kind of point the person in the right direction.

13       Q.  Let me show you Plaintiff's Exhibit 1552.

14  This is the groundwater monitoring system process that

15  you put together.  What was the, what groundwater was

16  being monitored?

17       A.  This document was created for the monitoring

18  of the drive-point piezometers on the west dike.  We

19  would have been monitoring the groundwater on the west

20  dike.

21       Q.  Were you attempting to monitor any other

22  monitoring wells or holes in the ground anyplace else

23  besides the west dike?

24       A.  No, sir, the responsibility stated here were

25  solely for the monitoring of the west dike.

185

1    Q.    And why was, why had that system been put

2    together?

3    A.    After they had the blowouts in 2003 and 2006

4    to help with the repairs they installed these

5    piezometers and well points first to help with the

6    repair and then afterwards they used it as extra data

7    just to continue to monitor the groundwater level on the

8    west dike.

9    Q.    If you would, look at -- I want you to look at

10   three plaintiff's exhibits, 3609, 3610 and 3611.

11   A.    I have them, sir.

12   Q.    Were there attachments to 3609?

13   A.    Yes, sir, there were two attachments to 3609,

14   two Excel spreadsheets that contained the raw data from

15   the inspector that went out and gathered it.

16   Q.    And do you have the two spreadsheets there?

17   Are they 3610 and 3611?

18   A.    Yes, sir, 3610 and 3611 are the two

19   attachments.

20   Q.    Take a look at them and tell me what data is

21   in 3610.

22   A.    3610 has the data for the west dike for the

23   piezometers and the well points.

24   Q.    Did you use that data?

25   A.    This is the data that I used and would input

186

1  into the spreadsheet that Geosyntec had created.

2      Q.   What is Plaintiff's Exhibit 3611?

3      A.   3611 are monitoring wells.

4      Q.   And where are those located?

5      A.   To my knowledge all these monitoring wells are

6  just located throughout the dredge cell.

7      Q.   Did you use that data?

8      A.   I did not use this data.

9      Q.   Was that part of the data you were supposed to

10 use in the Geosyntec program?

11     A.   I had no responsibility with this data.  The

12 only data I used came from 3610.

13     Q.   Can I have Plaintiff's Exhibit 606, please.

14 If we could enlarge it.  Do you see where it says well

15 ID on the left-hand column?

16     A.   Yes, sir.

17     Q.   Does that correspond to the ID numbers in 3610

18 or 3611?

19     A.   These well IDs correspond to the IDs located

20 in 3610.

21     Q.   And Plaintiff's 606 is the Geosyntec output,

22 right?

23     A.   Yes, sir.

24     Q.   Is there anyplace in that program to input the

25 monitoring well data in Plaintiff's Exhibit 3611?

187

1          A.   No, sir.

2               MR. MARQUAND:   No further questions.

3     Thank you, Mr. Buttram.

4               THE COURT:   Thank you.

5               Redirect?

6               MR. FRIEDMAN:   Very briefly, Your Honor.

7                    **REDIRECT EXAMINATION**

8     BY MR. FRIEDMAN:

9          Q.   Mr. Buttram, we have kept you here a long

10    time.   I appreciate your patience.

11              Did I just hear you say you didn't see any

12    sloughs, when you were out there that day in October?

13    Is that your sworn testimony?   You want to change that

14    answer?

15         A.   Well, based on what I know today, yes, sir, I

16    did not see --

17         Q.   Excuse me.   What about what you wrote in your

18    own notes?

19         A.   Yes, sir, I know that in my notes the word

20    "slough" was mentioned.   At the time --

21         Q.   At the time you were out there you thought you

22    saw a slough, didn't you?

23         A.   Yes, sir, I believe I stated that sloughs can

24    be opinionated depending on who you ask.

25         Q.   Well, you had an opinion while you were out

188

1   there doing this inspection you saw a slough. Now you

2   have an opinion that is changed because you are a

3   witness in a case against the TVA? Is that what is

4   changing your opinion?

5        A. No, sir. I was asked what I thought now. Did

6   I see anything out there.

7        Q. When you were out there, at the time you

8   thought you saw a slough. No question about that,

9   right? When you were out there at the time doing this

10   inspection, the one designated to write up the report,

11   the annual stability report, you thought you saw a

12   slough, right?

13        A. I wrote down a slough, but not a slough that

14   would be associated with a slope failure, no, sir.

15        Q. You didn't include it in your report, did you?

16        A. No, I did not have my notes at the time I

17   wrote the report.

18        Q. They just happened to be missing.

19        Now, let's just talk about real quick this

20   business about all the deletions of the term

21   "immediately" being taken out of the repairs in the

22   final report. Did I understand your testimony that you

23   didn't include "immediately" because the disaster

24   occurred and there was no need to do maintenance out

25   there any more? The pressing nature of it was all gone?

189

1    A.   No, sir, I felt that since the disaster had

2  happened the word "immediately" did not add the emphasis

3  that it would have prior to it.  I didn't feel it

4  changed the substance by removing the word

5  "immediately."

6    Q.   In other words, there is no need to shut the

7  barn door once the cow is gone, right?  It is too late

8  to do immediate repairs when the dike has failed, right?

9  Is that what you are trying to tell the Court?

10    A.   I am just trying to say what I, my personal

11  thought, what I thought at that time that the word

12  immediately -- I'm not saying that the repairs still

13  didn't need to be done.  In essence it was stated in the

14  report, I just didn't feel the word "immediately" added

15  the emphasis at that time.

16    Q.   Well, I understand what you are saying because

17  Exhibit 191, which is your final report, you have two

18  pages of recommendations for maintenance that needed to

19  be done on those dikes.  We read through them.  You

20  still want maintenance to go on out there, but the

21  urgency since the disaster occurred has passed.  Can we

22  agree on that?

23    A.   Yes, sir.

24         MR. FRIEDMAN:  No further questions, Your

25  Honor.

1                THE COURT:  Anything further,

2    Mr. Marquand?

3                MR. MARQUAND:  None, Your Honor.

4                THE COURT:  Mr. Buttram, you may be

5    excused.

6                MR. DAVIS:  Your Honor, we have another

7    witness we can start with today or we can wait until

8    tomorrow.  It's up to the Court.

9                MR. FRIEDMAN:  Before Mr. Buttram leaves,

10   we do not want to release Mr. Buttram from his subpoena.

11   We ask that the witness, as it pertains to his

12   testimony, remain sequestered.

13               THE COURT:  Mr. Buttram, just so you are

14   advised.  You are still under subpoena.  You may have

15   been informed about the rules of sequestration.  You

16   should not discuss your testimony with other witnesses

17   or potential witnesses or anyone else's testimony

18   discussed with you in the event you may be recalled as a

19   witness by either party in this case.

20               THE WITNESS:  Yes, Your Honor.

21               THE COURT:  Thank you.  You are excused

22   for now.

23               Why don't we go ahead and break.  I have a

24   few other matters to handle upstairs.  We'll plan to put

25   in a full day tomorrow.  Why don't we start fresh.  That

191

1  way you can get all of the documents fresh and we'll

2  start at 9:00 tomorrow, which would be September 20th.

3  We'll see everybody here and try to get started right at

4  9:00 a.m. on September 20th.  Thank you.

5                (Court was recessed.)

6         I CERTIFY THAT THE FOREGOING IS AN ACCURATE
   TRANSCRIPT OF THE RECORD OF PROCEEDINGS IN THE
7  ABOVE-ENTITLED MATTER.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25