| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| | FOR THE EASTERN DISTRICT OF TENNESSEE |
| 2 | NORTHERN DIVISION, AT KNOXVILLE, TENNESSEE |

```
 3   George Chesney, Jot Raymond,          :
     Anita Auchard, Lee Scofield,          :
 4   James Campbell, et., al.,             : VOLUME II
                   Plaintiffs,             :
 5   Vs.                                   : CV
                                           : 3-09-09
 6   Tennessee Valley Authority            : 3-09-48
                                           : 3-09-54
 7               Defendant,                : 3-09-64
                                           : 3-09-517
 8
                 Transcript of trial proceedings before the
 9   Honorable Thomas A. Varlan on September 20, 2011.

10
                         ON BEHALF OF THE PLAINTIFFS:
11                       Jeff Friedman
                         Gary A. Davis
12                       David B. Byrne, III
                         Paul D. Brandes
13                       Elizabeth A. Alexander
                         A. Brantley Fry
14                       Joanne M. McLaren
                         Jeff Matt Conn
15                       L. Jeffrey Hagood
                         Wayne A. Ritchie, III
16                       Todd Monday
                         Attorneys at Law
17
                         ON BEHALF OF THE DEFENDANT:
18                       Edwin Small
                         Elizabeth Ward
19                       Brent Marquand
                         James Chase
20                       David Ayiffe
                         Mark Anstoetter
21                       Peter Shea
                         Attorneys at Law
22
                         Jolene Owen, R.P.R.
23                  800 Market Street, Suite 131
                           P.O. Box 2201
24                  Knoxville, Tennessee, 37901
                           (865) 384-6585
25
```

1

```
 1                        I N D E X
        Examinations                                    Page
 2       MATTHEW WILLIAMS                                  5
        (Exhibit No. P-59 was marked for identification.)  7
 3      (Exhibit No. P-596 was marked for identification.) 13
        (Exhibit No. P-562 was marked for identification.) 16
 4      (Exhibit No. P-596 was received in evidence        16
        (Exhibit No. P-5461 was marked for identification.) 30
 5      (Exhibit No. P-59A was marked for identification.) 32
        (Exhibit No. P-59A was received in evidence        33
 6      (Exhibit No. P-1233 was marked for identification.) 37
        (Exhibit No. P-1232 was marked for identification.) 39
 7      (Exhibit Nos. P-919, 1233 were received in evidence.) 39
        (Exhibit No. P-1230 was marked for identification.) 42
 8      (Exhibit No. P-1251 was marked for identification.) 43
        (Exhibit Nos. P-1232, 1230 were received in evidence.) 44
 9      (Exhibit No. P-2306 was marked for identification.) 50
        (Exhibit No. P-1234 was marked for identification.) 55
10      (Exhibit No. P-2306 was received in evidence       55
        (Exhibit No. P-1234 was received in evidence       62
11      (Exhibit No. P-1242 was marked for identification.) 62
        (Exhibit No. P-1251 was received in evidence       65
12      (Exhibit No. P-285 was marked for identification.) 70
        (Exhibit No. P-1243 was marked for identification.) 72
13      (Exhibit No. P-1243 was received in evidence       75
        (Exhibit No. P-1215 was marked for identification.) 75
14      (Exhibit Nos. P-285, 1215 were received in evidence.) 77
        (Exhibit No. P-1196 was marked for identification.) 77
15      (Exhibit No. P-1194 was marked for identification.) 78
        (Exhibit Nos. P-1194, 1196 were received in evidence.) 78
16      (Exhibit No. P-4398 was marked for identification.) 80
        (Exhibit No. P-1204 was marked for identification.) 82
17      (Exhibit No. P-4398 was received in evidence       82
        (Exhibit No. P-1181 was marked for identification.) 84
18      (Exhibit No. P-2841 was marked for identification.) 87
        (Exhibit Nos. P-1204, 1181 were received in evidence.) 87
19      (Exhibit No. P-2841 was received in evidence       88
        (Exhibit No. P-1667 was marked for identification.) 89
20      (Exhibit No. P-1181 was marked for identification.) 95
        (Exhibit No. P-1181 was received in evidence       98
21      (Exhibit No. P-2833 was marked for identification.) 98
        (Exhibit No. P-2839 was marked for identification.) 102
22      (Exhibit No. P-2833 was received in evidence       102
        (Exhibit No. P-2840 was marked for identification.) 103
23      (Exhibit Nos. P-2839, 2840, 2841 in evidence.)     104
        (Exhibit No. P-3058 was marked for identification.) 105
24      CROSS EXAMINATION                                  123
        (Exhibit No. P-270 was marked for identification.) 126
25      (Exhibit No. P-270 was received in evidence        128
        (Exhibit No. D-194 was marked for identification.) 132
```

2

| | | |
|---|---|---|
| 1 | (Exhibit No. D-194 was received in evidence | 134 |
| | (Exhibit No. P-1763 was marked for identification.) | 141 |
| 2 | (Exhibit No. P-1763 was received in evidence | 144 |
| | (Exhibit No. P-245 was marked for identification.) | 144 |
| 3 | (Exhibit No. P-245 was received in evidence | 145 |
| | REDIRECT EXAMINATION | 147 |
| 4 | **CHRISTOPHER HENSLEY** | 157 |
| | (Exhibit No. P-1214 was marked for identification.) | 163 |
| 5 | (Exhibit No. P-1214 was received in evidence | 167 |
| | (Exhibit No. P-1185 was marked for identification.) | 167 |
| 6 | (Exhibit No. P-1185 was received in evidence | 168 |
| | (Exhibit No. P-1186 was marked for identification.) | 168 |
| 7 | (Exhibit No. P-1186 was received in evidence | 169 |
| | (Exhibit No. P-1201 was marked for identification.) | 170 |
| 8 | (Exhibit No. P-1201 was received in evidence | 170 |
| | (Exhibit No. P-1202 was marked for identification.) | 170 |
| 9 | (Exhibit No. P-1202 was received in evidence | 171 |
| | (Exhibit No. P-1217 was marked for identification.) | 175 |
| 10 | (Exhibit No. P-1217 was received in evidence | 176 |
| | (Exhibit Nos. P-1218, 1219 for identification.) | 176 |
| 11 | (Exhibit Nos. P-1218, 1219 were received in evidence.) | 180 |
| | (Exhibit No. P-2910 was marked for identification.) | 180 |
| 12 | (Exhibit No. P-2910 was received in evidence | 182 |
| | (Exhibit No. P-239 was marked for identification.) | 182 |
| 13 | (Exhibit No. P-239 was received in evidence | 183 |
| | CROSS EXAMINATION | 183 |
| 14 | (Exhibit No. P-287 was received in evidence | 185 |
| | REDIRECT EXAMINATION | 188 |
| 15 | **JOHN ALBRIGHT** | 190 |
| | (Exhibit No. P-538 was marked for identification.) | 197 |
| 16 | (Exhibit No. P-563 was marked for identification.) | 199 |
| | (Exhibit No. P-2552 was marked for identification.) | 209 |
| 17 | (Exhibit No. P-563 was received in evidence | 209 |
| | (Exhibit No. P-2552 was received in evidence | 214 |
| 18 | (Exhibit No. P-2553 was marked for identification.) | 214 |
| | (Exhibit No. P-5 was marked for identification.) | 221 |
| 19 | (Exhibit No. P-2553 was received in evidence | 221 |
| | (Exhibit No. P-618 was marked for identification.) | 225 |
| 20 | (Exhibit No. P-5 was received in evidence | 232 |
| | (Exhibit No. P-1665 was marked for identification.) | 232 |
| 21 | (Exhibit No. P-1542 was marked for identification.) | 233 |
| | (Exhibit No. P-1665 was received in evidence | 233 |
| 22 | (Exhibit No. P-1542 was received in evidence | 236 |
| 23 | | |
| 24 | | |
| 25 | | |

3

1              (Trial was resumed on September

2              20, 2011)

3              THE COURT:  Good morning everybody.

4    Mr. Davis, are you going to examine the next witness?

5              MR. DAVIS:  Yes, I will.  I believe

6    Mr. Marquand has something to address the Court with.

7              MR. MARQUAND:  Just a housekeeping matter,

8    Your Honor.  Yesterday during cross-examination of

9    Mr. Buttram we introduced two photographs from a

10   document that had been marked for identification to be

11   Exhibit 34.  We introduced those into evidence

12   indicating them by bates range.  Today we would like to

13   resubmit those and they have been remarked as

14   Defendant's Exhibit 34A, that is, page 37 of what was

15   marked as TVA Exhibit 34.  It was identified yesterday

16   in the record as TVK-277812.

17             THE COURT:  Go ahead and show both of

18   them.

19             MR. MARQUAND:  All right.

20             THE COURT:  This is 34B.

21             MR. MARQUAND:  34B was introduced

22   yesterday and it is, it was identified at that time as

23   TVK-277811.  It is in fact page 36 of what has been

24   marked as TVA Exhibit 34.

25             THE COURT:  Any objection?  We'll allow

4

1  those two photographs to be relabeled and introduced as

2  Defendant's Exhibit 34A and Defendant's Exhibit 34B.

3                    MR. DAVIS:  We are calling Mr. Matthew

4  Williams.

5                    MATTHEW WILLIAMS

6  was first duly sworn and testified as follows:

7                    COURTROOM DEPUTY:  Have a seat and state

8  your name for the record.

9                    **DIRECT EXAMINATION**

10  BY MR. DAVIS:

11       Q.   Good morning, Mr. Williams.

12       A.   My name is Matthew Williams.

13       Q.   My name is Gary Davis.  We haven't met before

14  have we?

15       A.   No, sir.

16       Q.   We haven't taken your deposition, but I'm sure

17  you know what you are here for today?

18       A.   Yes.

19       Q.   Before we start, you know that there is a

20  folder full of exhibits in front of you on the desk to

21  your left there, that big bucket as we call it.  Those I

22  will be referring to, as we go through your testimony.

23  Let me ask you, first of all, you are employed with TVA,

24  correct?

25       A.   Yes, sir.

1    Q.   How long have you been with TVA?

2    A.   Since May of 2002.

3           MR. DAVIS:  And, Your Honor, we are going

4  to be taking this witness as an adverse witness.  I just

5  wanted to ask the Court for permission to do that.

6           THE COURT:  That's fine.  He hasn't been

7  identified by position or anything.  Absent objection,

8  we'll allow you to proceed in that way.

9  BY MR. DAVIS:

10   Q.   Mr. Williams, what are your responsibilities

11 or position, or both, with TVA?

12   A.   I am an environmental engineer with TVA.  My

13 responsibilities, I'm in a field engineering outfit and

14 we are specialized -- I typically specialize in

15 groundwater work doing sampling and monitoring around

16 permitted facilities at TVA.

17   Q.   Are you an engineer?

18   A.   Yes.

19   Q.   What type of engineer?

20   A.   I am an environmental engineer by position.  I

21 have a civil degree undergraduate and a Master's in

22 environmental engineering.

23   Q.   You are not a geotechnical engineer are you?

24   A.   I am not.

25   Q.   Do you have any training in dike stability

1    inspections or slope stability evaluations at all?

2         A.   No specific training.  I have had some

3    academic background works and general work within

4    studies within civil engineering.

5         Q.   And you are primarily focused in your job on

6    taking the samples or measuring environmental levels of

7    some type, is that correct?

8         A.   Yes, sir, including hydraulic parameters.

9         Q.   What do you mean by hydraulic parameters?

10         A.   Typically we'll get environmental samples

11    including water surface measurements.

12         Q.   Now, you have had some involvement with the

13    Kingston ash disposal site prior to December 22nd, 2008,

14    correct?

15         A.   Yes, sir.  I have been involved with

16    monitoring out there, field monitoring since September

17    of 2002.

18         Q.   Okay.  Let me show you what has been marked as

19    Exhibit 59.  It is in your folder there, if you can

20    bring it up.  I want to just orient ourselves a little

21    bit using this exhibit, if we may.  Can you identify

22    this aerial photograph as a photograph of the Kingston

23    ash disposal site prior to the disaster on December 22,

24    2008?

25                     (Exhibit No. P-59 was marked for

                               7

1    identification.)

2         A.   Yes, I can.

3         Q.   Okay.  We have been using terminology that I

4    want to see if you will agree with in this trial thus

5    far.  That the dikes have names based on directions, and

6    I want to focus on the dredge cells, if we will that are

7    labeled in this aerial.  First of all, do you see the

8    Swan Pond Road label here?

9         A.   Yes, I do.

10        Q.   And secondly, would that be the West Dike as

11   it is sometimes called?  Do you agree with that

12   terminology?

13        A.   I myself have not used that terminology, but

14   it is the northwest facing dike.

15        Q.   What terminology do you normally use for that

16   dike?

17        A.   We usually use just the Swan Pond Road face.

18        Q.   Okay, would you agree if I say "west" that's

19   what I am referring to?

20        A.   Yes, sir.

21        Q.   Now, if you look at the dredge cell number 2

22   and the dike that is facing the top of the aerial, that

23   direction is north -- I will tell you that, if you'll

24   agree with that.  Is that what you understand?

25        A.   Yes, sir.

8

1    Q.   We have been using the terminology "North

2  Dike" for that dike of the Dredge Cell Number 2.  Do you

3  call it that yourself or what would you call it?

4    A.   Are you specifically referring to just the

5  area around the red line or the general northeastern

6  face of Dredge Cell Number 2?

7    Q.   That is what I'm trying to understand.  I have

8  seen you refer to that as northeast.  The whole north

9  face of Dredge Cell 2, do you call it north or

10  northeastern?

11    A.   Probably northeastern facing is the

12  terminology I would use most.

13    Q.   Just so we understand if you see where Swan

14  Pond Road curves to the left, as we are going to the

15  north and where the red line basically is on this

16  drawing the probable December 2008 failure location, can

17  you agree that -- I'm sorry, are you calling all of that

18  face of Dredge Cell Number 2 dikes all of the way around

19  to the eastern most part of the north face of Dredge

20  Cell 2?  Are you calling that northeast?

21    A.   Typically I refer to the faces of the dikes by

22  the direction that they extend.  You know, when you say

23  the corner and all of the way around, you know, I will

24  typically make a, distinguish a point at where that

25  corner of that northern most corner which would be

9

1    indicated by, you know, under the line of Dredge Cell 2.

2        Q.   So north would pretty much be where the red

3    line is, is that what you are saying?

4        A.   I am saying the northern most corner would be

5    about midway under that red line.

6        Q.   The rest you call northeast?

7        A.   Yes, sir.

8        Q.   Thank you.  Now, when you refer to south, what

9    do you mean on this drawing?

10       A.   If I was to say the south portion of the

11   dredge cell, from this drawing I would say it is

12   probably the southern most face of Dredge Cell 1.

13       Q.   Okay.  And the monitoring that you have done

14   at the Kingston Coal Ash Facility has been on the north,

15   the west and the south face of the dredge cells, is that

16   correct?

17       A.   And you are talking about the hydraulic

18   monitoring?

19       Q.   Yes.

20       A.   Yes, well, our monitoring was on the, as you

21   indicate, the western face along Swan Pond Road, which I

22   call the northwest face, as well as the southern face

23   along Dredge Cell 1 and the northeastern face along

24   Dredge Cell 2.

25       Q.   Okay, we'll get the location more precise in a

10

1  minute.  I wanted to make sure that we're oriented to

2  this aerial photograph.

3          Can you state what your duties were at the

4  Kingston Coal Ash Facility prior to December 22, 2008.

5      A.  Yes, sir.  I had primarily two interfaces, two

6  responsibilities out there.  We were doing groundwater

7  monitoring of what we call the ash pond area which

8  included the dredge cell and the main ash pond which was

9  sampling to support a TDEC permit, a solid waste permit

10  for the region which was comprised of semi-annual

11  sampling of wells out there.  These would be four wells,

12  including one along Swan Pond Road which was our

13  upgrading and background location and three down

14  gradient.

15      Q.  Let me stop you there one second.  I want to

16  make sure that we are distinguishing between the water

17  quality monitoring that you just spoke about and the

18  water level monitoring that I am going to talk about for

19  the rest of the testimony.

20      A.  Yes, sir.  This was generally water quality

21  monitoring.  There was a hydrologic component that we

22  are required to submit to the state, a potentiometric

23  map which shows a general direction of flow across the

24  dredge cell and the ash pond.

25      Q.  Those were flows, those are groundwater levels

11

1   and flows in the deep groundwater below the coal ash,

2   correct?

3        A.   Yes, sir.  Typically they are, it would be in

4   the alluvium which resides beneath the coal ash.

5        Q.   That is just to check for groundwater

6   contamination, correct?

7        A.   Yes, sir, we monitor groundwater

8   contamination.

9        Q.   I am not going to refer to those any more in

10  your testimony.

11       A.   Understood.

12       Q.   What is the second set of monitoring that you

13  did at the Kingston Coal Ash Facility?

14       A.   The second set of monitoring would be

15  monitoring wells and piezometers along the dredge cell

16  including -- this would go as far back as February of

17  2005.  This would be monthly monitoring that we

18  maintained until the failure of the dredge cell in

19  December of 2008.

20       Q.   Okay, I am going to walk you through some of

21  those reports that you submitted.  Just before I do

22  though, let me get you to state what a piezometer is.

23       A.   A piezometer is typically a pipe, a one inch

24  and up, that we would install to monitor water levels of

25  a discrete vertical interval.  Typically when we refer

12

1  to a well we are referring to something, a device that

2  while it looks similar to a piezometer in construction

3  form it is used for multiple purposes.  The piezometer

4  is typically only for water levels and it is typically

5  only to measure water levels in that discrete horizon

6  that it is screened in.  When I say screened, it is open

7  at the bottom with an actual screen to that layer, to

8  that material.

9      Q.  May we get you to look at Exhibit 596, please.

10  It is in your folder, if you care to see a paper copy of

11  it.

12              (Exhibit No. P-596 was marked for

13              identification.)

14              MR. DAVIS:  Before we leave Exhibit 59,

15  may we enter that, Your Honor.

16              MR. MARQUAND:  Your Honor, the witness

17  testified to this as an aerial photograph.  I don't

18  believe he has identified or can sponsor any of these

19  labels without any testimony or the data for what it --

20              THE COURT:  We'll mark it for

21  identification for the time being.  You can continue to

22  use it with the witnesses and move it for admission at

23  the appropriate time.

24              MR. DAVIS:  Thank you, Your Honor.

25  BY MR. DAVIS:

1      Q.   If we can turn to what is labeled as

2   deposition exhibit page 220, please.  You can look at

3   your screen now, or you can look at it on paper

4   Mr. Williams.  Is this a diagram of a piezometer?

5      A.   This would actually be a monitoring well.

6   Again, the distinction I make is they are similar in

7   design and construction.  This would be typical of what

8   a piezometer is, but this is in fact a monitoring well.

9      Q.   Why does it say "Type I piezometer

10  Installation Record" at the top?

11     A.   You know, that could be language that MACTEC

12  uses.  Again, when we use the term "well" it is because

13  we are getting something more from it than just water

14  level readings.

15     Q.   Okay.  If you are using a well -- let's go

16  ahead and identify what MACTEC document this is.  If you

17  will turn back to the cover page and switch back to

18  that, please.

19          This is a report from MACTEC, and can you

20  state what MACTEC is referring to in this report and the

21  date of it, please.

22     A.   The title is the "Report of Monitoring Well

23  Installation, Dredge Cell Dike Restoration, TVA Kingston

24  Fossil Plant."  The date is September 16th, 2005.

25     Q.   And this is actually three of the piezometers

14

1    or wells that you monitored, is that correct; 13, 14 and

2    15?

3         A.   This would actually be six of the wells that

4    we monitored.

5         Q.   Three on the north and three on the south?

6         A.   That is correct, three to the north, yeah.

7         Q.   And just so that we are using the terms

8    correctly, if a well is only used for measuring water

9    levels, could you also call it a piezometer?

10        A.   We could.

11        Q.   As a matter of fact, you just pointed out the

12   diagram says "piezometer" for this particular MW-13 that

13   we looked at, correct?

14        A.   Correct.

15        Q.   Okay.  Now, you understand that TVA decided to

16   install piezometers in 2005 to monitor water levels in

17   the dikes of the Kingston Coal Ash Facility, correct?

18        A.   Yes.  Among other purposes.

19        Q.   Well, and these were installed as a result of

20   the 2003 blowout, do you recall that?

21        A.   I do recall and the wells that were actually

22   installed in January of 2005 were actually installed for

23   multi-purpose including we had a permit that we were

24   submitting for expansion of the dredge cell.  This would

25   be a lateral expansion area.  We wanted some

15

1   multi-purpose wells out there that we can use to test

2   some of the hydraulic properties of the dredge cell.

3   That was one function that I was aware of.  I am aware

4   that there were other functions that were being used by

5   other groups.

6        Q.   These are some of the wells or piezometers

7   that you monitored starting in February of 2005 up to

8   the time of the failure of the dikes, is that right?

9        A.   Yes, sir.

10       Q.   Now, let's, if you will, look at Exhibit 562,

11  please.

12                (Exhibit No. P-562 was marked for

13                identification.)

14                While you are doing that, Your Honor, we

15  would like to go ahead and enter Exhibit 596.

16                MR. MARQUAND:  No objection.

17                THE COURT:  So admitted.

18                (Exhibit No. P-596 was received in

19                evidence.)

20  BY MR. DAVIS:

21       Q.   You mentioned -- it is a large document.  I am

22  not going through all of it with you, Mr. Williams.  You

23  mentioned a permit application.  When you said permit

24  application, did you mean a solid waste permit

25  application with the Tennessee Department of Environment

16

1    and Conservation?

2         A.   Yes, sir, I believe the lateral expansion was

3    either a new proposal or amendment to an existing

4    permit.

5         Q.   If you can look at what we have shown you as

6    Exhibit 562, please.  This is also a permit modification

7    with the Tennessee Department of Environment and

8    Conservation, correct?

9         A.   Yes, sir.

10        Q.   And this shows in the upper left-hand corner

11   "approved as minor modification" by a TDEC official.  Do

12   you understand that?

13        A.   Yes, sir.

14        Q.   Now, if we can turn, please, to the third page

15   of this document.  This shows it was submitted by TVA on

16   April 27th, 2005, correct?

17        A.   Yes, sir.

18        Q.   Okay.  And the purpose of this minor

19   modification you can see in this paragraph that is

20   highlighted here was to allow the repair of the blowout,

21   right?

22             MR. MARQUAND:  Your Honor, I think the

23   document speaks for itself.  I am not sure the witness

24   has personal knowledge, at least that has been

25   established.

17

1          THE COURT:  We'll see if he does.  You can

2   answer to the extent you can.  He can answer to the

3   extent he can or you can reword the question, if you

4   like.

5          THE WITNESS:  I just point out I have

6   never seen this document before.  My interpretation of

7   this document would be from just what I read.

8   BY MR. DAVIS:

9      Q.  Are you saying you were not informed about

10  this document?

11     A.  I was not informed about this document.  I

12  don't know I necessarily needed to be.

13     Q.  Let me show you what is page 5 of this

14  document -- it is not page 5.  It would be the page that

15  has 431 exhibit number at the bottom.  If you can turn

16  to that, please.  You understand this is a permit

17  modification, right?  It is part of a permit with the

18  Tennessee Department of Environment and Conservation?

19     A.  Yes, sir.

20     Q.  Okay.  Now, look at this conclusion on this

21  page.  Just go ahead and read the second paragraph

22  there.  Read it out loud.

23     A.  "To insure that the proposed fix is

24  successful, TVA will install piezometers on the north,

25  south and western faces of its dredge cells.  To monitor

18

1  performance of the drainage system, the phreatic surface
2  measured in these piezometers will be compared with that
3  predicted in the models."
4       Q.   That sounds like the piezometers that you were
5  monitoring, is that right?
6       A.   Yes, sir.
7       Q.   You weren't informed about this permit
8  requirement?
9       A.   I was not.
10      Q.   You knew that TVA decided to monitor
11 piezometers on the north, west and south faces of the
12 dredge cells, right?
13      A.   I knew because I was in charge of scheduling
14 folks to go out there and perform the measurements.
15      Q.   Okay.  Now, you say that was your job to
16 either monitor or to arrange to have someone actually go
17 measure the levels, is that right?
18      A.   Yes, sir.
19      Q.   And there is a second part.  If you can bring
20 that paragraph back up, please.  You are still looking
21 at it, are you not, Mr. Williams?
22      A.   There it is.
23      Q.   Is there is a second sentence that you read in
24 this paragraph that talks about that these piezometers
25 will be compared -- "the phreatic surface measured in

1    these piezometers will be compared with that predicted

2    in the models."  What model are they talking about, do

3    you know?

4          A.   I do not know.

5          Q.   Are you aware of any comparison that TVA did

6    with water levels on any particular models?

7          A.   I am not.

8          Q.   Okay.  But you do understand that it was

9    important to monitor these water levels to prevent

10   another blowout, right?

11         A.   I understood that the, that was our job to

12   monitor water levels.  We didn't really have any further

13   discussion.

14         Q.   Are you saying you weren't informed that it

15   was important to monitor these water levels to prevent a

16   blowout of the dredge cells?

17         A.   I think it is reasonable based upon my

18   experience and my education that we knew that the

19   hydraulic monitoring that we were doing was an important

20   component to measure to keep tabs on the water surfaces

21   within the cell.

22         Q.   And you were familiar with the November, 2003

23   blowout, were you not?

24         A.   Yes.

25         Q.   Did you see it yourself?

20

1      A.   No.

2      Q.   Okay.  Did you see photographs of it?

3      A.   No.

4      Q.   But you knew it occurred and you knew it was

5  on the West Dike, is that right?

6      A.   Yes, sir.

7      Q.   Or the Swan Pond Road dike.

8           Now, you didn't determine the location of

9  those piezometers that you monitored, did you?

10     A.   No, sir.

11     Q.   And that was done by TVA engineers or

12 consultants, as far as you know?

13     A.   As I recall, it was done by TVA and they might

14 have had some input from outside contractors.

15     Q.   And just before we leave, and we don't need

16 this on the screen, before we leave Exhibit 562 for the

17 moment, could you look at the third page of it, please.

18 This is the permit document we have been talking about.

19 This was stamped by Harold Petty, is that correct?

20     A.   Yes, sir.

21     Q.   And is he sometimes known as Lynn Petty?

22     A.   Yes, sir.

23     Q.   Is he a TVA engineer?

24     A.   He is.

25     Q.   That is dated 4-26-05, correct?

21

1  A. Yes, sir.

2  Q. And so a TVA engineer submitted the permit

3 modification that contained the requirement to monitor

4 on the north, the west and south dikes, correct?

5     MR. MARQUAND:  Objection, foundation.

6     MR. DAVIS:  I think we have the document

7 in front of us, Your Honor.  I don't know what more

8 foundation he needs.

9     MR. MARQUAND:  He has no personal

10 knowledge to this.  How is he going to know that?

11     THE COURT:  The witness can respond

12 accordingly.  You may answer to the extent you can.

13     THE WITNESS:  I am sorry.  Can you repeat

14 the question.

15 BY MR. DAVIS:

16  Q. A TVA engineer submitted this permit

17 modification that had the requirement to monitor on the

18 north, the west and the south dikes of dredge cells?

19  A. A TVA engineer stamped this.  I can tell you

20 that with certainty.

21  Q. And this you mean Exhibit 562 which contains

22 the requirement for monitoring on the north, the west

23 and south dikes, correct?

24  A. Yes, sir.

25  Q. Now, you would agree, would you not, that to

22

1   meet the requirements that we have just discussed with

2   the permit modification, that the water level monitoring

3   needs to be complete?

4       A.  I would agree that water level monitoring

5   needs to be performed.  In terms of complete, I guess I

6   do not understand what you are asking.

7       Q.  Let me see if I can explain that a little

8   more, "that all specified piezometers need to be

9   monitored."

10      A.  This document indicates that that was, you

11  know, what they proposed and that was a starting point.

12  I will agree to that.  I also agree that being familiar

13  with these types of permits that they become essentially

14  living, somewhat living documents in terms of, you know,

15  discussions with the state and when certain aspects of

16  it become more valuable and certain aspects become less

17  valuable they may or may not alter the, you know, what

18  is necessary.

19      Q.  As far as you know, there was not another

20  modification that eliminated this requirement?

21      A.  Not that I am aware of.

22      Q.  As a matter of fact, you continued performing

23  the monitoring that was specified in this permit

24  modification up until December of 2008, correct?

25      A.  We performed the monitoring that was started

23

1  with this.  Actually we had been monitoring for a couple

2  of months before this permit was even submitted to the

3  state.

4       Q.  Well, and just so we understand what I mean by

5  complete, is that if TVA decided to monitor certain

6  piezometers and that was given to you as your task, that

7  "complete" would be monitoring those that were

8  specified, correct?

9       A.  Yes, sir.

10      Q.  I mean, it wasn't up to you to decide which

11 ones to monitor, if TVA told you to monitor certain

12 ones, right?

13      A.  No.  We got what we were told to get.

14      Q.  And you would agree that water level

15 monitoring needs to be consistent.  I will explain what

16 I mean by that.  That you can, you're monitoring the

17 same wells or piezometers on a month-by-month basis so

18 you can see trends, is that right?

19      A.  That's typically best to get it on some

20 regular interval and to have a complete snapshot.

21      Q.  You would agree that the wet cool winter

22 months in East Tennessee are important for paying

23 attention to the water levels in these dikes, is that

24 right?

25      A.  Well, the whole year is important, but, you

                              24

1  know, typically we see higher water levels within the

2  winter and lower in the summer, lower during the dry

3  period and higher during the wet period.

4       Q.   So far we just talked about the November, 2003

5  blowout.  That was in the cool wet time of the year,

6  right?

7       A.   Yes, sir.

8       Q.   And we are going to get to the November, 2006

9  blowout, but that was also in the cool wet time of the

10 year, correct?

11      A.   Yes, sir.

12      Q.   Now, just going back in time you mentioned

13 that these piezometers that were required by the permit

14 were installed beginning in 2005 and you started

15 monitoring them in February of 2005, is that correct?

16      A.   That's correct.  Sometime late February of

17 2005.

18      Q.   And the ones that you began monitoring in

19 February of 2005 were 18 in number, is that correct?

20      A.   I do not know the exact number off the top of

21 my head.

22      Q.   We'll come to some documents that will help

23 you with that in just a minute.  Those at first were on

24 the west, is that correct, on the West Dike?

25      A.   The very first ones were on the West Dike

25

1    along Swan Pond Road.  They should be labeled something

2    like MW-1 through MW-9.  We also monitored one across

3    the road which was MW-16A and B.

4        Q.   And then what we showed you with Exhibit

5    Number 596 was the installation of 11 through 15, is

6    that correct?

7        A.   10 through 15.

8        Q.   And 10, 11, 12 are on the south and 13, 14, 15

9    were on the north, is that right?

10       A.   Yes, sir.

11       Q.   And/or northeast, if want to call it that.

12   Let me, I am going to show you an exhibit that I don't

13   believe was entered yesterday.  It is 919.  Can you grab

14   that out of your packet there.  Does this look familiar

15   to you, Mr. Williams?

16       A.   Yes, it does.

17       Q.   Is this the type of data you provided TVA

18   engineers beginning in February of 2005?

19       A.   Yes, sir.  I created this graph.

20       Q.   Okay.  And let me ask you then to explain to

21   the Court what this is.

22       A.   What this is is a, this plots the water level

23   data within those original how many ever piezometers

24   along the western face and including the additional

25   piezometers 10 through 15 on the north and south face

26

1    and including the monitoring wells across the road, the

2    MW-16A and 16B.  This shows sort of the rise and the

3    fall of the water levels within each of these wells with

4    regard to time.  Every point is another monthly

5    measurement.  Across the bottom you see the rainfall

6    that was observed by a meteorological station at site.

7        Q.   You used the term or the permit used the term

8    phreatic surface earlier that you read.  What does that

9    mean?

10       A.   Phreatic surface is the point where

11   groundwater is equilibrated at zero pressure.  It

12   typically represents the water table in the upper most

13   water table.

14       Q.   When you measure water levels you are

15   measuring the phreatic surface, is that right?

16       A.   Yes, sir.  Some of these wells are measuring

17   shallow groundwater, which is a true representation.

18   Some of them are measuring a little bit deeper which

19   might be in different materials and might give you a

20   slightly different potentiometric, a slightly different

21   representation of the water level because it might be

22   deeper and subject to different pressures.

23       Q.   These piezometers or wells that we are talking

24   about in this Exhibit 919 were all in the dikes or

25   intended to be in the coal ash dikes, is that right?

27

1      A.   You are asking if all monitoring wells are,

2    were installed into the dike or through the dike?

3      Q.   Yes.

4      A.   All the monitoring wells were installed into

5    the dredge cell.  Some of them, most of these were

6    installed into the dike.  Some were installed in the

7    upper most surface along the top of the dredge cell

8    which wouldn't have actually been through the dike.

9    Some of them actually monitor water levels within the

10   ash.  Some are within other materials, including the

11   materials of the dike itself or materials beneath the

12   ash.

13     Q.   Where they were drilled was in the dikes for

14   the most part?

15     A.   For the most part.

16     Q.   Let's go to the last pages, the third page

17   from the end of this Exhibit 919, please.  Just to

18   identify it, let's go to bates number TVK-000054313.

19          This table that we see here, or spreadsheet,

20   is this the first monitoring that was done of the levels

21   of these dikes that ended up being required by the

22   permit in April of 2005?

23     A.   Well, this would have represented our first

24   monthly sampling event.  We actually got a, you know,

25   the preliminary ones would have happened in January, but

28

1   this was the commencement of our monthly sampling.

2       Q.   Now, if we can look at the next sheet forward

3   in time, please February 24th, 2005.  That is bates

4   number TVK-00054312.  This is the next date you

5   monitored, is that correct?

6       A.   Yes, sir.

7       Q.   And just so we are clear, this document 919

8   contains all of the data for the monthly monitoring up

9   until the last time that you monitored, which was

10  November the 19th, 2008, correct?

11      A.   Sorry.  Just double checking the document.

12      Q.   That's fine.

13      A.   It appears to cover all of the data through

14  the final event, final monitoring event, November 19th,

15  2008.

16      Q.   Okay, we'll come back to this document at

17  times in your testimony.

18           Just so we are clear on where the MW-13, 14

19  and 15 were located, I would like to show you what we've

20  marked as Exhibit 5461.  It is -- you can either use the

21  screen or use the paper copy.  It is up to you.  We'll

22  blow this up so you might be able to see it better.  Let

23  me know when you are there.  Let's look at the screen.

24  Can you identify this as the what you call the North

25  Dike going over to the Swan Pond Road or West Dike?

 1                    (Exhibit No. P-5461 was marked for

 2                    identification.)

 3        A.   Yes, sir.  That point there is sort of the

 4   northern most point of the dike.  Everything to the left

 5   of that is what we are calling now the western face.

 6   Everything beneath that is what we are calling the

 7   northern face.

 8        Q.   Okay.  We are going to highlight the three

 9   dots we see in the lower part of this exhibit.  Go ahead

10   and blow up that area, including the language pointing

11   at those to the left.  Now, does this drawing depict the

12   location of MW-13, 14, and 15?

13        A.   Yes, sir.

14        Q.   And these are the wells or piezometers that

15   you sampled on a monthly basis, among others?

16        A.   Among others, yes, sir.

17        Q.   And are those on the Dredge Cell Number 2

18   dike, is that correct?

19        A.   Yes, sir.

20        Q.   They are at different levels vertically of

21   Dredge Cell Number 2 dike on the north, is that right?

22        A.   Yes, sir.  I am trying to recall whether or

23   not 13 was actually on top or on the side, but this

24   drawing does indicate that it was on the side of the

25   dike.  Yes.

30

1    Q.   Okay, let's just go back to Exhibit 59, the

2    original overview that we used.  Can you -- you can

3    actually use your finger on this screen and draw a

4    circle about where we just showed 13, 14 and 15.

5    A.   Approximately it is -- this is a little hard

6    for me to use.  It is approximately in that location.

7    Q.   That's okay.  Just while we are on this aerial

8    can you show approximately where the ones on the West

9    Dike were that you monitored?

10   A.   There would have been essentially two

11   transects which would have been, you know, kind of --

12   you might have to grant me some leeway.  This is not

13   exactly putting the lines where I intend them.  There

14   was another pair of wells kind of over here across the

15   road.

16   Q.   And then there were some on the south too,

17   right?

18   A.   Yes, sir.

19   Q.   Can you point out where those were.  Okay, why

20   don't we do this.  If you can take so we have a record

21   of it that we can make an exhibit, can you take the hard

22   copy of Exhibit 59 that we have here, can you take this

23   Sharpie and mark on that where 13, 14 and 15 were.

24            THE COURT:  We'll get the witness to mark

25   the document and then you can display it on the DEPS.

                          31

1           THE WITNESS:  I would like to point out

2   these are not going exact.  They will be approximate.

3   BY MR. DAVIS:

4       Q.  We have the engineering drawing which is the

5   prior exhibit.  I want to put it on this.

6       A.  Just 13, 14 and 15?

7       Q.  Please.  Can you label that 13, 14 and 15.

8           We would like to mark this as a new

9   Plaintiff's Exhibit 5461.  That is Exhibit 59 -- is that

10  our next number?

11          THE COURT:  5461 you actually showed a

12  moment ago.

13          MR. DAVIS:  We can make it 59A.  That is

14  probably easier.

15          THE COURT:  Are you done drawing on the

16  document?  Let's show it.  We'll get the witness to

17  reidentify it and then we'll introduce it.

18              (Exhibit No. P-59A was marked for

19              identification.)

20  BY MR. DAVIS:

21      Q.  Mr. Williams, can you having made this marking

22  on Exhibit 59, can you identify that as your marking --

23      A.  Yes.

24      Q.  -- and approximate location of MW-13, 14 and

25  15.  Is that your writing?

32

1      A.   Yes, sir.

2      Q.   Does this to the extent that you can on this

3  aerial photograph, does this represent a reasonably

4  accurate location of 13, 14 and 15 piezometers?

5      A.   Reasonably accurate.

6           MR. DAVIS:  We would like to go ahead and

7  enter this as Exhibit 59A.

8           THE COURT:  Any objection?

9           MR. MARQUAND:  We still have the same

10 problem with 59A as we have with 59, which is the data

11 this represents as well as this witness hasn't

12 identified all these labels put on there as well.

13          THE COURT:  We'll introduce, allow 59A

14 into evidence with the understanding that the witness

15 has identified everything on the document, but the

16 thrust of the document is for the witness'

17 identification of the monitoring wells 13, 14 and 15, as

18 drawn on the document.  So admitted.

19          (Exhibit No. P-59A was received in

20          evidence.)

21 BY MR. DAVIS:

22     Q.   Now, you didn't measure the levels in these

23 piezometers yourself every time, did you?

24     A.   Not every time.  We had folks associated with

25 your field engineering organization who was doing most

                        33

1    of it.  I went out myself on, you know, maybe two or

2    three occasions.

3        Q.    But you relied upon the measurements made by

4    your field staff, correct?

5        A.    Yes, sir.

6        Q.    That is something you normally do in the

7    course of your work with TVA?

8        A.    Yes, sir.  We have individuals who are

9    responsible for the field work and typically I schedule

10   and organize that.

11       Q.    Let me just ask you.  First of all, how did

12   you measure the levels or how did your field staff

13   measure the levels in these piezometers?

14       A.    To determine a water surface within a

15   piezometer well, we use two devices.  One is a reference

16   point which is typically a mark on the lip of the

17   piezometer itself which will usually be the, it will be

18   like a Sharpie mark on whatever the highest point of the

19   PVC casing is where we have surveyed that and that is

20   given to be an absolute reference point.

21            We take a measurement from that to the water

22   using a device called a water level indicator which is,

23   it is a metal piece on the end of a tape reel.  We

24   extend it down to the water surface and typically when

25   it contacts water it will connect the circuit on the end

34

1  of that metal piece and produce a tone.  That

2  measurement, whatever the depth is, is subtracted from

3  your top casing to give us the representative water

4  level within that well or piezometer.

5      Q.  That is assuming you have a surveyed elevation

6  for the top of the casing, is that right?

7      A.  Yes, sir.

8      Q.  If you don't have a surveyed elevation to the

9  top of the casing for the top of the casing, you just

10  report a distance from the top of the casing to the

11  water, is that right?

12      A.  That's correct.  They will report that.

13  Typically we'll carry that forward until we get a chance

14  to survey the well.

15      Q.  Okay.  And in this particular case with regard

16  to 13, 14 and 15, you eventually had a surveyed top of

17  casing level, correct?

18      A.  Yes, sir.

19      Q.  Now, who did you report the levels to?

20      A.  We reported the levels to Fossil Engineering,

21  the Fossil Engineering Department within TVA.

22      Q.  And was there a particular individual, and

23  over time did that change?  We'll come back to that.

24      A.  There was typically one, or one to two,

25  individuals specified for us to submit the data to.  We

35

1  collected the data and would submit it to them.  Over

2  time those individuals changed.  Usually there was one

3  person assigned, told to us to be the alternate

4  recipient of the data.

5       Q.  Do you know why the one person who was

6  assigned was assigned to receive the data?  Did they

7  have a particular responsibility for the dikes that you

8  are familiar with?

9       A.  I can't speak to who specifically, what

10  rationale Fossil Engineering had for assigning this.  I

11  assume they knew.

12       Q.  Did anyone ever tell you or your staff to look

13  for seeps on the dikes, when you were out there?

14       A.  No one told us specifically to look for seeps.

15  Our mission out there was to gather the measurements and

16  then report back anything that was out of the ordinary.

17  This would include any changes to landscape including

18  seeps.

19       Q.  Were you trained about what to look for at all

20  by TVA?

21       A.  By TVA?  I do not, I can't speak to the rest

22  of the field personnel, but I have seen seeps during my

23  time at the TVA at other facilities.  You know, at the

24  time with personnel who had experience with that who can

25  identify it.

36

1    Q.   You didn't have any specific training about

2  what to look for, when you were on the dikes, did you?

3    A.   I did not receive job-specific training for

4  that formally.  Maybe some informal training, just being

5  out there with folks who had seen it.  We had seen at

6  other TVA fossil plant locations we observed seepage.

7  That is usually something that we interface with

8  somewhat frequently being a groundwater issue.

9    Q.   You did report it whenever you had the

10  opportunity, correct?

11    A.   Yes, sir.

12    Q.   Now, did you ever notice if water was ponding

13  on the top of the dredge cells, when you were out there?

14    A.   I had noticed that.

15    Q.   Every time you have been out there?

16    A.   No.  There might be some ponding typically

17  associated with when they were stacking on the dredge

18  cell.

19    Q.   Now, beginning in February of 2005 there were

20  some problems with monitoring these piezometers that you

21  were charged with monitoring, weren't there?

22    A.   Problems?

23    Q.   Let's go to Exhibit 1233, which is in your

24  folder, if you will bring that up, please.

25              (Exhibit No. P-1233 was marked for

37

1          identification.)

2     Q.   You might look at the paper copy until we get

3 to the point we are looking at.  Let me just ask you,

4 first of all, can you identify Exhibit 1233 as an e-mail

5 starting with the bottom from you to Mr. Markus Boggs?

6     A.   Yes, sir.

7     Q.   And that is dated November 10th, 2005,

8 correct?

9     A.   Yes, sir.

10    Q.   And please bring up the highlighted language.

11 This is what you are reporting to Mr. Boggs, is that

12 right?  You are sending him the water levels and then

13 you are stating, if you can read on the next page the

14 sentence that is highlighted.

15    A.   "Attached is the water level data that Jim

16 Overton collected at the Kingston dredge cell area last

17 week.  Please note that one of the wells, 9B, could not

18 be located, as area was seemingly disturbed by a tracked

19 vehicle offloading rip-rap.  Another two wells were

20 submerged, 4A and 4B.  Please let us know, if you have

21 any questions or concerns."

22    Q.   There were problems from the beginning with

23 the wells disappearing, is that right?

24    A.   Well, there's a problem in November, many

25 months after we started, with wells disappearing, but 4A

                              38

1    and 4B I would have to take a look at that.  Those were

2    wells on top of the dredge cell more centrally located.

3    That was an issue that they were submerged, when they

4    were disposing of dredge materials up there.

5         Q.   Let's go ahead and look at Exhibit 1232, which

6    is the next one.

7                   (Exhibit No. P-1232 was marked for

8                   identification.)

9                   While you are pulling out the folder on

10   that, Your Honor, may we enter Exhibit 1233 and also

11   919.

12                  MR. MARQUAND:  No objection to either

13   exhibit.

14                  THE COURT:  So admitted, Plaintiff's 1233

15   and Plaintiff's 919.

16                  (Exhibit Nos. P-919, 1233 were

17                  received in evidence.)

18   BY MR. DAVIS:

19        Q.   This is an e-mail from you to Mr. Boggs again,

20   is that right?

21        A.   That's correct.

22        Q.   Dated December 6th, 2005?

23        A.   Yes, sir.

24        Q.   Just so -- this is again about the data that

25   you are sending to him for these piezometers that you

                              39

1  are monitoring the water levels for, is that right?

2      A.   That's correct.

3      Q.   On this one by this time in December MW-1 has

4  been buried, is that right?

5      A.   That's what I reported.

6      Q.   And 9B could still not be located.  Is that

7  right?

8      A.   That's what I reported.

9      Q.   And then you also reported that 2, 3A and 10

10  had ash slurry in the well, right?

11      A.   Yes, sir.

12      Q.   And then 10 and 15, 10 through 15 at that

13  point had no top casing information, right?

14      A.   At that time, yes.

15      Q.   This was before the surveyor came out and had

16  given you that?

17      A.   That's correct.  In fact, I think it was this

18  e-mail that actually spurred them, spurred action

19  getting the surveyors out there, which should have been

20  out there the following month.

21      Q.   And this even though you were sending this to

22  Mr. Boggs it also went to Lynn Petty, is that right?

23      A.   That's correct.  Again, when I refer to these

24  wells being for multi-purpose, these wells were -- the

25  primary function of our monitoring out there, you know,

40

1   was for both to support this investigation dealing with

2   the lateral expansion, this permit revision, as well as

3   the hydrologic monitoring of the cell for Fossil

4   Engineering.  Mr. Boggs represented former and Mr. Petty

5   was intended for the latter.

6        Q.   Okay.  Mr. Petty was someone you sent these

7   water levels to for several months over the course of

8   the work that you did, is that right?

9        A.   Yes, sir.

10       Q.   Okay.

11       A.   I will point out that we, our field personnel

12  took meticulous notes of these occurrences that happened

13  to the wells.  We were in most cases trying to note any

14  changes to the well to be marked with the data and also

15  for repair.

16       Q.   And you can go back and look at Exhibit 919,

17  and I just ask you to do this without having to bring it

18  back up on the screen, but you generally noted in these

19  tables, spreadsheets, in the back of Exhibit 919

20  whenever a well had been destroyed or filled over or

21  filled with ash or whatever?

22       A.   Yes, sir.

23       Q.   Okay.  And is that what you mean by your field

24  personnel would give you the information and you would

25  note it, when you made a report to Mr. Petty or

41

1    whomever?

2         A.   Yes, sir.  That was part of our to let them

3    know if conditions on the ground had changed.

4         Q.   Let's keep marching forward in time here.  If

5    you can look at Exhibit 1230, please.  You can identify

6    this as an e-mail from you to Mr. Boggs and Mr. Petty

7    and others, correct?

8                   (Exhibit No. P-1230 was marked for

9                   identification.)

10        A.   Yes, sir.

11        Q.   And this was also about the dredge cell

12   piezometer data, as you called it.  This is a date of

13   December 30th, 2005.  Again, you can see on this e-mail

14   that there were problems with MW-5 is underwater.  Is

15   that right?

16        A.   Yes, sir.

17        Q.   And MW-4A and B have been closed out.  Is that

18   what that says?

19        A.   Yes, sir.

20        Q.   You weren't informed about this beforehand

21   were you?

22        A.   No.  We were just monitoring.  We weren't

23   taking ownership of the wells.

24        Q.   So other people were doing things in the areas

25   of the wells and weren't paying any attention to your

42

1   wells, is that right?

2       A.   Well, to be honest, I cannot speak to that why

3   they were closed, but, you know, one thing, one of the

4   reasons why they could have been closed, if we have a

5   well that is compromised, it's standard procedure for us

6   to go back and to close those wells properly to prevent

7   any contamination.  Some of these wells are screened in

8   ash.  We aren't worried about having that as a conduit

9   to groundwater since the ash that is already, since the

10  ash would be the source of any issues that we are

11  concerned about.

12          For 4A and 4B, if they had been closed for

13  some time, if they had been underwater for a little bit,

14  they would have eventually been marked for closure

15  because they are kind of less valuable for us.

16      Q.   Certainly.  Let me ask if you can take a look

17  at Exhibit 1251 while we're at it.

18              (Exhibit No. P-1251 was marked for

19              identification.)

20          While you are looking at that, Your Honor,

21  we would like to enter 1232.

22              MR. MARQUAND:  No objection.

23              THE COURT:  So admitted.  What about 1230?

24              MR. MARQUAND:  No objection.

25              THE COURT:  So admitted.

43

1              (Exhibit Nos. P-1232, 1230 were

2              received in evidence.)

3    BY MR. DAVIS:

4         Q.   Do you have Exhibit 1251, Mr. Williams?

5         A.   1251 or 1215?

6         Q.   1251.  It could have been a dyslexic label.

7         A.   Yes, I do.

8         Q.   Now, starting with the second page of this.

9    Look at the e-mail that is at the bottom of the first

10   going over to the second page.  This is an e-mail from

11   you to Mr. Julian and Mr. Boggs, is that correct?

12        A.   Yes, sir.

13        Q.   Dated January 17th, 2006.  Who was Mr. Julian

14   at this point?

15        A.   Mr. Julian was another engineer within the

16   special projects group that dealt with the groundwater

17   and he is a, well, he is both an engineer and geologist,

18   a registered engineer and geologist.  He is one of the

19   two men who were in terms of the lateral expansion

20   permit heading up that effort.

21        Q.   Okay.  Now, look at the sentence on Page 2

22   that is highlighted here, if we can blow it up, please.

23   Can you read that starting with "we did notice"?

24        A.   "We did notice some seepage coming -- again

25   typo -- out of the side of the dredge cell in a couple

44

1   of spots, about 15 feet south of MW-15.  The ground

2   around the well was a gray ash mud."

3        Q.   Okay, was that you that noticed it or was it

4   your staff or do you know?

5        A.   Well, apparently we noticed while I was on

6   site with another member of my staff.  It was one of us.

7   We reported it together.

8        Q.   South of MW-15 would have been on the dike of

9   Dredge Cell Number 2 on the north side, correct?

10       A.   Yes, sir.

11       Q.   Okay.  Just if you will go to the first page,

12  please, of Exhibit 1251.  Look at the e-mail up here

13  dated January 19th, 2006, that you sent to Lynn Petty.

14       A.   Uh-huh.

15       Q.   And just read the second sentence of that that

16  is highlighted here.

17       A.   "We probably have never noticed it flowing as

18  full as it was that morning".

19       Q.   That again is referring to the seep near

20  monitoring well 15, is that right?

21       A.   It appears so.

22       Q.   You had noticed it before this morning of

23  January 19th, or I am sorry, the time when you visited

24  the site in January which apparently was the 17th, is

25  that right or near that time?

                              45

1     A.   To be honest, I do not recall.  What I might

2  have been saying there is that, you know, it might have

3  been flowing and we just noticed it because there was an

4  increased flow.  It might have been flowing before and

5  it was just never a -- well as noticeable as it was when

6  it was increased flow.  I do not specifically recall

7  seeing it before in that spot or else we would have

8  probably reported it earlier than this.

9     Q.   Just so -- your language here certainly

10  implies that you noticed it before, correct?

11     A.   The language implies that I think I was just

12  trying to come up with some explanation for why we

13  hadn't seen it before.  It could also be that it wasn't

14  flowing before and I assumed that it was.  I assumed

15  that we would have seen it, when we would have been out

16  there.

17     Q.   I am not positive we have all your

18  communications to TVA's engineers in charge of the

19  dredge cell dikes.  As of the point of time that we're

20  talking about here in January of 2006, you don't know

21  whether you reported it before or not?

22     A.   I do not know.  I don't recall that we did.

23  Our primary mission aside from taking measurements of

24  piezometer was looking for changes.  We reported this as

25  a change.  It was either a change that there was new

46

1    flow or change that there was, there had been some flow

2    out there existing.  At the time I was kind of surprised

3    to see the flow.  The gentleman who was with me didn't

4    seem so surprised.  It might be that he noticed it

5    flowing before.  Certainly if it's an under drain it

6    probably should have been flowing for a while.

7         Q.   Let me turn your attention back to Exhibit

8    919, please.  We are going to work with that one

9    periodically.  Keep it handy.

10        A.   Yes, sir.

11        Q.   I am going to ask you if you'll turn to the

12   table in the back that deals with January 23rd, 2006.

13   Do you have that that available?

14        A.   Yes, sir.

15        Q.   Is that what we are looking at on the screen?

16        A.   Yes, sir.

17        Q.   And see down here near the bottom where you

18   have MW-15 and you have remarks over on the right.  You

19   use the word "artesian."  Do you see that?

20        A.   Yes, sir.

21        Q.   What does that mean?

22        A.   "Artesian" generally means that the pressure

23   that you are monitoring, that the water pressure has

24   brought the water within the well to the ground surface.

25   That that is above the ground surface.

47

1    Q.   If you have heard the term that people have an
2  artesian well, is that what you are referring to there?
3    A.   Well, we are referring to the water level
4  within the, you know, with respect to the ground
5  surface, yes.
6    Q.   And so where you see that part of the column
7  it says distance to water, feet, and it says zero, that
8  means that the water is at the surface, is that right?
9    A.   Yes.
10   Q.   Okay.  And can we go to the next page previous
11 to this.  This is Exhibit 919 again, March the 2nd,
12 2006, is that correct?
13   A.   Yes.
14   Q.   And the monitoring well for MW-15 is artesian
15 again, is that right?
16   A.   Correct.
17   Q.   You noted that repeatedly throughout this
18 document.  I think we'll come back to some more of those
19 in a minute.  At any point did you note in this table
20 how high the casing was for monitoring well number 15 so
21 you could tell when it went artesian?
22   A.   We did not note it -- let me check back at the
23 master.
24   Q.   Actually if you look at December 29th, 2005,
25 if you look again at MW-15 for December 29th, 2005.

48

1      A.   Yes, sir.

2      Q.   See where it says "artesian grade is 4.72 feet

3  below RP"?

4      A.   Uh-huh.

5      Q.   Is that how you determine whether or not a

6  level measured in the casing of MW-15 was artesian or

7  not?

8      A.   Yes.

9      Q.   So anytime we have a column, a reading there

10  for MW-15 that is less than 4.72 below the surface, or

11  below the top of casing I mean, that would be artesian,

12  right?

13      A.   Unless the top casing elevation changed.

14      Q.   You would have noted that had it changed?

15      A.   Yes.  It would be noted under the TC elevation

16  column right here that changed from its current 773.37.

17      Q.   We'll come back to that in a minute in terms

18  of what was artesian and what is not.  I wanted to make

19  sure that we understood that part of your table.

20         If you will, go on to the April, I am sorry,

21  the March 30th, 2006 date.  Let me make sure I got that

22  one right.  March 14th, I am sorry, 2006 -- March 30th,

23  2006, is what I'm looking for.  There it is.  That is

24  2007, I'm sorry.  I just wanted to point out on this

25  page for MW-15 in March of 2006 it is also artesian,

49

1  correct?

2      A.  Correct.

3      Q.  Now, let me ask you then to look at Exhibit

4  2306.

5              (Exhibit No. P-2306 was marked for

6              identification.)

7      Q.  This is an e-mail from you to Mr. Boggs and

8  Mr. Petty dated May 2nd, 2006, correct?

9      A.  Correct.

10      Q.  And let me go ahead and bring that up and make

11  it a little larger, please.  This is also about the

12  water levels you were trying to monitor in these

13  piezometers.  This shows additional problems that were

14  happening with the system.  "MW-10 was apparently run

15  over."  Do you recall that?

16      A.  Yes, I do.

17      Q.  And then you go on to say, "Jim identified a

18  couple of seepage points, either intentional or

19  unintentional, identified along the northeastern edge of

20  the dredge."  Who is Jim?

21      A.  Jim refers back to Jim Overton who was

22  conducting the field measurements.

23      Q.  And when you say northeastern edge of the

24  dredge in this case, where do you mean?  If we can turn

25  back to Exhibit 59, maybe you can show us on there.

50

 1      A.   To be honest, I don't recall where these
 2  points were.  I do remember us having another issue.  It
 3  was somewhere along the spot, but I am not sure that I
 4  knew exactly where it was.  If I did, I probably would
 5  have given some indication.  Typically we would send
 6  someone out with an -- either send someone out with a
 7  GPS or refer it to Fossil Engineering for investigation.
 8  This doesn't, I don't see any follow-up here to indicate
 9  what the follow-up was.
10      Q.   You go on to say that "it looks like the
11  vegetation along the seepage is dying.  This might
12  indicate that the water might be transporting something
13  out with it."  What would that have been?
14      A.   It could be any -- if the transport, if the
15  water was transporting something out with it, it could
16  have been any of the material from within the dike.
17      Q.   Coal ash, right?
18      A.   It could be coal ash or it could be material
19  within the dike itself.  Some of the material within the
20  dike, some of the material that we spill has some
21  increased metals properties.  It could just have some
22  more iron in it that was causing staining or
23  overwhelming the vegetation.
24      Q.   The dredge cell dikes were made of coal ash,
25  right?

51

1    A.   I can't, I don't know specifically what they

2  are made of.  Typically coal ash was used at some

3  locations at Kingston.  Sometimes the actual dikes

4  themselves have a large amount of background clay fill

5  material that was, you know, borrowed from either other

6  areas of the site or whatever.  The different dikes

7  around Kingston have fundamentally different components

8  to them.  I am not knowledgeable enough to speak to what

9  material was used in which locations.

10    Q.   So going back to Exhibit 2306, when you say

11  "either intentional or unintentional," you don't know

12  the difference, do you?

13    A.   Well, intentional or unintentional there are

14  several under drains out there that I think are spaced

15  out 200 feet.  I don't know where the under drains are.

16  The seepage that we originally reported near monitoring

17  well 15 we identified as -- Lynn Petty came back and

18  indicated that it likely was an under drain.

19    Q.   He explained it as an under drain?

20    A.   Yes, there are active under drains out there.

21  They are on some regular spacing.

22    Q.   Did Mr. Petty go out and look at it with you

23  and show you the under drain?

24    A.   I did not go out with Mr. Petty.  That is not

25  to say he or another representative didn't go out with

52

1    someone.

2         Q.   He just sent an e-mail that said it was under

3    drain, right?

4         A.   He indicated there was an under drain close to

5    it.  I may or my not have actually received a map.  To

6    be honest, I can't recall that far back.

7         Q.   As far as this one that you identified on

8    April 27th, 2006, you have no idea whether it was an

9    under drain or not?

10        A.   Yeah, I can't say whether it was or whether it

11   was not.  We do know that there are some under drains

12   out there on regular spacing.  That is why we felt

13   compelled to report it.  We reported it because it was

14   something we hadn't noticed before.  This is generally

15   referring it back to Fossil Engineering to take charge

16   of.

17        Q.   Now, back to Exhibit 2306 again.  You are a

18   little frustrated that your monitoring wells, your

19   piezometers kept getting destroyed, weren't you?

20        A.   Yes, sir.  That is kind of a fact of life at

21   industrial sites.  That doesn't mean I have to be happy

22   about it, but, you know, most of the wells that weren't

23   permanently closed like the MW-4A and 4B we were able to

24   salvage some of them.

25        Q.   You were struggling to keep this monitoring

                                53

1   system going and it didn't appear that the ash handlers

2   any way had any care at all about it, right?

3       A.   We were struggling to keep the integrity of

4   the system as complete as it was.  You know, as we went

5   forward, you know, we had more piezometers installed out

6   there.  The importance of these ones on the top of the

7   dredge cell was kind of, you know, might have been

8   superfluous.

9       Q.   You are not referring to 13, 14 and 15 in that

10  regard, right?

11      A.   No, I don't recall them ever sustaining any

12  major damage.

13      Q.   Well, I am not asking about the damage to 13,

14  14 and 15.  I wanted to make sure you weren't saying

15  they were superfluous?

16      A.   No, sir.  In my mind, you know, our job out

17  there is to, you know, measure these and let them know

18  about any changes, and those changes that we can help

19  aid along including repairs to the well we wanted to

20  focus on.

21      Q.   Let me take you back to Exhibit 919 and just

22  to bring us up to date here.  Go to the June 1st, 2006

23  levels.

24      A.   Yes, sir.

25      Q.   June 1st, 2006 MW-15 was artesian, right?

54

1      A.   Yes, sir.

2      Q.   Go to the next one, June 29th, 2006.  MW-15

3   was artesian, right?

4      A.   Yes, sir.

5      Q.   August 1st, 2006 MW-15 was artesian, right?

6      A.   Yes, sir.

7      Q.   September 1st, 2006, MW-15 was artesian?

8      A.   Yes, sir, that is what is indicated.

9      Q.   And in each of these cases it indicated that

10   the water level was above the ground?

11     A.   Yes, sir.  That's indicated, I am basing that

12   off of that the top casing hasn't changed and that the

13   distance to water is less than that reported value which

14   we call the "stick up" which is the extent of the PVC

15   rise above grade.

16     Q.   Let's go to Exhibit 1234.

17          (Exhibit No. P-1234 was marked for

18          identification.)

19          MR. DAVIS:  While we are going to that, we

20   would like to enter 2306, please.

21          MR. MARQUAND:  No objection, Your Honor.

22          THE COURT:  So admitted.

23          (Exhibit No. P-2306 was received

24          in evidence.)

25   BY MR. DAVIS:

1      Q.   Do you have Exhibit 1234?

2      A.   I do.

3      Q.   This is an e-mail from you to Harold Petty

4   dated September 29th, 2006, correct?

5      A.   Correct.

6      Q.   And if you can read the highlighted sentence

7   starting with "the spike."

8      A.   "The spike in levels that we saw during our

9   September 1st visit has come back down.  Please note

10   decline of levels at the toe of the dike -- we might

11   have to go out and purge the wells just in case they are

12   getting silted in.  The seepage out of the northwestern

13   corner of the dike is still going steady."

14      Q.   Let's start with the first sentence that you

15   read.  What do you mean by spike in the water levels?

16      A.   If I generally refer to a spike in water

17   levels it would be a jump up.

18      Q.   Spike is not a good thing, right?

19      A.   Spike is not necessarily a good or bad thing.

20   It just indicates a change.

21      Q.   It means a rapid change upward in the water

22   levels in the dikes, right?

23      A.   Yes.  That could be indicating that they had

24   been doing some operations, some loading at the top of

25   the dredge cell, stacking operations.

56

1    Q.   And you said it went back down during your

2    September visit.  Let's go back to Exhibit 919 and let's

3    first of all show the chart, please.  I know this is a

4    busy chart, but does this first page of Exhibit 919 show

5    the water levels that were measured that we have been

6    discussing in the tables in 919?

7    A.   This shows -- can you repeat the question?

8    Q.   Is this a graphical representation of the

9    water levels in these piezometers that we have been

10   looking at in the tables that are also part of 919?

11   A.   Yes, sir.

12   Q.   And so when you are talking about a spike, can

13   you just point that to the Court what you meant by a

14   spike in September of 2006?

15   A.   Certainly.  A spike in this case would be a

16   sudden jump in the measurements.  The September 27th,

17   2006 visit should just be on your screen to the left of

18   what we see as noted by the October 4th, 2006, right in

19   there kind of to the left of that sort of that gridded

20   value going up that there is a jump up.  Spike

21   typically, I refer to that as a jump in the water

22   levels.

23       If you kind of go back and you look at the

24   full scale of this what you see a seasonal trend in the

25   wet months which will typically be the start of October,

1   give or take two weeks, through March or April, when you

2   are into the more wetter season, you know, when you are

3   into the wet part of the season.  You can also see that

4   mirrored in the rain levels along the bottom.  That is

5   why we post these up.

6           In fact, you can see a rather large rainfall

7   value at the end of September, which that is probably it

8   looks to be about three and a half almost four inches

9   there which is probably, which could be one factor that

10  influenced the spikes in water levels.  We also saw a

11  jump when the wet season came, a little bit of increase.

12          Q.   While we are on this view, the spike may have

13  come down in September, but it went back up in October

14  in a big way, right?

15          A.   Yes, sir.

16          Q.   And the next data that you went out and

17  observed was October 25th, 2006.  You are welcome to

18  look at the data back in the table.  Let's just leave

19  the graph up for a moment.  See if we can work together

20  here for a minute.  If you can look at the October 25th,

21  2006 comparing it to September 27th, 2006 and I want to

22  see if you agree with some of my math.  That MW-2 went

23  up over two feet?

24          A.   Yes, sir.

25          Q.   MW-3A went up over two feet?

1       A.   Yes, sir.

2       Q.   MW-3B went up over one foot.

3       A.   Yes, sir.

4       Q.   MW-7A went up eight feet.

5       A.   Yes, sir.

6       Q.   MW-7B four feet?

7       A.   Yes, sir.

8       Q.   And MW-8A six feet?

9       A.   Yes, sir.

10       Q.   MW-8B, three feet.

11       A.   Yes.

12       Q.   MW-11 over four feet?

13       A.   Yes, sir.

14       Q.   12, one and a half feet?

15       A.   Yes, sir.

16       Q.   And 15, which was still artesian, went up

17 three feet?

18       A.   Actually 15 did not.  What you see there, that

19 is a problem with my notes.  If you look at MW-14 where

20 it is at 776.52 it looks that I had an error in that

21 spreadsheet that I copied down.  That would be an oddity

22 that all those wells would represent the same exact

23 water level including 16A and 16B which are about a

24 thousand feet away.  It looks like it was corrected the

25 next month.

59

1     Q.   So in terms of 15 anyway, you could not state

2 that there was a spike in that case?

3     A.   That is correct.  I will point out that a lot

4 of these jumps up in water levels, this could be a true

5 jump up in water level or it could be that we are

6 measuring what's called a perched aquifer.  Within the

7 ground you might have certain voids or certain more

8 permeable zones that if the water level, if you are

9 getting enough infiltration and the water level rises it

10 will fill up those zones.  You can have essentially --

11 imagine as a drain from above that you are getting an

12 area fills up and it's draining down, and, you know,

13 where one or two locations you might have, you know, if

14 you are generally having a two feet spike everywhere and

15 you are having an eight foot spike in one location it

16 could be that is actual or it could be it's a

17 contribution from some sort of artificial function.

18     Q.   If you recall, these large spikes these are

19 mostly on the west side, the West Dike, is that right?

20     A.   That's correct.

21     Q.   And you agree that almost all of the water

22 levels spiked up sharply during that time period?

23     A.   That most of the wells have a significant rise

24 and this rise would be generally in or above what we

25 expect.

60

1     Q.   In and above what you would expect meaning

2  what?

3     A.   You're expecting a jump up with the beginning

4  of the wet season.  You are expecting that to hit either

5  at the end of sometime within September or sometime

6  within October.

7     Q.   Eight feet is what you would expect the water

8  level to --

9     A.   No.  We hadn't seen that previously.  That's

10  what makes me a little suspicious that could be another

11  mechanism kind of like a perched water table.

12     Q.   Do you know that week later there was another

13  blowout in the western dike of the dredge cells?

14     A.   Yes, sir.

15     Q.   That was November 1st, 2006?

16     A.   I do not recall the specific date.  It was

17  sometime during the November of 2006.

18     Q.   When did you send the water levels to

19  Mr. Petty from October 25th, 2006?

20     A.   I do not recall specifically when I sent them

21  to him.

22     Q.   Let me ask you to look at Exhibit 1242,

23  please.

24              THE COURT:  Did you want to introduce

25  1234?

1          MR. DAVIS:  Yes, Your Honor.  Thank you.

2          THE COURT:  I assume no objection.  Admit

3   plaintiff's 1234.

4          (Exhibit No. P-1234 was received

5          in evidence.)

6          (Exhibit No. P-1242 was marked for

7          identification.)

8   BY MR. DAVIS:

9      Q.  Do you have Exhibit 1242 in front of you,

10  Mr. Williams?

11     A.  Yes, sir.

12     Q.  It's an e-mail starting out at the bottom from

13  you to Mr. Petty and also Mr. Purkey.  This is dated the

14  bottom e-mail is November 2nd, 2006, correct?

15     A.  Correct.

16     Q.  That is when you sent the levels to Mr. Petty,

17  right?

18     A.  Yes, sir.

19     Q.  The day after the blowout?

20     A.  Yes, sir.

21     Q.  You weren't even aware that you had October

22  25th, 2005 data, were you?

23     A.  Was I --  I'm sorry, can you repeat the

24  question.

25     Q.  Read what you see here.  "Apparently we

                        62

1   captured a data snapshot this month, even though it was

2   not planned."

3       A.   Yes, sir.  In terms of not being -- in terms

4   of not being planned, I believe that's referring to the

5   month before we got a round of measurements on September

6   27th.  It might have been that we were supposed to go

7   out the following week and get a measurement then.

8   That's what I was expecting.  It might be that I had

9   other work or other field work and our field personnel

10  or their managers had to rearrange that schedule.

11      Q.   You just weren't paying attention that you had

12  gotten in a new round of water levels?

13      A.   I wouldn't say it was inattention.  I would

14  say we have an expectation to get regularly scheduled

15  water levels out there.  I had expectation on the field

16  personnel to adhere to that schedule and that's

17  something we set up as a community.  Now, I did not have

18  direct guidance over that, if it gets moved up a week or

19  back a week.  You know, during this time I was doing a

20  heavy amount of field work.  Typically I would be either

21  called or notified, you know, after the fact to review

22  the data and to receive the data and to send it on.

23      Q.   Back in September you had noticed a spike in

24  the water levels, but you didn't notice this October

25  one, did you?

63

1      A.   I did not comment on the October water levels.

2      Q.   Obviously, you didn't send any alarm to

3 Mr. Petty saying the water levels were spiking before

4 this blowout occurred, is that right?

5      A.   That would be correct.

6      Q.   What was Mr. Petty's response to getting these

7 water levels from you after the blowout occurred here on

8 Exhibit 1242?  What did he say?

9      A.   He said, "thanks."

10      Q.   Now, I want to recap up to this point in your

11 testimony that you agree that water levels, water level

12 measurements were required after the 2003 blowout to

13 prevent another blowout, right?

14      A.   Per our commitment to the state, yes.

15      Q.   And during 2005 and 2006 several piezometers

16 that were part of your system were filled over with coal

17 ash or run over with heavy equipment, right?

18      A.   Yes, sir.  Probably several of those were

19 decommissioned, potentially decommissioned.  Several

20 were salvaged and rehabilitated.

21      Q.   September 1st there was a spike in the water

22 levels in the dikes, right?

23      A.   September 1st?

24      Q.   That was what you commented on in your e-mail?

25      A.   Yes, sir.

64

1        Q.   Came back down to a certain extent September

2    29th, as you said?

3        A.   September 27th?

4        Q.   I believe it was, yes.

5        A.   Yes, sir.

6        Q.   And shot back up on October 25th?

7        A.   Yes, sir.

8        Q.   November 1st the blowout occurred on the West

9    Dike and you had not provided Mr. Petty the levels prior

10   to that time from October 25th, correct?

11       A.   Correct.

12       Q.   He got them a day after the blowout?

13       A.   Correct.

14            MR. DAVIS:  Now, Your Honor, I don't know

15   if the Court is going to take a morning break --

16            THE COURT:  Why don't we take a ten minute

17   break.  That would be a good idea.

18            (Off the record.)

19            (Back on the record.)

20            MR. DAVIS:  Before I resume examination of

21   the witness I want to see if we can enter Exhibit 1251,

22   which we previously discussed with the witness.

23            THE COURT:  Any objection?

24            MR. MARQUAND:  No objection.

25            (Exhibit No. P-1251 was received

65

1          in evidence.)

2          MR. DAVIS:  562 we'll reserve because of

3   the objection, but it was entered for identification

4   purposes, admitted for identification purposes.  5461 we

5   don't really need to enter.

6          THE COURT:  Thank you.

7          MR. DAVIS:  I have 59A that the witness

8   drew upon.  He might need to use it again.

9   BY MR. DAVIS:

10      Q.  Mr. Williams, I think we stopped in November

11  of 2006.  I want to pick up from there.  Let me ask you,

12  first of all, were there any measurements made in this

13  original piezometer system in November after the

14  blowout?

15      A.  That's not reflected in the records here, and,

16  you know, I do not recall specifically that we did or

17  did not.  I would assume that this is a complete record

18  though.

19      Q.  So you resumed in December, according to

20  Exhibit 919, is that right?

21      A.  Yes, sir.  That was more than likely because

22  there was probably a lot of activity, a lot of

23  construction activity out there.  We might have just

24  held off a week or two until it was safe for us to have

25  folks on site.

66

1      Q.    That is okay.  Look while you are at the

2   December 7th, 2007 table here.  You see that MW-15 is

3   artesian even though you didn't designate it as such,

4   correct?

5      A.    Yes, sir.

6      Q.    Because it's, 2.71 is less than 4.72, correct?

7      A.    Yes, sir.

8      Q.    And we also have on this one, 16B, artesian as

9   well, do we not?

10     A.    That's correct.  It is very often that 16B is

11  artesian.  I will point out that 16B is one of the wells

12  across the road that receives recharge off the pine

13  ridge.  We would, you know, historically we have seen

14  that well be artesian.

15     Q.    On this same table that we are talking about

16  4A and 4B are gone, right?

17     A.    Yes, because they were closed.

18     Q.    Right.  Then we have 5A, 5B, 6A, 6B

19  inaccessible, water filled cells.  Is that your

20  designation of those now?

21     A.    Yes, sir.  Most of those wells, they were not

22  submerged, but they were inaccessible because they were

23  out in the middle of the pool at the top of the dredge

24  cell.

25     Q.    9B is closed?

67

1      A.   Yes, sir.

2      Q.   And 10 is run over?

3      A.   Yes, sir.

4      Q.   While we are at it, let's go to the January

5  9th, 2007 page in Exhibit 919.  That is bates ending

6  with 54293.  Do you have that?

7      A.   Yes, sir.

8      Q.   Here you have eliminated 5A and 5B now, is

9  that right?

10     A.   Yes, sir.

11     Q.   And 6A and 6B are ash covered?

12     A.   Yes, sir.

13     Q.   And 15 is still artesian, right?

14     A.   Yes, sir.

15     Q.   10 is still run over?

16     A.   Yes, sir.

17     Q.   Go on to February of 2007.  There were no

18  measurements at all for 5A, 5B, 6A, 6B, 10, correct?

19     A.   Correct.  Likely by this time 5A, 5B, 6A, 6B,

20  they were with the disposal stacking operation on top.

21  They might have been -- you know, every time they

22  stacked they have to raise the level of the well.  At

23  some point they were likely closed because they, you

24  know, there wasn't any value in keeping it, you know,

25  and having that.

                              68

1    Q.   No one ever consulted with you about that,

2  right?  It just got filled over?

3    A.   No, sir, not that I can recall.

4    Q.   Now, looking on up to March 14th -- I am

5  sorry, before you leave February 7th, 15 was still

6  artesian, right?

7    A.   Yes.  The water levels are down close to

8  ground surface though.

9    Q.   But it is still above?

10   A.   Yes, sir.

11   Q.   Okay, now, go on to March 14th and previous

12  page.  The same wells are still unmonitorable that we

13  talked about in January or February.  Now 15 is still

14  artesian, right?  March 14th, 2007?

15   A.   That's correct.

16   Q.   April 3rd, 2007, 15 is still artesian,

17  correct?

18   A.   The value of the stick up was 4.72, correct?

19   Q.   I do recall that.  You agree with that don't

20  you?

21   A.   If that's what I indicated, that's what it

22  was.  This would still be artesian.

23   Q.   Still no 5A, 5B, 6A, 6B or 10?

24   A.   That's correct.

25   Q.   And go on to May 4th, 2007.  15 is still

69

1  artesian, right?

2        A.   Yes, sir.  Just above.

3        Q.   So certain things happened after the November

4  1st, 2006 blowout and you have described some

5  construction activities.  Another thing that happened is

6  there were additional piezometers installed on the West

7  Dike to expand the monitoring network, is that right?

8        A.   Yes, sir, the subcontractor that they hired to

9  come in and to evaluate the site had apparently

10  installed a number of piesometers along, you know, along

11  the Swan Pond Road, sort of the western face.

12        Q.   I am going to ask you to look at Exhibit 285,

13  please.  If we can bring this up.

14               (Exhibit No. P-285 was marked for

15               identification.)

16               Do you recognize Exhibit 285, Mr.

17  Williams, as the Swan Pond Road side of the dikes and

18  the location of the piezometers that were installed

19  here?

20        A.   That would appear to be what we are looking

21  at.

22        Q.   I am not going to ask you to identify them

23  specifically because there is a bunch of them.  Were

24  there over 50 all together that were installed at one

25  time?

1    A.   That sounds like it is in the ball park.

2    Q.   Let's bring Exhibit 59 back up, please.  Just

3  so we can get you to show the Court where these

4  additional piezometers were located.  Let's don't --

5  okay, why don't we do this.  Take 59A and go ahead and

6  indicate with a pen on 59A where the additional

7  piezometers were installed after November, 2006.  Just

8  in a general location on the West Dike.

9    A.   In a general location.

10    Q.   Yes.

11    A.   Okay.  Again, all these are going to be

12  approximate because I never walked down these wells.  I

13  saw them, you know, from somewhat of a distance.  I

14  might have, you know, we might have had pictures out

15  there.

16    Q.   If I had something better, I would give it to

17  you.  If you can like on Exhibit 59A, Mr. Williams, can

18  you identify the circle you drew on the West Dike of

19  Dredge Cell 1 and 3, Mr. Williams, on this photo?

20    A.   Yes, sir, it would be essentially along Swan

21  Pond, the face of the dredge cell.

22    Q.   And you wrote this "additional wells installed

23  post 2006 blowout" on here, right?

24    A.   Yes.  I'm kind of using wells and piezometers

25  interchangeably there.  They are, I guess they are

1     actually designated piezometers.

2          Q.   They were only used for measuring water

3     levels, correct?

4          A.   Yes.  Now, there were some that we are used

5     for drainage.

6          Q.   We may talk about those in a minute.  As far

7     as you know, where there is a label on Exhibit 59A that

8     says "slope issues 2003 and 2006 location" is that the

9     approximate location of the blowouts in 2003 and 2006?

10         A.   I can't really testify knowledgeably to that.

11    I knew it was, the approximate location was marked by

12    the transect of piezometers.  I believe it's MW-1

13    through MW-4 was along the approximate area of 2003.  As

14    far as 2006, I did not know that I was out there to see

15    when it had blown out or when it had been repaired.

16         Q.   I appreciate that.  Let me turn your attention

17    to the May 2007 time period.  You were out there

18    sometime in May of 2007 weren't you?

19         A.   I do not recall specifically.  I was out there

20    likely at some point during 2007.

21         Q.   If I can ask you, please, to look at Exhibit

22    1243.  If you would look at the first e-mail in this

23    chain from you to Mr. Petty dated May 6th, 2007.  Is

24    that your e-mail?

25                    (Exhibit No. P-1243 was marked for

72

1                    identification.)

2        A.   Yes, sir.

3        Q.   Mr. Petty replied to you the same day.  If you

4   will expand the first highlighted paragraph.  This

5   indicates that you had been out in May of 2007 and that

6   you noticed these new piezometers on the West Dike, is

7   that right?

8        A.   That's correct.  I think I was out there

9   actually doing work at the Peninsula site.  I had just

10  kind of driven by on Swan Pond and saw additional

11  piezometers.  I asked if that was something that we

12  should be picking up as well.

13       Q.   At that point did you know if anyone else was

14  monitoring those or had you been told about those being

15  installed even?

16       A.   I knew that there was some work going on out

17  there.  I did not know what specific work was being done

18  or who was monitoring those wells or what frequency.

19       Q.   And so you asked Mr. Petty if he would like

20  for your team to monitor those new piezometers that were

21  part of the water level monitoring system and he said

22  no, not for now.

23       A.   Correct.

24       Q.   Did you have any further discussion with him

25  about who was doing it at the time and the cost of it or

73

1  anything like that?

2       A.   No, not at this time.  You know, we figured

3  that they would come back to us if they wanted us to --

4  you know, we extended the offer.  They knew we were

5  going out there any ways.  You know, we figured that

6  they could call us, if they wanted to take advantage of

7  that.

8       Q.   Let me ask how things worked within TVA about

9  the monitoring level system, the water level monitoring

10  system you were performing.  Did you get paid by another

11  part of TVA to do that?

12       A.   In terms of how we got -- in terms of who was

13  paying us at the outset, and it changed a couple of

14  times throughout the life of the monitoring from 2005 to

15  2008, but at the outset our funds were coming through

16  Fossil Engineering.  Now, whether they were generating

17  those funds or if they had given us account numbers that

18  tied back to the plant, I can't give a knowledgeable

19  answer to that.

20       Q.   You were a service organization within TVA.

21  You go -- you are almost like an outside contractor in

22  that respect.  You go where you get paid, right?

23       A.   Yes, sir.

24       Q.   And if someone had, if you weren't paid to do

25  this water level monitoring you wouldn't do it?

74

1      A.   Generally that's correct.  I know that there

2   is a couple of times at the start when -- our fiscal

3   year for the federal government goes on October through

4   September cycle.  There was at least one, and maybe two

5   occasions, where we didn't have funding in place in

6   October, that we went ahead and went out there and got a

7   snapshot any ways.

8      Q.   You have even seen the e-mails back and forth

9   about who is going to pay for it.  People seem to want

10  to pass it to the other department.  Is that now how it

11  normally works?

12     A.   Yes, sir, there is some negotiating back and

13  forth for certain on that.

14     Q.   I won't go into the details about that.  I

15  noted that in your e-mail chain.

16          Let's go to Exhibit 1215.  While you are doing

17  that -- Your Honor, I would like to enter Exhibit 1243.

18              MR. MARQUAND:  No objection Your Honor.

19              THE COURT:  So admitted.

20              (Exhibit No. P-1243 was received

21              in evidence.)

22              (Exhibit No. P-1215 was marked for

23              identification.)

24  BY MR. DAVIS:

25     Q.   I am just showing you Exhibit 1243 to ask you

75

1  if -- this is an e-mail from you to Mr. Petty dated July

2  18th, 2007, is that correct?

3      A.  Yes, sir.

4      Q.  1215, I am sorry.

5      A.  1215 does appear to be an e-mail from me to

6  Lynn Petty from July 18th, 2007.

7      Q.  And just so we are clear about this.  You are

8  sending Mr. Petty at this time each month the dredge

9  cell piezometer attachment to an e-mail.  Is that how

10 you are doing it?

11     A.  Yes, sir.

12     Q.  And we have been talking a lot about Exhibit

13 919, which is the color chart with the tables behind it.

14 Is that essentially the dredge cell piezometer, KIF

15 dredge cell piezometer master sheet?

16     A.  I believe so, yes, sir.

17     Q.  In this particular e-mail you also sent him

18 something regarding Peninsula water levels.  That is

19 another site we are not really going to be dealing with

20 in this case, is that right?

21     A.  Yes, sir.

22     Q.  All right.  Let's go back to Exhibit 919 since

23 you have it in front of you.  Just look at the July 5th,

24 2007 table in the back.  For that one MW-15 was

25 artesian, right?

76

1      A.    Yes, sir.

2      Q.    Okay.  Also while we're at it, let's look at

3 Exhibit 1196.

4            While were doing that, if we may move in 1215.

5                MR. MARQUAND:  No objection, Your Honor.

6 We don't nave have any objection to 285, if counsel is

7 tendering that as well.

8                MR. DAVIS:  We'll go ahead and tender 285

9 as well.

10               THE COURT:  285 is admitted.  1215 is

11 admitted.

12               (Exhibit Nos. P-285, 1215 were

13               received in evidence.)

14 BY MR. DAVIS:

15     Q.    If you look at 1196, please.  You see that

16 again you are sending this each month to Mr. Petty.  Is

17 that correct?

18               (Exhibit No. P-1196 was marked for

19               identification.)

20     A.    That's correct.  For a long period of time we

21 were sending it either primarily to either Lynn or to

22 Lynn and additional personnel.

23     Q.    And let's go ahead and pull up 1194 while we

24 are at it.  This is just another one that shows you were

25 still sending these to Lynn Petty, right?

1                    (Exhibit No. P-1194 was marked for

2                    identification.)

3          A.    That's correct.

4                    MR. DAVIS:  I would like to move in 1194

5    and 1196, Your Honor.

6                    THE COURT:  Any objection?

7                    MR. MARQUAND:  No objection.

8                    THE COURT:  So admitted, 1194 and 1196.

9                    (Exhibit Nos. P-1194, 1196 were

10                    received in evidence.)

11   BY MR. DAVIS:

12         Q.    At some point in time, and we can pin it down,

13   your team began monitoring these additional piezometers

14   that were installed on the West Dike after November of

15   2006, right?

16         A.    That's correct.

17         Q.    And do you recall when that was, the first

18   month that you began doing that?

19         A.    Specifically I do not recall, but it would

20   have been probably sometime around November of 2007,

21   give or take.

22         Q.    Okay.  Now, did you understand at that point

23   in time that GeoSyntec, a consultant to TVA, had been

24   monitoring those piezometers before your team took them

25   over?

                            78

1      A.   I knew at the time that someone had been going

2   out there and monitoring.  I don't recall specifically

3   if we were told GeoSyntec would, you know, it might have

4   come up.  It probably came up at the time.

5      Q.   Do you know who GeoSyntec is?

6      A.   Yes.

7      Q.   Are they a consultant that works for TVA in a

8   number of places?

9      A.   They are a consultant that works for TVA and

10  they work at at least two fossil plants, I know.

11     Q.   You do know why your team took over monitoring

12  from GeoSyntec?

13     A.   I believe there was certain economies.

14     Q.   To save money, right?

15     A.   To save money.

16     Q.   And you sent your team out to monitor those

17  beginning around November of 2007, is that correct?

18     A.   Yes, sir.

19     Q.   And when you were doing that you were also

20  still monitoring the same system that had begun in 2005?

21     A.   Yes, sir.

22     Q.   Minus those piezometers that had been

23  destroyed, run over, filled up, whatever?

24     A.   Yes, sir.

25     Q.   So you, were you ever given the GeoSyntec

1   chart or software for plotting the levels for those new

2   piezometers on the western dike?

3       A.   No, sir.  The only software that we dealt with

4   were the spreadsheets that we sent to them.  Most of

5   this data would have come in to me certainly through

6   most of 2007 in paper form from folks in my office or

7   via e-mail.  I would have transferred it over to this

8   sheet and sent it on to Fossil Engineering.

9       Q.   This transition between GeoSyntec and the TVA

10  monitoring didn't go very well, did it?

11      A.   I don't think I understand the question.

12      Q.   Let me show you Exhibit 4398, please.

13               (Exhibit No. P-4398 was marked for

14                   identification.)

15      Q.   This is an e-mail from you to Paul Smith dated

16  October 17th, 2007.  Who is Paul Smith?

17      A.   Paul Smith was a former TVA employee who came

18  back to work for TVA as a contractor.  He lived in the

19  Kingston area and we utilized him for these monthly

20  measurements from a period from sometime in 2007 until

21  we finished, until the failure of the dredge cell.

22      Q.   When you took over this new system on the

23  western dike, the piezometers were not labeled, right?

24      A.   I can't recall specifically that they were

25  labeled or they were not.  I know that there was at

1  least initially some confusion and we had to make a

2  special trip out there -- I can't remember if we had a

3  Fossil Engineering with us, that Paul made a special

4  trip out there to double check that we had a specific

5  counting of each piezometer and that matched up with the

6  maps that we received from them.

7      Q.   Exhibit 4398 you say, "there is no marking

8  system for those well points and piezometers out at

9  Kingston."

10     A.   That's correct.

11     Q.   You wouldn't know what you were monitoring

12  without a marking system, right?

13     A.   Or a map to tell us.

14     Q.   Okay.  And it took you a couple of months to

15  sort that out, didn't it?

16     A.   From what I recall, you know, we would have

17  taken over -- my memory on dates might be off a little

18  bit -- sometime around November of 2007.  It might have

19  been October of 2007.  We had Paul go out there and if

20  they weren't marked at the time -- eventually there was

21  a, they were all marked by Sharpies that they had taken

22  and written on the side of the well.  I know Paul

23  indicated that to me.  We were still monitoring because

24  we had, when we began monitoring we started monitoring

25  because we finally understood which wells were

81

1  designated which.  Eventually, some months later, it

2  probably would have been early 2008, we changed to a

3  permanent monument.  I think we had metal tags out

4  there.

5       Q.  For most of the time though it was just a

6  magic marker or Sharpie written on a piece of PVC pipe,

7  right?

8       A.  It would have been probably several months

9  there at the end of 2007.

10      Q.  Just so we are clear how long it took you to

11 get that straightened out, go to Exhibit 1204, please.

12              (Exhibit No. P-1204 was marked for

13              identification.)

14              THE COURT:  Let's go ahead and without

15 objection introduce 4398.

16              MR. DAVIS:  Thank you.

17              (Exhibit No. P-4398 was received

18              in evidence.)

19 BY MR. DAVIS:

20      Q.  Exhibit 1204 you recognize this as an e-mail

21 from you to Mr. Petty, correct?

22      A.  Yes, dated January 2nd, 2008.

23      Q.  And you are telling him that you finally got

24 everything labeled as of November, is that right?

25      A.  That's correct.

82

1    Q.   This took about two months to get that

2    straightened out, is that right?

3    A.   Again, off the top of my head I do not

4    remember when we started monitoring out there.  That

5    exchange between Paul and myself was in October of 2007.

6    I can't recall whether we started monitoring in October

7    of 2007 or November of 2007.  It might be that we went

8    out the month ahead to, you know, make sure we had all

9    our ducks lined up to, you know, had a job walk down to

10   make sure we knew what we were doing.

11   Q.   For those on the west side, the new ones, the

12   new piezometers that came after the November, 2006

13   blowout, you didn't have elevations or top of the casing

14   elevations for those piezometers, right?

15   A.   We did not have top casing elevations for the

16   piezometers, that's correct.

17   Q.   All you reported was the depth of the water

18   below the top of the casing, is that right?

19   A.   Yes.  That's correct.  You know, again, with

20   the monitoring wells 10 through 15 there that as long as

21   those reference points hadn't changed that once we got

22   survey information we can kind of back apply that.

23   Q.   I am talking about the new system.

24   A.   Yes.

25   Q.   Some 50 piezometers and well points on the

83

1   western dike, you never were given the elevations of

2   those, were you?

3      A.  We were never given -- as long as we trusted

4   that, or figured that the Fossil Engineering would have

5   all that information.  What was important was that we

6   got the measurements and got them, you know, on period

7   and got them to them.

8      Q.  Contrary to the original piezometer system

9   that included numbers 13, 14, 15, the new system all you

10   reported were the difference between the top of the

11   casing and the water level, is that right?

12      A.  Yes, sir.

13      Q.  And so you really didn't know what the water

14   levels were for the new system on the west?

15      A.  I did not and my group did not, but, you know,

16   we weren't, you know, we weren't required to track the

17   water levels.  We were required to turn in the data.

18      Q.  Okay.  If you can look, please, at Exhibit

19   1181.

20             (Exhibit No. P-1181 was marked for

21             identification.)

22             And if you will turn, first of all, to the

23   second page.  This is an e-mail from you to Mr. Petty

24   dated April 28th, 2008.

25      A.  That's correct.

84

1    Q.   Can you read what that says, please.

2    A.   The highlighted portion?

3    Q.   Yes.  I'm sorry.  If you go to the whole

4  portion starting "Lynn."

5    A.   At the bottom last one or second to the last

6  one?

7    Q.   That one.

8    A.   "Lynn, attached is the raw data for the April

9  update for the Kingston dredge cell update.  This is the

10  second month that we have been to the site where the

11  well points have been actively draining.  As a result,

12  over a dozen piezometers at the toe of the slope are

13  dry.  No information was again collected for the well

14  points themselves, as they were actively draining.

15  Please let me know if you have any questions or

16  concerns."

17    Q.   So let's make sure we understand what you mean

18  by that.  The well points were piezometers, is that

19  right?

20    A.   The well points were essentially piezometers

21  that were set up where they are allowed to freely drain.

22    Q.   And meaning that when you say "freely drain"

23  the water was coming up out of the ground out the top of

24  these piezometers, right?

25    A.   Yes, sir.

85

1    Q.   And are you saying that whenever your team

2 went out and saw the water coming up on out of the

3 ground out of these piezometers that you didn't make any

4 measurements?

5    A.   Make any measurements for what?

6    Q.   You didn't report any data for those

7 piezometers that had water coming up out of the ground?

8    A.   The water that was coming up out of the ground

9 we wouldn't get any really any value out of these

10 measurements to get a true static level.  They would

11 have to be, they would have to be closed off so we could

12 measure them, and as I was under, you know, since they

13 were the draining piezometers and not the toe of the

14 slope ones, you know, I am not sure how important it was

15 to get an active measurement out of it.

16        We had been out there a number of times where

17 it was, where they were freely draining, and, you know,

18 we were never asked to go back so no one every told me

19 explicitly, but I assume the value of that particular

20 grouping of piezometers was probably less important.

21    Q.   Did anyone ever comment that they wanted you

22 to even indicate whether there was a water level coming

23 out of the ground in those piezometers?

24    A.   I don't know if anyone explicitly indicated as

25 such.  Whatever data we could collect in the field, we

86

1    were going to collect in the field.

2       Q.   So when you collected the data you at least

3    indicated that the water levels were coming up out of

4    the ground, right?

5       A.   If those draining piezometers were draining,

6    we tried to indicate that they were draining and that we

7    couldn't get a reasonably accurate picture, a reliable

8    snapshot I should say.

9       Q.   Let me take you to an exhibit -- just so we

10   understand what we are looking at, can you go to 2841,

11   please.

12              (Exhibit No. P-2841 was marked for

13              identification.)

14              MR. DAVIS:  Let's go ahead and enter 1181.

15   I will come back to it.

16              THE COURT:  We'll admit 1181 as well as

17   1204, both e-mails.

18              (Exhibit Nos. P-1204, 1181 were

19              received in evidence.)

20   BY MR. DAVIS:

21      Q.   If you can look at 2841 and identify that,

22   please.

23      A.   2841 is a hydro graph showing the dredge cell

24   slope piezometers.  These are piezometer along the toe

25   slope of the Kingston dredge cell along Swan Pond.  This

87

1  shows our monthly measurements from what appears to be

2  November of 2007 until July, 2008.

3      Q.  And is this the kind of information that you

4  sent to Mr. Petty regarding those dredge cell toe of

5  slope piezometers?

6      A.  Yes, sir.  Primarily what I sent to Mr. Petty

7  were two things.  One is the raw measurements that we

8  made and that is essentially the data that they asked

9  for.  That extends back to those earlier piezometers and

10 wells before.

11         The second thing is this hydro graph which I

12 put together on my own for ease of reading for him if he

13 wanted to, if anyone wanted to make a quick check.  This

14 was not requested by anybody.

15     Q.  Okay.

16             MR. DAVIS:  Let's go ahead and enter 2841,

17 please.

18             MR. MARQUAND:  No objection.

19             THE COURT:  So admitted.

20             (Exhibit No. P-2841 was received

21             in evidence.)

22 BY MR. DAVIS:

23     Q.  Let's turn to one that appears to be complete

24 for all the measurements you made.  This is Exhibit

25 1667.  If you can find that in your stack.  I want to

88

1  dwell on this a few minutes like we did 919.

2                 (Exhibit No. P-1667 was marked for

3                 identification.)

4      Q.   Exhibit 1667, is this a similar graph and

5  tables like we were just talking about in 2841?

6      A.   Yes, it appears similar.

7      Q.   And this one would have complete data up to

8  and including November, 19th, 2008, is that right?

9      A.   It appears so.

10     Q.   Now, going back to this question that we were

11 discussing a few minutes ago in April of 2008 about the

12 well points draining and what kind of indication was

13 made of that.  If you can turn to the TVK-000332235 page

14 of Exhibit 1667.  It is actually the second to last

15 page.  Is this a table that would have been used for

16 indicating the depth of water for the well points in

17 this recording that you did?

18     A.   Yes, sir.

19     Q.   And for March, 2008, April 2008, May, 2008,

20 June 2008, July, 2008 on this particular page you did

21 not measure any data, correct?

22     A.   That's correct.  As I recall, most of the, you

23 know, most of the time those drains were actually open

24 and functioning.  We had tried to schedule it where, and

25 Fossil Engineering had indicated they tried to get every

                                89

1  other drain open so we can get an active measurement.

2  That didn't always sync up in terms of that function

3  being performed ahead of our monitoring which might have

4  just been, you know, either issues in communication or

5  issues in schedules.

6      Q.  I didn't mean you to launch into a long

7  question about that.  My question was simply you didn't

8  measure any data during those months, right?

9      A.  We did not.

10      Q.  And you said "told Paul Smith to skip event."

11  Was that you told him to?

12      A.  Yes, we were -- I relayed a message from

13  Fossil that, you know, we would go ahead and get it next

14  time because we can't get valid data out of that.  We

15  were never asked to go back, you know, the following

16  week or another time to pick that data up.

17      Q.  If you look at the next page of Exhibit 1667.

18  This also occurred in September of 2008, correct?

19      A.  Yes, sir.

20      Q.  And read what it says down there at the

21  bottom.

22      A.  "Well points were draining--a mix-up in

23  communication.  Paul Smith will swing by to close valves

24  early next time."  At that point they told us that we

25  can open and close the valves.

90

1   Q.   What do you mean by "valves"?

2   A.   The way that -- these drains had like a "T" on

3   them that, you know, if you imagine where ground surface

4   was and that this is a PVC riser sticking out of the

5   ground surface, there would be a "T" close to where the

6   ground surface was.  These were to, the main function of

7   these piezometers were to be drains that they could open

8   that drain and it would flow freely.  If they chose to

9   close it, the water would equilibrate within the

10  piezometer and rise to a level that would give us an

11  indication of the hydrostatic pressure within that

12  piezometer.  We can actually get a measurement from the

13  top of the casing down to the water.  If the wells are

14  draining, we can't get any sort of viable reading.

15  Q.   You are not a hydrologist, as I recall?

16  A.   No, sir.

17  Q.   Or a hydro geologist?

18  A.   No, sir.

19  Q.   You had no idea how opening or closing valves

20  would affect the water levels in the dikes, did you?

21  A.   By my training and by my experience, I did

22  know we could not get a viable reading with it open.

23  You know, and in terms of Paul being out there and

24  trying to get those readings, you know, I told him and

25  based on conversations with Fossil Engineering that, you

91

1    know, we would go ahead and skip those, if they were

2    draining.

3        Q.   I am just focused on the system on the West

4    Dike, the new system on the West Dike at this point.

5    Closing half or opening some and not others, you had no

6    idea how that would have affected the accuracy of any

7    readings you got, right?

8        A.   No.  It is, you know, it is reasonable to

9    expect, you know, these things for the drains were

10   fairly tightly spaced, but they weren't, you know, so

11   closely spaced that we should get a large deviation from

12   if they are all closed off.  When we started out we

13   tried to get measurements when they were all closed, but

14   that, at that point it was deemed by Fossil Engineering

15   to be good enough, if we got every other one.  In terms

16   of influence, you know, wouldn't expect there to be a

17   large influence from one well to the next if one was

18   draining and one was not.

19       Q.   Do you have any idea how the engineers you

20   were sending these levels to interpreted your indication

21   on here that you didn't take any data or you didn't

22   measure any levels?

23       A.   I never received any feedback or instruction

24   on exactly how they were handling it.  You know, all we

25   could do were, you know, tell them that we couldn't get

92

1    it during that event or indicate why we couldn't get it

2    and ask if they want us to go back and make a follow-up

3    visit, when we could close the drains.

4        Q.   I want to turn your attention to an exhibit

5    entered in this case.  It should be on your table.  It's

6    called Exhibit 606 and has color charts on it.  Do you

7    have it?

8        A.   Yes, sir.

9        Q.   We have been talking using this master list,

10   which is Exhibit 1667, about the months of March, April,

11   May, June, July, September of 2008 with regard to well

12   point levels.  Can you -- I want to, first of all, give

13   you a predicate for this.  I want you to assume that

14   this is the way that the engineers you were sending the

15   data to interpreted the data, by putting it into some

16   software that GeoSyntec provided to them.  That has been

17   the testimony thus far.  I would like you to turn, if

18   you will, to the months that we just mentioned in

19   Exhibit 606 starting with March of '08.  Do you see

20   that?  It would be the fourth page, I believe, fifth

21   page.

22       A.   Yes, sir, 813.

23       Q.   Yes.

24       A.   Yes, sir.

25       Q.   How did, if you look at the "WP"s that means

93

1  well point, is that right?

2       A.   Yes, sir.

3       Q.   That is how they are indicated?

4       A.   "WP" for well point, "PZ" for piezometer.

5       Q.   Whereas, you had reported to engineering that

6  the well points were actually overflowing out of the

7  ground in March of '08, how did engineering report them

8  in this table?

9            MR. MARQUAND:  Objection.  The document

10 speaks for itself.  The witness yesterday testified to

11 it.  This witness has no personal knowledge of that.

12           THE COURT:  You want to ask him if he

13 does?

14 BY MR. DAVIS:

15      Q.   You can see here on this Exhibit 606 that the

16 term that was indicated in the table was "dry," is that

17 right?

18      A.   That is the term indicated in the table.  I

19 don't know how to interpret that, what their use of that

20 term indicates.

21      Q.   Dry is the opposite of wet, is it not?

22      A.   Generally, yes.

23      Q.   And so instead of the well points being

24 indicated by the engineers as flowing out of the ground,

25 if they indicate dry, that would mean the opposite,

94

1    correct?

2         A.   You would think so.  I have no knowledge of

3    this software and in terms of its applications it might

4    be that that is what you are supposed to do when you use

5    it.  I can't knowledgeably speak to this.

6         Q.   I wouldn't ask you to go through those other

7    months, but the document speaks for itself.  Where you

8    indicated the well points overflowing, they indicated

9    dry.  If you want to look at it to confirm that, that is

10   fine.  Will you take my word for that?

11        A.   How about I take that as your interpretation

12   of that.

13        Q.   That is fair enough.  Thank you.

14             I don't know if I asked about this already.

15   Exhibit 1181, if you can turn to that, please.

16                  (Exhibit No. P-1181 was marked for

17                  identification.)

18             I think we were talking about it before.

19   I don't believe we entered it yet.

20        A.   We did discuss it before?

21        Q.   I think we did.  We were talking about the

22   second page of it.  I appreciate you being better

23   organized than me.

24        A.   Let's see.  Yes, sir.  Sorry about that.

25        Q.   Okay.  If you will turn to the second page of

1    1181 again.  Look at the top e-mail there.  This is an

2    e-mail from you to Lynn Petty April 28th, 2008.  Can you

3    read that, please.

4         A.  Yes, sir.  "Lynn, sorry for any confusion.

5    'Run over' should be synonymous with 'destroyed.'  It

6    seems fairly predictable that each time we go out, we'll

7    find one or two piezometers as having encountered some

8    sorry of heavy equipment.  There have been a couple of

9    times that toe of slope piezometers were found to be

10   'artesian', though not of recent record.

11        We will take care from this point forward to

12   clear any ambiguity within our reporting.  If there is

13   any way that we can improve what we collect or how we

14   present it, please do not hesitate in letting me know."

15        Q.  Are you saying there were a number of

16   piezometers on this new system on the west side of the

17   dikes that were also being destroyed by heavy equipment?

18        A.  Yes, sir.  There was multiple piezometers that

19   were being destroyed which appeared, and I am reporting

20   this second hand, to be largely from mowing operations

21   or from heavy equipment that was placing rock and

22   rip-rap and when we encountered this all we could do is

23   report this to the customer and either typically expect

24   some indication that that was okay or whether that they

25   were going to fix it or we were directed to fix it.

96

1    Sometimes it can be fixed, sometimes not.

2        Q.   Obviously if you have a piezometer destroyed

3    or mowed over, that means it is no longer an effective

4    part of the monitoring system, correct?

5        A.   That's correct.  There was a large number of

6    piezometers out there on a very tightly gridded system.

7    Given the location of the piezometers and given the

8    number and spacing of them, I think that they were kind

9    of over, that they were compensating for the eventual

10   destruction of several.  That's the only reason I can

11   think they would have so many piezometers out there.

12       Q.   Were you ever told that or was that your

13   supposition?

14       A.   That was my supposition based on experience.

15       Q.   You thought it was important to monitor every

16   one of them that was out there, right?

17       A.   We were paid to monitor every one that was out

18   there.

19       Q.   You thought it was important too?

20       A.   I thought it was important that we got

21   everything that we could.  You know, our role in this

22   was to collect the data.  If there was going to be a

23   shortcoming in the data, it wasn't going to be on our

24   shoulders.

25       Q.   Just so we know how many actually were

                              97

1   destroyed, we'll come back to that.

2          Let's go ahead and enter Exhibit 1181, please.

3                  THE COURT:  So admitted.

4                  (Exhibit No. P-1181 was received

5                  in evidence.)

6   BY MR. DAVIS:

7      Q.   Please look at 2833 while we are at it.

8                  (Exhibit No. P-2833 was marked for

9                  identification.)

10     Q.   Let's start with the first e-mail on the third

11  page.  Let me ask if you recall, first of all, that Lynn

12  Petty left the Engineering Design Services Group in

13  early '08?

14     A.   Yes, sir.

15     Q.   And you know that he turned over the

16  responsibility for receiving this data from your

17  department, your team, to Mr. Christopher Hensley?

18     A.   Yes, sir.

19     Q.   And that is what this e-mail here May 27th,

20  2008 is from Christopher Hensley to you, correct?

21     A.   That's correct.

22     Q.   And he told you he is leaving as well, right?

23     A.   Yes, sir.

24     Q.   Do you know how many months he received this

25  data and was responsible for it?

1    A.   I don't recall specifically.  It wasn't very

2  long.

3    Q.   Turn to the next page in this e-mail, if you

4  will, please.  Looking at the e-mail starting with at

5  the bottom here from you to Mr. Dotson.  Mr. Jamey

6  Dotson, he was the contact whom Christopher Hensley

7  referred you to, wasn't he?

8    A.   Yes, sir.

9    Q.   Was he also in Engineering Design Services?

10    A.   At the time, yes.

11    Q.   Okay.  Going up to the next e-mail, June 24th,

12  2008, Mr. Dotson told you he is leaving as well?

13    A.   Yes, sir.

14    Q.   And so then if you will please go on to the

15  next page, the first page, you ended up getting referred

16  to Mr. Kimsey for a period of time, right?

17    A.   Yes.  Jamey was I believe during this time

18  still the primary recipient of the data.  He had been

19  out on leave.  I was to cc Barry in the intermediate,

20  Barry Kimsey in the intermediate.

21    Q.   Do you know what Mr. Kimsey's position was?

22    A.   I knew just by the signature of his e-mail

23  that he was one of the managers down there.

24    Q.   Then he referred you to Mr. Chris Buttram, is

25  that correct?

99

1      A.   Yes, sir.

2      Q.   So over the course of about four months in

3  2008 Mr. Petty told you he was leaving, to send the

4  results to Mr. Hensley, is that right?

5      A.   That's correct.

6      Q.   And Mr. Hensley in May --

7           MR. MARQUAND:  Objection.  This is

8  cumulative and totally repetitious of what we just went

9  over.

10          THE COURT:  I will allow some summation.

11          MR. DAVIS:  I am trying to make it simpler

12  rather than going through the e-mail.

13  BY MR. DAVIS:

14     Q.   In May of 2008 Mr. Hensley told you he was

15 leaving, to send the results to Mr. Dotson, correct?

16     A.   That's correct.

17     Q.   In June of 2008 Mr. Dotson told you he was

18 leaving, to send the results to Mr. Buttram, is that

19 right?

20     A.   In June?

21     Q.   July, Mr. Kimsey told you that, right?

22     A.   Yes.

23     Q.   And then beginning with the August results, in

24 August of 2008 you sent those to Mr. Buttram, is that

25 right?

1      A.   It would have either been July or August, yes.

2      Q.   We'll come back to an e-mail on that.

3           Did any of these engineers from Mr. Petty down

4  to Mr. Buttram ever discuss the results with you or

5  comment on them?

6      A.   No.  The scope of our communications was

7  typically limited to either timing or to the conditions

8  of the site.

9      Q.   You had no idea of whether or not they were

10  even looking at the results you sent them, did you?

11      A.   I had no idea if they were or were not.  I had

12  no idea to believe that they weren't.

13      Q.   Okay.  Now, at this point in time, and when I

14  say this point in time I mean July of 2008, which I

15  think you said was the first time that you sent the

16  results to Mr. Buttram, or maybe in August you were

17  sending two sets of results, is that correct?

18      A.   Yes, sir.  I was sending one spreadsheet which

19  was the original spreadsheet with the original

20  monitoring network, the MW-1 through 16 which had

21  existed since February of 2005 from the start.  And a

22  second spreadsheet which covered all the new GeoSyntec

23  wells.  Again that wasn't a GeoSyntec or Fossil

24  Engineering spreadsheet.  It was one I created and

25  compiled.

1      Q.   What was the acronym you just used?  Someone

2  just created and compiled?

3      A.   I create and compiled.

4      Q.   I created.  I am sorry.  The first one you

5  sent, the KIF dredge cell piezometer sheet, that

6  included wells 13, 14 and 15 from the North Dike of

7  Dredge Cell Number 2, correct?

8      A.   Yes, sir.

9      Q.   Throughout all this time from at least

10  December of '05 when you first started monitoring 13, 14

11  and 15 up until July and including beyond July of '08

12  you were sending the results from 13, 14 and 15 on the

13  North Dike of Dredge Cell Number 2, is that right?

14      A.   That's correct.

15      Q.   Just so we know exactly what you were sending

16  can you -- we have already looked at 2839.  Let's look

17  at 2839.

18              (Exhibit No. P-2839 was marked for

19              identification.)

20              THE COURT:  I am not sure if we moved in

21  2833.  The Court will admit it.

22              MR. DAVIS:  Thank you, Your Honor.

23              (Exhibit No. P-2833 was received

24              in evidence.)

25  BY MR. DAVIS:

102

1      Q.   Exhibit 2839 is an e-mail from you to

2  Mr. Dotson and Mr. Kimsey dated July 18th, 2008 which

3  was the e-mail by which you sent the two sets of data

4  that I just mentioned, is that correct?

5      A.   That's correct.

6      Q.   And let's go ahead and bring that up.  Just so

7  we are clear, the KIF dredge cell piezometer master file

8  that is mentioned as an attachment here, that was the

9  original piezometer network starting in 2005, is that

10 right?

11     A.   Yes, sir.

12     Q.   And the KIF piezometers and well points master

13 was the new part of the network that came after the 2006

14 blowout, is that right?

15     A.   Yes, sir.

16     Q.   And let's go ahead and we have already

17 mentioned 2841.  If you will pull out Exhibit 2840.

18              (Exhibit No. P-2840 was marked for

19              identification.)

20              Is this the KIF dredge cell piezometer

21 file that you were sending in July of 2008 to Mr. Dotson

22 and Mr. Kimsey?

23     A.   It appears so.

24     Q.   So this e-mail would have attached this

25 e-mail, meaning Exhibit 2839 would have attached Exhibit

103

1   2841 and Exhibit 2840, correct?  2841 was the GeoSyntec

2   wells.

3        A.   I apologize, I misplaced 2841 here.

4        Q.   I think I saw you put it back in the folder.

5        A.   Got it right here.

6        Q.   Just so we are clear what my question is, the

7   e-mail that is 2839 would have attached 2840 and 2841,

8   is that right?

9        A.   Yes, sir.

10            MR. DAVIS:  Move to enter all three of

11  these, Your Honor.

12            MR. MARQUAND:  No objection.

13            THE COURT:  Call out the numbers again.

14            MR. DAVIS:  2839, 40 and 41.

15            THE COURT:  So admitted.

16            (Exhibit Nos. P-2839, 2840, 2841

17            were received in evidence.)

18  BY MR. DAVIS:

19       Q.   In the summer of 2008 your team continued to

20  have problems with piezometers being destroyed, correct?

21       A.   I can't recall specific dates and times of

22  piezometers being destroyed.

23       Q.   Do you recall a time when you actually offered

24  to put up bicycle flags to help the crews out there

25  avoid running them over?

                            104

1    A.   We did.  That was two fold; one to help heavy

2  equipment operations better identify the piezometers and

3  second the vegetation out there was, you know, growing,

4  you know, where it obscured some of the piezometers and

5  made it a little bit harder for our field folks.

6    Q.   I am going to ask you in a few minute just how

7  many piezometers were actually destroyed during this

8  time frame.  Before I do, let me show you another

9  e-mail.  Just see if this shows you that they continued

10 to be destroyed throughout this time period.  Look at

11 Exhibit 3058.

12            (Exhibit No. P-3058 was marked for

13            identification.)

14            This is an e-mail at the bottom of the

15 page anyway from you to Mr. Buttram, right?

16   A.   Yes, sir.

17   Q.   And at this point in time you are sending the

18 data to Mr. Buttram, is that right?

19   A.   That is correct.

20   Q.   So this shows that "an additional number of

21 wells/piezometers have been found destroyed --

22 apparently by maintenance mowing activities.  This

23 includes 7B, PZ-131 and PZ-134."  The 7B was from the

24 original piezometer program, is that correct?

25   A.   That's correct.

105

1     Q.   And PZ-131 and 134 were from the GeoSyntec

2 monitoring program, correct?

3     A.   That's correct.

4          THE COURT:   Why don't we, we'll go ahead

5 and admit Plaintiff's 3058 and then break for lunch.   I

6 have some criminal matters to take up between 1:00 and

7 1:30.   I will do that in Judge Shirley's courtroom.

8 We'll probably unlock this courtroom about 1:15 so you

9 all can get back in and hopefully be ready to go at

10 1:30.   I might be running a minute or two late,

11 depending on how I complete my criminal matters.

12          I assume we'll have some cross

13 examination.   We'll hopefully finish up shortly after

14 that.   Let's go ahead and take a break at this time.

15          (Off the record.)

16          (Back on the record.)

17 BY MR. DAVIS:

18     Q.   Mr. Williams, I am going to continue the march

19 of time as we have been doing through here.   I think I

20 might have been discussing Exhibit 3058 prior to lunch.

21 Do you recall that?

22     A.   Yes, sir.

23     Q.   And would you mind bringing that back up.   Or

24 bringing it back up over here.   Do you have it in front

25 of you?

1      A.   Yes, sir.

2      Q.   Let me just ask first of all with regard to

3  the timing of the data that you sent to Mr. Buttram on

4  November 10th, 2008.  You waited about two weeks to send

5  the results to Mr. Buttram, did you not?

6      A.   That's correct.

7      Q.   And was there a reason for that delay?

8      A.   The main reason for the delay -- typically we

9  have been sending them within a week or less, when I was

10  in the same office as the people that were going out to

11  do the monitoring.  With Paul there is a little bit of a

12  delay in back and forth since he wasn't operating out of

13  a TVA facility.  It might take him a little while to

14  send off information and once I got it it might take me

15  a little bit to interpret and to, you know, make a

16  positive point of contact with him that I have

17  everything correct.  There was a little bit of a delay

18  once Paul came on board.  This two weeks was probably

19  more typical.  That was kind of new normal in terms of

20  getting the data off.

21      Q.   You can correct me if I am wrong, but this is

22  the longest delay there has been in the transmittal of

23  the data that I have seen.

24      A.   It could be.  Like I said, our typical had

25  been a, had been, you know, approximately one week for

1    most the life of this project.  When Paul Smith had

2    initially taken over he had actually, you know, we made

3    special trips so he wouldn't have to e-mail them and he

4    made that trip typically within a week.  When we went

5    to, eventually when we went to e-mail there is just a

6    little bit of time added in there to make sure we had

7    proper communication.  When I get Paul's notes I might

8    have to do a little bit of interpreting, if I didn't

9    have him there to ask specifically.

10        Q.   Mr. Smith would e-mail you his notes as a

11   scan?

12        A.   He would send me a physical copy or e-mail and

13   I would put them in.  Most of actual data was easy to

14   understand.  If there was any notes that needed

15   interpretation that he sent, I would have to give him a

16   call.

17        Q.   Now, at this point in time you were still

18   sending both sets of data, is that right?

19        A.   Yes, sir.

20        Q.   And that would have been the original set of

21   piezometers that included 13, 14 and 15 and the ones

22   that were added after the November, 2006 blowout,

23   correct?

24        A.   Yes, sir.

25        Q.   At this point in time Mr. Buttram was your

108

1    main contact, is that right?

2        A.   I believe so.  I sent it to Mr. Buttram and

3    ccing Jamey Dotson.

4        Q.   I want to ask you to look at Exhibit 3609,

5    which has already been admitted.  Do you have that in

6    front of you?

7        A.   Yes, sir.

8        Q.   This is an e-mail from you to Mr. Buttram.

9    You mentioned you cc'd Mr. Dotson on November -- I'm

10   sorry, December 18th, 2008, with the November 2008 well

11   level results, right?

12       A.   Yes, sir.

13       Q.   And this was sent over a month after you made

14   the measurements, right?

15       A.   Approximately one month later, yes, sir.

16       Q.   And you explain in here, "sorry for the delay.

17   I have been holding on this until Paul Smith got another

18   chance to investigate the site."  You didn't think they

19   needed these results immediately?

20       A.   One of the issues that we had is there was a

21   number of piezometers that they couldn't find or

22   couldn't properly identify and there is also some issues

23   with communication between me and Paul in terms of what

24   the status of some of the missing information was.  All

25   this was somewhat antagonized by other work and by the

109

1    holidays, but Paul had gone out there and had to make a

2    subsequent trip and once we were able to square that

3    away we were able to report the data.

4        Q.   And just so we are clear, if you look at

5    Exhibit 3610, please.  You should have that in front of

6    you.  It has already been entered into evidence.

7        A.   Yes, sir.

8        Q.   These are the West Dike piezometers that were

9    added after the 2006 blowout, is that right?

10       A.   Yes, sir.

11       Q.   And this is the data that was sent on December

12   18th, 2008, right?

13       A.   Yes, sir.

14       Q.   And then if you look at 3611 which is another

15   one that you should have in front of you which has also

16   been admitted.

17       A.   I have it.

18       Q.   Okay.  These are the original dredge cell

19   piezometers including 13, 14 and 15, correct?

20       A.   Yes, sir.

21       Q.   And when we have been using Exhibit 919 so far

22   in your testimony would that be the same as Exhibit 3611

23   you think?  The tables are a little chopped off in 3611.

24   That's why I prefer to use 919 for a couple of more

25   questions.

110

1      A.   Yes, 3611 is approximately the same as 919.

2      Q.   I would like to ask you a few questions about

3  the data that were transmitted on December 18th, 2008.

4  Let's refer to Exhibit 919, if you will, please.  Go to

5  the November 19th, 2008 table in Exhibit 919.  If you

6  need me to help you with a page, I will be happy to try.

7  For the record, this is the bates number TVK-00054272.

8  Do you see that?

9      A.   Yes, sir.

10     Q.   This has the entire list -- first of all, this

11  is for the original set of piezometers that included 13,

12  14 and 15 on the North Dike, right?

13     A.   Yes.

14     Q.   Does this list the entire list of the

15  piezometers that you started with back in 2005?

16     A.   Yes, it is.

17     Q.   Under well number.  If you look under remarks

18  on the right, does that discuss the fate of many of

19  those piezometers over the course of three years?

20     A.   Yes.  That is our impression of what, you

21  know, happened.

22     Q.   You can count, if you would like, but by my

23  count half have either been destroyed or covered with

24  ash in that three year period that you were monitoring

25  the piezometers, is that right?

111

1          A.   Yes, sir.

2          Q.   And I am going to take you to what I think is

3     the same compilation of data as was in 3610, which is

4     Exhibit 1667 we have been talking about previously.  Do

5     you have that in front of you?

6          A.   I have it right here.

7          Q.   And this version that we have is not in color,

8     but do you normally or did you normally send these in

9     color?

10         A.   Yes, sir.

11         Q.   Now, go to the fourth page of Exhibit 1667, if

12    you will.  Does that show the depth to water

13    measurements from November 19th, 2008?

14         A.   It does.

15         Q.   And you can refer back to the second page, if

16    you would like to get the names of the piezometers or

17    the numbers of the piezometers, but is this the complete

18    list of the piezometers that you started with in 2007

19    when you began monitoring the West Dike piezometers?

20         A.   The toe slope piezometers, yes, sir.

21         Q.   The ones that don't show up anywhere on

22    November 19th, 2008, which would be on the fourth page

23    and you would have to go over to the page that has that

24    same column in, which is at 000332232 because the

25    spreadsheets aren't wide enough to follow easily, but

112

1  the blanks are the ones that were destroyed, is that

2  right?

3      A.   Well, as you will see on the bottom of the

4  next page, 2230, there's a little key and what's missing

5  here is the color coding.  When these were printed out

6  in color, the blanks here would have indicated the fate

7  of these wells.  It might be that all these, that some

8  of these were destroyed.  Some of them might also be dry

9  or obstructed wells or just simply lost in the

10 vegetation.  Being in November it is not likely that

11 most of these were lost in vegetation.  The fact that

12 they are blank is not an indication that they are

13 destroyed, but rather that was something preventing us

14 from getting data from this piezometer.

15     Q.   Do you know how many were destroyed over that

16 period of time?

17     A.   I am not sure if I hazard to guess.  I know

18 that a number of them were destroyed or damaged and we

19 were able -- one of the previous e-mails we just looked

20 at indicated that Harold Catlett had been able to go out

21 and to rehabilitate some of the wells.  Some of the

22 wells for one reason or another might have been damaged

23 or damaged in a way that we can reestablish them and

24 also reestablish the reference point.  That is why if

25 you see throughout the span of the monthly recovery of

113

1   these toe slope piezometers that some of them kind of

2   disappear and reappear.

3       Q.   Now, look, if you will, at the second part of

4   this document which starts with another graph or chart

5   of well points.  You see that?

6       A.   Yes, sir.

7       Q.   That would be page 332233.  You see a large

8   blank area there, right?

9       A.   Uh-huh.

10      Q.   As we previously discussed, that was as a

11  result of you deciding not to measure the levels in

12  those well points because they were overflowing from the

13  ground, right?

14      A.   Yes.  Those were actively draining and we were

15  told not to worry about them.

16      Q.   And in your November 19th, 2008, measurements

17  of the well points, if you will look at the last page of

18  Exhibit 1667, please.  Do you see the measurements that

19  are made there, that are reported there?

20      A.   Yes, sir.

21      Q.   All the blanks, those weren't measured, right?

22      A.   The blanks were not measured and there is no

23  indication of why they weren't measured.

24      Q.   Now, when you received these water level

25  measurements in November of 2008, did you review them?

114

1    A.   You know, typically when I get the data

2  throughout the course of our monitoring and

3  disseminating the data typically I will get it and check

4  it for errors or for what we call a busted measurement.

5  That is just a measurement that might be attributable to

6  error on the part of the field sampling; it could be

7  instrument error, person error.  We confirm that with

8  the sampling crew there was nothing in error for us to

9  invalidate that data point.  I would check that as I was

10  transferring it over.  In terms of making a qualitative

11  judgment, you know, if something would pop out, I might

12  put it in an e-mail that I pass on.

13    Q.   Let's ask you if something popped out here.

14  If you will go to the, let's focus in on the right side

15  of this graph, please in Exhibit 919.  Surely you

16  noticed, if you looked at MW-14, 15 and 13 spiked

17  sharply in November of 2008, right?

18    A.   Yes.  You can see a definite upward movement.

19    Q.   Let's talk about how much they moved up.  If

20  you will please look at the same exhibit and go to the

21  page where we were talking about November 19th, 2008

22  with the table.  I can give you that number.  That would

23  be bates number 54272.

24    A.   Yes, sir.

25    Q.   And you can refer to the October levels, if

115

1  you would like, because I want you to compare the

2  November 19th with the October 23rd MW-13 increased by

3  over eight feet.  Is that right?

4      A.   It would appear so.

5      Q.   MW-14 almost seven feet?

6      A.   Yes, a little over six, yeah.

7      Q.   MW-15 almost six feet?

8      A.   Yes, sir.

9      Q.   It became artesian, right?  It was artesian?

10     A.   Yes, sir.

11     Q.   That was as steep as an increase of any of

12  these piezometers that preceded the November 2006

13  blowout, right?

14     A.   From our discussions today, it is in the same

15  range.

16     Q.   It's the same time of the year?

17     A.   Approximately.

18     Q.   And that is the time of the year when you have

19  more rain and also it is colder so you have less

20  evaporation, right?

21     A.   Uh-huh.

22     Q.   Can you say yes or no, please?

23     A.   Yes.

24     Q.   And it is also at a time when they were

25  dredging in to Dredge Cell Number 2.  Do you know that?

116

1      A.   I found that out after the fact.

2      Q.   That as of October 16th, 2008, TVA began

3 sluicing water and ash into that northern most dredge

4 cell, Dredge Cell Number 2, right?

5      A.   If you say so.  I found out after the fact

6 that they were dredging.  I don't know what specific

7 dredge cell they were dredging to.

8      Q.   That dredging continued until December 18th,

9 2008, right?

10      A.   Again, I don't know the specifics.

11      Q.   We don't have the December rainfall on Exhibit

12 919.  Do you happen to know what the December rainfall

13 was up until that time?

14      A.   Not off the top of my head.

15      Q.   December can be a wet month, though, right?

16      A.   Yes, sir.

17      Q.   You really wanted to pay attention to those

18 levels during that time of the year, right?

19      A.   Yes, sir.  And I will point out, if you zoom

20 out on this graphic that's being shown here on 919, that

21 there is a significant jump.  The water levels we

22 observed in November of 2008 they are still pretty much

23 within the range of what we see during the wetter

24 periods of the year.

25      Q.   Now, given the fact that they were sluicing

117

1   water into Dredge Cell Number 2 during this time period

2   and December is typically a rainy month, you would have

3   expected that trend to continue up until December 22,

4   2008, right?

5        A.   Not necessarily.   Now, you are saying, you

6   know, you are expecting operations to go out there and

7   that would be continuing up.   It might be that the water

8   levels had reached some stability and we are seeing an

9   instantaneous snapshot of that, of a flat line.   We

10  don't know if it is going up, we don't know if it is

11  going down or going to flat.   Right now what we are

12  seeing in November of 2008 are still within the ranges

13  of historical data.

14       Q.   But not within the range of the increase that

15  MW-13, 14 or 15 had ever seen before?

16       A.   It was a -- 13, 14 and 15 do make a little bit

17  of a jump up in water level, yes.

18       Q.   You wouldn't disagree if there were to be

19  testimony in this case that that was the sharpest level,

20  the sharpest rate at which 13, 14 and 15 had ever gone

21  up?

22       A.   I don't know.   My response to that would be,

23  you know, if I had time to sit here and look back over

24  the data, I could give you a yes or no.

25       Q.   Now, who told you that TVA was sluicing water

                                118

1   and ash into Dredge Cell Number 2 in December of 2008?

2       A.   I don't recall specifically, but it happened

3   post failure.  Typically, you know, I am not informed,

4   you know, whether they are stacking or not, I might hear

5   that anecdotally or I might hear that from our field

6   crew.  That is not something that Paul and I discussed.

7   After the failure of the dredge cell I was actually part

8   of the people, part of the environmental crew that was

9   on site and evaluating, and during some of our

10   preliminary discussions we were talking about the

11   conditions that happened at the site and it was

12   indicated to me they were stacking at that time.

13       Q.   When you say "stacking" is that the same thing

14   as dredging?

15       A.   Yes, sir.

16       Q.   Or sluicing?

17       A.   Loading material on top of the dredge cell.

18       Q.   And they do that by pumping out of the ash

19   pond into the dredge cell, right?

20       A.   As I understand it, yes.  I'm not saying that

21   I have a complete understanding of their technique.

22   That is roughly as I understand it.

23       Q.   Now, did Mr. Buttram or Mr. Dotson either one

24   call you in November and ask where the November water

25   levels were?

1    A.   I don't recall that they did.  I don't recall

2  that they didn't.

3    Q.   And your understanding was that Mr. Buttram

4  was the one who was the primary responsible party for

5  evaluating these levels that you sent, right?

6    A.   I understood he was the primary receiver.  I

7  didn't know once he got it if he turned around and

8  somebody else actually did the interpretation.

9    Q.   You certainly thought he was reviewing both

10  sets of data that you sent him, right?

11    A.   I certainly thought and had the expectation

12  that someone within Fossil is reviewing it.  It might be

13  that they had him -- for all I know and I don't know --

14  is that he was preparing the data for someone else to

15  review.

16    Q.   You were holding information in your hands in

17  November of 2008 until December 18th, 2008, that could

18  have prevented the dikes from failing?  Do you agree

19  with that?

20    A.   I agree that we held it longer than typical.

21  I would make two points.  One is that typically we

22  believe sending out bad data is worse than sending out

23  no data at all.  We wanted to clarify, I wanted to

24  clarify between me and Paul that this was, you know, the

25  data was as we understood it, clarifying any

120

1    miscommunications.

2        Q.   Well, what you were talking about the

3    miscommunication, the data you wanted to clarify had

4    nothing to do with MW-13, 14 and 15, correct?

5        A.   I don't believe it did.

6        Q.   So it was only about the well points on the

7    West Dike, is that right?

8        A.   To be honest, I can't recall specifically what

9    we talked about, but generally I think it was the

10   piezometers along Swan Pond.  It was the markings of

11   some being destroyed or -- there had been so many, there

12   had been several changes.  I just wanted to make sure

13   that what we were reporting was accurate.

14       Q.   Just to make sure your answer to my question

15   is clear, the data that, the reason that you say you

16   delayed sending the November 19th well level results had

17   nothing to do with 13, 14 and 15?

18       A.   That's correct.

19       Q.   Did you discuss those results with anyone

20   before you sent them?

21       A.   No.  I typically didn't.

22       Q.   You didn't sound any alarm in November up

23   until December 18th, 2008, right?

24       A.   No.  Again, we experienced a jump up in water

25   levels in select wells, but I don't spend a lot of time

121

1  reviewing the data because we had no call to make a

2  qualitative evaluation.  That was done further down the

3  data processing line.  You know, I do give it kind of an

4  eyeball check.  They are, these values were within kind

5  of historical norms.  We hadn't seen a large any sort of

6  increase that coincided with the wet weather

7  approaching.  We were expecting some sort of increase.

8      Q.  Again, the largest increase you have ever seen

9  in these three piezometers, right?

10     A.  I am not saying we were expecting the largest

11 increase we ever saw.

12     Q.  You didn't sound the alarm.  You just went on

13 vacation?

14     A.  I can't recall if I was on vacation or off

15 doing another work.

16     Q.  Exhibit 3609 says, "since I will be off for

17 parts of the next two weeks I wanted to send you the

18 latest update."  You see that in 3609?

19     A.  I do.  Actually being off I might have meant

20 being on vacation or in the field.  This is typically

21 work that unless there is a high priority -- unless I

22 was going to be out of the office an extended amount of

23 time, I wouldn't have had somebody else process it while

24 I was out.

25     Q.  You did expect a further increase in December,

1  correct?

2      A.   We would have expected an eventual increase,

3  yes.

4      Q.   And you did not hear from Mr. Buttram about

5  this data.  You have no idea if he even saw it?

6      A.   I am sorry.  Can you restate.

7      Q.   You never heard from Mr. Buttram about these

8  data once you sent them, did you?

9      A.   I never got a positive confirmation of

10  receipt.

11     Q.   And do you have your e-mail set to where you

12  would get a confirmation of receipt?

13     A.   No.

14     Q.   Okay.  But you never heard from him though,

15  did you?

16     A.   No.

17     Q.   And you know, as we sit here today, that on

18  December 22, 2008, the North Dike failed where 13, 14

19  and 15 were located?

20     A.   The North Dike failed and they believe it was

21  somewhere in the area of 13, 14, 15.

22             MR. DAVIS:  Thank you.

23             THE COURT:  Thank you.  Cross-examination.

24                   **CROSS EXAMINATION**

25  BY MR. MARQUAND:

123

1        Q.   Good afternoon, Mr. Williams.

2        A.   Good afternoon.

3        Q.   Do you have any professional certifications in

4   addition to your academic degrees?

5        A.   Yes, sir, I am a Licensed Professional

6   Engineer in the state of Tennessee.

7        Q.   When did you obtain your license?

8        A.   2007.

9        Q.   Let me show you Plaintiff's Exhibit 59.  Can

10  you speak to the accuracy of those labels on that

11  document?

12       A.   From what I recall, these are all labeled

13  properly.  I cannot speak to the areas where the slope

14  issues of 2003 and 2006 locations are.  You know, I know

15  they are generally along that western face that face

16  Swan Pond Road.  I can't speak with any certainty to

17  where they actually were.

18       Q.   Can you speak to the accuracy of the red mark

19  that is in here that says December, 2008 failure

20  location?

21       A.   Yes, sir.  Per the AECOM report I believe that

22  was the area that they indicated probably it likely

23  failed first.

24       Q.   Do you know the date of this aerial

25  photograph?

124

1    A.   I do not.  We use similar base maps.  I can't

2  specifically identify the year.

3    Q.   Okay.  I am correct in assuming you didn't

4  prepare this photograph with the labels, is that right?

5    A.   That is correct.  I did not prepare that.

6    Q.   Now, there has been a lot of discussion about

7  and I would have heard the terms "piezometers,"

8  "monitoring wells" and "well points."  At one point I

9  believe you corrected counsel that something wasn't a

10  piezometer, was a monitoring well.

11    A.   I indicated that piezometers and monitoring

12  wells have similar construction.  The only difference is

13  in functionality, how we use them.  Typically

14  piezometers are just for water levels and monitoring

15  wells are typically something that we get more than

16  water levels out of, water levels and more out of, I

17  should say.

18    Q.   Is there some way that we could have

19  Plaintiff's Exhibit 59A?  That was the one that was

20  marked up this morning.

21       I understood that Mr. Williams also marked in

22  red the location of some other wells that were in this

23  area.  Is that not correct?

24            MR. DAVIS:  On the screen is when he did

25  it.

1          THE COURT:  I am not sure he penned in, as

2    I recall --

3          MR. MARQUAND:  We only had that shown on

4    the screen?

5    BY MR. MARQUAND:

6    Q.   Then I am going to show you, Mr. Williams,

7    Plaintiff's Exhibit 270.

8          (Exhibit No. P-270 was marked for

9          identification.)

10         Does that accurately show the location of

11   monitoring wells 1 through 9 and I believe number 16?

12   A.   Yes, sir, 16A and 16B.  This appears to be the

13   original network that we started the monthly sampling on

14   from February of 2005 that we, and was the entirety of

15   our sampling activity out there until sometime in late

16   2007.

17   Q.   Do you know why those, what purpose those

18   wells were used for?

19   A.   Initially they had multiple purposes.  The

20   location, these two transects that you see on one side

21   MW-1 through MW-5 on the other, and MW-6 through MW-9,

22   the locations were selected by TVA with a large

23   discussion with one of their subcontractors, Worley

24   Parsons, I believe where they wanted to get information,

25   get certain information, but primarily in terms of the

126

1    depths and what I was aware that they were being used

2    for was to test for hydraulic properties of the dredge

3    cell that we would be using later on for the lateral

4    expansion of the permit provision.

5         Q.   Was that test completed?

6         A.   Yes, we performed that testing in January of

7    2005.  Originally these wells were only supposed to be

8    monitored for a short period of time and then be closed.

9         Q.   Do you know what kind of depth these wells

10   were screened to?

11        A.   Off of the top of my head, I don't know.

12   Typically these pair wells, there would be a well that

13   is installed into the ash, either shallow or deep, which

14   would be the A wells and the B wells would typically be

15   a little bit deeper either into the deeper ash or down

16   into alluvium, the area, the material that resides under

17   the ash.

18        Q.   I am not an environmental engineer.  When you

19   say these are "screened," can you explain what that

20   means?

21        A.   Yes, sir, water level piezometers are

22   typically only screened within the material of interest.

23   Screening means that the piezometer is open, and when I

24   say open, it has a screen there and not a solid section

25   of riser across the vertical horizon of interest.  The

127

1    reason why we want to have multiple wells paired with or

2    multiple wells or piezometers paired together across

3    multiple, you know, target medium or target strata is if

4    you want to observe the behavior in different mediums.

5    By testing these wells you can find out about how the

6    mediums interact. You can also find out the hydraulic

7    properties of the mediums around them. You can also

8    figure out what direction water is flowing.

9         Q.   All right.  I am going to show you what has

10   offered as Plaintiff's Exhibit 596, page 220.  It was

11   the installation record for monitoring well 10.

12                   THE COURT:  Before you move on, do you

13   want Plaintiff's 270 into evidence since he identified

14   it?

15                   MR. MARQUAND:  I would offer that, Your

16   Honor.

17                   THE COURT:  Without objection, we'll admit

18   plaintiff's 270.  Thank you.

19                   (Exhibit No. P-270 was received in

20                   evidence.)

21   BY MR. MARQUAND:

22        Q.   Does that installation record indicate the

23   depth to which monitoring well 10 was drilled?

24        A.   This indicates the depth to which it was

25   installed.  In terms of drilling --

1    Q.   Maybe that is a better term, installed then.

2    A.   Yes, sir, to which it is installed.  It

3 indicates that the total well depth here is 45 feet

4 below beneath the surface.

5    Q.   Does this indicate some sort of screen for

6 that well?

7    A.   Yes, sir, this indicates that is a five foot

8 screen from about 39.8 feet beneath the ground surface

9 to 44.8 feet beneath the ground surface.

10    Q.   So if there is water 38 or 39 feet below the

11 ground surface or below, the water can enter the well,

12 but not otherwise?

13    A.   I'm sorry.  Can I ask you to repeat that.

14    Q.   At what levels can the water enter the well?

15    A.   The water can enter the well from 39.8 to

16 44.8.  There would be water purge collating down from

17 above that could enter the well.  Ideally there could

18 also be water entering from below, but, you know,

19 typically you are going to be pulling in water from that

20 screen.  Any water that, other water that would have to

21 get in would have to travel from above or below.

22    Q.   So when you are measuring the depth of the

23 water in this well, what does that show you?

24    A.   The depth in the water of the well is giving

25 us an indication of what the hydro stratographic

129

1    pressure is between 39.8 and 44.8.  For instance, if

2    this was the ash, and it's homogenous material all the

3    way up, that ash is likely going to give you the true

4    phreatic surface, the water table.  This is the first

5    water.

6            If there is a, if there would be a confining

7    layer above it, you could have, or a separate layer

8    above it, the pressure in this well can either be

9    greater, the same or lesser than the pressure of the

10   stratum above or below it.

11        Q.  So you are measuring water pressure at this

12   point?

13        A.  Yes, sir.

14        Q.  Within the various reports that you testified

15   about we were talking about monitoring well 10.  How

16   would that particular monitoring well have been

17   designated in those spreadsheets and reports that you

18   were sending to Mr. Petty and Mr. Hensley and

19   Mr. Buttram?

20        A.  Are you indicating, are you asking what they

21   are called or --

22        Q.  This particular well.

23        A.  Yes, sir.

24        Q.  When you took measurements from it?

25        A.  We would call it MW-10.

130

1      Q.    It would appear in the spreadsheet as MW-10?

2      A.    Yes, sir.

3      Q.    And the "MW" stood for monitoring well?

4      A.    Yes, sir.

5      Q.    Now, I believe you also testified about what

6  you saw along the west wall and you initially asked

7  Mr. Petty if he wanted you to monitor that?

8      A.    That is correct.

9      Q.    What was that?

10      A.    These were the additional piezometers that

11  were installed along the west wall, mostly on the lower

12  half of the dike.

13      Q.    And you called those piezometers, as opposed

14  to monitoring wells.  What was the difference?

15      A.    Again, the only difference, the main

16  difference is in functionality.  The monitoring wells

17  were, you know, typically when we use the term

18  monitoring well they are intended to be multi purpose

19  for some hydraulic testing or potentially environmental

20  sampling, as well as water levels.  These other

21  piezometers were only referred to us as hydraulic

22  monitoring points.

23      Q.    Were these physically different?

24      A.    No.

25      Q.    Did they reach a different level?

1      A.    The toe of slope piezometers, as I understand,

2   were much shallower, more in the range of five to ten

3   feet, whereas the ones up on top extended quite deep.

4      Q.    I am going to show you Plaintiff's Exhibit

5   285.  Can you tell by looking at this, is that the

6   extent of all of the piezometers that you were measuring

7   on the west wall that you took over from GeoSyntec?

8      A.    There is a lot of piezometers on there.  I

9   cannot tell you definitively.  That looks like most, if

10  not all, of them.

11     Q.    I am going to show you a document which we

12  have identified as Defendant's Exhibit 194.  It appears

13  on Plaintiff's Exhibit list as page 369 of Exhibit 6034.

14  Have you seen that before?

15                  (Exhibit No. D-194 was marked for

16                   identification.)

17     A.    I have.

18     Q.    Can you tell me what it is.

19     A.    That is a hand drawing of the GeoSyntec

20  designed or installed piezometers along the west face of

21  Swan Pond Road.

22     Q.    What was the occasion for you to see that?

23     A.    When we contracted with Fossil Engineering to

24  go out there we needed an initial map to identify which

25  piezometers were which.  This was what was sent to me.

132

1    I can't recall specifically who sent it to me.  It might

2    have been Jim Settles.

3         Q.   So are these and the other piezometers the

4    ones that you ultimately took over monitoring that

5    GeoSyntec had installed and monitored?

6         A.   Yes, sir.

7         Q.   I note that on this particular document there

8    is some labels that say, that have a "WP"?

9         A.   Yes, sir, for well point.

10        Q.   And there are some that are "PZ"?

11        A.   Yes, sir, for piezometer.

12        Q.   What was the difference between the well

13   points and the piezometers?

14        A.   I was never told this by Fossil Engineering at

15   the time, but from what I gathered and what is typically

16   used by TVA and in my experience, the piezometers at the

17   toe of the slope are for measuring kind of near surface

18   water level measurements at the bottom.  Since the well

19   points can open drain, they were intended to be more

20   functional in terms of acting as drains so the

21   piezometers was the data that kind of dictated what the

22   water levels were near the surface at the toe of the

23   slope and well points were mostly for drainage, adding

24   additional drainage functionality.

25              MR. MARQUAND:  Your Honor, I tender

133

1    Defendant's Exhibit 194.

2                     MR. DAVIS:  We don't have any objection to

3    it, I don't think.  I think he stated the incorrect

4    exhibit that was part of.  We can track that down with

5    the bates number.

6                     THE COURT:  You can clarify that for the

7    number.  We'll admit this single page as Defendant's

8    194.

9                     (Exhibit No. D-194 was received in

10                        evidence.)

11   BY MR. MARQUAND:

12       Q.   I notice there is some discrepancy between

13   Defendant's 194 and Plaintiff's 285.  I don't see any

14   well points shown on that particular document, is that

15   correct?

16                     MR. DAVIS:  I object to the testimony by

17   TVA's counsel, Your Honor.

18                     MR. MARQUAND:  I withdraw the question.

19                     THE COURT:  Thank you.

20   BY MR. MARQUAND:

21       Q.   Do you see any well points depicted on

22   Plaintiff's Exhibit 285?

23       A.   I do not.  None are obvious to me.

24       Q.   Now, Plaintiff's 285 is part of, it looks like

25   part of a CAD drawing, is that right?

134

1    A.   This looks to be a CAD base with some notation

2    handwritten on there.

3    Q.   Do you see anywhere on plaintiff's 285 or did

4    you see anywhere on defendant's 194 any of the

5    monitoring wells?

6    A.   On this one in front of me there is two

7    monitoring wells indicated at the very top center;

8    monitoring well 1 and monitoring well 2.  There is also

9    another unspecified monitoring well at the bottom

10   center.

11   Q.   Do you see monitoring wells 13, 14 and 15 on

12   either Plaintiff's Exhibit 285 or Defendant's 194?

13   A.   I do not.

14   Q.   Did you know what use Fossil Engineering was

15   making of the data from the piezometers on the west wall

16   that are contained in Plaintiff's Trial Exhibit 1667?

17   A.   I never had a conversation with Fossil

18   Engineering to speak about what explicitly they are used

19   for.

20   Q.   And similarly did they ever tell you what use

21   they were making of the data from the monitoring wells?

22   A.   No, they did not.

23   Q.   You were shown Plaintiff's Exhibit 606.  I

24   believe you have a copy up there.

25   A.   Yes, sir.

135

1      Q.   I don't know if you will be able to read it

2   off this document camera better from the one that you

3   have got.

4      A.   I have it in front of me.

5      Q.   Do you see any indication in the note at the

6   bottom of the page as to the reliability of the data

7   from the monitoring wells in predicting the water with

8   respect to ground surface?

9           MR. DAVIS:   Object to that, Your Honor.  I

10  believe Mr. Marquand objected when I asked this witness

11  a similar question about this document and he said the

12  document speaks for itself.

13          MR. MARQUAND:   I did, Your Honor.  He was

14  allowed to ask the witness a question.

15          THE COURT:   I will allow the question.

16  BY MR. MARQUAND:

17     A.   There is a note on the bottom.  Would you like

18  me to read it?

19     Q.   If you can.

20     A.   "Under the site specific conditions the well

21  points may indicate equipotential levels higher than

22  ground surface and should not be compared against the

23  water level thresholds, i.e., the colored water level

24  legend.  WP, well points are screened approximately 20

25  feet below ground surface and represent the

136

1  equipotential levels at this depth. In contrast, the

2  piezometers are screened at approximately three to five

3  feet below ground surface and represent the location of

4  the water table."

5      Q.  Let me direct your attention to Plaintiff's

6  Exhibit 1251. I believe you testified with respect to

7  the bottom e-mail you notified Mr. Petty about some

8  seepage you noticed in the North Dike.

9      A.  That's correct.

10     Q.  And what did Mr. Petty tell you that he had

11 determined that seepage was?

12     A.  Mr. Petty indicated that that was likely from

13 under drains on the side of the dredge cell, the outlet

14 into the ditch and that they were, they didn't know

15 exactly where the drains were, but he indicated that it

16 is on a 200 foot interval, and, you know, that

17 approximate location, he indicated that the water was a

18 good sign.

19     Q.  Was a good sign?

20     A.  That the clear water was a good sign, yes,

21 sir.

22     Q.  You mentioned a ditch. Where was this seep in

23 the monitoring well 15 in relation to that ditch?

24     A.  It was pretty close. One of the earlier

25 e-mails that we reviewed, and I can't tell you which one

137

1   it was off the top of my head, said it was actually --

2   it was this one.  Said that it was approximately 15 feet

3   south of MW-15.  That is in the e-mail that initiated

4   the change.

5        Q.   There has been some discussion with the fact

6   that a number of wells were buried and/or closed.  Can

7   you explain why it is that a well would be buried?

8        A.   More than likely the wells that were buried --

9   off the top of my head, I believe the e-mails referred

10  to 5A, 5B, 6A and 6B.  I would have to look at the

11  notes.  I think there at the end, towards the end of

12  monitoring, 7B as well, were buried due to stacking

13  operations.

14       Q.   Stacking of what?

15       A.   Stacking of ash on top of the dredge cell.

16       Q.   As we look at Exhibit 270, where were those

17  wells located?

18       A.   In the center of the dredge pond cells on the

19  very top of the dredge cell.

20       Q.   And when you say that wells are closed, what

21  do you mean by that?

22       A.   If wells are either damaged beyond repair or

23  of little use to us or too much of a hassle to keep up

24  with -- in this case if they are stacking on top, it

25  would have raised the elevation of the ground up with

                              138

1  the stacking of the ash and they would have had to
2  extend those casings.  In any three of those cases they
3  would want to just go ahead and close it.

4          The closing would take just a few different
5  forms, including the form that we discussed for
6  monitoring wells 4A and 4B which is using bentonite
7  pellets, which is an expansive clay, to fill up the hole
8  and that clay would expand to prevent any further
9  infiltration through that well.

10         Q.  I want to ask you to direct your attention to
11 an e-mail dated, the last in the chain was dated April
12 28th, 2008.  It is Plaintiff's Exhibit number 1181.  I
13 want to ask you about the first e-mail in that chain
14 which is your April 28th e-mail to Mr. Petty.  There was
15 some discussion about well points draining.  Can you
16 explain how a well point drains, how these particular
17 well points drain.

18         A.  These particular well points are draining,
19 again, because they are built so that they can drain.
20 Typically the ordinary piezometer or well will feature a
21 length of riser, PVC riser, closed in section extending
22 to some nominal height above the ground surface which is
23 typically around three feet.  These wells would have had
24 some sort of "Y" valve on them that would allow them to
25 freely drain just above the surface where they can open

                              139

1  that valve and instead of the water going up the

2  instrument, it is actually day lighting at this valve.

3        Q.   Do you know if the draining was intentional or

4  not?

5        A.   I did not specifically know.  Just based on my

6  experience they wouldn't have built it like that, if it

7  wasn't intentional.  They wouldn't have given it the

8  ability to drain like that, if they weren't intending to

9  drain like that.

10       Q.   Were these the drive point piezometers that

11 you said were five to six feet long or were those one of

12 the well points that were at some depth?

13       A.   I believe these were the -- let me double

14 check the other document here.  I believe these were the

15 well points where the screen was approximately 20 feet

16 below grade.  These were not the piezometers at the near

17 surface.

18       Q.   Thank you.  Now, you mentioned in Plaintiff's

19 Exhibit 3058 at the very top it said, "Harold Catlett

20 was on site last week and repaired some of the wells."

21 What is that all about?

22       A.   Earlier in the e-mail on the bottom of this

23 same e-mail I refer to an additional number of wells and

24 piezometers including 7B, PZ-131 and PZ-134 had been

25 destroyed.  I am sure there might have been some damage

140

1  to several of these wells that might not be indicated in

2  this e-mail, but were on the spreadsheet that I sent the

3  data.  The e-mail here, you know, part of our mission

4  out there is to look for any changes, including any

5  changes to the integrity of the wells and report that to

6  the customer.

7          In my previous e-mail I reported that to Chris

8  Buttram and cc'd Jamey Dotson.  Jamey responded back

9  that "Harold Catlett was on site last week and repaired

10  some of the wells."  He would have brought some of the

11  wells back to functionality.

12      Q.  I want to show you Plaintiff's Exhibit 1763.

13  Let's begin with the first e-mail in this chain.  It is

14  from you to Mr. Buttram dated August 22, 2008.  Have you

15  seen that before?  Do you have that there?

16      A.  I am pulling it out now.

17                  (Exhibit No. P-1763 was marked for

18                  identification.)

19      A.  August 22nd, 2008.  The e-mail from me to

20  Chris Buttram, yes, sir.

21      Q.  And you noted in there, did you not, that some

22  of the wells, you asked him to close some of the wells,

23  is that correct?  I am sorry, that is from Mr. Dotson to

24  you.  I am reading the wrong one.  You mention to

25  Mr. Buttram that several piezometers were broken.  You

1    ask him about closing the valves.  Do you know why?

2         A.   The closing of the valves, we had a couple of

3    months in a row there where we were unable to take a

4    real valid measurement from those instruments because

5    they were flowing freely.  When I, you know, talk about

6    Paul about coming up with a solution to this, he

7    indicated that if it was permissible that he can go out

8    a couple of days in advance and just close them and then

9    we can go, you know, sometime several days after and

10   take a measurement.  After we got all our measurements,

11   open up the valves and let it freely drain.

12        Q.   Does this have to do with the wells that you

13   previously testified you couldn't take measurements from

14   when they were flowing?

15        A.   Yes, sir, it is the exact same ones.

16        Q.   So did you make arrangements to have someone

17   close those valves prior to taking the measurements?

18        A.   Yes, sir.  We had an agreement with Fossil

19   Engineering.  They had a gentleman on site who they got

20   to go by and close them ahead of schedule, if we let

21   them know when we were coming out.  Eventually I believe

22   they did just give us permission later in the year to

23   just close it ourselves.

24        Q.   Look at the next e-mail of this e-mail chain

25   on Plaintiff's Exhibit 1763.  It is from you to Jamey

1   Dotson.  Do you see where it says, "may I ask you to

2   arrange to close every other valve at Kingston next

3   week?"

4        A.   Yes, sir.

5        Q.   Why every other valve?

6        A.   When I talked to Fossil Engineering, they

7   indicated that if we gave them some warning that they

8   would be willing to close every other valve.  They

9   wanted the valves to be open and draining as much as

10  they could.  They suggested that maybe just closing

11  every other valve because we would still be able to get

12  a representative data.  There is a number of valves in

13  fairly tightly spaced.  They indicated it wasn't

14  critical to get a measurement for every well to have a

15  good representative spacial distribution.

16       Q.   Would you read the next paragraph, please.

17       A.   The next paragraph, "Did you get a chance to

18  review my other two questions below concerning

19  additional flagging for wells at risk from mowers, and

20  continuation of our monitoring at the dredge cell into

21  fiscal year 2009?"

22       Q.   Did you get a response from Mr. Dotson about

23  your questioning about flagging the other wells?

24       A.   Yes.  In fact, it is on the first page of the

25  e-mail.

1        Q.   What was that response?

2        A.   His response is "Matt, we do want for you to

3   continue monitoring the levels of the wells and make the

4   necessary minor repairs, flag addition, etcetera.

5   By-products will fund this effort instead of

6   Environmental Affairs since these are not regulatory

7   wells, but are more for stability issues.  It would be

8   great if Paul would open the valves each month after his

9   monitoring activities."

10           Do you want me to continue reading?

11              MR. MARQUAND:  Your Honor, we tender

12   Plaintiff's Exhibit 1763.

13                THE COURT:  So admitted.

14                (Exhibit No. P-1763 was received

15                in evidence.)

16   BY MR. MARQUAND:

17        Q.   Did you follow up on that?  Let me ask you to

18   look at Plaintiff's Exhibit 245.  I think you can see it

19   on your monitor.

20        A.   I don't think I have a copy of that.

21                (Exhibit No. P-245 was marked for

22                identification.)

23        A.   Yes.  Jamey responded to me and my response to

24   him.

25        Q.   Did you give him an estimate of how much it

144

1    would cost?

2         A.   Yes.

3         Q.   Did you follow up on, did he follow up with

4    respect to that cost estimate?

5         A.   He followed up by asking "how much do you

6    think the repairs and flags will cost?"

7         Q.   Did you give him an estimate?

8         A.   I did.  We indicated that it would be

9    something in the range of a hundred to one hundred fifty

10   as a ceiling.

11        Q.   And so what did he tell you to do?

12        A.   He said "sounds great.  Thanks for all the

13   help."

14        Q.   What did you do?

15        A.   We proceeded forward.

16        Q.   To do what?

17        A.   We proceeded with the monitoring and we

18   proceeded forward to mark the wells, to repair the wells

19   and also mark them, you know, prevent future damage,

20   marking them as a warning to --

21              MR. MARQUAND:  Your Honor, we tender

22   Plaintiff's Exhibit 245.

23              MR. DAVIS:  No objection.

24              THE COURT:  So admitted.

25              (Exhibit No. P-245 was received in

145

1          evidence.)

2   BY MR. MARQUAND:

3        Q.   Just so we are clear, Mr. Williams, I want to

4   show you Plaintiff's Exhibit 59A.  The area of

5   piezometers and monitoring wells that you were

6   monitoring for Fossil Engineering were along the west

7   wall, is that correct?

8        A.   Are we talking about --

9        Q.   In this area you circled this morning.

10       A.   Yes, sir.  That would be the additional

11  piezometers, the area of the additional piezometers

12  having picked up.

13       Q.   The GeoSyntec?

14       A.   That GeoSyntec had called for and had

15  arranged, called for, designed and they may or may not

16  have even arranged for them to be drilled.

17       Q.   Monitoring wells 13, 14 and 15 are in this

18  area up on the northeast dike, correct?

19       A.   That's correct.

20       Q.   They were not part of the system and not in

21  the same area as the GeoSyntec piezometers and well

22  points?

23       A.   No, sir.

24            Thank you, Mr. Williams.

25                 THE COURT:  Redirect examination.

146

1          MR. DAVIS:  Just a few, Your Honor.  I

2    will try and make it brief.

3                    **REDIRECT EXAMINATION**

4    BY MR. DAVIS:

5        Q.   Mr. Williams, we'll try to get you out of here

6    in just a minute.  I have just a couple of things to

7    follow up with.

8        A.   Yes, sir.

9        Q.   You know that GeoSyntec intended for the well

10   points to be measured for water levels, is that right?

11       A.   I do not.  I never had a conversation with

12   GeoSyntec regarding that.  You know, we were told to

13   measure everything.  At the outset we were told to

14   measure everything out there, yes, sir.

15       Q.   TVA decided to measure those and you were

16   given the task to do it, right?

17       A.   Yes, sir.

18       Q.   And they do indicate water levels in the

19   dikes, do they not?  Or did?

20       A.   You are talking about all of the GeoSyntec?

21       Q.   We are talking about the well points at the

22   moment that you were being asked about on the West Dike

23   by Mr. Marquand.

24       A.   Yes, sir, they give indication of water at

25   whatever specific vertical horizon that they are

                           147

1    screened in, whatever material that they are screened

2    in.

3         Q.   And I think that we are abundantly clear about

4    this.  I want to make absolutely sure.  All monitoring

5    wells are piezometers, if they are used to measure water

6    levels, right?

7         A.   If all you are doing is getting water levels

8    out, they are all piezometers.

9         Q.   But not all piezometers can be monitoring

10   wells, unless you can do something else with them, is

11   that right?

12        A.   Yes.  Typically that comes down to

13   construction.  I can't say specifically whether or not

14   all the piezometers out there adhered to how we, you

15   know, as an industry standard install monitoring wells.

16        Q.   Let's just, I think if we can bring up Exhibit

17   596, please.  If we can go to the Monitoring Well 13

18   diagram here.  Do you have 596 yet, Mr. Williams?

19        A.   Not yet.  It couldn't have gone far.  I can

20   look at the screen, if needed to.

21        Q.   You were asked with regard to Mr. Marquand's

22   cross-examination about this diagram from MW-10.  Do you

23   see that one?

24        A.   Yes, sir.

25        Q.   Now, you were asked about this screen.  If the

148

1    water level is above the level of the screen, you still

2    get that level in the piezometer or well, right?

3          A.   If the water level is above the screen --

4          Q.   Let's just take -- if the water level were at

5    the surface in this diagram, which is shown in this case

6    where the horizontal line is that is shaded at the top,

7    right?

8          A.   Yes, sir.

9          Q.   If the water level were at the surface, you

10   would see it at the same level within the piezometer,

11   correct?

12         A.   If the material from the surface down through

13   the screen is the same material you would expect to see,

14   you would expect there to be water all the way down,

15   yes.  If it's ash from the surface all of the way down

16   and to the bottom of the screen, yes.

17         Q.   And just as we were talking about with the

18   artesian wells, if the water is at the surface in the

19   piezometer that you are measuring or at the level of the

20   surface in the piezometer that you are measuring, that

21   means it is at that same level approximately within the

22   ground or in this case the ash, is that correct?

23         A.   If you are seeing artesian conditions.

24         Q.   Right.

25         A.   Artesian conditions exist when essentially the

149

1    phreatic surface crosses the ground surface elevation.

2    If the phreatic surface is kind of like this and you

3    have a slope that is kind of like that where they

4    crisscross, that's going to be where you can have a

5    seep.  If this was all screened the same material,

6    that's correct.  Where you can have a case where it

7    might extend up the piezometer a couple of feet, if you

8    are measuring the water in the material underneath like

9    the alluvium and the alluvium has a different

10   hydrostatic pressure than the ash, then you could exceed

11   the ground surface.

12        Q.   And the case that we have been talking about

13   MW-15, it was the lower of the three monitoring wells on

14   the North Dike, is that right, the lower in elevation?

15        A.   Yes, sir.

16        Q.   So if it were artesian, as it was many times,

17   that is because the levels in the dikes were higher than

18   the level of that monitoring well, is that right?

19        A.   If it is artesian, that means the water

20   pressure in that screened interval, and, again, this

21   document doesn't -- I just looked through -- doesn't

22   indicate what material that is screened in, but the

23   hydrostatic pressure there would be in excess of the

24   ground surface.

25             When you are looking at this you usually put

                              150

1    hydrostatic pressure in terms of feet.  We use the datum

2    of the well to represent that system, and if you have an

3    exceedence of the ground surface, it just means that the

4    pressure -- if the pressure, if the material above was

5    not there, then it would, it would push the water, the

6    confining material was not there, it would push the

7    water up to that given level.

8        Q.   So, whenever MW-15 was artesian it meant that

9    the water levels were higher in the dike up above it, is

10   that right?  Higher than the elevation of the surface

11   where MW-15 was located?

12       A.   The pressure within that screened interval,

13   that's correct.  Again, I don't know if this was

14   screened in the ash or in -- off the top of my head I

15   don't know if it was screened in the ash or in the

16   material that is deeper that might have been at a higher

17   pressure.

18       Q.   You don't know whether the original intent was

19   to measure the levels in the ash dikes with those

20   piezometers?

21       A.   I didn't specify where to stick these wells.

22   I didn't specify how deep to stick these wells.  I

23   really never had an opportunity for a conversation with

24   either the Fossil Engineering or its representative as

25   to what the goal for these wells were.

151

1    Q.   You mentioned some conversations you had with

2  Fossil Engineering.  I hate to keep switching back and

3  forth from the ones on the north to the ones on the

4  west, but about the well points on the west side that

5  they needed to be open and flowing.  Did they ever tell

6  you why?

7    A.   They didn't indicate why specifically.

8    Q.   Are you aware that part of the remedial

9  measures after the November, 2006, blowout were to

10  provide spring boxes on that West Dike to allow more

11  water to flow?

12    A.   I never had that conversation.  By the fact

13  that they had dewatering, these dewatering points out

14  there, you know, I think it was reasonable for me to

15  assume that it was, that is what they were there for.

16    Q.   I am trying to understand.  Did anyone give

17  you the impression that the remedial measures weren't

18  working well enough so they had to let these piddly

19  little plastic pipes flow as well?

20    A.   I never had that conversation.

21    Q.   Okay.  You were, let's look at Exhibit 245.

22         THE COURT:  Before you leave this exhibit,

23  or put it back up, 596, sorry.

24         The water that you are measuring, it

25  infiltrates through the two inch diameter slotted

152

1  screens on this diagram, is that correct?

2         THE WITNESS:  Yes, sir.

3         THE COURT:  You may have discussed this.

4  How did you or your team members actually take the water

5  measurements?

6         THE WITNESS:  You see at the top of the

7  diagram where you have the lockable plastic, the rubber

8  plug at the top.  If you move that lockable plastic

9  rubber plug, you just have -- that area above the ground

10 surface is what we called stick up.  It's just the part

11 of the PVC riser which is a solid section.  It sticks up

12 typically about three feet.  We will approach that and

13 there will usually be a mark there.  Typically we use a

14 Sharpie to indicate what side.  By convention we always

15 pick the highest point.  Sometimes they are flat,

16 sometimes they are at a slight angle.  From that point

17 we'll know what the measurement is.  Let's say it's like

18 800 feet.

19        We'll use an electronic instrument called

20 a water level indicator, which it is a measure tape on a

21 reel.  The tape at the end it has got, you know, about a

22 four inch metal probe on it and in the middle of the

23 probe it has got essentially one end of a circuit which

24 is not touching the metal around it and the rest of it

25 is the other end of the circuit.

153

1    Once that goes down to the water, the

2   water will allow electricity to transmit.  It will

3   complete the circuit which sends a signal to the top.

4   The reel that we are holding, it will sound a tone and a

5   light.  Whatever depth that is -- let's say it's reading

6   20 feet.  What we do is we take --

7          THE COURT:  When you say 20 feet, are you

8   talking about 20 feet from the cap?

9          THE WITNESS:  Yes, sir, down to water.  If

10   the elevation of the cap is 800 and it's 20 feet to

11   water, we are saying that at that instant for that

12   piezometer which is screening whatever the specific

13   strata that we are interested in, that the hydrostatic

14   pressure there is 780 feet.

15          Again, that, if that is ash, it could be a

16   true phreatic surface, true representation of the water

17   table.  If it is, if we are actually measuring something

18   beneath the ash, then it might be the same.  It might be

19   slightly higher, it might be slightly lower.

20          THE COURT:  Thank you.

21   BY MR. DAVIS:

22     Q.  This instrument that His Honor just asked you

23   about how you measured the level in the piezometers, is

24   that something you can carry with you on your person?

25     A.  Yes, sir.  It is relatively small and it is

154

1   relatively light weight.

2       Q.   How expensive would something like that be?

3       A.   We just bought one last week.  They range

4   anywhere from $500 to $800.

5       Q.   So someone doing an annual dike stability

6   inspection could carry one of those easily and measure

7   levels in these monitoring wells?

8       A.   They could.

9       Q.   Okay.  You responded to a question from TVA's

10  counsel about what use you thought Fossil Engineering

11  was making of these water levels you kept sending them

12  month after month.  Would it surprise you to learn that

13  Mr. Buttram testified from that seat where you are

14  sitting yesterday that he made no use of the ones that

15  included 13, 14 and 15?

16      A.   In terms of would that surprise me?  It would

17  surprise me a little bit because, you know, if you are

18  taking data you are taking data for some purpose,

19  whether it is immediate purpose or a future purpose.

20  You know, did I have any, you know, knowledge of what

21  the system was beyond what we sent, as we have indicated

22  here, that Fossil Engineering had a way to rectify that

23  data, no.  I have no awareness, that if anyone was to

24  enter it in it would necessarily be Chris.

25      Q.   You would be surprised to learn that he didn't

155

1    even know that there were levels being measured on the

2    North Dike, wouldn't you?

3         A.    Again, if he is receiving the data -- you

4    know, for what I do, you know, I am essentially a

5    middleman in this process.  It's possible that Chris

6    could have been a middleman in this process and handing

7    off to someone else.  If he was the person in charge,

8    and, you know, he might deal with it directly, he might

9    have someone else to deal with it.  I would certainly

10   expect if we had this commitment to the state that

11   someone would be doing that.  You know, I can't be too

12   surprised or not if Chris didn't read it, or not knowing

13   what happened to the data after we sent it off.

14                    MR. DAVIS:  That's all I have.

15                    THE COURT:  Thank you.  Any Recross?

16                    MR. MARQUAND:  No, Your Honor.

17                    THE COURT:  Thank you, Mr. Williams.  You

18   may be excused.  Do you want to keep Mr. Williams under

19   subpoena?

20                    MR. DAVIS:  We would ask that he remain

21   subject to subpoena, Your Honor.

22                    THE COURT:  All right, Mr. Williams just

23   as a reminder to you, it is possible you may be called

24   later in this trial back as a witness.  It's probably

25   already been explained to you.  You should not discuss

156

1    your testimony today with any other potential witnesses

2    or discuss anybody else's potential testimony until the

3    trial is over.

4                    THE WITNESS:  Yes, Your Honor.

5                    THE COURT:  Thank you.  You are excused

6    for now.

7                    We ready for our next witness?

8                    MR. FRIEDMAN:  Your Honor, may it please

9    the Court, can we have a five minute break before our

10   next witness?

11                   THE COURT:  Who is that?

12                   MR. BRANDES:  Christopher Hensley, Your

13   Honor.

14                   (Off the record.)

15                   (Back on the record.)

16                   THE COURT:  The defendant may announce

17   their next witness.

18                   MR. BRANDES:  Plaintiff calls Christopher

19   Hensley to the stand.

20                        CHRISTOPHER HENSLEY

21   was first duly sworn and testified as follows:

22                   **DIRECT EXAMINATION**

23   BY MR. BRANDES:

24        Q.   Mr. Hensley, good afternoon.

25        A.   Good afternoon.

                              157

1    Q.   Just so that you know, there is a bucket of

2  exhibits right in front of you that we might be

3  referring to today.  When we go through them, I will

4  reference you to them and you can pluck them out and

5  read them, as you go along, okay?

6    A.   Okay.

7    Q.   Mr. Hensley, what do you do for a living?

8    A.   I am a senior civil design tech.

9    Q.   What does that mean to be a senior civil

10 design tech?

11   A.   I just take the information that the engineer

12 sketches, they prepare, and I will put them into a

13 program called AutoCAD and basically make them, make

14 everything look pretty for them and just put drawings

15 together for them.

16   Q.   Are you an engineer?

17   A.   No, I am not.

18   Q.   Do you work within the Engineering Design

19 Division?

20   A.   I am just a design tech.

21   Q.   Just a design tech.  Can you trace your

22 educational background for us?

23   A.   I graduated from high school.  I got a

24 two-year degree from Pellissippi State.  I have been

25 with TVA for a little over ten and a half years.

158

1      Q.   In the same position?

2      A.   Well, as far as job title, yes.  I have

3  changed from Fossil to Environmental group.

4      Q.   As of the 2008 time frame, what group were you

5  with?

6      A.   I was with Fossil up to June of '08.  I

7  started June of '08 here with Environmental Group.

8      Q.   Now, have you ever worked on creating any

9  designs for TVA, any engineering drawings, actually

10  creating them?

11      A.   Just what the engineers have given to me.  I

12  put them on drawings yes, for them.

13      Q.   You don't come up with the design yourself?

14      A.   No.

15      Q.   Have you ever done any work for TVA specific

16  to the Kingston facility?

17      A.   Yes.  I have worked on a plan that goes up on

18  the Peninsula area.

19      Q.   Have you ever worked on any plans for the

20  Kingston facility dealing with the ash pond or dredge

21  cells there?

22      A.   No, I haven't.

23      Q.   Have you ever done any work regarding the

24  Kingston facility regarding any repairs to the dredge

25  cells or ash ponds at the Kingston facility?

159

1    A.    I made some minor revisions to for as-built

2  construction on the weir when they closed it on the --

3  well, bottom ash, I guess.

4    Q.    Specific to the dikes that make up the dredge

5  cells or the impoundment at Kingston, did you ever do

6  any work on that?

7    A.    No.

8    Q.    Any design work or repair work on those

9  portions of the impoundment?

10    A.    No.

11    Q.    Did you ever do any work on placing well

12  points or monitoring wells or piezometers at the

13  Kingston facility?

14    A.    No.

15    Q.    What about in terms of inspecting them?

16    A.    Never.

17    Q.    What about in terms of taking measurements

18  from them?

19    A.    Never.

20    Q.    Had you ever walked the dikes of Kingston?

21    A.    No, I haven't.

22    Q.    Have you ever been to Kingston?

23    A.    Yes, I have.

24    Q.    When was the last time before December 22,

25  2008 you had been to Kingston?

160

1        A.    Probably about three years ago before that.

2        Q.    Three years earlier.  Sometime in 2005 you

3   mean?

4        A.    Yes.  Sometime in that time frame.

5        Q.    Did you ever have an office at Kingston?

6        A.    No, I haven't.

7        Q.    You always worked out of Chattanooga?

8        A.    Until I moved up here, yes.

9        Q.    Fair enough.  Thank you for the clarification.

10  Were you ever an inspector for TVA?

11       A.    Yes, I was.

12       Q.    For what were you an inspector?

13       A.    I helped in the inspection of ash ponds and

14  then in a few years after that I have been doing

15  railroads is what I am doing now.

16       Q.    As an engineering tech?

17       A.    As a design tech.

18       Q.    As a design tech, excuse me.  Did you ever

19  have any specific education on inspecting impoundments?

20       A.    On-the-job training.

21       Q.    What about school training?

22       A.    No, no school training.

23       Q.    When was the first time you ever did an

24  inspection of an impoundment for TVA?

25       A.    Probably around 2002.

161

1      Q.   How many inspections would you do a year for

2 TVA?

3      A.   I would probably do maybe at least maybe

4 assist with an engineer, maybe three, three or four a

5 year.

6      Q.   Would you agree with me there were times

7 during maybe up through 2008 you were doing inspections

8 on your own for the TVA?

9      A.   Yes.

10     Q.   As a matter of fact, during 2008 you were

11 assigned to do three inspections at various impounds at

12 the TVA on your own, correct?

13     A.   Yes, I was.

14     Q.   Do you know what the permit requirements are

15 with regard to the Kingston impoundment?

16     A.   No, I don't.

17     Q.   Did anybody ever teach you about that?

18     A.   Not the requirements, no.

19     Q.   Did anybody ever show you the actual permit

20 regarding the Kingston facility?

21     A.   No.

22     Q.   Did anybody ever show you the actual TDEC

23 permit for the dredge cell repair work at Kingston?

24     A.   No, because I never, like I said, I have never

25 done Kingston.

162

1    Q.   So you have no knowledge about the content of

2   the requirements of the TDEC approved permit for

3   Kingston, correct?

4    A.   That is correct.

5    Q.   So to the extent that there are requirements

6   in that permit, as it relates to groundwater or water

7   level monitoring, you have no concept of that, no idea

8   about that, correct?

9    A.   No idea.

10    Q.   I want to show you -- let me ask you this

11   first.  At some point in time in 2008, and please

12   correct me if I am wrong, you took on a role or were

13   assigned a role with regard to some aspect of the

14   groundwater or water level monitoring at Kingston, is

15   that right?

16    A.   I was filling out an Excel spreadsheet.

17    Q.   Okay.  If you can take out in front of you, if

18   you can pull up on the screen Exhibit 1214, 1214.

19             (Exhibit No. P-1214 was marked for

20             identification.)

21    Q.   Let me know when you are ready.

22    A.   I am ready.

23    Q.   Would you agree with me that the top e-mail

24   there is an e-mail from Harold Lynn Petty to you dated

25   January 25th, 2008?

163

1          A.   Yes, that's correct.

2          Q.   Mr. Petty was your supervisor or boss?  How

3     would you classify him?

4          A.   He was my immediate supervisor.

5          Q.   And the e-mail immediately below that is from

6     Mr. Williams to Mr. Petty, correct?

7          A.   Yes.

8          Q.   That is dated December 12th, 2007 correct?

9          A.   Yes.

10         Q.   And it indicates that Mr. Williams is

11    forwarding to Mr. Petty the December monthly update on

12    the Kingston dredge cell, right?

13         A.   Yes.

14         Q.   That is data that was collected regarding

15    December of 2007 right?

16         A.   It looks correct.

17         Q.   Okay.  And then Mr. Petty six weeks later on

18    January 25th, 2008, he forwards that data to you,

19    correct?

20         A.   Yes.

21         Q.   And he writes to you, "Chris, I am going to

22    forward this e-mail to you and then another one from

23    Geosyntec.  Study these up and apply the readings from

24    this e-mail into the Geosyntec monitoring form," right?

25         A.   Yes.

164

1    Q.   This was your first ever assignment on this

2  project, correct?

3    A.   Yes.

4    Q.   And this was your first introduction into

5  anything dealing with water monitoring at Kingston,

6  correct?

7    A.   Correct.

8    Q.   What is this e-mail from Geosyntec?  Do you

9  have any recollection?

10   A.   That was the spreadsheet that they created.

11   Q.   Okay.  And that was the sum total of your

12 introduction to this water monitoring issues, correct?

13   A.   That is correct.

14   Q.   Nobody ever gave you a book on it?

15   A.   No.

16   Q.   Nobody ever gave you a pamphlet on it?

17   A.   No.

18   Q.   He told you to read the e-mail and start

19 plugging in numbers?

20   A.   Well, that is what it was, numbers that was

21 given in these attachments.

22   Q.   And you were supposed to put them into a

23 spreadsheet?

24   A.   Yes.

25   Q.   Mr. Petty never met with you and walked you

165

1    through all the issues regarding Kingston?

2         A.   Well, you know, I worked with him and during

3    group meetings, staff meeting type we would, you know,

4    we would listen to, you know, different kind of like a

5    little overview of what their projects, what project

6    status was.

7         Q.   Did anybody ever tell you the significance of

8    this groundwater monitoring?

9         A.   No.

10        Q.   So you were working on a project that you

11   didn't know the significance of it, correct?

12        A.   Correct.

13        Q.   You didn't know if it had anything to do with

14   stability of the dikes, for example, right?

15        A.   That's correct.

16        Q.   You didn't know the level of importance of it,

17   right?

18        A.   Well, I understood some, but not fully.

19        Q.   What did you understand?

20        A.   I just knew it was something they were

21   monitoring and it was something that, you know, the

22   engineers were studying and looking at.

23        Q.   Did you understand that the monitoring was

24   relevant or important or significant to the issue of the

25   stability of the dikes at Kingston?

166

1        A.   No.

2        Q.   Did you have an understanding that if the

3   levels got to a certain range it could be a red flag or

4   a warning sign that the dikes might fail?

5        A.   No.

6        Q.   Did they ever give you any information from

7   Geosyntec, for example, that said that the dikes could

8   be in danger, if the water levels got too high?

9        A.   No.

10       Q.   If you can turn now to Exhibit 1185, I would

11   appreciate that.

12                THE COURT:   You want to introduce 1214?

13                MR. BRANDES:   Yes, Your Honor.

14                THE COURT:   Plaintiff's 1214 is admitted.

15                MR. BRANDES:   Thank you, Your Honor.

16                (Exhibit No.  P-1214 was received

17                in evidence.)

18                (Exhibit No. P-1185 was marked for

19                identification.)

20   BY MR. BRANDES:

21       Q.   That is an e-mail from Harold Petty to you in

22   January of 2008, correct?

23       A.   Yes.

24       Q.   And he is forwarding you some data that had

25   been forwarded to him by Mr. Williams the same day,

167

1  correct?

2      A.   Yes.

3      Q.   And that is the January, 2008 data, correct?

4      A.   Yes.

5      Q.   And he says to you, "Chris, please plot it

6  into the Geosyntec spreadsheet," correct?

7      A.   Yes.

8      Q.   So you did that?

9      A.   Yes.

10           MR. BRANDES:  Can we move that into

11 evidence, please.

12           THE COURT:  So admitted.

13           (Exhibit No. P-1185 was received

14           in evidence.)

15 BY MR. BRANDES:

16     Q.   If you take out of the box Exhibit 1186.

17           (Exhibit No. P-1186 was marked for

18           identification.)

19     Q.   That should be the Kingston dredge cell water

20 level data sheet.  It was a pretty thick document.  Do

21 you have it in there?  It is not in there?  All right.

22 We can look at it on the screen this way, if you will.

23     A.   Unless -- wait a minute.  Unless it is by

24 itself here.

25     Q.   1186.  It is not in there?

1          THE COURT:  Are you going to look at this

2     one page?

3               MR. BRANDES:  We can look at it through

4     the screen.

5          A.   Yeah, I have got it.

6     BY MR. BRANDES:

7          Q.   Thank you very much, great.  Looking at the --

8     flip through a few of the pages.  I want you to get

9     familiar with it.  I ask you this.  Have you ever seen

10    it before?

11         A.   Some of it looks familiar.  It is stuff that

12    would be in Matt's e-mail.

13         Q.   Okay.  Did you ever, did anybody ever tell you

14    how to interpret this?

15         A.   No.

16         Q.   Did anybody ever tell you how to determine if

17    there were levels in the data that were too high or of

18    concern or red flagged?

19         A.   No.

20               MR. BRANDES:  Your Honor, I move into

21    evidence Exhibit 1186.

22               THE COURT:  So admitted.

23               (Exhibit No. P-1186 was received

24               in evidence.)

25    BY MR. BRANDES:

1    Q.   I would like to turn your attention now to

2  Exhibit 1201.

3            (Exhibit No. P-1201 was marked for

4            identification.)

5    Q.   That is an e-mail from Mr. Petty again to you

6  on February 25th, 2008, correct?

7    A.   Yes.

8    Q.   And he is forwarding to you an e-mail and

9  attachment from Mr. Williams of the same date sending

10 you the February data for the water monitoring, correct?

11   A.   Yes.

12   Q.   I take it you took the data and plugged it

13 into the sheet again, right?

14   A.   Yes.

15            MR. BRANDES:  Your Honor, move into

16 evidence Exhibit 1201.

17            THE COURT:  So admitted.

18            (Exhibit No. P-1201 was received

19            in evidence.)

20 BY MR. BRANDES:

21   Q.   Attached to the data in your bucket of

22 documents there is Exhibit 1202.

23            (Exhibit No. P-1202 was marked for

24            identification.)

25   Q.   Is that the data sheet and the data that was

170

1  sent to you by Mr. Petty for February?  You see it goes

2  up to February 4th, 2008.

3      A.   It looks to be.

4      Q.   Okay.  And again, even as of this time in

5  February you had no idea as to how to interpret this

6  information, correct?

7      A.   That is correct.

8          MR. BRANDES:  Your Honor, I move into

9  evidence Exhibit 1202.

10         THE COURT:  So admitted.

11         (Exhibit No. P-1202 was received

12         in evidence.)

13  BY MR. BRANDES:

14      Q.   Now, I want you to go back to Exhibit 1186, if

15  you don't mind.  Let me know when you are there.

16      A.   I am there.

17      Q.   Okay.  If you look at the exhibit on the

18  bottom right corner, there is a serial number.  It

19  starts with TVK.  Do you see that?

20      A.   Yes.

21      Q.   I would like you to turn to TVK-000189965.  It

22  is about midway through the document, 189965.

23         If you turn to the previous page, 964, would

24  you agree with me that that shows data for December 7th,

25  2006?

171

1        A.    Yes.

2        Q.    And if you turn the page now to line item 23

3   on the spreadsheet, you see that?

4        A.    Yes.

5        Q.    It says "run over 4/27/06 Monitoring Well 10,

6   correct?

7        A.    Yes.

8        Q.    On that column G are there any other

9   indicators of monitoring wells being destroyed or run

10  over?

11       A.    Well inaccessible.

12       Q.    I am talking about destroyed or run over?

13       A.    I don't see one.

14       Q.    Okay.  Now, if you go forward in the document

15  to page 189941.  Let me know when you are there.

16       A.    I am there.

17       Q.    It still lists on that line 23 that monitoring

18  well destroyed, correct?

19       A.    Yes.

20       Q.    Now, with regard to the various data that you

21  were sent by Mr. Petty, were you aware of which data

22  went into the spreadsheet that you are talking about?

23       A.    I was just -- the spreadsheet listed the names

24  and numbers for PZs and WPs and whatever I received I

25  just looked for that number and filled in the blank on

172

1    that spreadsheet.

2         Q.   So you are just looking at numbers and filling

3    in blanks.  Not doing any analysis or doing any

4    interpretation?

5         A.   None.

6         Q.   Now, if you turn to Exhibit 1181, please. Let

7    me know when you are there.

8         A.   I am there.

9         Q.   That is an e-mail string from Mr. Williams to

10   Mr. Petty and ultimately the last e-mail on this string

11   on the first page is from Mr. Petty to Mr. Williams and

12   copied to you, is that right?

13        A.   That is correct.

14        Q.   You had already been receiving the data from

15   Mr. Petty as of January, right?

16        A.   That is correct.

17        Q.   Did Mr. Williams ever directly send you the

18   data?

19        A.   Yes.

20        Q.   When did they he start sending you the data

21   directly instead of through Mr. Petty?

22        A.   It was about around this time frame when Lynn

23   took his new position.

24        Q.   Now, was it the intention that you were going

25   to take over this data entry permanently?

173

1        A.    That was going to be the intention.

2        Q.    When was it that you left your position and

3   went to Environmental?

4        A.    My actual last day in Chattanooga was June 5th

5   of '08.

6        Q.    When was it that your supervisor Mr. Petty or

7   other supervisor knew that you were going to be making

8   that change?

9        A.    Late May.

10       Q.    Okay.

11       A.    About two weeks before that date.

12       Q.    If you look at the bottom e-mail on the first

13  page of Exhibit 1181, it is an e-mail from Mr. Petty to

14  Mr. Williams dated April 28th.  Do you see that?

15       A.    Yes.

16       Q.    He writes on the second paragraph, "I have

17  taken a new job in TVA and I'm still transitioning

18  somewhat.  For the time being please send these reports

19  to Chris Hensley."  Do you see that?

20       A.    Yes.

21       Q.    Was there any question in your mind that you

22  were only a temporary to work on this job or was it your

23  understanding that you were "the guy"?

24       A.    I understood I was going to be the guy, but I

25  was until we had new supervisor in place I was just, I

174

1    was still giving them to Lynn.

2        Q.   Okay.  I understand.

3             MR. BRANDES:  Your Honor, if we can move

4    that into evidence, please.

5             THE COURT:  Yes.  What is that number

6    again?

7             MR. BRANDES:  1181.  I believe it is

8    already in.  I apologize.

9             THE COURT:  Thank you.

10   BY MR. BRANDES:

11       Q.   Now, if you turn to Exhibit 1217, I would

12   appreciate that.

13            (Exhibit No. P-1217 was marked for

14             identification.)

15       Q.   This is an e-mail from Mr. Petty to you dated

16   April 28th, 2008, correct?

17       A.   Yes.

18       Q.   And he is forwarding to you the latest data to

19   add to the Geosyntec spreadsheet, right?

20       A.   Yes.

21       Q.   That is probably the April data, is that

22   right?

23       A.   Yes.

24            MR. BRANDES:  Your Honor, I move into

25   evidence Exhibit 1217.

175

1              THE COURT: So admitted.

2              (Exhibit No. P-1217 was received

3              in evidence.)

4 BY MR. BRANDES:

5     Q.  If you look at the next document, the next two

6 documents, I should say, Exhibits 1218 and 1219.

7              (Exhibit Nos. P-1218, 1219 were

8              marked for identification.)

9     Q.  Let me know when you are ready.

10     A.  I am ready.

11     Q.  Exhibits 1218 and 1219 were the two

12 spreadsheets that were included with the e-mail exhibit

13 1217?

14     A.  It looks to be.  I don't remember exactly what

15 they look like.

16     Q.  Exhibit 1218, what did you do with that data

17 once it came to you?

18     A.  Since it was for monitoring wells, I didn't

19 look at it.  I saw that they were MW-s and that wasn't

20 on the Excel spreadsheet, as far as what I needed to

21 fill in, so I didn't look at them.

22     Q.  Okay.  Did anybody ever give you any

23 instructions about that spreadsheet?

24     A.  No. Well, the Geosyntec one, yes.  This one,

25 the one that was from Matt, no.

176

1    Q.   The one dealing with monitoring wells nobody

2    ever gave you an instruction on?

3    A.   That's correct.

4    Q.   But Mr. Petty was forwarding it to you every

5    month, right?

6    A.   Because it was given as a set from Matt.

7    Q.   Okay.

8    A.   He just forwarded the entire e-mail to me.

9    Q.   What would you do with the data from the

10   monitoring wells?

11   A.   It wasn't on the spreadsheet for Geosyntec.  I

12   never used it.

13   Q.   What did you do with the data then?  Did you

14   throw it out, keep it in your e-mail inbox?  What did

15   you do with it?

16   A.   Didn't keep it.

17   Q.   You threw it out?

18   A.   Yeah.  I didn't need it.  I wasn't keeping it.

19   It was a running Excel spreadsheet.  You just keep

20   building every month.

21   Q.   Did you bring to anybody's attention any of

22   the readings on Exhibit 1218 at any point in time?

23   A.   No.

24   Q.   What about any exhibits, any spreadsheets

25   similar to 1218 that you received from month to month,

177

1  did you bring the data on those spreadsheets to any

2  one's attention at TVA?

3          A.   No, it wasn't my job.

4          Q.   Whose job was it?

5          A.   My job was just filling the Excel spreadsheet,

6  print it off and give it to Lynn.

7          Q.   Okay.  Whose job was it to deal with the

8  monitoring well data?

9          A.   I don't know.

10          Q.   Exhibit 1219, that is the PZ, piezometer, data

11  you are talking about?

12          A.   Yes.

13          Q.   That is the one that you paid attention to?

14          A.   That is the one where I would look at the

15  numbers, the PZ number, and I would go to the Geosyntec

16  Excel spreadsheet, look at that number and I filled it

17  in.

18          Q.   Okay.  When you filled in the information on

19  that spreadsheet were you supposed to make any notes as

20  to what the graph showed on the spreadsheet from

21  Geosyntec?

22          A.   No.  I just printed it off and gave it to

23  Lynn.

24          Q.   You never made any memos about that?

25          A.   It wasn't my job.

178

1        Q.    Did Mr. Petty ever tell you anything, what to

2   do with the monitoring well data?

3        A.    No, he didn't.

4        Q.    Did you ever ask him what am I supposed to do

5   with this?

6        A.    No.

7        Q.    Did you have any idea what aspects -- did you

8   have any idea what portions of the impoundment for the

9   dikes or dredge cells those piezometers related to at

10  Kingston?

11       A.    No, I didn't.

12       Q.    Did you even know what a piezometer was?

13       A.    I have heard of them.  I don't know exactly

14  what they do.

15       Q.    Did you even know what a monitoring well was?

16       A.    I have heard of them.  I have seen them.

17       Q.    Did you know what their significance was at

18  Kingston?

19       A.    No, I don't.

20       Q.    Did you know what the significance of the

21  piezometers at Kingston were?

22       A.    No, I don't.

23       Q.    Do you know what role they played at all at

24  Kingston with regard to the stability for assessing the

25  stability of those dikes and dredge cells?

179

1      A.   No, I didn't.

2           MR. BRANDES:  I would Your Honor, I would

3   like to move those two exhibits into evidence, please.

4           THE COURT:  So admitted Plaintiff's

5   Exhibits 1218 and 1219.

6           (Exhibit Nos. P-1218, 1219 were

7           received in evidence.)

8           MR. BRANDES:  Thank you, sir.

9           I would like you to turn now to Exhibit

10  2910.

11          (Exhibit No. P-2910 was marked for

12          identification.)

13  BY MR. BRANDES:

14     Q.   Let me know when you are ready.

15     A.   Okay.

16     Q.   If you go to the last page of that exhibit.

17  It's an e-mail string.  Your e-mail is the first in the

18  string on that last page.  Do you agree that is an

19  e-mail from you to Mr. Williams dated May 27th, 2008?

20     A.   Yes.

21     Q.   And you wrote to him "Matt, I will be leaving

22  the Civil Group here June 5th so Jamey Dotson will be

23  the new contact to send the monitor information to.  He

24  will be keeping the spreadsheet and looking at the

25  information.  Thank you."

                              180

1        A.   Yes, sir.

2        Q.   Did you ever have a conversation with

3   Mr. Williams about the monitoring data?

4        A.   No, I haven't.

5        Q.   You just exchanged an e-mail with him?

6        A.   Yes.

7        Q.   Did Mr. Dotson ever speak with you about the

8   data?

9        A.   No, he didn't.

10       Q.   Did he ever e-mail with you about that?

11       A.   I don't recall of any.

12       Q.   Did he ever come to you or e-mail you, for

13  example, to say, hey, I am taking over from you on this

14  data.  What am I supposed to do or how is it supposed to

15  work?

16       A.   I showed him what he is supposed to.  That is

17  it.

18       Q.   What did you show him he is supposed to do?

19       A.   Probably right before I left.

20       Q.   So sometime in June, early June?

21       A.   Late May or early June.

22       Q.   You actually -- you had a face to face with

23  him?

24       A.   Yes.

25       Q.   And you told him where things were kept?

181

1       A.   Yes.

2       Q.   You showed him where stuff was on the

3  computer --

4       A.   Yes.

5       Q.   -- specific to this monitoring and data?

6       A.   Yes.

7            MR. BRANDES:  Your Honor, I move into

8  evidence Exhibit 2910.

9            THE COURT:  So admitted.

10            (Exhibit No. P-2910 was received

11            in evidence.)

12  BY MR. BRANDES:

13       Q.   Sir, if you turn to the next exhibit, 239.

14            (Exhibit No. P-239 was marked for

15            identification.)

16       Q.   That is an e-mail at the top of the page from

17  Mr. Dotson to Mr. Buttram copied to you, is that right?

18       A.   That is correct.

19       Q.   That is dated July 7th, 2008, correct?

20       A.   Yes.

21       Q.   Several weeks after you met with Mr. Dotson

22  and transferred the duties over to him, right?

23       A.   Yes.

24       Q.   And he wrote to Chris Buttram, "Chris B, if

25  you can contact Chris Hensley, he can tell you where he

182

1    left this information on our server and probably walk

2    you through the process.  I never actually received

3    anything on this after Chris H left our group, so I have

4    never updated the spreadsheet."  Is that right?

5         A.   That is correct.

6         Q.   You met with him and you told him where

7    everything was, right?

8         A.   Yes.  He knew that.

9              MR. BRANDES:  Your Honor, I move into

10   evidence Exhibit 239.

11             THE COURT:  So admitted.

12             (Exhibit No. P-239 was received in

13             evidence.)

14   BY MR. BRANDES:

15        Q.   Did you perform any engineering function at

16   TVA?

17        A.   No, I did not.

18             MR. BRANDES:  That is all I have, Your

19   Honor.

20             THE COURT:  Thank you.  Cross-examination.

21                      **CROSS EXAMINATION**

22   BY MR. MARQUAND:

23        Q.   Good afternoon, Mr. Hensley.

24        A.   Good afternoon.

25        Q.   I show you Plaintiff's Exhibit 1214.  You

                           183

1    identified this as the e-mail where Mr. Petty assigned

2    you to maintain the Geosyntec spreadsheet, correct?

3         A.   That's correct.

4         Q.   Were there attachments to this?

5         A.   Yes.

6         Q.   What was attached?

7         A.   The master which would be the Geosyntec file

8    and the two or three files from Matt.

9         Q.   Let me show you what has been marked for

10   identification as Plaintiff's Exhibit 287.  The first

11   page indicates it's "groundwater level data entry and

12   viewing directions."  Did you ever see that before?

13        A.   Yes, that was in a separate e-mail, when I

14   received the Geosyntec file.

15        Q.   And what was this?

16        A.   This was basically the directions on how to

17   fill out the spreadsheet.

18        Q.   I show you Page 2 of that.  Can you read that

19   from there?  Can you tell us what that is?

20        A.   That was the actual first like notebook sheet

21   in the file that listed all the well IDs and you would,

22   each month you would enter these numbers for each of

23   these PZs and WPs.

24        Q.   The well IDs, are they in the first column?

25        A.   Yes.

184

1      Q.   And the wells are identified how?

2      A.   You got PZs and WPs.

3      Q.   And so it was your responsibility to enter

4  wells corresponding to those IDs into this worksheet?

5      A.   Yes.

6           MR. MARQUAND:  Your Honor, we tender

7  Plaintiff's Exhibit 287.

8           MR. BRANDES:  No objection.

9           THE COURT:  So admitted.

10          (Exhibit No. P-287 was received in

11          evidence.)

12  BY MR. MARQUAND:

13     Q.   Now, counsel introduced a number of the

14  monthly assignments from Mr. Petty to you saying here is

15  the latest to add to the Excel spreadsheet, right?

16     A.   Yes.

17     Q.   And each one of them had attached to it -- had

18  two attachments, correct?

19     A.   Yes.

20     Q.   And what were those attachments?

21     A.   They were both files from Matt.

22     Q.   On this particular one, this is the April 28th

23  data for the month of April.  There is, was an

24  attachment, the first one was Plaintiff's Exhibit 1218.

25  What data was that?  Can you tell by looking at the

185

1  column on the right-hand side?

2      A.   They were MW-s.

3      Q.   Did that go into the spreadsheet?

4      A.   No, it did not.

5      Q.   Did you attempt to put them in the

6  spreadsheet?

7      A.   No.  I mean, what Geosyntec sent me, that is

8  what I used.

9      Q.   And the other attachment was Plaintiff's

10  Exhibit 1219.  Can you tell us what that is?

11     A.   They are listed as PZs.

12     Q.   Did you put those PZ, that PZ information,

13  that is the first page.  I will show you the second page

14  which has the specific depth of water in them.  Did you

15  put that in a spreadsheet?

16     A.   Yes, I did, if the numbers matched.

17     Q.   Okay.  I will turn a little further over into

18  this Plaintiff's Exhibit 1219.  We come to another chart

19  of well points.  Can you tell us what that is?

20     A.   They were WPs.

21     Q.   Did you put that information in the

22  spreadsheet?

23     A.   If the numbers showed up on the Excel

24  spreadsheet, yes, I did, for Geosyntec.

25     Q.   You put the WP information there, if you had

186

1  well IDs for that?

2      A.  Yes, if it was on the Geosyntec list, I put

3  them in.

4      Q.  Okay.  Once you put them into the spreadsheet,

5  what did you do with that information?

6      A.  I would go to the next tab where it would form

7  the graphs, print them out and then I took them and

8  personally gave them to Lynn.

9      Q.  Let me show you Plaintiff's Exhibit 287, page

10  1668.  Can you tell us what that is?

11      A.  That would be a monthly printout of the

12  information from the Geosyntec spreadsheet.

13      Q.  That is the output for the information that

14  you could put in?

15      A.  Yes, that is the output.

16      Q.  Let me show you the last page of Plaintiff's

17  287, Page 1677.  Can you tell us what that is?

18      A.  That would be, that is the output down at the

19  bottom.  That is the graph.  On top that is listing the

20  PZs and WP well ID numbers and the number of depth of

21  water that I took from Matt's spreadsheet and it shows--

22      Q.  This specific chart is for October of 2007.

23  Is that what you received or is that one that you

24  actually created?

25      A.  I never created that one.

187

1    Q.   So this would be an example of one that came

2  to you in this Plaintiff's 287?

3    A.   Yes, that would be a, that was something that

4  I received.

5    Q.   Okay.  Let me show you page out of Plaintiff's

6  606.  I want to show you Page 2 which is December of

7  2007 of Plaintiff's 606.  Is that a page that you would

8  have outputted based on information that you put into

9  that spreadsheet?

10    A.   That is correct.

11    Q.   And what did you do with that output once you

12  created it?

13    A.   I give it to Lynn.

14    Q.   Do you know what he would do with it?

15    A.   No idea.

16         MR. MARQUAND:  Thank you, Mr. Hensley.  No

17  further questions.

18         THE COURT:  Thank you.  Mr. Brandes, any

19  redirect?

20         MR. BRANDES:  Just a couple, Your Honor.

21                **REDIRECT EXAMINATION**

22  BY MR. BRANDES:

23    Q.   Mr. Hensley, you mentioned in response to

24  Mr. Marquand's question you said, I believe I got it

25  down here, that Geosyntec sent you information.

188

1    Geosyntec never sent you anything, did they?

2        A.   No, they, that spreadsheet went from Geosyntec

3    to Lynn and Lynn forwarded it to me.

4        Q.   I just want the record to be clear.  You have

5    never had any direct communication with Geosyntec,

6    correct?

7        A.   I never had any connections to them.  I just

8    received it from Lynn as a forwarded e-mail.

9        Q.   You said something about it is on the

10   Geosyntec list.  What did you mean by that?

11       A.   The one that is entered at 287.  This was when

12   I received the Excel spreadsheet -- that is what I

13   received from them.

14       Q.   The yellow graph.  Can you show that to the

15   judge so he knows what we are talking about.  Thank you.

16       A.   It had all the well IDs on it already.

17       Q.   Were you aware that Geosyntec wanted the

18   monitoring wells tracked as well?

19       A.   No.

20               MR. BRANDES:  Thank you.

21               THE COURT:  May the witness be excused?

22               MR. BRANDES:  With the provisor of the

23   witness sequestration.

24               THE COURT:  Is that how you want all of

25   the witnesses excused?

189

1          MR. BRANDES:  Yes, Your Honor.

2          THE COURT:  I am telling everybody you are

3     still under subpoena.  The attorneys for TVA will let

4     you know if you need to come back as a witness for any

5     reason.  In the meantime you shouldn't talk about your

6     testimony with any of the other potential witnesses in

7     this case or discuss with them any of their testimony.

8     Thank you.  You are excused for now.

9          THE WITNESS:  Thank you.

10          THE COURT:  We ready with your next

11    witness?

12          MS. ANDERSON:  Yes, Your Honor.

13    Plaintiffs call John Albright, please.

14                    JOHN ALBRIGHT

15    was first duly sworn and testified as follows:

16          COURTROOM DEPUTY:  Please state and spell

17    your name for the record.

18          THE WITNESS:  John Albright.

19                **DIRECT EXAMINATION**

20    BY MS. ALEXANDER:

21      Q.   Good afternoon, Mr. Albright.  My name is

22    Elizabeth Alexander.  I don't think we have met.  I

23    represent some of the plaintiffs in this matter.

24          You have a BS in civil engineering, is that

25    correct?

190

1      A.   That is correct.

2      Q.   Do you have any other formal education beyond

3   that?

4      A.   I have several seminars that I have taken over

5   the years in different fields of civil engineering.

6      Q.   Okay.  Do any of them have anything to do with

7   dike engineering?

8      A.   There have been two or three on slope

9   stability for landfills and rock and soil stability.

10     Q.   When were those?

11     A.   I don't remember exact dates.  Sometime in the

12   last approximately 15 years.

13     Q.   That is a pretty good spread.  Anything that

14   might have been in the last five years or more than

15   that?

16     A.   I can't remember.

17     Q.   Okay.  What about dam engineering?

18     A.   Nothing specifically about dam engineering.

19     Q.   Okay.  You are not a Licensed Professional

20   Engineer are you?

21     A.   I am not.

22     Q.   Have you ever tried to take the exam to be a

23   Licensed Professional Engineer?

24     A.   I have not.

25     Q.   You are not a geotechnical engineer, is that

191

1  correct?

2       A.   No.

3       Q.   And what is your current position with TVA?

4       A.   My job title is senior civil engineer.

5            MS. ALEXANDER:  Your Honor, we call this

6  witness as an adverse witness as well.

7            THE COURT:  You may proceed.

8  BY MS. ALEXANDER:

9       Q.   How long have you been with the TVA?

10      A.   Just over 30 years now.

11      Q.   Have you -- let me ask you this.  You left the

12 TVA and went to work for the Corps of Engineers for one

13 year, correct?

14      A.   That is correct.

15      Q.   That is the only time since 1979 you haven't

16 worked for the TVA?

17      A.   Yes, that is correct.

18      Q.   Let's start when you -- I don't want to go all

19 of the way back to 1979.  When did you first start doing

20 work at Kingston Fossil Plant?

21      A.   Around 1985.

22      Q.   And so take me through the things that you

23 have done for Kingston Fossil Plant starting at that

24 time?

25      A.   My first assignment was in a section called

192

1    Waste Planning and Disposal.  We planned new projects

2    for, you know, disposal of the byproducts from the

3    plant.

4            The next, the next job I had was the Corps of

5    Engineers.  I returned after a year to be an

6    environmental engineer.  My job title was environmental

7    engineer for several years.  I worked in permitting and

8    various areas along that line and then somewhere about

9    1994 I transferred into the Engineering Group that I am

10   still in.

11        Q.   Okay.  Who have you reported to during the

12   time you have been in the Engineering Group?

13        A.   Who have I reported to?

14        Q.   Right.  You do have somebody over you I assume

15   you report to, Mr. Petty or Mr. Snider?

16        A.   I have had several supervisors, Mr. Petty and

17   Snider were two of them.

18        Q.   They were principal engineers at that time?

19        A.   I believe so.

20        Q.   So then at that, during that time when you

21   went, were you in the Engineering Design Services

22   Department of TVA, is that correct?

23        A.   It had that title for some of the time, yes.

24        Q.   Can you tell us when it had the title?

25        A.   That would have been in the last eight or so

193

1  years, I guess.

2      Q.   Okay.  In 2008 would you have been in the

3  Engineering Design Services Department?

4      A.   I believe that is the title at that point,

5  yes.

6      Q.   They refer to that as EDS, is that correct?

7      A.   We did often.

8      Q.   You have conducted a number of stability

9  studies at TVA, correct?

10     A.   I have.

11     Q.   When was the first time you did a stability

12  inspection of the Kingston Fossil Plant dikes?

13     A.   The first time I participated in a pond

14  inspection at Kingston was in 1986, I believe.

15     Q.   Okay.  At any time before you conducted an

16  inspection of the Kingston Fossil Plant coal ash

17  empowerment for stability, did you see any design

18  drawings?

19     A.   I have in the past seen the design drawings.

20  I can't tie them to a specific time or relate them to a

21  specific inspection.

22     Q.   Do you think you saw them in conjunction with

23  conducting that inspection so that you saw them in order

24  to prepare yourself for the inspection?

25     A.   I don't remember doing that.  That was not the

194

1   intent of the inspection so there would not have been a

2   great need to review the design drawings.

3       Q.   Okay.  So do you mean by saying that wasn't

4   the intent of the inspection, that it wasn't the intent

5   of the inspection to look at the dams to determine if

6   they were constructed in accordance with the design

7   drawings?

8       A.   That's correct.  We were not inspecting for

9   as-built condition.

10      Q.   And are you aware of any inspections that were

11  done to determine if the construction of the dredge

12  cells was done in accordance with the design drawings?

13      A.   I am not aware of that.

14      Q.   Okay.  Have you been given any instructions by

15  TVA as to what to look for, when you conduct a dike

16  stability inspection?

17      A.   Yes.

18      Q.   What instructions were you given?

19      A.   I don't know that I can list them all.  We

20  were all taught to look for, you know, erosion,

21  vegetation, the kind of vegetation, the condition of it,

22  you know, different changes in slope, we look for seeps,

23  we look for maintenance issues.  There were lots of

24  different things that we were looking for.

25      Q.   Okay.  I am going to show you, I want you to

195

1    take a look at -- this is your deposition testimony at

2    Page 73, line 20 through 24.  The question was, "At any

3    time were you given any instructions by anyone at TVA as

4    to what to took for during the course of the dike

5    stability inspection in Kingston?"  Your answer was, "I

6    do not remember any."

7            Have you, has someone refreshed your

8    recollection or instructed you between the time of your

9    deposition and today as to what you needed to look for

10   during a stability inspection?

11       A.   Would you ask that question again.

12       Q.   Is there a reason that you didn't remember

13   anything that you were supposed to look for during your

14   deposition, but today you know things that you might

15   need to look for during a stability inspection?

16       A.   I suppose it's a difference in the way you

17   asked the question.  You know, there were things we knew

18   to look for.  Were there written instructions?  I was

19   not aware of any.

20       Q.   Okay.  That is fair enough.  Did you have any

21   training with respect to how to perform a dike stability

22   inspection?

23       A.   We did have on-the-job training.  The more

24   experienced engineers would teach the less experienced

25   or younger engineers how to do the inspections.

1    Q.    Okay.  Here again, Mr. Albright, when you were

2    deposed back in July you were asked, "Were you trained

3    on how to perform those inspections generally?"  And you

4    said, "I don't recall any training to do dike

5    inspections."  Is that correct?

6    A.    Where are you looking?

7    Q.    Right here on page 74.  "Were you trained on

8    how to perform those inspections generally?"  Your

9    answer was, "I do not recall any training to do dike

10   inspections."

11        Has something changed between July of 2009 and

12   today that has allowed you to recall your training?

13   A.    No, I don't think so.  I am not sure exactly

14   what you are asking me.

15   Q.    I am just trying to find out what the

16   difference is, why there is a difference between your

17   answer there.  I think I am asking you the same

18   question.

19   A.    I don't recall the specifics or the particular

20   instances where I was trained to do these inspections.

21   To this day I do not.

22   Q.    Okay, thank you.  You have a set of exhibits

23   in front of you.  If you could, please, sir, locate

24   Exhibit Number 538.

25             (Exhibit No. P-538 was marked for

197

1            identification.)

2  BY MS. ALEXANDER:

3       Q.   Okay.  Mr. Albright, before you, before the

4  December 22, 2008, dike failure at Kingston, did you

5  ever see Exhibit 538?

6       A.   I did not.

7       Q.   Just for the record, this is the Tennessee

8  Valley Authority engineering procedure for Inspection

9  and Maintenance of Ash Disposal Areas, is that correct?

10      A.   The title is Inspection and Maintenance of Ash

11 Disposal Areas.

12      Q.   Okay.  Take a look at if you would, please,

13 Page 1, it says number 1 down at the bottom.  There is

14 Section 6.0 right above the page number.  Mr. Albright,

15 the bottom of the page there is a section called

16 Inspections by P broad plant operating personnel.  It

17 says "regularly scheduled inspections will be made by

18 plant operating personnel as outlined in Section 8.0."

19 You haven't had a chance to review Section 8.0, which is

20 on the next page, have you?

21      A.   Not recently.

22      Q.   You said you didn't see this document before

23 the December 22nd dike failure?

24      A.   I had not.

25      Q.   You didn't see this section before that?

1       A.   No.

2       Q.   And then you didn't ever use this instruction

3 as a checklist, when you did inspections, did you?

4       A.   No.

5       Q.   There is another exhibit in front of you,

6 Exhibit 563.  Have you had a chance to look over it a

7 little bit?

8               (Exhibit No. P-563 was marked for

9               identification.)

10      A.   Okay.

11      Q.   Have you seen this document before today?

12      A.   I think I have seen one similar, if not this

13 one.

14      Q.   In what context do you think you may have seen

15 this document?

16      A.   I was shown this after the failure at

17 Kingston.

18      Q.   You never saw it before the failure at

19 Kingston?

20      A.   I did not.

21      Q.   Who showed it to you afterward?

22      A.   At this point, I am not sure.

23      Q.   Do you remember the context in which it was

24 showed to you?

25      A.   I don't.

1    Q.   That is okay.  Did you ever use any checklist

2   or documents other than the previous year's inspection

3   report, when you conducted inspections of the dikes for

4   stability at the Kingston Fossil Plant?

5    A.   I have not.

6    Q.   All right.  I want to talk a little bit about

7   the things that you said you would look for, when you

8   conducted an inspection.  One of them was erosion, is

9   that correct?

10   A.   Yes.

11   Q.   And when you conducted your inspections you

12  were not aware that erosion could cause a stability

13  problem in the dikes were you?

14   A.   Would you repeat that again, please.

15   Q.   Were you aware at the time you conducted

16  inspections prior to December 22nd, 2008, for stability

17  at the Kingston Fossil Plant dikes that erosion could

18  cause a stability problem?

19   A.   Was I aware?

20   Q.   Yes.

21   A.   Yes.

22   Q.   Well, did you think it was a problem for

23  stability or did you think it was a problem for

24  maintenance?

25   A.   It depends on how severe it gets.  It could be

1 both or either.

2     Q.  Okay.  Mr. Albright, I want you to take a look

3 at Page 76 of your deposition, if you would.  You were

4 asked, "Is erosion a potential problem?  And your answer

5 was, "I don't think I would classify it as a potential

6 problem, but it can be a maintenance issue."

7     A.  Again it goes back to how severe it is.

8     Q.  What is your understanding of how severe

9 erosion has to be before it becomes a stability problem?

10     A.  My understanding?

11     Q.  Do you have an understanding of that?

12     A.  I don't know that I can describe at what point

13 it becomes a stability issue and what point it doesn't.

14 I don't know how to quantify that.  It is just sort of a

15 visual observation and a judgment call.

16     Q.  Okay.  When you were conducting stability

17 inspections at the Kingston Fossil Plant dikes, were you

18 aware that trees on the dike could cause a stability

19 problem?

20     A.  There has been a lot of discussion in several

21 areas internal of TVA and outside as to whether or not

22 it's actually a stability issue.  We prefer not to have

23 trees on the dikes.

24     Q.  When you were conducting inspections -- I am

25 sorry, I have to remember my question.  I don't think

1  your answer addressed it.  When you were conducting

2  inspections before the failure at Kingston did you know

3  that trees could cause stability problems?

4  　　　A.　I believe I answered that correctly.

5  　　　Q.　What was your answer?

6  　　　A.　My answer was that there has been a lot of

7  discussion as to whether or not it is in fact a

8  stability issue both inside and outside of TVA.  We

9  prefer not to have trees on the dikes.

10 　　　Q.　All right.  Mr. Albright, when you were

11 deposed in July and asked the question whether trees

12 cause stability questions on dikes you answered, "I have

13 no knowledge that that's a stability thing with the

14 dike."  Was that -- did I read that correctly?

15 　　　A.　It was difficult to read it on the screen

16 here.

17 　　　Q.　I will give you another opportunity.

18 　　　A.　Again, I think that there is a lot of

19 discussion about it.  We have had discussions internal,

20 we know that there are others outside of TVA that, you

21 know, have both points of view.

22 　　　Q.　Have the discussions taken place because of

23 the dike failure?

24 　　　A.　No.

25 　　　Q.　Have they taken place since the dike failure?

1      A.   Both before and after.

2      Q.   Okay.  But you testified in July that you had

3  no knowledge that that is a stability thing with the

4  dike, is that correct?

5      A.   It is, depending on the condition I don't

6  believe it is necessarily a stability issue with the

7  dike.

8      Q.   Okay.  I will move on.

9           Is there some reason that you gave a different

10  answer today than you did back in July?

11      A.   Not that I am aware of.  Perhaps it is the way

12  the question is asked.

13      Q.   Have you had an opportunity to train other

14  people within the TVA as to how to conduct stability

15  inspections, and in particular with the Kingston Fossil

16  Plant dike?

17      A.   I have.

18      Q.   And when you train people to conduct

19  inspections, is it fair to say that you train them to

20  use the prior year's inspection report as a check list?

21      A.   Yes, we did.

22      Q.   Okay.  Did you ever provide them with any

23  other documents regarding the impoundment?

24      A.   I don't remember specific documents.

25      Q.   Were there any, any documents?

1    A.   I don't remember any specific documents.

2    Q.   Okay.  Did you ever refer to any other

3 documents while you were conducting inspections?

4    A.   No.  I don't remember referring to any.

5    Q.   And you didn't refer to the design drawings,

6 is that correct?

7    A.   No.  I am sorry, that's correct.  We were not

8 out there to survey the design drawings.

9    Q.   And you never trained anyone to refer to the

10 design drawings, is that correct?

11    A.   That is correct.

12    Q.   Did you ever look for seeps while you

13 conducted stability inspections?

14    A.   Yes.

15    Q.   What was your understanding at the time as to

16 why you were looking for seeps during stability

17 inspections?

18    A.   A seep is an undesirable condition.  Depending

19 on the exact situation, it can be a stability issue.

20    Q.   At the time that you were conducting

21 inspections did you understand it was a stability issue?

22    A.   Yes.  It could be a stability issue.

23    Q.   Again, Mr. Albright, you were deposed in July

24 and you were asked the same question as to whether you

25 understood at the time you were conducting inspections

1   why you looked for seeps on the dikes.  I would like to
2   refer you to your testimony.

3           "Why would you spend your time looking for
4   seeps during a dike stability inspection?  Answer; It's
5   just one of the things we looked for."  Objection;
6   Argumentative.  You may answer.  Answer; I don't know.
7   I don't understand.  Question; Well, is it fair to say
8   that you instructed TVA personnel performing dike
9   stability inspections to identify seeps as part of that
10  work?  Answer; yes, that was one of the items we were
11  supposed to identify, if we found any.  Okay, could you
12  fairly describe to me why you understood it was
13  something that TVA employees should be spending their
14  time doing?  Actually I can't, cannot, no."

15          So is it your testimony that you were wrong on
16  the day of your July deposition, that you didn't
17  understand at the time you conducted inspections why you
18  we are looking for seeps?

19      A.   I am not sure how to answer that.  We do look
20  for seeps.  You know, depending on the situation it can
21  be more of a problem than other times.  It can be an
22  environmental issue.  There is a lot of reasons why you
23  look and identify seeps.

24      Q.   But you agree with me, don't you, at the time
25  of your deposition in July when you were asked why you

1  looked for seeps on the dikes during the stability

2  inspection you said you could not say.  Is that correct?

3          A.  That is what I said in the deposition.

4  Apparently by the way the question was asked I did not

5  understand what he was looking for.

6          Q.  It is not a tricky question.  Why would you

7  spend your time looking for seeps during a dike

8  stability inspection.  You said I can't answer.  I don't

9  know.  Is that correct?

10         A.  If that is what is written.  It is apparently

11  correct.

12         Q.  Thank you.  Did you train other people to look

13  for seeps?

14         A.  Yes.

15         Q.  And did you explain to them why they were

16  looking for seeps?

17         A.  I don't remember specifically explaining why

18  we were looking for seeps.

19         Q.  Would you agree with me, Mr. Albright, that

20  one of the reasons that a person would conduct a

21  stability inspection of the dikes at Kingston Fossil

22  Plant is to determine whether or not the dikes were

23  stable?

24         A.  Yes.  To the extent that we could examine them

25  visually and determine something of that sort.

1    Q.   A visual inspection was the extent of your

2  inspection of the dikes, is that correct?

3       A.   That is correct.

4       Q.   So I want you, if you would, to just sort of

5  help me, walk through with me how you would prepare a

6  stability inspection report.

7       A.   Please ask that again, how I would prepare a

8  stability inspection report.

9       Q.   You have wrote a number of reports, correct?

10      A.   I have.

11      Q.   You sit down at your computer, right?  Do you

12  do them on the computer?

13      A.   Normally, yes.

14      Q.   Okay.  Do you start with a blank sheet of, a

15  blank screen or do you start with some, a template?

16      A.   Often I start with a previous report.  This is

17  done after the inspection.  I use the notes that I made

18  during my walking inspection and either edit or revise

19  the previous inspection or rewrite each section in the

20  inspection report based on what I had seen.

21      Q.   Often in our office we call that duping and

22  revising.  Have you ever heard that term?

23      A.   I have not.

24      Q.   After you have prepared a report, who

25  typically would review it?

1      A.   Most often my supervisor would.  Occasionally

2  we would have a peer review or engineer of an equal

3  level review it as well.

4      Q.   What was your understanding of the purpose of

5  preparing the annual dike stability inspection report?

6      A.   The purpose varied at times.  Some years we

7  were required by our permit, state permit to perform

8  these things.  We adjusted the format accordingly.  It

9  was an annual inspection of the condition and apparent

10 stability of the dikes that we did.

11     Q.   I know you did it.  I am asking why you did

12 it.  You did it to comply with the permit?

13     A.   Some years that was a permit requirement from

14 the state.

15     Q.   Was there any other reason that you prepared

16 an annual stability inspection report?

17     A.   Outside of being instructed to do so, I don't

18 know of another reason.

19     Q.   Did you ever review any other person's

20 stability inspection report in the capacity of a

21 supervisor?  As a supervisor, did you review anyone

22 else's draft report?

23     A.   No.

24     Q.   Do you agree that each year engineering made

25 recommendations for -- that the preparer of the report

208

1  would make recommendations within the report for items

2  that were to be done the following year?

3      A.   Engineering did make recommendations in each

4  report.

5      Q.   Then the reports also have a section titled

6  Actions on Recommendations of Last Inspection.  What was

7  the purpose of that section of the report?

8      A.   It documented the actions taken on previous

9  recommendations.

10     Q.   Did you try to be thorough in documenting the

11 actions taken on the previous recommendations?

12     A.   I did.

13     Q.   Mr. Albright, you have in front of you an

14 exhibit that is numbered 2552.

15              (Exhibit No. P-2552 was marked for

16              identification.)

17 BY MS. ALEXANDER:

18     Q.   Let me back up, if I may, and move Exhibit 563

19 into evidence.

20              THE COURT:  So admitted.

21              (Exhibit No. P-563 was received in

22              evidence.)

23 BY MS. ALEXANDER:

24     A.   What was that number again, please?

25     Q.   2552.

1      A.   I don't believe I have 2552.  I have 2553.

2               THE COURT:  Let's see if we can use the

3    screen.  Mr. Albright, if you need the actual physical

4    copy --

5               THE WITNESS:  This is a better image than

6    previous.

7               THE COURT:  We'll try to use the screen.

8    If you need a hard copy, let us know.

9    BY MS. ALEXANDER:

10     Q.   Do you recognize this cover page,

11   Mr. Albright?

12     A.   I believe so.

13     Q.   And you prepared the dike stability inspection

14   report for the inspection that was enclosed with this

15   cover letter, is that correct?

16     A.   It says so.

17     Q.   Okay.  It says that inspection occurred on

18   October 24th, 2001, correct?

19     A.   It does.

20     Q.   Mr. Albright, at the bottom of the cover page

21   which is the cover page for the inspection, the next

22   page, it says that the report was prepared on November

23   9, 2001, is that correct?

24     A.   It says so, yes.

25     Q.   All right.  And if you go to the first

Case 3:09-cv-00009-TAV-HBG  Document 474  Filed 10/24/11  Page 210 of 239  PageID #:
17275

1 paragraph of the next page it says that "The waste

2 disposal areas at Kingston Fossil Plant were inspected

3 for dike structural stability on October 21, 2001."  Is

4 that the purpose of the inspection, to inspect for dike

5 structural stability?

6       A.   To the extent that we can see stability from

7 visual observation of the surface, yes, that is correct.

8       Q.   Would there be, was there ever a time when

9 there was something obstructing your view so that you

10 couldn't see something that might have been a stability

11 problem?

12       A.   Possibly, you know, that is sort of leading.

13 I don't know how to answer that kind of question.

14       Q.   You did a number of inspections.  Was there

15 ever a time when you felt like you couldn't see the dike

16 and that there was something blocking your view and

17 keeping you from determining whether there a stability

18 problem?

19       A.   Do you have something specific in mind that

20 was blocking my view?

21       Q.   You said you conducted a visual inspection and

22 you might not be able to determine based on a visual

23 inspection.  I am trying to find out from you what you

24 have in mind that might be there that you couldn't see?

25       A.   What I meant by visual inspection is what you

1   can see on the surface may not fully indicate what could

2   be under the surface that no one can see.

3        Q.   Okay.  Was there ever an excessive amount of

4   vegetation on the surface you thought might have

5   hampered your ability to conduct a visual inspection?

6        A.   Possibly.

7        Q.   Going back to this report, it looks like you

8   conducted the inspection on October 24th and you issued

9   the report on November 9th.  Is that correct?

10       A.   That is what it indicates.

11       Q.   So it just took you a couple of weeks, is that

12  right?

13       A.   It was released on December 12th.  It took a

14  little more than a couple of weeks to get it done.

15       Q.   Okay.  You prepared it on November 9th,

16  correct?

17       A.   That is when I initiated preparation,

18  apparently.

19       Q.   So this November 9th date isn't the date it

20  was finalized?

21       A.   The date it was released is the date on the

22  cover letter.

23       Q.   Right.  So just let's back up for a second.

24  You would finalize this document on November 9th and you

25  would send it to -- who would you send it to after that?

1    A.   I did not say I finalized it on November the

2  9th.

3    Q.   What is the significance of the November 9th

4  date?

5    A.   At this point this far in the past, I can't

6  remember why that date was chosen.

7    Q.   Fair enough.  How long did it typically take

8  you to write a stability inspection report?

9    A.   Approximately a month.  It would depend on

10  workload at the time.

11    Q.   Okay.  A few minutes ago you testified that

12  you conducted inspections in order to, and prepared

13  reports in order to comply with permit requirements.  Do

14  you know what permit you were complying with by

15  preparing a report?

16    A.   It's my understanding that in some years our

17  water permit, called an MPDES permit, was requiring an

18  annual inspection.

19    Q.   Okay.  If you will go to Page 1 of the report,

20  Exhibit 2552.  Under active ash disposal areas the last

21  paragraph if you will notice there in the middle of that

22  paragraph it says "The dikes were in need of mowing, as

23  several small trees had grown to a height of three to

24  five feet."  Did I read that correctly?

25    A.   It does say that.

1      Q.   Would you have recorded that accurately at

2  that time?

3      A.   I suppose so.

4      Q.   Okay.  If you go to Page 2 of the report,

5  please under "Dredge Cells," second paragraph.  It says,

6  "Dike slopes around the area were all stable with some

7  rill erosion in places."  Did I read that correctly?

8      A.   Yes.

9      Q.   Did you report that accurately?

10     A.   Yes, I suppose so.

11     Q.   I hope you can locate Exhibit 2553.

12              THE COURT:  You want to introduce 2552?

13              MS. ALEXANDER:  Yes, Your Honor.  Thank

14  you.

15              THE COURT:  Without objection, so

16  admitted.

17              (Exhibit No. P-2552 was received

18              in evidence.)

19              (Exhibit No. P-2553 was marked for

20              identification.)

21  BY MS. ALEXANDER:

22     A.   Okay.

23     Q.   I am going to ask you to go back to 2552 just

24  for a second.  I want to cover one more thing.  If we

25  can go to 510704.

214

1    THE COURT: While you are doing that --

2  maybe it's just me. On the page you talk about rill,

3  r-i-l-l erosion. What does that refer to?

4    THE WITNESS: Very small areas of erosion.

5  It has a ribbon-like look to it. Typically, you know,

6  two to four inches wide and maybe two inches deep.

7    THE COURT: Thank you.

8  BY MS. ALEXANDER:

9    Q.  This is the last few pages of the 2001

10  inspection. The title is Summary -- Kingston Dredge

11  Cell Dike Stability Inspection of Dikes With One Hundred

12  Percent Fly Ash. Do you recall this analysis being

13  done?

14    A.  What page are you on again, please?

15    Q.  I am on page, it is up on the screen. It's

16  page 510704. It's about four pages to the last.

17    A.  I see it.

18    Q.  Do you recall this inspection or this study

19  being done?

20    A.  I remember when it was done, yes. I did not

21  perform this analysis.

22    Q.  Did you have -- did you review it at the time?

23    A.  I did not.

24    Q.  It was part of your inspection report?

25    A.  Yes.

215

1    Q.   Is there a reason you didn't review it?

2    A.   I included this because it, including it in

3  the report made it easy and quick to retrieve.  It

4  would, this made finding this analysis simple and fast

5  should a question come up about it.

6    Q.   Okay.  You have identified I think in your

7  stack Exhibit 2553, correct?

8    A.   Yes.

9    Q.   And that is the stability inspection report

10  for the next year, is that correct?

11    A.   Yes.

12    Q.   You prepared that report?

13    A.   It appears so, yes.

14    Q.   Okay.  Let's go back to the study that was

15  attached to the 2001 inspection.  In the last paragraph

16  it says, "An increase in localized sloughing of dikes is

17  likely to occur.  We expect this to be tolerable and to

18  best be handled by daily inspections and rapid attention

19  to small rills before they expand."

20    A.   What page is that on, please?

21    Q.   510705.

22    A.   Okay, I see it.

23    Q.   So having not read this report, you weren't

24  aware of that recommendation, when you conducted the

25  inspection for the next year, is that correct?

216

1    A.   I don't think that is correct.  Ask it again,
2  please.

3    Q.   You just testified that you didn't read this
4  study about the use of one hundred percent fly ash in
5  the dikes.  My question to you is when you conducted the
6  inspection the next year you weren't aware of this
7  recommendation to have daily inspections and have rapid
8  attention to small rills before they expand, correct?

9    A.   I did not testify to that.  I did not testify
10  I did not read this.  I testified I did not review the
11  stability analysis.  In my engineering parlance "review"
12  is a technical check.  I did not do that.

13    Q.   But you read it?

14    A.   Of course.

15    Q.   Okay.  Well, we are speaking different
16  languages, I suppose.  You were aware of this
17  recommendation, when you conducted the inspection the
18  next year, is that correct?

19    A.   I don't view this as a recommendation.  I knew
20  to, I knew that pure fly ash dikes would have a tendency
21  to erode much more easily than dikes constructed of fly
22  ash and bottom ash.

23    Q.   And were you aware that rapid attention needed
24  to be paid to small rills before they expanded because
25  of that?

217

1     A.   I agree that rapid attention should be given

2 to it, yes.

3     Q.   But you disagree that this is a

4 recommendation?

5     A.   I do not view that as a recommendation, no.

6 It's a statement.

7     Q.   Okay.  All right, let's take a look at the

8 2002 inspection report.  Before we do, do you know if

9 TVA conducts daily inspections of the Kingston fossil

10 dikes?

11     A.   I am not certain if it is done daily.  The

12 plant people do frequent inspections.  I know they do it

13 after a rain event.  I know there are several triggers

14 in addition to a periodic inspection, but I am uncertain

15 as to exactly what the frequency is.

16     Q.   So you don't understand that they do daily

17 inspections, but they do frequent inspections, is that

18 your testimony?

19     A.   I am aware that they have done frequent

20 inspections, yes, on a periodic basis.

21     Q.   Okay.  So the 2002 inspection, if you will

22 turn to the first page, please.  Again it says that the

23 dikes were inspected for structural stability, correct,

24 at the top?

25     A.   Yes.

218

1     Q.   And again, if you will look at the last

2  paragraph, you have identified the fact that there are

3  small trees that have grown five feet tall on the dike,

4  is that correct?

5     A.   Would you, which paragraph is that, please?

6     Q.   The last paragraph on the first page.

7     A.   Yes.

8     Q.   Okay.  That is the same issue that you

9  identified the previous year, correct?

10     A.   It is.

11     Q.   Okay.  The bottom of that paragraph it states

12  that you have identified rill erosion, correct?

13     A.   Yes.

14     Q.   And that was also identified in the previous

15  report?

16     A.   Yes.

17     Q.   Is that correct?

18     A.   Yes.

19     Q.   If you can turn to Page 2, please.  Under

20  dredge cells the second paragraph at the first sentence

21  it says "Dike slopes around the area were all stable

22  with some rill erosion in places," is that correct?

23     A.   That is correct.

24     Q.   And did you make a recommendation that those

25  should be given rapid attention?

219

1      A.   I did not specifically identify the rill

2 erosion as requiring rapid attention.

3      Q.   Thank you.  If you go back to Exhibit 2552 at

4 Page 3.  There is a list of recommendations.  You agree

5 with that?

6      A.   Okay, I see the recommendations.

7      Q.   Okay.  There is, let's see, there is seven

8 recommendations, right?

9      A.   Yes.

10     Q.   And if you go to Page 3 of the 2002 inspection

11 there is a section called Action on Recommendations of

12 Last Inspection which I think, correct me if I am wrong,

13 that you said identified things that had been done

14 during the course of the year that were recommended the

15 previous year, is that correct?

16     A.   Yes.

17     Q.   And there is one item listed there, is that

18 correct?

19     A.   That is correct.

20     Q.   Do you see that item on page 3 of the 2001

21 inspection, the previous year's inspection?

22     A.   Do I see --

23     Q.   It says there was an action item, Actions on

24 Recommendations of Last Inspection, Page 3.  Was that

25 listed the previous year as a recommendation?

1    A.   I did not call out C3 as one of the

2  recommendations.

3    Q.   Okay, were any of the recommendations from the

4  previous year listed on Action on Recommendations from

5  the previous year?

6    A.   Ask that again.

7    Q.   Of the seven recommendations made the year

8  before, were any of them listed the following year under

9  Actions on Recommendations of Last Inspection?

10    A.   In my opinion, the first recommendation of the

11  2001 inspection for reseeding and mulching the slopes

12  applies to this lift C3.  The others don't appear to

13  have been listed.

14    Q.   Okay.  If you would, please, find for me

15  Exhibit 5 in your file folder.

16                (Exhibit No. P-5 was marked for

17                identification.)

18                THE COURT:  Without objection, why don't

19  we introduce Plaintiff's 2553.

20                MS. ALEXANDER:  Yes, Your Honor.  Thank

21  you.

22                (Exhibit No. P-2553 was received

23                in evidence.)

24  BY MS. ALEXANDER:

25    A.   I have 5.

1  Q.  Okay.  Can you identify that for the record,

2  please.

3  A.  It is the Annual Ash Pond Stability Inspection

4  dated March 1, 2004.

5  Q.  Did you prepare this inspection report?

6  A.  With the help of another gentleman I did.

7  Q.  Okay.  If you go to again Active Ash Disposal

8  Areas on Page 2, the fourth paragraph down, second

9  sentence reads, "The dikes were in need of mowing.

10  Small trees had grown to a height of three to five

11  feet."  Is that the same issue you identified the

12  previous two years?

13  A.  It is a similar recommendation, yes.

14  Q.  And the last sentence of the final paragraph

15  on Page 2.  It says, "The dike slope near one of the

16  road ruts showed signs of erosion."  Would that be rill

17  erosion?

18  A.  Where is that again?

19  Q.  The next to the last sentence on the same

20  page, Page 2.

21  A.  I can't say that is rill erosion.

22  Q.  Okay.  If you can turn to Page 3 of the

23  report, please.  The top of the page it says, "Post

24  Inspection Note.  The Ash Team Blitz inspection during

25  the week of January 19 revealed several areas of seepage

222

1  along toe of Dike C and below the toe of the dike along

2  the intake channel."  Is that correct?

3       A.   It says that.

4       Q.   Did you include this post inspection note in

5  the report?

6       A.   Yes.  I am sure I did.

7       Q.   Why would this have been important to include?

8       A.   One of the reasons we do this inspection

9  report is to find and document seepage.  You know, this

10  is additional information.

11       Q.   Do you find and document seepage because it

12  can affect stability?

13       A.   If the conditions are right, it could.

14       Q.   Are you familiar with the "Ash Team Blitz"?

15       A.   I know what it was.

16       Q.   Were you involved at all in it?

17       A.   Not at Kingston.

18       Q.   You were involved in it at other facilities

19  then?

20       A.   I remember doing one other facility or one

21  facility.

22       Q.   Which one was that?

23       A.   Allen.

24       Q.   And can you describe for us what the Ash Team

25  Blitz was?

1     A.   We sent a large number of people to each of

2  the sites and we walked all of the slopes and all of the

3  disposal areas at each site and very carefully examined

4  them to, you know, see what we could find.

5     Q.   Was that somehow different than an annual

6  stability inspection?

7     A.   Yes, it was much greater depth and detail.

8     Q.   Do you typically walk the dikes when you do an

9  inspection, a regular annual stability inspection?

10     A.   Yes, we did.

11     Q.   How was it more detailed when you did the Ash

12  Blitz then?

13     A.   A greater number of people and a greater

14  amount of time.

15     Q.   How much time did you spend at Allen?

16     A.   Most of a day with I don't remember how many

17  people.

18     Q.   Five?

19     A.   I don't remember how many people.

20     Q.   Okay.  How does Allen compare in size to the

21  Kingston Fossil Facility?

22     A.   I would say about half the acreage.

23     Q.   Are you familiar with how many acres Kingston

24  is?

25     A.   Not the whole reservation.

1       Q.    What about the impoundment area?

2       A.    It is approximately 220 acres.

3       Q.    When you conducted dike stability inspections

4  of the Kingston Fossil Plant, how long did it take you

5  typically?

6       A.    We almost, well, we always spent all day doing

7  these inspections.

8       Q.    So, what time would you start in the morning?

9       A.    You know, it varied each time.  There was no

10  set time to start.

11       Q.    Did you walk the whole facility?

12       A.    Yes.

13       Q.    You walked all 220 acres?

14       A.    No.  A lot of that 220 acres was water.  We

15  don't walk that.  We just walk the perimeter dikes.

16       Q.    Do you know the length of the perimeter dikes?

17       A.    I do not.

18       Q.    But you walked each of them?

19       A.    Yes.

20       Q.    Were you ever provided or are you familiar

21  with the -- it's Exhibit 618 in your stack.  It's titled

22  Kingston Ash Disposal Ash Recovery Team Exit Interview.

23                 (Exhibit No. P-618 was marked for

24                  identification.)

25       A.    I didn't participate in the Kingston Ash Blitz

225

1  so it is going to be difficult to comment on this.

2      Q.   Okay.  Were you ever informed of their

3  recommendations generally?

4      A.   I can't say for certain.

5      Q.   Do you remember any of the recommendations

6  other than the one that we just reviewed?

7      A.   Which one did we just review?

8      Q.   The one that says that there was seepage along

9  the toe of Dike C.  Maybe that wasn't a recommendation.

10 It was an observation?

11     A.   That was an observation.

12     Q.   Do you recall anything else that came out of

13 the Ash Blitz?

14     A.   Not in detail.  I may be able to look at this

15 and remember, you know, some of the things that were

16 said.

17     Q.   Well, let me -- let's take a look at it then.

18 Were you ever told that red water seeps were a problem?

19     A.   I had been aware of red water seeps at

20 Kingston for many years.

21     Q.   Did you know that Kingston was one of the

22 worse?

23     A.   I object to the characterization as being the

24 worse.  I don't know whether it was better or worse than

25 any other place.

1     Q.   Okay.  You weren't aware that is what the Ash

2 Blitz determined?

3     A.   Not until you said so.

4     Q.   Okay.  Were you aware that they determined

5 that at Kingston there were underdrains that were

6 plugged?

7     A.   I don't recall hearing that before having seen

8 this, no.

9     Q.   Okay.  What about the fact that the Swan Pond

10 site of the cell was saturated at the time they did the

11 Blitz.  Were you told that?

12     A.   I already knew that that side of the dike was

13 saturated at the time this was, this Blitz was

14 performed.  In fact, as I remember, the reason for the

15 whole Ash Blitz was the 2003 event that saturated the

16 Swan Pond side of the dredge cells.

17     Q.   Okay.  Were you aware that the Ash Blitz found

18 that holes had formed in the side of cells and localized

19 areas?

20     A.   I don't know what they mean by holes.  I don't

21 know where they were.  This is, it is sort of a poor

22 description.  I don't know how to comment on that.

23     Q.   Were you aware that they found that the lower

24 exterior dike of the north side was saturated?  Before

25 today were you aware of that?

227

1        A.    I don't remember that.

2        Q.    What about the fact that they found trees on

3   the dikes?  I guess that wouldn't be surprising to you,

4   right?

5        A.    There have been trees on the dikes in places.

6   This doesn't say where the trees were.

7        Q.    Well, if you go to Page 12, the first bullet

8   point says "Trees on dikes systemwide problem."  You

9   wouldn't agree with that?

10       A.    We have had trees on the dikes at several

11  plants.

12       Q.    Would you agree it's a systemwide problem?

13       A.    We have trees on several dikes at several of

14  the sites.  I am not sure I would agree I would

15  characterize that as a systemwide problem.

16       Q.    Were you aware that the Ash Blitz

17  characterized it that way?

18       A.    Not in so many words, no.

19       Q.    Okay.  When you said that the inspections that

20  we are done in conjunction with the Ash Blitz were much

21  more in depth and they took longer and they used more

22  people to do each inspection, can you tell us what was

23  done during the Ash Blitz inspections that was different

24  than a regular annual inspection like the one that, the

25  ones that produced the reports that we are looking at?

228

1    A.   The one that I participated in was very

2  similar other than the fact that there were generally

3  enough people that we could almost stand fingertip to

4  fingertip.

5    Q.   Okay, in a normal annual inspection, how many

6  people would participate?

7    A.   It was commonly about three.  It varied

8  depending on the plant, the location, and who was

9  available, and, you know, size and things like that.

10   Q.   All right.  You have mentioned the 2003

11 blowout a minute ago.  That was reported in your, in the

12 reported Exhibit 5, is that correct?

13   A.   Exhibit 5.  I will have to pull that again.

14   Q.   Page 3 of Exhibit 5.  It references a blowout

15 area.  Is that the blowout area you were just referring

16 to?

17   A.   Where do you see that?

18   Q.   Page 3, the middle of the page.  It says the

19 dredge cell dike slopes were fully saturated along Swan

20 Pond Road on the day of the inspection.  It references

21 blowout areas and a repair done with rip-rap.  That is

22 all referring to the 2003 blowout, correct?

23   A.   That is correct.

24   Q.   If you would, after the inspection report and

25 the photographs that are attached there is an e-mail

229

1    that is included in this report.

2        A.    Which exhibit are you talking about?

3        Q.    Exhibit Number 5.  It is page number 5668.  Do

4    you recognize that e-mail?

5        A.    Yes.

6        Q.    What was your responsibility with respect to

7    the 2003 blowout area?

8        A.    I assisted in the initial response to the

9    event.

10       Q.    Okay.  Did you ever see the repair work?

11       A.    Yes, I did.

12       Q.    And why was this e-mail attached to the

13   inspection report?

14       A.    It documents our recommendations for emergency

15   repairs.

16       Q.    Okay.  Who are the, why is this group of

17   people included as recipients?  Were they other people

18   who were involved in the repairs as well?

19       A.    Yes.  One is plant manager.  One is the plant

20   environmental professional.  One is the, I believe, the

21   yard superintendent at the time.  These were people that

22   had some involvement in it.

23       Q.    Okay.  You will notice there is the fourth

24   paragraph down it says, "We do not recommend any

25   equipment on the slopes until the toe is stabilized and

1    the pool of water (the driving force behind all of this)

2    in the dredge cell is completely drained."  Did you

3    write that sentence?

4          A.   Yes.

5          Q.   Was it your understanding that the pool of

6    water that was, that there was a pool of water

7    associated with this blowout?

8          A.   There was a pool of water in the dredge cell,

9    in the top of the dredge cell.  It had been used --

10   either it was in operation when the blowout occurred, or

11   it was still up there from previous use.

12         Q.   Okay.  And it was your understanding that the

13   pool of water was the driving force behind the blowout,

14   is that correct?

15         A.   It added pressure to the water that was

16   forcing its way out next to the road, yes.

17         Q.   So is it fair to characterize it as the

18   driving force?

19         A.   Yes.

20         Q.   If the pool of water hadn't been there, the

21   blowout wouldn't have occurred, is that correct?

22         A.   I don't know if I can say that.

23         Q.   Did you ever consider that there might have

24   been a slime layer that caused the blowout?

25         A.   No.  Not at this elevation.

1    Q.   Okay.  You didn't conduct this stability

2  inspection at Kingston in '06, did you?

3    A.   I am not sure.  I can't answer that.

4         MS. ANDERSON:  Okay.  I would like to move

5  Exhibit 5 into evidence.

6         THE COURT:  Without objection, so

7  admitted.

8         (Exhibit No. P-5 was received in

9         evidence.)

10 BY MS. ALEXANDER:

11   Q.   If you will turn, please, Mr. Albright, to

12 Exhibit 1665.

13        (Exhibit No. P-1665 was marked for

14        identification.)

15   A.   Okay.

16   Q.   That is the 2006 inspection report, is that

17 correct?

18   A.   Yes.  It appears to be.

19   Q.   Did you prepare that report?

20   A.   No, it doesn't look like I did.

21   Q.   Did you have any involvement in reviewing it

22 or drafting it?

23   A.   I don't remember having any involvement in

24 this one.

25   Q.   Okay.  If you could just turn to the last

232

1  page, Page 5 of the report.

2        A.   Okay.

3        Q.   The first bullet point there says, "Remove

4  trees from Dike C, as reported in the FY 2005 report."

5  Is that a recommendation made in his report?

6        A.   It is.

7        Q.   Is that the same recommendation we have been

8  reviewing in the previous reports?

9        A.   It is a common recommendation that we make.

10        Q.   Okay.  If you would, please, in your stack you

11  have Exhibit 1542.

12              (Exhibit No. P-1542 was marked for

13              identification.)

14              MS. ALEXANDER:  I would like to move

15  Exhibit 1665 into evidence.

16              THE COURT:  Without objection so admitted.

17              (Exhibit No. P-1665 was received

18              in evidence.)

19  BY MS. ALEXANDER:

20        A.   You said 1542?

21        Q.   Yes, sir.

22        A.   I have it.

23        Q.   Okay.  Are you, if you would, please -- well,

24  let's start are the beginning.  You prepared this

25  report, correct?

233

1    A.   With the assistance of another man I did.

2    Q.   And you conducted the inspection that is the

3  subject of the report, yes?

4    A.   He and I did, yes.

5    Q.   And the inspection was done for dike

6  structural stability, is that correct?

7    A.   Yes.  To the extent we could see it.

8    Q.   Understood.  It says at the top that it was

9  done on November 21st, 2005.  I think that might be a

10  typo.  Would that be 2006?

11    A.   There must be a typo in one of these dates.

12  At this point I can't tell which.  It is likely that

13  November 21st, 2005 is the typo.

14    Q.   You think November 21st, 2005 might be the

15  time frame?

16    A.   Typo.

17    Q.   Typo, thank you.  I couldn't hear you.  If you

18  would, please, turn to Page 4 of this report.  You see

19  the photograph there where it says "new sump"?

20    A.   Yes.

21    Q.   It says, "a few small trees are growing on the

22  slopes."  Is that a recommendation or observation?

23    A.   It's an observation.

24    Q.   It's an observation that has been made

25  throughout each of these reports, is that correct?

234

1     A.   It is a common observation, yes.

2     Q.   It's a common observation that they should be

3 removed every year?

4     A.   Removed or mowed, yes.

5     Q.   If you go to the bottom of that page it says,

6 "Since November 1 over 30 piezometers and a system of

7 dewatering wells have been installed?"  Do you know why

8 those were installed?

9     A.   It was to help monitor the condition of the

10 dike slope along Swan Pond Road.

11     Q.   Is that because there was another blowout?

12     A.   There were two incidents and seeps long that

13 section of dike.

14     Q.   The piezometers were installed in response to

15 the second one, correct?

16     A.   Yes, I believe so.

17     Q.   All right.  Have you ever been trained to

18 measure water levels using a piezometer?

19     A.   That is, I had classes through the years and

20 some of this sort of thing was mentioned in some of the

21 refresher and continuing education seminars I have had.

22 Specific training on reading and measuring levels and

23 piezometers, no, I have not.

24     Q.   So you have never undertaken to read a

25 piezometer or do a water level measurement during one of

235

1   your annual dike stability inspections, correct?

2       A.   No, I have not.  We have other people that do

3   that for us.

4       Q.   All right.

5           MS. ALEXANDER:  If I could move 1542 into

6   evidence, Your Honor.

7           THE COURT:  Without objection, so

8   admitted.

9           (Exhibit No. P-1542 was received

10          in evidence.)

11  BY MS. ANDERSON:

12      Q.   Are you aware that Brian Langford and Jamey

13  Dotson conducted the inspection of the Kingston Fossil

14  Plant dike in 2008, or I am sorry, 2007 and the report

15  was issued the winter of 2008?

16      A.   I am not particularly aware of that.  Do you

17  have a copy that you want me to look at?

18      Q.   Sure.  There is Exhibit 188 in your folder.

19  Take a look at that.

20      A.   What number was what again?

21      Q.   188.

22      A.   I have it.

23      Q.   It says that Brian Langford and Jamey Dotson

24  performed the inspection on December 4, 2007, correct?

25      A.   The cover letter says that.

236

1    Q.   Were you involved in that inspection or

2  drafting this report?

3    A.   I don't remember having any involvement in

4  this inspection.

5              MS. ANDERSON:  I would like to move

6  Exhibit 188 into evidence.

7              THE COURT:  Without objection, so

8  admitted.

9              (Exhibit No. P-188 previously

10                 received in evidence.)

11  BY MS. ANDERSON:

12    Q.   You were involved in the inspection that took

13  place October 20, 2008?

14    A.   Was that the last inspection?

15    Q.   Yes, it was.

16    A.   Do you have a copy in here that I can look at?

17    Q.   I have multiple copies.  Let's start with

18  Exhibit 12.

19              THE COURT:  Why don't we do this.  Before

20  we get into this particular inspection, which might take

21  a little while longer, why don't we take a break for the

22  evening.  That sound all right with everybody?  I

23  appreciate everybody staying a little bit past the five

24  clock hour, including my staff, of course.

25              We'll break at this time and come back and

237

1    resume with this witness tomorrow at nine a.m.,

2    Wednesday, September 21.

3                      Mr. Albright, you may be excused for the

4    evening.  Remember you are still under subpoena.  You

5    should not discuss your testimony with any witness, or

6    continued testimony with other witnesses in this case.

7                      THE WITNESS:  All right.

8                      THE COURT:  Thank you.

9                      Mr. Small.

10                     MR. SMALL:  Your Honor, the housekeeping

11   matter we want to speak about was the testimony of TVA's

12   Chief Executive Officer, Tom Kilgore.  We made

13   arrangements to have him here in the morning.  Of

14   course, there are different scheduling issues with

15   making the CEO available.  Mr. Friedman has indicated he

16   expects the examination to be relatively short.  He has

17   no objection to taking Mr. Kilgore out of order so that,

18   if it would be okay with the Court, we would ask to take

19   Mr. Kilgore out of order at nine and then --

20                     THE COURT:  At what time?

21                     MR. SMALL:  At nine o'clock.

22                     THE COURT:  Tomorrow morning?

23                     MR. SMALL:  If that's acceptable to the

24   Court.

25                     THE COURT:  It sounds like that is fine

238

1  with everybody, take Mr. Kilgore and do his complete

2  direct and cross, however long that might take and then

3  pick back up with Mr. Albright.

4            MR. FRIEDMAN:  If the Court please, we

5  would like to do that.

6            THE COURT:  Mr. Small, if you will inform

7  Mr. Albright -- it sounds like he doesn't need to be

8  here at nine o'clock as he may have been under the

9  impression.

10           MR. SMALL:  We'll take care of those

11  arrangements.

12           THE COURT:  Do we know how long

13  Mr. Kilgore might take?

14           MR. FRIEDMAN:  We'll try to get him on and

15  off.

16           THE COURT:  I won't hold you to it.  On

17  and off could be 30 minutes or all day.

18           MR. FRIEDMAN:  That's right.  It is just

19  between the on and off I am stuck with.

20           THE COURT:  That's fine.  Okay.  We'll

21  start at nine a.m. tomorrow with Mr. Kilgore and then

22  when he's done, we'll pick back up with Mr. Albright.

23                 (Court was recessed.)

24      I CERTIFY THAT THE FOREGOING IS AN ACCURATE
   TRANSCRIPT OF THE RECORD OF PROCEEDINGS IN THE
25  ABOVE-ENTITLED MATTER.

                          239