```
 1          IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF TENNESSEE
 2      NORTHERN DIVISION, AT KNOXVILLE, TENNESSEE

 3  George Chesney, Jot Raymond,           :
    Anita Auchard, Lee Scofield,           :
 4  James Campbell, et., al.,              : VOLUME V
              Plaintiffs,                  :
 5  Vs.                                    : CV
                                           : 3-09-09
 6  Tennessee Valley Authority            : 3-09-48
                                           : 3-09-54
 7            Defendant,                   : 3-09-64
                                           : 3-09-517
 8
            Transcript of trial proceedings before the
 9  Honorable Thomas A. Varlan on September 26, 2011.

10
                    ON BEHALF OF THE PLAINTIFFS:
11                  Jeff Friedman
                    Gary A. Davis
12                  David B. Byrne, III
                    Paul D. Brandes
13                  Elizabeth A. Alexander
                    A. Brantley Fry
14                  Joanne M. McLaren
                    Jeff Matt Conn
15                  L. Jeffrey Hagood
                    Wayne A. Ritchie, III
16                  Todd Monday
                    Attorneys at Law
17
                    ON BEHALF OF THE DEFENDANT:
18                  Edwin Small
                    Elizabeth Ward
19                  Brent Marquand
                    James Chase
20                  David Ayiffe
                    Mark Anstoetter
21                  Peter Shea
                    Attorneys at Law
22
                    Jolene Owen, R.P.R.
23            800 Market Street, Suite 131
                    P.O. Box 2201
24            Knoxville, Tennessee, 37901
                    (865) 384-6585
25
```

```
 1                         I N D E X
```
```
      Examinations                                      Page
 2    JAMEY DOTSON                                          3
      CONTINUED DIRECT EXAMINATION                          3
 3    (Exhibit No. P-287 was marked for identification.)   17
      (Exhibit No. P-287 was received in evidence          18
 4    (Exhibit No. P-2701 was marked for identification.)  38
      (Exhibit No. P-245 was received in evidence          46
 5    (Exhibit No. P-254 was marked for identification.)   57
      (Exhibit No. P-254 was received in evidence          58
 6    (Exhibit No. P-248 was marked for identification.)   65
      (Exhibit No. P-248 was received in evidence          66
 7    (Exhibit No. P-255 was marked for identification.)   72
      (Exhibit No. P-1758 was marked for identification.)  72
 8    (Exhibit Nos. P-255, 1758 were received in evidence.) 74
      (Exhibit Nos. P-189, 190, for identification.)       88
 9    (Exhibit No. P-190 was received in evidence          90
      (Exhibit No. P-192 was marked for identification.)   95
10    (Exhibit Nos. 189A, 192A were received in evidence.) 114
      CROSS EXAMINATION                                   141
11    (Exhibit No. D-193A was marked for identification.) 144
      (Exhibit No. D-193A was received in evidence        150
12    (Exhibit No. D-163 was marked for identification.)  150
      (Exhibit No. P-812 was marked for identification.)  187
13    (Exhibit No. D-194 was marked for identification.)  192
      (Exhibit No. D-812 was received in evidence         203
14    (Exhibit No. P-1212 was received in evidence        208
```
```
15

16

17

18

19

20

21

22

23

24

25
```

1              (The trial was resumed on

2              September 26, 2011.)

3                   JAMEY DOTSON

4    was previously sworn and testified as follows:

5              **CONTINUED DIRECT EXAMINATION**

6    BY MR. BYRNE:

7         Q.   Mr. Dotson, good morning.

8         A.   Good morning.

9         Q.   Since leaving the stand on Thursday afternoon

10   have you had an opportunity to review any case-related

11   documents or exhibits?

12        A.   I did review some of the information that I

13   had reviewed prior to seeing you last Thursday.  I

14   looked over the Excel spreadsheet that we discussed on

15   Thursday, as well as some of the photographs that I took

16   during the October 2008 inspection.

17        Q.   Did you review anything else?

18        A.   I looked at the e-mail that I sent to Melissa

19   Hedgecoth.

20        Q.   What was the date of that e-mail?

21        A.   I believe December 10th, '08.

22        Q.   Do you remember the number of that e-mail?

23        A.   I was relating to a report I received from

24   James Settles.  I copied and pasted some information

25   from his report and sent it to Ms. Hedgecoth.

3

1      Q.    Anything else you reviewed over the weekend

2   that may be pertinent to your testimony here today?

3      A.    No, not in particular, no.

4      Q.    Did you have an opportunity to review those

5   documents with TVA counsel?

6      A.    I did look at one of those with counsel.

7      Q.    Did you generally discuss your Thursday

8   testimony and your anticipated testimony here today with

9   TVA counsel?

10     A.    No, we did not.

11     Q.    Okay.  When you and I last spoke on Thursday

12  we were discussing your interview with the OIG and

13  specifically your comments to the OIG about water level

14  monitoring data.  Do you have that testimony in mind?

15     A.    Yes, I do.

16     Q.    How did the subject of water level monitoring

17  data come up during the OIG interview?

18     A.    I don't recall exactly.  The only thing I can

19  guess is I was asked by the OIG, asked the information

20  of how I received it and what was done with it?

21     Q.    Okay.  Do you recall telling the OIG that you

22  were receiving monthly stats of piezometer and well

23  point data and monitoring well data for the South and

24  North Dikes?

25     A.    I recall telling him that I was receiving data

4

1    monthly for the various wells, yes.

2        Q.   Did you specifically tell them that you were

3    also getting monthly data stats for the South and North

4    Dikes?

5        A.   I don't recall if I called those out in

6    particular.

7        Q.   Let's take a look at Exhibit 606, which I

8    believe was previously admitted into evidence.  This

9    appears to be the second set of data we have been

10   discussing, specifically the piezometer and well point

11   data.  Do you recognize it as such?

12       A.   Yes, I do.

13       Q.   In Exhibit 606 there is a series of tables at

14   the top with numbers that have been inputted and just

15   below there are a series of bar graphs.  Do you see

16   those?

17       A.   Yes, I do.

18       Q.   Who inputs the numbers into the table each

19   month or who did as of late 2008?

20       A.   Late 2008 Chris Buttram was responsible for

21   inputting the data.

22       Q.   I believe you testified on Thursday for a

23   short period of time you had that responsibility, but

24   did not have an opportunity to actually enter monthly

25   data into the spreadsheet.  Is that correct?

5

 1    A.  Yes, it is.

 2    Q.  If we can, let's just back up just briefly to

 3 Exhibit 919.  Again, I think that is the other set of

 4 data we spoke about at length on Thursday, correct?

 5    A.  Yes, it is.

 6    Q.  All right.  I'm sorry to jump back and forth

 7 for you so much here.  I hope you didn't put 606 away.

 8    A.  No.

 9    Q.  I was trying to lay a foundation to kind of

10 dive back in with you here today.

11        Let's do go back to 606 just for one moment,

12 if we can pull that up on the screen.  I called it a bar

13 graph.  I don't know that is actually the correct term.

14 What is that bar chart or graph at the bottom?  What

15 does that depict?

16    A.  It's not a bar graph.  It's some sort of

17 scatter plot, or I am not sure of the exact term you

18 would like to use, in Excel.  It's similar to a scatter

19 plot.

20    Q.  Did you say scatter plot, p-l-o-t?

21    A.  Yes, sir.

22    Q.  That is as good a term as any for me.  We'll

23 stick to scatter plot.  The scatter plot, if I

24 understood Mr. Williams' testimony last week, Matt

25 Williams' testimony, that is a computer-generated plot

6

1   that comes together once all of the data points in the

2   tables above it are inputed each month.  Is that right?

3        A.   That is true.

4        Q.   And then in the X axis of that scatter plot

5   you have got several numbers actually beginning to the

6   far left with negative 2,000 and then to the far right

7   we have the number 600.  Do you see that?

8        A.   Yes, I do.

9        Q.   As I understand it, those numbers, those

10  ascending and descending numbers denote the location of

11  a particular monitoring well in relation to the site of

12  the 2003 and 2006 blowout area, is that correct?

13       A.   No, it's not.  They don't indicate the

14  location of monitoring wells.  They indicate the

15  location of piezometers and dewatering well points.

16       Q.   We kind of went through this a little bit on

17  Thursday.  Just to refresh the Court's recollection, a

18  monitoring well can be a piezometer, correct?

19       A.   Yes, it can be.

20       Q.   Okay, but a piezometer can't necessarily have

21  the multi-function capacity of a monitoring well, is

22  that true?

23       A.   I don't know that I agree with that.  A

24  piezometer is used to measure the static water level in

25  a given area.  We had three what I would call sets of

7

1   two sets of piezometers and one monitoring or two

2   watering well points.  The monitoring wells as in 13,

3   14, 15 on the north or 10 through 12 on the south were

4   piezometers, but they weren't referred to as piezometers

5   in our reports.  They were referred to as monitoring

6   well X.  When you say the term "monitoring well" those

7   come into mind, not the piezometers located on the west.

8        Q.   Just to close out that.  Why don't we turn to

9   exhibit -- let me get you Exhibit 596 which was

10   previously entered during Mr. Williams' testimony.

11        A.   I have it.

12        Q.   Okay.  If you would, turn to bates stamped

13   page 11426; sorry, 11429.  It's toward the second half

14   of the document.  At the top of the 11429 Plaintiff's

15   Trial Exhibit 596, you will see it reads "Type 1

16   Piezometer Installation Record."  Do you see that?

17        A.   Yes.

18        Q.   Under TVA well number it says MW-13.  You see

19   that?

20        A.   Yes, sir.

21        Q.   And that is one of the wells on the North Dike

22   that you were talking about earlier, correct?

23        A.   Yes, it is.

24        Q.   Okay.  Although it is labeled a piezometer, it

25   is actually a monitoring well because it can perform

1  other functions besides simply collecting water level

2  data, is that right?

3      A.  I understand that that was not the intent of

4  those monitoring wells.  It could be used for other

5  functions, yes.

6      Q.  You know sitting here today that is precisely

7  what it was used for or at least one of the things it

8  was used for was to measure water levels within the

9  North Dike?

10     A.  That was the sole intent.

11     Q.  Sir?

12     A.  That was the sole intent, as I understand it.

13     Q.  Okay.  So, good.  We are on the same page.

14         Now, Mr. Williams suggested last week that

15 another purpose for the North and South Dike monitoring

16 wells during their installation back in January of 2005

17 was to provide a means of testing hydraulic property of

18 the dredge cells or the dikes during the lateral

19 expansion project.  Is that true?

20     A.  My understanding of Monitoring Wells 13, 14

21 and 15 was that they were installed as a way of

22 verifying the water levels that were used in the seepage

23 analysis of the dredge cells.

24     Q.  Okay.  Generally speaking, one of the purposes

25 of the North and South monitoring wells was to aid in

9

1  the construction and the monitoring of construction for

2  the lateral expansion dredge cell project, if you know?

3      A.  I am sorry.  I didn't understand your

4  question.

5      Q.  Would you agree with me, sir, at least one of

6  the purposes of Monitoring Wells 10 through 15, the

7  North and South Dike monitoring wells, at least at the

8  time they were installed, was to assist in the

9  collection of data pertinent to the lateral expansion

10  dredge cell project?

11      A.  I don't believe they were related to the

12  lateral dredge cell.  The lateral dredge cell was on the

13  east side of the complex, not on the north or south.  My

14  understanding is that they were installed solely to be

15  able to verify the water levels that were used in the

16  seepage analysis.

17      Q.  Let me read you a passage of testimony.  This

18  is from Matt Williams, page 150 of his trial transcript

19  starting with line 17.  I am just reading this to you to

20  try to get an idea or framework for a discussion about

21  the monitoring wells.  The question was asked, "Well,

22  and these were installed as a result of the 2003

23  blowout, do you recall that?  Answer, I do recall and

24  the wells that were actually installed in January of

25  2005 were actually installed for multi-purpose,

10

1  including we had a permit that we were submitting for

2  expansion of the dredge cell.  This would be a lateral

3  expansion area.  We wanted some multi-purpose wells out

4  there that we could use to test some of the hydraulic

5  properties of the dredge cell."

6          Was Mr. Williams right about that?  Does that

7  refresh your recollection?

8      A.   As I said several times now, my understanding

9  is that they were there for verification of the water

10  levels that were used in seepage analysis.  I am not

11  saying that is their only intent.  That was the extent

12  of my knowledge.

13      Q.   The seepage analysis that you are referring

14  to, did that not have any connection to the lateral

15  expansion dredge cell project?

16      A.   Potentially.

17      Q.   Well, that project is concluded, hasn't it?

18      A.   The lateral expansion was not finished.  It

19  concluded on December 22nd, 2008.

20      Q.   Okay.  But it was well underway as of December

21  of 2008, right?

22      A.   I wouldn't say it was well underway.

23  Construction had started, but no significant progress

24  had been made.  We were barely out of the ash pond with

25  the dikes.  We weren't even up to the drainage layer

11

1   portion of the bottom of the expansion.

2       Q.   Okay.  Well, at any time during those initial

3   stages of the lateral expansion project did you make use

4   of any hydraulic data coming from Monitoring Wells 10

5   through 15?

6       A.   My involvement with the expansion was to

7   provide construction support, so I am not sure if anyone

8   had used these prior to my involvement.  I did not use

9   them as part of the initial construction.

10      Q.   Okay.  Pull, if you would, Plaintiff's Trial

11  Exhibit 5461, which is a document that was also

12  previously admitted last week.  Do you have that in

13  front of you, sir?

14      A.   Yes, sir.

15      Q.   Do you know what that is?

16      A.   I can barely read it.  It appears to be a

17  drawing that covers the northwest section of the dredge

18  cell.

19      Q.   Okay.  And I will -- if you can pull up the

20  highlighted portion, those three dots, maybe that will

21  give us a little more -- or pull up an even larger area

22  in case there is any writing around it.

23          Does that make it a little easier to read?

24      A.   Thank you, yes.

25      Q.   Can you tell from this expanded version of

1    Plaintiff's Exhibit 5461 what those three highlighted

2    dots are?

3         A.    Those are Monitoring Wells 13, 14, 15.

4         Q.    Let's go back to the full image then.  If you

5    would, and you can do this simply by touching the screen

6    in front of you.  Can you point to the area generally

7    where you understand the December 22, 2008, dike failure

8    to have occurred?  Where is that in relation to these

9    monitoring wells?

10        A.    (Indicating on screen).

11        Q.    And based upon your knowledge of the dike

12   system, how far away is that failure point from those

13   three monitoring wells on the North Dike?

14        A.    I can't make out the scale on this drawing.

15        Q.    Is it less than 200 feet, more than 200 feet,

16   do you know?

17        A.    More.

18        Q.    More?  How much more, roughly?  I not looking

19   for an exact, just a ball park.

20        A.    From the northwestern most point where I have

21   drawn the blue line on the monitoring wells?

22        Q.    Uh-huh.

23        A.    I would estimate to be on the order of 1,500

24   to 2,000 feet.

25        Q.    And are you talking about where the arrow is,

13

1  see where the arrow is pointing you are saying that is

2  1,500 feet?

3      A.  No, from the northwestern most point where I

4  initiated the blue line.

5      Q.  I see.  How far are the monitoring wells from

6  the point where you initiated the blue line?

7      A.  1,000 to 1,200 feet.

8      Q.  All right.  And that total dike surface, that

9  North Dike surface spans approximately how many feet

10  total, or yards, if you need to use yards.

11      A.  Without seeing the drawing, I would dare say

12  2,500 to 4,000 feet.

13      Q.  Wait a minute.  So is it your testimony that

14  that's -- why don't we do this.  Why don't we pull up

15  another map.  I want to make sure we have the scale

16  right here.  Let's put up Plaintiff's Exhibit 59.  You

17  have seen this particular exhibit before haven't you?

18      A.  Yes.

19      Q.  Okay.  And you see the red outline and the

20  area that says probable December, 2008 failure location?

21      A.  Yes, I do.

22      Q.  Now, based on my study of the previous

23  exhibit, and other exhibits that have been introduced,

24  would you agree that the monitoring wells are actually

25  at the eastern most extent of the red line depicting the

14

1   failure location?

2        A.   I would agree that they are in that general

3   area, if not further to the east.

4        Q.   You think they are further to the east than

5   the eastern most extent of the red line probable failure

6   location marking?

7        A.   I would agree they are at or near the eastern

8   most portion of that line or further to the east.

9        Q.   Okay.  Now, during the course of your

10  interview with the OIG agents on January 7, 2009, you

11  discussed water level monitoring data with them,

12  correct?

13       A.   Yes.

14       Q.   And then at some point did you offer to

15  provide them with the monitoring well data that you had

16  or the water level monitoring data that you had?

17       A.   I don't recall.  It might be helpful if I

18  actually had the exhibit that contains the interview.

19       Q.   Certainly.  That is Exhibit 4518.

20            Let's turn to page 3 of that exhibit, bates

21  116563.  We'll focus our attention.  We'll focus our

22  attention on the fourth paragraph of that page.  Okay,

23  beginning with I believe the fourth sentence there is a

24  reference to water level readings for approximately the

25  last year.  Do you see that?

1     A.   Yes, I do.

2     Q.   Again, is that information that you provided

3  based on a question that was put to you by the OIG

4  agents or did you raise the issue yourself?

5     A.   I don't recall.  That interview took place a

6  few years ago.  At that point in time I was interviewed

7  by lots of people various times.  I don't recall if I

8  offered the information or if I was asked.

9     Q.   How many times were you interviewed by the

10  OIG?

11     A.   Once for this incident.

12     Q.   And all the other interviews were with TVA

13  officials or TVA contractors?

14     A.   Yes, TVA or TVA contractors.

15     Q.   At some point either before, during or after

16  this January 7, 2009, interview with the OIG agents did

17  you assist in the production of water level monitoring

18  data to the OIG?

19     A.   I don't recall if I did.  It is not a stretch

20  to say that I did.

21     Q.   Would you say it's a probability that you did,

22  or it's probable that you --

23     A.   I think it's reasonable.

24     Q.   Okay.  You say it's likely that you did?

25     A.   I don't recall.

1      Q.    Okay.  Probable is good enough then.

2            Well, in front of you you should find what has

3      been marked as Plaintiff's Trial Exhibit 1584.

4      A.    Okay.

5      Q.    While you are at it, can you pull 1585 as

6      well, both 1585 and 1584 were admitted last week.  We'll

7      be talking about both of them.  So that we can be really

8      efficient this morning, can you pull Exhibit 287 as well

9      once you get 1584 and 1555 in front of you.

10     A.    Okay.

11     Q.    You have all three exhibits in front of you?

12     A.    Yes.

13     Q.    Okay.  Now, let's start with Exhibit 287

14     because I think I don't believe we have introduced this

15     before.  Exhibit 287 appears to be a document created at

16     some point by Geosyntec.  It's entitled Groundwater

17     Level Data Entry and Viewing Directions.  Have you seen

18     that?

19                 (Exhibit No. P-287 was marked for

20                 identification.)

21     A.    Yes.

22     Q.    Have you seen a copy of this document or at

23     least this first page instruction sheet prior to today?

24     A.    Yes, I, have.

25     Q.    Do you recognize it as a record that TVA

17

1  received and kept in the ordinary course of its

2  business?

3       A.   Yes.

4            MR. BYRNE:  Your Honor, we offer

5  Plaintiff's Trial Exhibit 287 at this time.

6            MR. MARQUAND:  No objection.  I think it's

7  already entered in Mr. Hensley's testimony.

8            THE COURT:  As a precaution, we'll admit

9  287.  Perhaps we have already admitted it.

10           MR. BYRNE:  It may have been double marked

11 or I may have made a mistake.  I apologize for that.

12           THE COURT:  That is fine.

13           (Exhibit No. P-287 was received in

14           evidence.)

15 BY MR. BYRNE:

16      Q.   Let's go to the last paragraph on the first

17 page under the heading Data Protection.  You see that?

18      A.   Yes.

19      Q.   And as I understand it, this data protection

20 paragraph then is addressing or applying to the

21 piezometer and well point data tables and charts that

22 follow on the pages after that?

23      A.   That is my understanding, yes.

24      Q.   Now, the data protection paragraph reads, "The

25 table/graph format and calculation pages are protected

18

1  to maintain the file's integrity and reporting

2  capabilities."

3        That's a pretty common procedure, is it not,

4  for the handling of the most sensitive scientific data

5  charts, graphs, tables, that sort of thing?

6     A.   It's not something that I typically use if I

7  am the only person managing a spreadsheet.  If you have

8  a potential for multiple people to be opening and

9  editing, I think it is something that would be used.

10    Q.   It's a good idea to keep people from getting

11 into data and manipulating it, changing it, deleting it

12 worse still, would you agree?

13    A.   No, I don't.  I think it is a precaution to

14 prevent the inadvertent changing of something.

15    Q.   Okay.  What about the inadvertent deletion of

16 important data?

17    A.   I think it would depend on the intent.

18    Q.   Okay.  The intent is what matters, correct?

19    A.   Yes.

20    Q.   All right.  It says in the next sentence,

21 "Should a change be absolutely necessary, please see the

22 project manager for the password."  Who was the project

23 manager for the well point piezometer data and who had

24 the password?

25    A.   I am not sure who the project manager was, but

1    it would have been someone with Geosyntec Consultants,

2    most likely.

3         Q.   You think it would have been Neil Davies?

4         A.   That would have been the first person I would

5    have gone to, should I needed to access or change the

6    data.

7         Q.   Okay.  That would have been the first person

8    that Mr. Buttram would have had to go to if he wanted to

9    access or change data, correct, at least as of December

10   of 2008 and January of 2009, correct?

11        A.   I am not sure of the contacts that Chris had

12   with Geosyntec.  At this point in time Neil Davies was

13   my primary contact so that is who I would have used.

14        Q.   Okay.  Let's turn to what has been previously

15   admitted as Plaintiff's Exhibit 1555.  This appears to

16   be an e-mail chain between yourself, Chris Buttram and

17   Ronald Hall and Barry Snider.  Do you see that?

18        A.   Yes.

19        Q.   The subject line is KIF Groundwater Monitoring

20   Outlook.  That begins with a Saturday January 3, 2009,

21   e-mail from Mr. Buttram to you.  You see that at the

22   bottom?

23        A.   Yes.

24        Q.   Okay.  Mr. Buttram sent this to you and copied

25   it to Barry Snider.  Again for the Court's benefit, can

                              20

1  you tell us who Barry Snider is?

2      A.  At this point in time Barry Snider was the

3  civil engineering principal in Fossil Engineering.

4      Q.  And then as of January 3, 2009, who was Ronald

5  C. Hall?

6      A.  Ron Hall was the Plant Manager at Kingston.

7      Q.  Do you happen to know when he became plant

8  manager, just a general time frame?

9      A.  No, I don't.

10     Q.  Is he still in that position today?

11     A.  No, he's no longer the plant manager.

12     Q.  Is he retired?

13     A.  I'm not certain.

14     Q.  All right.  Let's look at what Mr. Buttram

15  told you on Saturday here at the bottom.  We'll pull

16  that paragraph up under, "Please find attached."

17  Mr. Buttram says, "Please find attached the Excel

18  spreadsheet containing piezometers that were used to

19  monitor the groundwater level.  This is just a copy and

20  has been modified so that the well points do not show on

21  the graph.  The original is still in its usual location.

22  If you have any questions, please let me know."

23          All right.  Let's look at your response.

24              MR. MARQUAND:  Objection.  Is there a

25  question, or is counsel just reading the document into

21

1  the record?

2              THE COURT:  I thought he was directing him

3  to part of the document.

4              MR. BYRNE:  I can rephrase.

5              THE COURT:  Go ahead.

6  BY MR. BYRNE:

7      Q.   The first paragraph we read from Mr. Buttram,

8  you recall getting that e-mail from him don't you?

9      A.   Yes.

10     Q.   And did you respond to it?

11     A.   Obviously we have a copy here in front of us

12 where I responded.

13     Q.   I am asking for Mr. Marquand's benefit.  If

14 you will look at the top, let's look at your response.

15 Read that three sentence response into the record,

16 please.

17     A.   "Chris, you still have one well point showing

18 in the red in August of 2008.  Doesn't this need to be

19 removed?  I believe this should only show the well

20 points."  For clarity, I have misspoken there with the

21 last two words "well points."  The intent was for that

22 to read piezometers.

23     Q.   Right.  You wanted well points removed from

24 the spreadsheet, is that accurate?

25     A.   It wasn't that I wanted them removed from the

22

1  spreadsheet.  The intent of removing them was to improve

2  the clarity of the data.  If one were to look at the

3  output or the graph only and not pay attention to some

4  of the fine text that is located beneath the output, it

5  would be very easy for someone to misunderstand the data

6  that was shown.

7       Q.   Who did you think would misunderstand the

8  piezometer and well point data or the text that you just

9  referred to?

10      A.   It wasn't I felt anyone in particular would

11 misunderstand it.  We understood there was the potential

12 for someone to if one were to look at it solely at the

13 colored chart and not read the information contained on

14 the page -- that is a very busy page, as you know -- we

15 felt it was important to remove any extraneous data so

16 when somebody takes a two second look at it they see the

17 data that is important.

18      Q.   Again, you are talking about somebody seeing

19 it outside of the TVA organization?

20      A.   No, not necessarily.  I think there was a

21 potential there for upper management to look at it and

22 see we were showing that the dewatering well points were

23 actually plotting in the red, when that wasn't actually

24 an indication of any problems.

25      Q.   Well, the well points were measuring water

23

1  levels at least within a certain horizontal plane were

2  they not?

3      A.   They weren't measuring static water surface.

4  Those were actually, as I understand it, showing a

5  dynamic flow of water due to some local phenomenon that

6  was in the area and that they weren't indicative of the

7  static phreatic water surface.  They were more

8  representative of flowing data.  It was possible to have

9  a piezometer that was nested in the same general area as

10  one of the dewatering well points, but at a shallower

11  elevation as the piezometers were and have that

12  piezometer show a different water level.  The dewatering

13  well points were actually nested on the order of 20 feet

14  below the ground surface, whereas the piezometers were

15  three to five feet below the ground surface.

16      Q.   Going back to Exhibit 287, this is the

17  groundwater data level entry and viewing directions

18  exhibit that we saw earlier.  Just jumping to that for a

19  second.  In any portion of this exhibit did Geosyntec

20  instruct you or anyone else at TVA to ignore the well

21  point data?

22      A.   Without reading the entire exhibit, I can't

23  say for certain whether it is contained in here, but we

24  had been told verbally I know that the dewatering well

25  points weren't indicative of the phreatic surface.

24

1    Q.   They gave an indication of the phreatic

2 surface and the extent to which water had or had not

3 intruded into the dike didn't they?

4    A.   I just said they were not indicative of the

5 water surface.  They were actually measuring of the

6 dynamic flow of water taking place at depth, not the

7 local phreatic surface near the level of the

8 piezometers.

9    Q.   Why do you think -- Geosyntec kept this

10 spreadsheet for quite some time didn't it?

11   A.   I am not sure how long they maintained the

12 spreadsheet.  I do understand they did for a while.

13   Q.   At some point TVA took it over in 2008?

14   A.   I am not sure of the time frame when we took

15 over the ownership of the spreadsheet.  At some point it

16 became less costly for us to maintain it ourselves

17 instead of paying somebody from Atlanta to drive to the

18 site or Knoxville to drive to the site, read the data,

19 handle the spreadsheet in addition to the managerial and

20 administrative cost that would be associated with an

21 outside party handling this for us.

22   Q.   The answer to my original question was, yes,

23 Geosyntec handled this spreadsheet for a period of time?

24   A.   That was my understanding, yes.

25   Q.   And then there was a time period where you

25

1    took ownership for a brief time and Mr. Buttram after

2    you.  TVA, meaning you and/or Mr. Dotson, were inputting

3    the data into these Geosyntec spreadsheets?

4         A.  I am Mr. Dotson.  I believe you meant Buttram.

5         Q.  Mr. Buttram.

6         A.  Yes.

7         Q.  Is it your understanding -- well, at any point

8    in time when Geosyntec was handling this spreadsheet did

9    they ever delete any well point data from this chart?

10         A.  I wasn't involved with the project, when

11   Geosyntec was managing it.  I wouldn't have seen a need

12   for them to have done so because they understood what

13   the spreadsheet was meant to portray since they were the

14   initiators.  They understood the dewatering well points

15   weren't indicative of the static phreatic surface along

16   the western dike of the dredge cell.

17         Q.  If they understood that, why did they plot the

18   way they did and why did you feel the need after the

19   December 22, 2008 ash release to change it?

20         A.  The answer to the first question is I am not

21   sure why they did that.  I wasn't involved, nor was I

22   privy to any conversation that took place while they

23   were developing it.  As I previously testified, we felt

24   the need to remove that data because it was extraneous

25   and wasn't indicative of the surface conditions in the

26

1  area.  It was a measure of flowing water.  If someone

2  were to get ahold of the spreadsheet and take a look at

3  the graph and not read anything, they would take away a

4  message that was not true, that there were elevated

5  water levels in the area.  Had someone taken the time to

6  read the footnote, they would have understood the

7  dewatering well points were not indicative of the static

8  phreatic surface.  To be honest, I don't know why

9  Geosyntec plotted them in the area they did.

10      Q.   They did didn't they?

11      A.   Yes, they did.

12      Q.   Let's turn to Exhibit 1584.  This is an e-mail

13  string that begins at 5:33 p.m. on January 7, 2009, and

14  concludes on Thursday, January 8, 2009.  Do you see

15  that?

16      A.   Yes, I do.

17      Q.   All right.  If I recall correctly, you were

18  interviewed by the OIG on January 7, 2009, is that

19  right?

20      A.   Without looking back, I am not certain.  I

21  know it was early January.

22      Q.   Look at 4518.  It has the date on the first

23  page.

24      A.   Yes, I was interviewed by the OIG on January

25  7th, 2009.

27

1     Q.   Okay.  So you are interviewed on Wednesday,

2    January 7th, 2009, and then on January 8th, 2009,

3    Mr. Buttram appears to be requesting the monitoring

4    well, excuse me, the piezometer and well point

5    spreadsheet password from Geosyntec.  Does that appear

6    to be what this e-mail chain indicates?

7     A.   Yes, it does.

8     Q.   Why would Mr. Buttram be looking for the

9    password for the piezometer and well point spreadsheet

10    the day after your OIG interview?

11     A.   I don't think that there is any common

12    denominator between the two.  As I recall the events,

13    there was the fear that if someone in upper management

14    got ahold of the spreadsheet and didn't take the time to

15    read the fine print they might misunderstand the plot.

16    That they might have thought that there was a problem

17    when indeed there wasn't.  Had they taken time to have

18    read the footnote, they would have understood that.

19     Q.   See, that is what troubles me, Mr. Dotson,

20    because on the day of the incident, December 22, 2008,

21    you actually sent a small one paragraph memorandum with

22    the well point and piezometer data to some of the top

23    officials at TVA, to include Mr. Kilgore, didn't you?

24     A.   Yes.  We have established that.

25     Q.   Okay.  So why would you need to be removing

28

1   anything from these spreadsheets?  You had already

2   explained to upper management what the significance or

3   insignificance of the well point data was, right?

4        A.   Yes.  Let me retract that.  I gave you an

5   answer I don't accept.  I don't know that I had

6   explained that.  I realized that I provided files and

7   did cc TVA's executive management.  Did I direct them to

8   read the footnote and fine print?  I don't recall doing

9   that.  Did I tell them that when you look at this data

10  you need to be careful and read the entire sheet?  No, I

11  did not.

12       Q.   You didn't send Mr. Kilgore and a lot of other

13  top executives at TVA a memorandum, a one paragraph

14  memorandum with the well point piezometer data on

15  December 22, 2008, that explained exactly what you have

16  testified to here today?

17       A.   No, I did not.

18       Q.   You didn't?

19       A.   That explained everything that I have

20  testified to here today, no.

21       Q.   You didn't send them a memorandum on December

22  22, 2008, that told them that the well point data, just

23  to sum it up, wasn't all that important?

24       A.   I don't recall what the body of the e-mail or

25  the memorandum stated.  If you would like, I will gladly

1  look at it.  I don't recall exactly what I wrote.

2      Q.  We'll look at that in just a moment.  How

3  would it help them understand better what is going on in

4  these spreadsheets by removing it?  How does removing

5  data help people understand data?

6      A.  As I previously testified a few times now, if

7  someone were to look at that data without taking the

8  time to read the fine print, they would misunderstand

9  what was being shown.  By removing the data and not

10 destroying the data -- the native file was left in tact,

11 as a previous exhibit that you provided states.  Chris

12 says the original file is still in its location.  He

13 even gives the server location of where it was

14 maintained.  This is simply a cleanup of that data.

15      Earlier when I said it might have been for

16 upper management, it might have been for public

17 consumption.  I don't recall.

18      Q.  I asked you if it was for public consumption.

19 You told me it wasn't.  Are you saying now that one

20 concern might have been this could get out into the

21 public domain?

22      A.  What I stated was I don't recall.  As you

23 said, I previously testified I was asked for the

24 password or what we could do to unlock that and it

25 appeared that I had either provided Chris the password

1  or a contact.  I don't recall what the previous exhibit

2  stated.

3      Q.  You didn't have the password as of January 3,

4  2009, did you?

5      A.  I don't recall when I received the password.

6  The previous e-mail does have the date on it.

7      Q.  Do you think perhaps the reason Mr. Buttram is

8  asking Neil Davies of Geosyntec to provide him the

9  password on January 8th, 2009, is because he didn't have

10  it and you didn't either.  Only Geosyntec had it?

11      A.  That is likely, yes.

12      Q.  In fact, you directed Mr. Buttram, did you

13  not, to contact Geosyntec the day after your OIG

14  interview to get the password so that you could formally

15  remove that well point chart from the spreadsheet?

16      A.  I don't recall directing Chris to do that.  I

17  believe I previously testified I don't recall there was

18  anything that tied the OIG interview to the request for

19  someone to pull out the extraneous data.

20      Q.  Well, you told Mr. Buttram on the third,

21  January the 3rd, to remove the extraneous data as you

22  called it, didn't you?

23      A.  If you would like me to look at an exhibit, I

24  can answer your question.

25      Q.  I have shown you the exhibit.  It's Exhibit

31

1   1555.  Here you are telling Mr. Buttram, "You still have

2   one well point showing in the red in August of 2008.

3   Doesn't this need to be removed?  I believe this should

4   only show the well points."  You clarified what you

5   meant to say, this should only show the piezometer

6   readings?

7        A.  I am glad you brought this back up.  This

8   actually shows --

9        Q.  Sir, I am asking, I have a question pending.

10  I would like you to answer it.  Did you direct

11  Mr. Buttram on January 3, 2009, to remove the well

12  points data from the spreadsheet, to include this August

13  2008 reading?

14       A.  I did not make the initial request for Chris

15  to remove the data.

16       Q.  Who did?

17       A.  I am uncertain.

18       Q.  Did one of your superiors direct you to give

19  that instruction to Mr. Buttram?

20       A.  I am not sure who asked Chris to do that.  I

21  was not in Chris' chain of command, nor was he in mine.

22       Q.  Is it your idea to have him do this or did

23  someone come up with this idea and present it to you?

24       A.  I don't recall whose idea this was.

25       Q.  You are not sure if it was yours?

1    A.   I would have had no reason to have pulled that

2  out.

3    Q.   What I am getting at, Mr. Dotson, is I am

4  trying to figure out is this something you came up with

5  or did you have help?  How did the idea of removing the

6  well point data from the spreadsheet come up?

7    A.   I don't know.  If asked to speculate, my

8  imagination would tell me that we had conferred with

9  Geosyntec, as we had multiple consultants at this point

10  in time, and they had told us once again that the

11  dewatering well point data was not indicative of the

12  static phreatic surface and if someone doesn't take the

13  time to read the footnote, it's possible for someone to

14  misrepresent the data.

15    Q.   Footnotes aside, Mr. Buttram on the 8th,

16  January 8th, he isn't asking anybody at Geosyntec to

17  perform the deleting function.  He is just trying to get

18  the password so he can do it himself.  Isn't that a fair

19  characterization of what is going on?

20    A.   At that point in time TVA managed the

21  spreadsheet and would have not needed Geosyntec to

22  manipulate it or delete it.

23    Q.   To do it at TVA you had to get the password

24  didn't you?  Mr. Buttram did.

25    A.   That's correct.

33

1    Q.    These were data-protected files, correct?

2    A.    These were data-protected files that TVA

3 owned.

4    Q.    You didn't own the password, did you?

5    A.    At that point in time we did not, no.  With

6 any design or analysis that takes place for TVA, once

7 the analysis or design is complete, TVA takes ownership

8 of all native files.  That is standard practice.

9    Q.    Okay.  Well, just to kind of bring this full

10 circle, Mr. Buttram got the password, did he not?

11    A.    Yes, he did.

12    Q.    And he removed the well point information from

13 the plot graph, correct?

14    A.    Yes, he did.

15    Q.    Did he make any other changes or modifications

16 to the spreadsheet after he got the password other than

17 ones we have just enumerated?

18    A.    With the exception of preserving of the

19 initial file and saying this as a different file name,

20 not that I am aware of.

21    Q.    To your knowledge, was this changed file that

22 Mr. Buttram created on the 8th, did you get a copy of

23 it?

24    A.    I am sure I did.

25    Q.    What did you do with it?

34

1    A.    It would have been stored somewhere in

2  Microsoft Outlook or on the hard drive of my computer.

3    Q.    The reason I ask is we have never had a copy

4  of it produced to us in this case.  I am wondering, is

5  that something you could get without much difficulty

6  sometime this week?

7    A.    It is something I could attempt to search for.

8  I provided all external and external hard drives that

9  were associated with my laptop as part of the discovery.

10    Q.    The version that Mr. Buttram created on

11  January 8th, or shortly thereafter, was that then in

12  turn produced to the OIG at some point by TVA?

13    A.    I am uncertain.

14    Q.    Are you sure?  You don't have any recollection

15  of the changed version of this spreadsheet being

16  produced to the OIG?

17    A.    That's correct.  I don't recall.

18    Q.    Who besides you got a copy of the deleted

19  spreadsheet, the spreadsheet with the deleted well point

20  information?

21    A.    Do you recall the exhibit number that contains

22  the e-mail where Chris had sent that?

23    Q.    Sent what?

24    A.    Where Chris sent the modified spreadsheet.

25  You have given me about --

35

1     Q.   He e-mailed it to you, didn't he?

2     A.   I am asking could I see the exhibit.

3     Q.   I could if TVA counsel produced it to us.

4 They have not.  Do you have a specific recollection of

5 Mr. Buttram sending that back to you via e-mail?

6     A.   I would have received it because on January

7 3rd, four days prior to my OIG interview I sent Chris an

8 e-mail back, which you provided as an exhibit this

9 morning, where I informed Chris he actually left one of

10 the dewatering well points still in place.

11    Q.   Sometime after January 8th, 2008, he got the

12 password, made that change and then forwarded another

13 draft of the revised spreadsheet to you via e-mail,

14 correct?

15    A.   That is reasonable to assume, yes.

16    Q.   And what did you do with it?  Did you forward

17 it to anybody?

18    A.   I don't recall.

19    Q.   Do you remember back on December 22, 2008,

20 when you were e-mailing a lot of different people in

21 upper management this monitoring well data and

22 piezometer and well point data?  Do you remember that?

23 Do you have that time frame in mind?

24    A.   I remember sending lots of e-mails during the

25 19 hours I worked on December 22, 2008, yes.

36

1    Q.   Do you have a similar recollection of sending

2  this revised spreadsheet to those same people in upper

3  management?

4    A.   I didn't recall sending it to upper

5  management, as I previously testified on Thursday, and I

6  am testifying now I don't recall whether I sent that out

7  or not.

8    Q.   We didn't talk about the edited spreadsheet on

9  Thursday.

10    A.   On Thursday.

11    Q.   I am talking about the one that Mr. Buttram

12  went in and got the password, changed and then sent to

13  you.  Did you send that to upper management?

14    A.   As I don't recall sending the initial

15  spreadsheet to upper management, I don't recall whether

16  or not I sent the revised spreadsheet to upper

17  management.

18    Q.   Are you now saying that you don't recall

19  sending those, all that monitoring well data out on the

20  22nd during the I think you said 19 hours you were

21  working that day?

22    A.   For clarity, I said I did not recall.  I

23  recall that now, as you provided that as an exhibit to

24  me.

25    Q.   Okay.  I see.

37

1          Pull if you would, Exhibit 2701.

2               (Exhibit No. P-2701 was marked for

3               identification.)

4     Q.    This appears to be a pair of e-mails the first

5  one at the bottom dated Thursday, January 15, 2009, from

6  Mr. Jack Brennan to Joseph Bohr.  The subject line reads

7  "KIF Piezometers and Well Points Master."  You see that?

8     A.    Yes, I do.

9     Q.    Okay.  Do you recall sending the piezometer

10 and well point spreadsheet that we have been talking

11 about and that Mr. Buttram got the password for on

12 January 8, do you recall sending that to TDEC at some

13 point?

14    A.    I don't recall sending the revised Excel

15 spreadsheet that Chris provided to anyone.

16    Q.    Okay.  Do you know who Jack Brennan is?

17    A.    No, I don't know who Jack Brennan is.

18    Q.    Do you know who Joseph Bohr is, B-o-h-r?

19    A.    Joseph Bohr works for the OIG.  He is one of

20 the agents that interviewed me on January 7th, 2009.

21    Q.    I see.  Okay.  Mr. Brennan writes, "Looking at

22 e-mail and found this.  If you look at the sheet titled

23 TOS piezometers you see a series of measurements.  What

24 struck me was the number of wells or whatever that were

25 not available for measurement summer to November."  The

38

1    next paragraph it reads, "In any event, this lack of

2    measurement from parts of the dike could be the

3    negligent event."  You see that?

4         A.   Yes, I do.

5         Q.   Would you agree with me, sir, that as early as

6    -- well, less than 30 days after the December 22, 2008,

7    ash release incident the OIG was looking carefully at

8    the monitoring, the water level monitoring issue and its

9    role in the disaster?

10        A.   I couldn't speak on the OIG's intent.  It does

11   appear they were interested in the water level

12   monitoring that had taken place.

13        Q.   It also looks like they got a copy of the

14   piezometer and well point spreadsheet, right?

15        A.   Yes, it does.

16        Q.   Do you know how they got it?

17        A.   I can't tell from this e-mail if Jack Brennan

18   had sent it.  I am uncertain.

19        Q.   You think that Jack Brennan sent the

20   piezometer and well point spreadsheets to Mr. -- how

21   would Mr. Brennan get that without it coming from TVA?

22        A.   I am not sure who Mr. Brennan is.  What I said

23   is I can't tell from reading this e-mail if he sent it

24   to the OIG.  I might very well have sent it to them

25   around with the thousands of other e-mails that were

39

1    sent.  I don't recall if I did or not.

2         Q.   You don't have any idea how the agent who

3    interviewed you got his hands on this piezometer and

4    well point data?

5         A.   I believe I told you several times now that I

6    don't recall if I sent it or not.  If asked to provide

7    the data, I would have gladly done so.

8         Q.   Mr. Brennan goes on to say in the second to

9    the last sentence, "I haven't yet found a drawing that

10   shows where the measurement points are located in the

11   dike.  Have you seen one?"  You see that sentence?

12        A.   Yes, I do.

13        Q.   Do you know if your office sent a drawing

14   depicting the location of the piezometers, well points

15   and monitoring wells to the OIG agents?

16        A.   I don't recall if we sent the drawing.  The

17   spreadsheet that they obviously received has a depiction

18   of the location of those wells that is contained in the

19   graph.  You previously noted the ascending and

20   descending numbers along the bottom, the scatter plot.

21   That was indicative of the location of each of the

22   piezometers and dewatering well points in relation to

23   the remediation area.

24        Q.   This is shortly after the December 22, 2008,

25   disaster.  Wouldn't the OIG agents have to have a map or

40

1    a little more information about that zero point to be

2    able to interpret those locations?

3        A.   I can't speak to what they had or didn't have,

4    needed or didn't need.

5        Q.   I got to tell you.  I mean, even two and a

6    half three years into this case it took me quite a while

7    to figure out exactly what that plot meant.  Are you

8    saying these agents should have picked up on that right

9    from the jump?

10       A.   I am saying had I been asked I could have

11   provided them the information and can't say today

12   whether I did or didn't provide additional information

13   for them.

14       Q.   You don't know if you were the one who sent

15   this to the agents seven days after Mr. Buttram made his

16   changes to the spreadsheet or not?

17       A.   I have testified to that several times now.

18       Q.   Okay.  This reference here -- if we can go up

19   one paragraph.  Mr. Brennan says, "What struck me was

20   the number of wells or whatever that were not available

21   for measurement summer to November.  It struck me that a

22   reason could be that the wells weren't able to be

23   measured because the ground had moved and closed the

24   wells."  You see that sentence?

25       A.   Yes, I do.

41

1      Q.   You are aware, are you not, that over the

2 three year period of this water level monitoring work at

3 the KIF plant, nearly half of the piezometers that were

4 used for that exercise were either destroyed or covered

5 with ash and became unserviceable are you not?

6      A.   I don't recall that half were.  The ones that

7 you just referred to as covered with ash weren't

8 actually piezometers.  They were monitoring wells that

9 were located within hydro Dredge Cells 1, 2 or 3 that

10 were covered with ash, as you said, through the planned

11 vertical expansion.

12           There were some piezometers along the western

13 slope that during periodic mowing might have been cut

14 flush to the ground or the upper casing that is exposed

15 from the ground cut with a bush hog or some sort of

16 mowing equipment.  We had staff that periodically came

17 in and repaired those.

18           The number of piezometers was such that if one

19 or two or three even in a row were unable to be read at

20 any given point in time, it was such that it wasn't

21 significant.  We had I believe 33 along that remediation

22 area and with just the sheer number that was there

23 provided some redundancy so if some were unable to be

24 read it wasn't of concern.

25      Q.   Do you know where I started that question?  I

                            42

1    just asked if half of them were destroyed or covered

2    with ash over the three year history of this well, of

3    this water level monitoring exercise.  Is your answer to

4    that question yes or no?

5         A.   I don't recall.

6         Q.   Okay.  Well, Mr. Williams did recall last

7    week.  It was his testimony that in fact half were

8    either destroyed or covered with ash in the three year

9    period that TVA was monitoring the piezometers out at

10   KIF.  Will you accept his testimony as true?

11        A.   I don't doubt that Matt said that.  I am sure

12   that he didn't state just that and stop.  I am sure he

13   would have said the same thing.  He in fact had a

14   technician that helped repair those.  Matt was aware the

15   ones covered with ash are part of the expansion.

16        Q.   Let's see exactly how he put it.

17             MR. MARQUAND:  This is improper

18   impeachment.  This is not this witness' prior testimony.

19   This witness was not present during that testimony.

20             THE COURT:  I will sustain the objection.

21   BY MR. BYRNE:

22        Q.   You would defer to Mr. Williams to the number

23   of piezometers destroyed or covered with ash and became

24   unserviceable under that monitoring period would you

25   not?

43

1      A.   I didn't understand the first of your

2  question.

3      Q.   You would defer to Mr. Williams, his memory,

4  his knowledge and his testimony on the issue of the

5  number of piezometers that over a three year monitoring

6  program were either destroyed or became unserviceable

7  due to being covered up by ash stacking?

8      A.   I can't speak to the accuracy of Matt's

9  testimony.  I believe I just provided my account of what

10  took place.

11      Q.   You never went out there and measured anything

12  having to do with piezometers, did you?

13      A.   I did not measure piezometers, but I

14  frequently toured the site.

15      Q.   Did you ever measure them?  Yes or no?

16      A.   I did not have to measure them.

17      Q.   That is the question.  Did you ever measure

18  the piezometers yourself?

19      A.   No, I did not.

20      Q.   Mr. Williams and his crew did, did they not?

21      A.   As I understand it, Mr. Williams did not.  He

22  had a technician that performed that service for him.

23      Q.   Okay.  But Mr. Williams helped put all that

24  together, put the punch list of corrected activities

25  that needed to be taken on those wells, interfaced with

44

1  you in fact a little bit on that issue about corrective

2  actions that needed to be taken for certain wells?

3       A.   Yes, Matt and I did interact on making repairs

4  to some of the piezometers.

5       Q.   Pull if would, Plaintiff's Exhibit trial

6  Exhibit 245 from your stack, please, sir.  Do you have

7  that in front of you, sir?

8       A.   No, I don't.

9       Q.   Do you have it in front of you now, sir?

10      A.   Yes, I do.

11      Q.   This appears to been an e-mail chain that you

12  were involved in that begins with an e-mail from Matt

13  Dallas Williams to you on Friday August 22, 2008.  Do

14  you see on the last page?

15      A.   I see the e-mail was directed to Chris Buttram

16  and I was cc'd.

17      Q.   Okay, let me ask first, is this an e-mail

18  string involving a series of e-mails you either sent or

19  received in the ordinary course of business of TVA?

20      A.   Yes, it is.

21           MR. BYRNE:  Your Honor, we offer

22  Plaintiff's Exhibit 245 at this time.

23           MR. MARQUAND:  Objection.  This was

24  already received during Mr. Williams' testimony.

25           MR. BYRNE:  I apologize.  I will withdraw

45

1  that.

2  BY MR. BYRNE:

3      Q.   If you will look on the very first --

4          THE COURT:  Ms. Norwood is indicating to

5  me it was used, but perhaps not admitted.

6          MR. MARQUAND:  No objection.

7          THE COURT:  Out of an abundance of

8  caution, we'll admit Plaintiff's 245 at this time.

9          (Exhibit No. P-245 was received in

10          evidence.)

11  BY MR. BYRNE:

12      Q.   Beginning on bates page 413374, that is the

13  last page of Plaintiff's Exhibit 245, Mr. Williams tells

14  Mr. Buttram and cc's you on the same communication in

15  paragraph number one, "Mowing has damaged or destroyed a

16  significant amount of piezometers.  Would you be okay if

17  we set up some additional flagging?"  You see that?

18      A.   Yes, I do.

19      Q.   Do you recall during that time frame that

20  Mr. Williams simply wanted to get some bicycle flags up

21  so people would quit running over his piezometers with a

22  lawn mower?

23      A.   Yes, I do.

24      Q.   He asks in the last paragraph whether

25  Mr. Buttram, and I assume you as well, want him to

46

1    continue the monitoring into fiscal year '09.  If so, we

2    need to come up with a plan.  You see that?

3         A.  Yes, I do.

4         Q.  After a couple of weeks Mr. Williams returned,

5    if you will turn to the second page, e-mails you

6    directly on September 5, 2008, and turning the page to

7    the last paragraph he asks "Did you get a chance to

8    review my other two questions below concerning

9    additional flagging of the wells at risk for mowers and

10   continuation of our monitoring of the dredge cell into

11   fiscal year '09."  Do you see that?

12        A.  Yes, I do.

13        Q.  Okay.  You told Mr. Williams, did you not,

14   that you did want him to continue the monitoring work at

15   KIF, correct?

16        A.  Yes, I did.

17        Q.  And you told him that you wanted him to make

18   the necessary minor repairs, flags, addition of things

19   like that, right?

20        A.  Yes, I did.

21        Q.  We jump ahead to the 9th, September 9th.  We

22   ask Mr. Williams how much he thinks the repairs and

23   flags will cost.  You were talking about the repairs to

24   the damaged piezometers, right?

25        A.  Or damaged dewatering well points.

47

1    Q.   Okay.  And Mr. Williams comes back and tells

2 you flags will run you about fifty to a hundred dollars,

3 is that right?

4    A.   That is what he said, yes.

5    Q.   Okay.  And he told you that on, or you guys

6 concluded your discussion about the bicycle flags and

7 repairs on September 10th.  Why did it take so long?

8 Why did it take from August 22 to September 10 to get

9 that sorted out with the repairs and bicycle flags to

10 keep people from mowing over the piezometers?

11    A.   If you are familiar with the mowing frequency,

12 as well as monitoring frequency with the dewatering well

13 points and piezometers, that's not a great deal of time.

14    Q.   You never did get all of the piezometers up

15 and running for the last data set that came in before

16 December 22, 2008, did you?

17    A.   I don't recall if all of them were in place.

18 I do recall testifying just a moment ago that even if

19 all of them were not in a readable condition, that that

20 was not anything of concern.

21    Q.   I heard that testimony.  What I am asking is

22 is it not true that for that last data set, that

23 November 2008 data set that was collected prior to the

24 December 22, 2008, ash release, you still had a number

25 of piezometers that weren't functional, correct?

48

1     A.   I don't recall the exact number.  I do recall

2   that some weren't functional, but it is important to

3   note --

4     Q.   Some were what, sir?

5     A.   Some were functional, some were not.  I don't

6   recall the number.

7     Q.   Your answer to my question is yes, right?

8     A.   Please restate your question.

9     Q.   I have stated it several times.  I don't

10   understand why you are fighting me with this.

11     A.   I have answered you several times.

12     Q.   All I am asking is, sir, for the last

13   November, 2008, water level data collection effort isn't

14   it true that a good number of those piezometers were not

15   in service still; yes or no?

16     A.   I don't understand what you mean by good

17   number.

18     Q.   More than ten?

19     A.   I don't recall.  I would have to look back at

20   the data that was provided for the November readings to

21   answer that question.

22     Q.   Okay.  Let's go back to 606.  I am going to

23   have to introduce an entirely new exhibit now to go

24   through this, but we'll do it.

25          Can you tell from 606 how many of your

49

1    piezometers were out of commission for that last

2    November sampling event?

3         A.   The page that is bate stamped ending 139 it

4    doesn't appear that any are.

5         Q.   You don't think any of them were out of

6    commission as of November, 2008?

7         A.   I believe what I said is from the page bate

8    stamped ending 139 from the November -- I am sorry that

9    is November of '07.

10        Q.   That is November of '07.  The time period at

11   issue here is November of 2008.

12        A.   The information contained on the page that is

13   bate stamp ending 151 it seems to indicate that there

14   was water level found in all of piezometers or well

15   points that are contained in the two tables at the top

16   of the page.

17        Q.   So that reference to dry, you see that?

18        A.   Yes, I see the reference to dry.

19        Q.   Do you have any idea what that means?

20        A.   There is some language somewhere previous in

21   this exhibit or another that explains how to key these.

22   I don't recall if "dry" means that a water level wasn't

23   found.  I don't understand what "dry" means, when I read

24   the word "dry."

25        Q.   It doesn't mean it was dry, does it?  It means

50

1    they couldn't collect a water reading because the

2    piezometer wasn't functional.  Isn't that true?

3         A.  I don't know.

4         Q.  You really don't know.  Even as of today you

5    don't know the answer to that question?

6         A.  I have had no reason to research the question.

7         Q.  You did a lot of research on piezometers, well

8    points, monitoring wells in the weeks and months

9    following the incident didn't you?

10        A.  I did a lot of research in addition to my

11   normal day to day activities.

12        Q.  Mr. Dotson, you know, do you not, that that

13   reference to dry, and there must be I mean, there must

14   be 20 of them, all means that you couldn't collect a

15   sample, you couldn't collect a valid water level from

16   that piezometer or well point because it was damaged,

17   destroyed or out of operation, right.  You know that?

18        A.  I believe what I testified was I don't know if

19   dry means a water level wasn't found in the well or if

20   it was not able to be read.  I don't have the answer to

21   your question.  I am sorry.

22        Q.  Well, if that is what Mr. Williams said, would

23   you rely on this testimony?

24        A.  I have no reason to disagree with what Matt

25   has testified to.

51

1       Q.   Okay.  If he testified that that dry

2  designation does not mean there wasn't water in the

3  well, on the contrary, it simply meant that a valid

4  measurement couldn't be made because of damage or

5  problems that made the well unserviceable, you would not

6  quibble with that testimony, would you?

7       A.   No, I wouldn't.  Looking at the data it is

8  evident that a lot of these weren't piezometers.  They

9  were indeed the dewatering well points.  There are

10  several of those listed as dry as well.  Looking at the

11  sheer number of drys that are shown here, that's not

12  really indicative of much information to me.

13       Q.   Okay.  Let's count them together, okay.  I can

14  tell you are a precise man.  Let's get a precise count.

15  Let's start at the top.  PZ-101, dry.  105, that is two.

16  106, that is three.  107, that is four.  113, that is

17  five.  114, that is six.  115, that is seven.  117, that

18  is eight.  118, that is nine.  119, that is ten.  123,

19  that is eleven.  32, that is twelve.  31, that is

20  thirteen.  30, that is fourteen.  25, that is fifteen.

21  34 is sixteen.  35, that is seventeen.  126, that is

22  eighteen.  127, that's nineteen.  129, that's twenty.

23  131 that's twenty-one.  134, that's twenty-two.  22

24  piezometers showing dry, as Mr. Williams testified,

25  unserviceable piezometers.  You counted along with me,

52

1  didn't you?

2      A.   Yes, you did a very good job.

3      Q.   Did we get that exact number correct?

4      A.   Yes, we did.

5      Q.   Okay.  It isn't good to have any equipment out

6  of service, especially when it's used to measure the

7  amount of water saturation in that dike system at KIF,

8  is it.  You disagree?  You were shaking your head.

9      A.   I was waiting on a question.  You made a

10 statement.

11     Q.   It's not good to have any piezometers out of

12 service when the intent of same is to measure the degree

13 of water saturation in the dikes at KIF, is it?

14     A.   As I previously stated, there was a level of

15 redundancy there such that if two or three in a row were

16 damaged, it was of no significance.

17     Q.   You didn't have two or three in a row, sir.

18 You had 22 out of service, did you not?

19     A.   Are you aware of the location of that 22?

20     Q.   Does is matter, sir?

21     A.   I believe I have answered previously.

22     Q.   You only had how many well points?  How many

23 piezometers did you have?

24     A.   There were 33 in the initial remediation area.

25     Q.   And 22 --

53

1            MR. MARQUAND:  Can the witness be allowed

2    to complete his answer.

3            THE COURT:  Let him finish his answer.

4    BY MR. BYRNE:

5        A.   There were 33 in the area of the initial

6    remediation.  As you saw when you were counting the ones

7    labeled dry, the numbering system went up as high as 137

8    so if indeed there were 137 and twenty plus were or a

9    sixth were out of commission, that is not significant to

10   me.

11       Q.   How many piezometers did you say all total you

12   had on the dike system?

13       A.   I said if indeed there were 137.

14       Q.   You don't know if there were or not do you?

15       A.   Looking at this sheet here, there weren't 137.

16   I am not sure of the exact number.

17       Q.   You know there weren't.  You know how many are

18   depicted in this table don't you?

19       A.   Without counting I am not certain.

20       Q.   Count them.  You want to count them, we'll

21   count them.  Please, how many piezometers?

22       A.   Would you like me to count them?

23       Q.   I would like you to physically count them,

24   yes, sir.  That is about where we are on this.  Count

25   them up.

1    A.   I count 51 piezometers.

2    Q.   Okay, 51 piezometers.  21 or excuse me, 22

3  appear to be dry or out of service.  Is that right?

4    A.   That's correct.

5    Q.   You understood at least from the time period

6  July of 2008 to December of 2008 all this water level

7  monitoring wasn't just something TVA was doing because

8  it wanted to, it was doing it because it had to.  TDEC

9  required TVA to do this, correct?

10    A.   I understand that we made a commitment to TDEC

11  to implement a water monitoring program and that we

12  would follow through with that, yes.

13    Q.   You committed to implementing this specific

14  program with the 51 piezometers, didn't you?

15    A.   I don't recall.

16    Q.   Not you, but the TVA?

17    A.   I don't recall seeing any commitment to

18  monitoring 51 piezometers.  I do recall seeing some

19  information that said we had 33 in place and that we

20  would perform water or groundwater monitoring as far as

21  the levels.

22    Q.   Mr. Williams had asked you a lot for

23  permission to repair these piezometers.  Not just you,

24  but other people besides you; Mr. Petty, Mr. Hensley,

25  Mr. Buttram, all had been asked at various times by

55

1 Mr. Williams for permission to go out there and do

2 something about these piezometers, isn't that true?

3     A.   I am not sure who he asked outside of me.  I

4 do recall that he asked me.  I even recall seeing an

5 e-mail back from Matt stating that some had already been

6 repaired by an individual that worked for me.

7     Q.   But that was too late to get the last set of

8 data wasn't it?

9     A.   I don't recall the date.

10     Q.   Because you still had 22 out of 51 out of

11 commission in November, right?

12     A.   It appears we did have 22 out of 51 out of

13 commission in November, correct.

14     Q.   Okay.  Let me ask you this question.  You, I

15 believe, you were a project lead, I think you said, on

16 the lateral expansion dredge cell construction?

17     A.   Yes, I was.

18     Q.   How far did you say you got with that before

19 the December 22, 2008 incident?

20     A.   The construction on the lateral expansion on

21 the dredge cell had commenced to the point where we had

22 the external dikes above the surface of the water level

23 of the ash pond and we were dredging material from the

24 ash pond into the center of what was the planned

25 expansion.

1    Q.    As of when?

2    A.    As of December 22, 2008.

3    Q.    Well, on the days or weeks leading up to the

4    December 22, 2008, was it not true that you already had

5    the water and ash levels in the expansion dredge cell as

6    high as the adjoining cell, is that accurate?

7    A.    Can you define adjoining cell?

8    Q.    Adjoining cell, the cell that was right next

9    to the dredge cell, the lateral expansion dredge cell.

10   A.    The cell that joined the lateral expansion was

11   actually Cells 1 and 2 which were much higher than the

12   lateral expansion cell.

13                  (Exhibit No. P-254 was marked for

14                  identification.)

15   Q.    Turn, if you would, to Plaintiff's Trial

16   Exhibit 254.  That should be in front of you.  I think I

17   made a mistake there when I referenced the adjoining

18   dredge cell.  Please forgive me.  I meant to say is that

19   the ash material sluiced into the area of the lateral

20   expansion dredge cell was at or near the same elevation

21   of the water in the dredge cell where the dredging

22   equipment was sitting.  You see what it says in 254?

23          Why don't we start, let's start from the

24   beginning there.  Plaintiff's Exhibit 254 appears to be

25   a November 7, 2008, e-mail from a James Catlett to you

57

1   and Melissa Hedgecoth entitled "KIF Lateral Expansion."

2   You see that?

3          A.   Yes, I do.

4          Q.   Did you receive this e-mail from Mr. Catlett

5   in the ordinary course of your business at TVA?

6          A.   Yes, I did.

7                 MR. BYRNE:   Your Honor, we offer

8   Plaintiff's Exhibit 254 at this time.

9                 MR. MARQUAND:   Your Honor, I object on the

10  grounds of relevancy, unless it can be shown -- the

11  lateral dredge cell is not in the area of the failure

12  and is not an issue in this case.   It was never built.

13                THE COURT:   Your response Mr. Byrne.

14                MR. BYRNE:   Yes, Your Honor.   By November

15  7, 2008, the wet ash that had been sluiced into the

16  lateral expansion dredge cell, according to this e-mail,

17  had reached the same level as the water level in the

18  adjoining dredge cell such that it created another

19  significant source of pressure on what I think we have

20  shown were already unstable dikes.

21                THE COURT:   I will admit Plaintiff's 254.

22  You may go ahead.

23                (Exhibit No. P-254 was received in

24                evidence.)

25  BY MR. BYRNE:

58

1      Q.   Turning your attention back to Exhibit 254,

2  Mr. Dotson, Mr. Catlett here is telling you he is

3  sending you some photos of the KIF project that show the

4  material sluiced in the area of the lateral expansion.

5  You see that?

6      A.   Yes, I do.

7      Q.   And Mr. Catlett goes on to say that "The

8  material -- meaning ash sluiced into the area of the

9  lateral expansion -- is real near the same elevation of

10  the water in the dredge cell where the dredge is

11  sitting."  Now, was that an accurate statement as of

12  November 7, 2008?

13      A.   It appears to be accurate of what Harold

14  Catlett saw on November 7, 2008.  I don't recall for

15  myself on that exact date.  I do recall on or near that

16  timeframe the lateral expansion to the dredge cell had

17  been dredged into such that the ash within the confines

18  of the still under construction perimeter dikes was

19  approximately at the elevation of the water level in the

20  ash pond, or what Harold Catlett calls the dredge cell.

21      Q.   Okay.  It was the same level as the existing

22  ash pond, correct?

23      A.   Yes, same level.

24      Q.   Okay.  Now, the TVA was using the new lateral

25  expansion dredge cell for disposal of sluiced coal ash

59

1  directly from the Kingston plant even in the fall of

2  2008, wasn't it?

3      A.  Not directly from the plant, no.  The fly ash

4  was actually discharged from the end of the sluice lines

5  into a trench.  The ash flowed from the trench into the

6  ash pond at which point the hydraulic dredge sucked, if

7  you will, the material from the ash pond into another

8  location within the confines of the actual ash pond.

9      Q.  Maybe this is an easier way to put it.  In the

10  fall of 2008 TVA was already sending and sluicing coal

11  ash into the new lateral expansion dredge cell, correct?

12      A.  We weren't sluicing ash, we were dredging ash.

13      Q.  You were adding ash to it?

14      A.  May I finish my statement, please?

15          THE COURT:  Go ahead.

16  BY MR. BYRNE:

17      Q.  Go ahead.

18      A.  As I was saying, we were sending the material

19  into the ash pond and through the planned construction

20  and the approved technique we were using we were indeed

21  taking that ash from the ash pond and placing it into

22  the planned expansion to the dredge cell, the lateral

23  expansion, yes.

24      Q.  So, in the fall of 2008 you were already

25  adding ash to the new lateral expansion dredge cell?

60

1      A.   As part of the planned construction, yes.

2      Q.   So your answer is, yes?

3      A.   Yes, it is.

4      Q.   Now, you said as part of the planned

5  construction.  Part of the planned construction was to

6  make sure that a bottom drainage layer had been

7  installed in the lateral expansion dredge cell.  Isn't

8  that true?

9      A.   There was a drainage layer that was designed

10  to plan at a certain elevation within the lateral

11  expansion.

12      Q.   It hadn't been completed.  You didn't have the

13  whole thing completed before ash started getting

14  deposited in the dredge cell?

15      A.   We had not reached an elevation yet that

16  required that drainage layer to be installed.  We were

17  still constructing the elevations that were beneath the

18  designed drainage layer.

19      Q.   What designs are you talking about?

20      A.   The design that Worley Parsons had provided to

21  TVA.

22      Q.   You talking about design drawings?  You

23  talking about according to design drawings?

24      A.   There were some drawings prepared that were

25  used to acquire a permit.  Within the permit drawings

61

1  there was a planned drainage layer that was above the

2  level of the ash pond surface and above the level at

3  which we were currently working.

4      Q.  Okay.  Were those drawings, I mean, did they

5  prove to be accurate or inaccurate on that point?

6      A.  Could you define "accurate or inaccurate at

7  that point."

8      Q.  You said you hadn't quite reached that point

9  where you had to put this drainage layer, done this

10 additional drainage layer construction because it hadn't

11 reached that point of the plans.  I am asking at some

12 point in time did you discover that there was a problem

13 with the plans?

14     A.  I discovered that for construction to continue

15 above where we were, or much further, we would have had

16 to have had additional details provided to the drawings.

17 The drawings that we submitted to TDEC were sufficient

18 enough to obtain a permit, but as a practice when we

19 submit permit drawings we intentionally don't include

20 minute design details because through the course of

21 construction things might require a change.  Through

22 that change if you deviate from a permit drawing you

23 have to go back to the regulator for approval.

24          Through our relationship with the TDEC we

25 would submit drawings sufficient enough for them to

62

1   understand the intent of the design and then once we

2   received the permit we would commission someone to take

3   the permit drawings and provide construction drawings

4   that included all of the finer details that were

5   required for a complete build out.

6       Q.   Who created the initial drawings that were

7   sent to TDEC?

8       A.   Worley Parsons created the permit drawings

9   sent to TDEC for the lateral expansion to the dredge

10  cell.

11      Q.   And who prepared these more detailed post

12  permit construction drawings?

13      A.   We were in process of having someone prepare

14  those, when the ash release occurred in December of

15  2008.

16      Q.   Right.  Who was doing that work for you?

17      A.   At that point it was yet to be determined.

18  There were a few firms that we had talked about.  Worley

19  Parsons was one of those.

20      Q.   Now, if I am not mistaken, you were already

21  doing the construction work when all of this

22  construction plan work was going on, right?  You had

23  already been constructing the lateral expansion dredge

24  cell post permit.  You had already begun adding ash to

25  the lateral expansion dredge cell before you ever got

63

1    anywhere on those construction plan drawings from Worley

2    Parsons, right?

3        A.   The construction that had taken place was

4    performed with the permit drawings.  For the level of

5    work that we had performed, there were sufficient detail

6    contained on the permit drawings.  For us to have gone

7    much further, we would have needed additional details.

8        Q.   In fact, you told your fellow engineers at TVA

9    that you weren't happy about the fact that you were

10   having to construct this thing with nothing more than

11   permit drawings, didn't you?

12       A.   No, I did not.  What I did do is express

13   concern because I was under the impression when I took

14   the job over that we already had construction drawings.

15   I didn't realize that I was working with the permit

16   drawings.  I did express concern that Worley Parsons had

17   not included enough details for us to build out the

18   lateral expansion.  Once I dug into it a little more

19   deeply, I found we were actually using the permit

20   drawings and that the work had commenced at someone's

21   approval with the use of those drawings and that we were

22   not yet at a level that required the additional details

23   that would be contained in construction drawings.

24       Q.   When did work commence?  When did the first

25   field work, construction work, commence on the lateral

64

1  expansion dredge cell project post permit?

2      A.   Without referring back to notes, I would say

3  in the winter, January/February time frame, possibly of

4  '08, maybe a little later in the fall or early winter of

5  '07.

6      Q.   Winter of '08 meaning the January or February

7  timeframe or late '07?

8      A.   Without looking at notes, I would estimate

9  late '07 calendar year or early calendar year '08.

10      Q.   Back to Plaintiff's Exhibit 248.  You have

11  that in front of you?

12              (Exhibit No. P-248 was marked for

13              identification.)

14      A.   I apologize.  There is no particular order in

15  which these files are placed in the expandable folder.

16      Q.   This appears to be an e-mail chain that you

17  were involved in that begins as early as October 28th,

18  2008, and concludes on November 13th, 2008, and each

19  e-mail regards the KIF ash lateral expansion.  You see

20  that?

21      A.   Yes, I do.

22      Q.   This appears to be a series of e-mails which

23  you either sent or received in the ordinary course of

24  business of TVA, correct?

25      A.   That is correct.

65

1          MR. BYRNE:  Your Honor, we offer

2    Plaintiff's Exhibit 248 at this time.

3          MR. MARQUAND:  No objection.

4          THE COURT:  So admitted.

5          (Exhibit No. P-248 was received in

6          evidence.)

7    BY MR. BYRNE:

8        Q.  Turn, if you would, to the second to the last

9    page that is bates 407301 to the e-mail from William

10   Perry dated October 28, 2008.  Do you see that?

11       A.  Yes, I do.

12       Q.  Who was William Perry?

13       A.  William Perry was a heavy equipment operator

14   who was serving as the foreman for the Heavy Equipment

15   Division.  He was the project superintendent over the

16   construction of the lateral expansion.

17       Q.  He says here, "Prints need verification that

18   the prints on site will be revised and adjusted to meet

19   the criteria of the approved construction prints.

20   Prints have a date of April, 1981."  Do you see that?

21       A.  Yes, I do.

22       Q.  Were you at that point in time, October 2008,

23   was construction following a series of prints that dated

24   back to 1981?

25       A.  I am not sure why William used that date.  We

1   were not, we were actually using permit drawings that

2   would have been dated around 2005 or '6, as my memory

3   serves me.

4       Q.   Well, you responded to several people just

5   above that on November 5, 2008, and you say, "Right now

6   we are in a holding pattern on this job.  The drawings

7   are incomplete at best."  You see that?

8       A.   Yes, I do.

9       Q.   It says, "I plan to speak with Barry this week

10  and see what we need to do to get a set of construction

11  drawings prepared.  I realize this will take time so I

12  am also in the process of trying to determine what we

13  can do in the meantime to keep the project moving."  Did

14  I read that correctly?

15      A.   It appears that you did, yes.

16      Q.   Let me make sure I have got this straight.

17  Was construction going on for this lateral expansion

18  dredge cell at KIF from somewhere around January of 2008

19  all the way to November of 2008 just off permit drawings

20  and not actual construction drawings?

21      A.   As I testified a moment ago, the construction

22  that had taken place from whenever it started through

23  this timeframe had taken place with permit level

24  drawings that contained enough details for the work that

25  we were currently undertaking.  William's concern was

1  that at some point in the future he would not be able to

2  continue work because he didn't have details to continue

3  working.

4      Q.   When did you first realize -- excuse me, he

5  couldn't continue working because it wasn't safe to

6  continue working, isn't that true?

7      A.   No, I disagree.  What we were doing out there

8  was standard practice.  It was safe.

9      Q.   But you might have a permit -- if it was safe,

10  why did you need the construction drawings?

11      A.   To continue the construction we needed

12  drawings that contained other details.  For example, a

13  spillway.  You mentioned earlier the dikes of the

14  lateral expansion had material within the lateral

15  expansion that were at or near the elevation of the

16  phreatic surface or water surface, I am sorry, in the

17  ash pond.

18          To continue to elevate those external dikes

19  and the material that is contained within those, we

20  would have had to have installed a spillway structure to

21  allow the water that comes from the dredge when the

22  dredge pumps material into the cell -- it's an ash/water

23  solution where there's about 20 to 25 percent fly ash

24  and 75 to 80 percent water.  The water that you are

25  placing in that cell has to have a place to escape.

68

1          The plan was to install a spillway structure

2    that would allow that water to decant back into the ash

3    pond.  Details such as that were needed to continue with

4    the construction.

5          Q.  Did you stop all of the dredging into the

6    lateral expansion dredge cell from that point in time,

7    November, 2008 through December 22, 2008, so that you

8    could go out and get these good construction drawings

9    done?

10          A.  I don't know at this point in time whether we

11   had reached a point where we had to stop.  William's

12   concern was we would be nearing that point in the

13   future.  We needed to get information to allow him to

14   continue to work.

15          Q.  Let me see if I have got this straight.  From

16   early November of 2008 through December 22, 2008, you

17   kept dredging in the lateral expansion dredge cell while

18   simultaneously trying to get someone to get you actual

19   construction drawings so you could continue that work?

20          A.  I believe I testified I am not sure if we were

21   continuing to dredge.  I did say we are not yet at the

22   point where we required more information.

23          Much like if you need an exhibit to present in

24   court today you wouldn't ask for it at 8:59 a.m., you

25   would get it well in advance.

69

1    Q.   I wouldn't try to question the witness without

2    the exhibit either.  My question is were you still

3    dredging in that lateral expansion dredge cell in

4    November and December despite knowing full well at that

5    point you didn't have accurate construction drawings?

6    A.   I disagree with several things in you're

7    question.  It was not that we didn't have accurate

8    construction drawings for the level of construction that

9    was taking place.  Indeed we did.

10   Q.   Did you just say --

11   A.   May I continue?

12   Q.   You said you think you did?

13   A.   May I continue?

14   Q.   Certainly, sir.

15   A.   I will restate.  We had drawings of a permit

16   level that contained sufficient details for the

17   construction that is taking place and for the

18   construction that could potentially take place for some

19   point in time.

20        William's concern was if we continued without

21   making progress on getting the additional details that

22   we needed that at some point in time he would no longer

23   be able to work and we would have to stop construction

24   on the project.  His concern was about getting details

25   for future work activity, not details for existing

1  activities.

2      Q.   But then you say on November 5th the drawings

3  are incomplete at best?

4      A.   I testified previously that at that point in

5  time I was under the impression these were the

6  construction drawings.  This project had been handed off

7  to me and when I took ownership of it I was under the

8  impression these were the construction drawings.

9      Q.   When was it handed off to you?

10     A.   At some point late in 2007.

11     Q.   So from late 2007 up until November of 2008

12 you have done all this construction out there on the

13 lateral expansion dredge cell without ever knowing that

14 what you were using in the way of plans was just permit

15 drawings, not construction drawings?

16     A.   For the work that we completed?

17     Q.   Yeah.

18     A.   The work that we were performing?

19     Q.   Yeah.

20     A.   We had adequate details.  It wasn't until --

21     Q.   Now I'm going to interrupt you.  You are not

22 answering my question.

23     A.   I have done that several times.

24     Q.   My question to you is from the time you took

25 ownership of this project in late 2007 until November of

1   2008, when this e-mail chain started up, you had no clue

2   that what you were using to do all this construction

3   work were just simple permit drawings, isn't that true?

4        A.   I don't really agree with your

5   characterization of simple.

6        Q.   Didn't you just testify to that effect?

7   Didn't you just tell us you didn't know?

8             MR. MARQUAND:  Can the witness complete

9   his answer?  He has disagreed with counsel's question

10  and he was explaining.

11            MR. BYRNE:  I will withdraw it, Your

12  Honor.

13            THE COURT:  Why don't we take a morning

14  break, ten minutes.

15            (Off the record.)

16            (Back on the record.)

17  BY MR. BYRNE:

18       Q.   Turn, if you would, Mr. Dotson, to Plaintiff's

19  Trial Exhibit 255.

20            (Exhibit No. P-255 was marked for

21             identification.)

22       A.   Yes, sir.

23       Q.   While you are doing that, if you can also pull

24  1758, Exhibit 1758.

25            (Exhibit No. P-1758 was marked for

72

1  identification.)

2  A.  Yes.

3  Q.  Let's start with Exhibit 255.  This appears to

4  be an e-mail from an A.J. Monsees to you and Melissa

5  Hedgecoth.  It's dated December 12, 2008.  Do you see

6  that?

7  A.  Yes, I do.

8  Q.  And the subject line reads "KIF pictures" and

9  the attachments are labeled "RKQ_stuck.pdf."  Do you see

10  that?

11  A.  Yes, I do.

12  Q.  Is this an e-mail you received in the ordinary

13  course of business of TVA?

14  A.  Yes, it is.

15  Q.  There is a series of photographs or photograph

16  attachments that follow beginning at bates 338598 and

17  continuing through page 338601.  Do you see that?

18  A.  Yes, I do.

19  Q.  Did you receive all those photographs as part

20  of this e-mail from Mr. Monsees?

21  A.  Yes, I did.

22  Q.  And finally, Exhibit 1758, so we can introduce

23  those all together, appears to be a color photo that TVA

24  furnished us, two color photos as a replacement for the

25  last two photos, black and white photos, on the last

73

1    page of exhibit 255.  Is that what 1758 represents?

2         A.   Yes, the Exhibit 1758 does represent the two

3    photographs contained on bates number ending 60.

4                   MR. BYRNE:  At this time plaintiff's offer

5    Exhibits 255 and 1758 into evidence.

6                   MR. MARQUAND:  No objection.

7                   THE COURT:  So admitted.

8                   (Exhibit Nos. P-255, 1758 were

9                   received in evidence.)

10   BY MR. BYRNE:

11        Q.   Who is A.J. Monsees?

12        A.   A.J. Monsees is currently in the form of

13   management in TVA's Surveying Department.

14        Q.   Was he doing some surveying work out of the

15   KIF dikes before sending this December 12, 2008 e-mail?

16        A.   A.J. was not, no.

17        Q.   Okay.  Was one of his crews, did he have a

18   crew out there doing some survey work shortly before he

19   sent this December 12, 2008 e-mail?

20        A.   Yes, A.J. did have a surveying crew working on

21   the lateral expansion on the Kingston dredge cell around

22   this time frame.

23        Q.   If we can go back to the diagram we started

24   with to give the Court a sense of where we are doing all

25   this work.  Let's pull up Exhibit 59 for a second.  Can

                              74

1  you point out the area on this map that was the subject

2  of the lateral expansion dredge cell construction

3  project?

4      A.  Would you like me to show the outline of the

5  lateral expansion?

6      Q.  Yes.

7      A.  This isn't a very good depiction.  It is in

8  the general area that I have shown.  It was horseshoe

9  shaped with the northwestern boundary being made up of

10  the existing lateral expansion to the dredge cell and

11  the lower slopes of the Dredge Cell Number 2.

12      Q.  Okay.  Let's -- let's go back then.  Let's

13  keep that up for just a second, but let's turn your

14  attention back to Exhibit 255.  Here is what Mr. Monsees

15  says in this December 12, 2008, e-mail.  "Here are a few

16  quick pictures of KIF.  Those dikes are the softest

17  dikes that I have ever been on.  Not sure what material

18  is being used overall, but you can sink quickly without

19  notice, as Randy did in these pictures and we did

20  yesterday finishing the survey."

21          I assume Randy was the gentleman that we saw

22  pictured on 1758, correct?

23      A.  Yes, I understand that is Randy Quarrels.

24      Q.  Randy who?

25      A.  Quarrels.

75

1      Q.    Randy Quarrels, okay.

2            All right, go back to this map just a moment

3   before we pull the pictures back up.  This photo 1758,

4   do you happen to know where Mr. Quarrels was standing,

5   when he sank in up to his above his knees?

6      A.    Looking at the photo alone it's hard to tell

7   where Randy was standing.

8      Q.    But it was somewhere along this blue outline?

9      A.    It was on the dike of the lateral expansion

10  that I have depicted with the blue outline.

11     Q.    Okay.  All right.  Let's take down the map

12  just a moment and look at the pictures.  Let's go to the

13  next page, to the first page of the black and white

14  photos.  I am not so interested in the photos as the

15  captions.  The captions on the photos, were those put in

16  place by Mr. Monsees or someone on his crew?

17     A.    I am not sure who put the captions on the

18  photographs.  All I know is that A.J. Monsees sent the

19  e-mail that contained the .pdf attachments that were

20  actually these photographs with the captions.

21     Q.    Okay.  Let's go to the picture at the bottom

22  of that page, if we can.  The caption reads, "Notice

23  that the area inside this newest dike being built seems

24  to be pretty much full.  There is no way we can get near

25  it or inside to survey this area."  You see that?

76

1        A.   Yes, I do.

2        Q.   And this new dredge cell he is referring to,

3   that's the lateral expansion dredge cell itself?

4        A.   Yes, it is.

5        Q.   Did you understand that Mr. Monsees surveying

6   crew at least as of December 12, 2008, couldn't even get

7   in there to survey it was so full?

8        A.   My understanding of the task that was put in

9   place for AJ's crew was to survey the centerline of the

10  exterior dike and possibly the offsets that would

11  delineate the crest of the dike on either side.  I

12  wasn't aware that they were to be inside the sluiced

13  material.  As a matter of fact, had I been known or had

14  I known they had been tasked with that, I would have

15  asked that they not have done that.  That is sluiced

16  material and it is not intended to be walked upon.

17       Q.   Let's go back to the Plaintiff's Exhibit 1758.

18  What is your particular opinion of what this gentleman,

19  Randy, is standing in?

20       A.   It appears that Randy is standing on one of

21  the dikes of the lateral expansion.  He is standing near

22  the edge on fly ash.

23       Q.   What did you say Mr. Monsees' position was

24  with TVA, as of December of 2008?

25       A.   At that point I believe Mr. Monsees was the

77

1  equivalent of a principal engineer.  He would have

2  directed the work of subordinate engineers or surveyors.

3      Q.   He was above you, correct, in the chain of

4  command?

5      A.   As of December 22nd, 2008?

6      Q.   Yes, sir.

7      A.   I don't necessarily agree with that.  We

8  weren't in the same organizations.  I was on the

9  management scale.  He was on the engineering scale.  He

10 was a principal engineer.  I was a program manager.

11     Q.   Do you know how long Mr. Monsees was, had been

12 with TVA as of the 2008 time frame?

13     A.   I have no idea.

14     Q.   Do you know whether he is a long-time employee

15 of TVA?

16     A.   I am not sure of his tenure with TVA.

17     Q.   Do you know if he does a good bit of work that

18 involves surveying dikes, visiting the dikes in the TVA

19 fossil plant system?

20     A.   I understand that the organization that

21 employees A.J. performs surveying work for all aspects

22 of any kind of construction that is ongoing at TVA, be

23 that at the hydroelectric dam, nuclear facility,

24 transmission line project or an expansion to an ash

25 disposal facility.  I can't really speak to his

78

1  experience, as far as it relates to surveying on dikes.

2      Q.   In any event, as of December 12, 2008, just

3  ten days prior to the ash release -- I think that is the

4  term you used on Thursday -- Mr. Monsees says that these

5  dikes they are surveying are "the softest dikes I have

6  ever been on."  Did he say that?

7      A.   I did see that that was AJ's opinion that

8  those were the softest dikes he had ever seen.

9      Q.   Was that your opinion as of December 12th,

10 2008?

11     A.   I wasn't really in the business of rendering

12 an opinion.  I myself would not have walked on them

13 because of the level of construction they were currently

14 under, I wouldn't have walked on them.  The intent of

15 the dikes at that point was they were in the process of

16 being constructed.  Prior to placing any men or

17 equipment on those dikes there were other levels of

18 construction that would have taken place to stabilize

19 that material such that it would not be soft.  The plan

20 was to use bottom ash as well as a reinforced biaxial

21 synthetic grid that helps distribute load.  These

22 materials have been used in conjunction on top of this

23 base once this base was sufficiently compacted to make

24 it safe for people or equipment to travel on.

25     Q.   This grayish material that Mr. Quarrels is

1  sunk into in the photograph, 1758, that is just fly ash,

2  right?

3      A.   It's my understanding that was just fly ash.

4      Q.   That is not bottom ash, correct?

5      A.   That is my understanding, correct.

6      Q.   And TVA was supposed to build the dikes --

7  were they supposed to build the dikes with fly ash?

8      A.   It's been so long since I have looked at those

9  design drawings, I can't recall.  I do remember that we

10  were going to use bottom ash at some point.

11      Q.   You think that is what you promised TDEC you

12  would do, right?

13      A.   As I was saying, the plan was to use bottom

14  ash and a reinforced grid to provide a stable base.  At

15  that point we were going to construct the dikes above

16  that base and above the elevation where they currently

17  were.

18      Q.   That is not what this material is on this

19  dike, right?  That is just fly ash?

20      A.   This material was adequate for the level of

21  construction that we were currently undertaking.

22      Q.   Right.  But you had already put fly ash

23  material and you were already using this dredge cell?

24      A.   The dredge cell was under construction.

25      Q.   It almost appears to be at the same level as

                              80

1    the man standing in the muck, doesn't it?

2        A.    I am sorry, muck?

3        Q.    The fly ash.

4        A.    Your question was?

5        Q.    My question is the water in this dike appears

6    to be only inches from the level that this man is, of

7    this fly ash dike, isn't that true?

8        A.    That is what I previously testified to, yes.

9        Q.    It can't get much fuller than that can it?

10       A.    The dike doesn't get "full" as you are saying.

11       Q.    If it gets any more full, he will be under

12   water, right?  The there won't be a dike.  The dike will

13   be overtopped?

14       A.    If what gets more full?

15       Q.    You see the water behind this guy,

16   Mr. Quarrels, you see all that?

17       A.    Yes, I do.

18       Q.    That's a mixture of water and ash, isn't it?

19       A.    That is actually water.  The ash would have

20   settled out beneath it.

21       Q.    Okay.  So the ash at the bottom.  The water is

22   at the top.  My point is it is just inches away from

23   overtopping this soft dike material -- well, the dike

24   that this gentleman is shovelling around in, correct?

25       A.    I would look at it from the opposite

81

1  standpoint. Water isn't inches from overtopping. The

2  dike is inches above the water surface, as was the

3  planned construction. The plan was to raise these dikes

4  out of the surface of the ash pond.

5      Q.  That didn't happen, it never happened because

6  ten days later, December 22, 2008, disaster occurred,

7  correct -- I am sorry, ash release occurred, right?

8      A.  I understand the ash release did occur ten

9  days later in an area totally unrelated to the lateral

10  expansion to the dredge cell. Even if these under

11  construction dikes to the dredge cell had been breached

12  by the water that was on the exterior of them, there

13  would have been no significance because there was

14  external containment within this facility.

15      Q.  You are talking about the containment that

16  this gentleman is standing on?

17      A.  No, I am not.

18      Q.  You don't think this impoundment, this ash

19  impoundment system with all its dredge cells, you didn't

20  view that at the time as one continuous system of cells

21  that were interconnected and could each impact the

22  other?

23      A.  It is an interconnected system. They do have

24  the ability to impact each other, yes. My statement was

25  that the failure of the release occurred in an area

82

1  unrelated to construction that was ongoing in this

2  location and had something happened to this dike that

3  Randy is standing on, there would have been no

4  significance because the material there was not

5  considered the primary containment for the ash pond.

6  The primary containment for the ash pond was Dike C,

7  which went around the parameter and what was referred to

8  as the divider dike, which was what separated the ash

9  pond and the stilling ponds.

10      Q.   You talking about the divider dike between

11  Dredge Cell 2 and 3?

12      A.   No, the divider dike between the ash and

13  stilling ponds.

14      Q.   You see the water in this picture with

15  Mr. Quarrels in it?

16      A.   Yes.

17      Q.   Where did all that go on December 22, 2008?

18      A.   That water didn't go anywhere.

19      Q.   It's perfectly intact, wasn't it?

20      A.   As I was saying, that water didn't go

21  anywhere.  The failure didn't impact this portion of the

22  facility.

23      Q.   All that came out was Dredge Cell 2 water, is

24  that what you are saying?

25      A.   Material from the dredge cells.

1    Q.   Material, water, whatever?

2    A.   As I was saying, material from Dredge Cell 2

3  and the former Dredge Cell 3 were displaced during the

4  release in 2008.

5    Q.   All right.  Did you have occasion to

6  participate in two annual inspections of the KIF plant

7  dike systems?

8    A.   Yes, I did participate in two annual

9  inspections of the disposal facility at Kingston.

10   Q.   Which ones?

11   A.   All of the disposal facilities.

12   Q.   I am saying which years did you participate in

13  KIF plant annual dike stability inspections?

14   A.   Well, I previously said in my deposition that

15  I take exception to the term "stability" included in the

16  inspection title.

17   Q.   I didn't ask you that question.  We'll get

18  into you taking exception to that title in a minute.  My

19  question is what two annual inspections did you

20  personally conduct or participate in at the KIF plant?

21   A.   I participated in or conducted the inspections

22  that took place in December of 2007 and October of 2008.

23   Q.   Okay.  I believe during the December, 2007

24  inspection you were actually running that inspection and

25  actually drafted the report, correct?

84

1    A.   I was the responsible engineer for the

2   inspection that took place during the calendar year 2007

3   and was the author of the inspection report.

4    Q.   And then for the October 2008 inspection that

5   led to the fiscal year '09 annual inspection report you

6   were a participant, but not the principal inspector,

7   correct?

8    A.   That is correct.  I was not the person

9   responsible for leading nor drafting the report for the

10   inspection that took place in October of 2008.

11    Q.   In fact, I think you testified previously that

12   you didn't review or edit any of the drafts of that 2009

13   Annual Inspection Report, is that correct?

14    A.   That's correct.  I did say that in my

15   deposition.  After further document review I was

16   provided with a draft of that report that was written

17   based on the findings of the October, 2008 report.  I

18   did see some handwriting that appeared to be mine.

19    Q.   Okay.  Is that handwriting that you put on the

20   report or that you put on there during the actual

21   inspection or afterwards?

22    A.   No, it wasn't during the inspection.  I have

23   seen a draft that has what appears to be my handwriting.

24   As far as being asked to "review" the "draft" I do not

25   recall that taking place.  I do recall there were

85

1  several meetings where what I call the joint project

2  team got together where we were reviewing various

3  things.  At some point I made notations on what turned

4  out to be one of the drafts for the report for fiscal

5  year 2009.  At the time I don't think that I was aware

6  it was a draft.

7      Q.  Did you make any edits or suggested edits to

8  any of the drafts of the 2009 Annual Inspection Report

9  that actually made their way into the report?

10      A.  I don't think so.  The note that I saw that

11  first prompted me to recall I had written on a draft was

12  on the cover page.  I wrote the name Gill Francis and

13  circled it in some sort of fashion.  Then on another

14  page I had written down the chronology for some of the

15  chronology for the facility.

16      Q.  Who is Gill Francis?

17      A.  I am not sure what his title was, but at the

18  time of the recovery, the initial recovery efforts, Gill

19  worked in TVA's Communications Group.

20      Q.  He was a Media Relations person?

21      A.  He worked in the Communications Group.  That

22  was probably one of his functions.

23      Q.  You knew that was one of his functions, didn't

24  you?  You knew he interacted with the media on TVA's

25  behalf, yes?

86

1      A.   That is what I just stated.

2      Q.   You stated he was a communications person.  I

3  said involved with interacting with media?

4      A.   I said that was one of his functions.

5      Q.   Very good.  Okay.  Is he an engineer?

6      A.   I am not sure of Gill's background.  I doubt

7  it is in engineering.

8      Q.   Was he one of the guys helping to edit the

9  draft report, the draft inspection report?

10     A.   I am not sure if Gill was involved directly.

11 I do recall that the communications people were

12 assisting with the process of drafting the report.

13     Q.   Did anybody from TVA's Media Relations or

14 Communications Department assist you in editing your

15 2008 annual inspection report, the one you authored?

16     A.   No.  When I drafted and finalized the report

17 for the December, 2007, annual inspection, no Media

18 Relations personnel reviewed the report.

19     Q.   Now, during the October 20, 2008, inspection

20 you accompanied Chris Buttram and John Albright, is that

21 right?

22     A.   Yes, I did.

23     Q.   And did you assist them by marking what are

24 known as waypoints?

25     A.   While participating in that inspection I took

87

1   photographs, I used a handheld GPS to mark waypoints.

2   When I noted items of interest, I would call Chris and

3   John over and as a group we could collectively look at

4   what we saw.

5       Q.   I am sorry to interrupt.  Is the answer to my

6   original question, did you assist them by taking

7   waypoints, yes?

8       A.   Taking waypoints was one of my functions, yes.

9       Q.   Listen to my question.  I am trying to take

10  this step by step.  You will get a chance to say

11  whatever you need to say.

12           The waypoints are a GPS plot of a location

13  where you shot a photograph that day during the

14  inspection, correct?

15      A.   The waypoints were shot on areas that

16  ultimately photographs were taken of, yes.

17      Q.   Okay.  These waypoints, you would give them a

18  description to help identify what was at that location

19  you were shooting the GPS reading on, correct?

20      A.   That is correct.

21      Q.   Okay, turn, if would, to Plaintiff's Exhibits

22  190 and 189, please, sir.

23               (Exhibit Nos. P-189, 190, were

24                marked for identification.)

25      Q.   Let me know when you have those in front of

88

1  you.

2      A.    I have them.

3      Q.    Let's start with Exhibit 190.  This appears to

4  be a Monday December 22, 2008, e-mail from yourself to a

5  Cynthia McCowan and Melissa Hedgecoth.  The subject line

6  reads "KIF monitoring/inspection data."  You see that?

7      A.    Yes, I do.

8      Q.    Is this an e-mail that you sent to

9  Ms. Hedgecoth and Ms. McCowan in the ordinary course of

10  business at TVA?

11      A.    This e-mail was sent during the ordinary

12  course of business I was conducting on the date that is

13  shown on the e-mail, yes.

14      Q.    Thank you.

15           MR. BYRNE:  Your Honor, we offer

16  Plaintiff's Exhibit 190 at this time.

17           MR. MARQUAND:  I am not going to object to

18  this cover document, but I am going to object to the

19  document under the rule of completeness.  It does

20  indicate there was two attachments to this.  There is

21  only one attachment.  It specifically refers to GPS

22  points which are not attached.

23           THE COURT:  Is that in another document?

24           MR. BYRNE:  It is, Your Honor.  I think

25  you have pulled out 189, didn't you?

1            THE WITNESS:  Yes, I did.

2            MR. BYRNE:  I think it is in 189.  I was

3    just taking it step by step.

4            THE COURT:  We'll admit 190 with that

5    understanding.

6            (Exhibit No. P-190 was received in

7            evidence.)

8    BY MR. BYRNE:

9        Q.   Turning back to Plaintiff's Exhibit 190.  Am I

10   correct that on the day of the ash release, the December

11   22, 2008, ash release, you had sent water level

12   monitoring data around to some higher ups and now you

13   were sending around your waypoints and your waypoint

14   descriptions from the October of 2008 inspection to

15   several higher ups, is that right?

16       A.   This e-mail was sent to my manager and not

17   necessarily a higher up, as you referred to her as, but

18   she was the Plant Administrator, Environmental.  She was

19   responsible for all environmental activity at the plant.

20   I did send this to Cynthia and Melissa.

21       Q.   You reported to Ms. McCowan, didn't you?

22       A.   No, I did not report to Ms. McCowan.

23       Q.   To Ms. Hedgecoth, I apologize.

24       A.   Yes, I did.

25       Q.   So she was your superior at that time?

90

1    A.   Yes, she was.

2    Q.   Then you say in the first line, "Cynthia, see

3    2008 inspection report attached."  That is the first

4    attachment referenced in this e-mail, correct?

5    A.   Yes, it is.

6    Q.   And you say, "Chris Buttram has not prepared

7    writing the report for the 2009 (October 20, 2008)

8    inspection, but has updated the attached drawing with

9    GPS points that I took while performing the inspection.

10   They are simply shown as a number with a point (dot).

11   Here is a description on the numbered points."

12       These two sentences describe I guess the other

13   two attachments so let's go through the attachments.  We

14   have your 2008 final report as an attachment.  Then I

15   guess you are resending groundwater level or water level

16   monitoring data and then I guess this last one

17   KIFAPI2009.  That is your waypoint, those are your

18   waypoint entries?

19   A.   That is actually the schematic that shows the

20   waypoints, waypoint or dot.

21   Q.   All right.  You collected approximately 30

22   waypoints during your inspection or during the

23   inspection back in October of 2008, correct?

24   A.   That's not correct.

25   Q.   How many did you collect?

91

1    A.   I collected waypoints starting at I believe

2  point 20 going through point 30 with the exclusion of

3  point 27 because it was a duplicate of point 28.

4    Q.   Okay.  You are saying the waypoints that are

5  described in your e-mail to Ms. Hedgecoth in Plaintiff's

6  Exhibit 190 are the only waypoints you took during the

7  October 20, 2008 inspection?

8    A.   That's correct.

9    Q.   Okay.  Did Ms. Hedgecoth ask you to send this

10  to her on December 22, 2008?

11    A.   I don't recall who made the request.  It makes

12  sense that I was asked to provide that to Missy.

13  Otherwise, I don't know why I would have copied her.

14    Q.   Do you know who else this was forwarded to?

15    A.   I have no control of someone's e-mail account

16  once they receive something from me.

17    Q.   I am not asking if you have control over it.

18  I am asking if you happen to know somebody else got this

19  after you sent it?

20    A.   I am not sure who either Cynthia or Melissa

21  sent this to after I sent it to them.

22    Q.   If you will turn the page in Plaintiff's 190,

23  there is a drawing here.  What does this drawing

24  represent?

25    A.   This is a schematic, actually.  I wouldn't

1    classify it as a drawing. It represents the dredge

2    cells, the lateral expansion of the interim dredge cell,

3    the active ash disposal area or ash pond, the stilling

4    pond, the plant intake channel, a portion of the

5    peninsula area that is part of the plant proper. It

6    also shows our loaded rail yard, as well as the area

7    referred to as the ball field which contained two

8    chemical treatment ponds as well as showing a portion of

9    the powerhouse.

10       Q.   All that. That is a pretty detailed

11   schematic. What I am getting at is what does that have

12   to do with the waypoints? Are the waypoints logged in

13   on this schematic in some way?

14       A.   The waypoints are shown on this schematic. It

15   was later realized after I received it that all of the

16   points were shifted. The wrong datum had been used when

17   Chris initially input these into this schematic. It was

18   corrected after that.

19       Q.   This is the version of Mr. Buttram's waypoint

20   schematic that was just wrong that he later had to

21   correct, right?

22       A.   Yes, the datum that was used in preparing this

23   was incorrect. After the fact of me sending it out, he

24   corrected it.

25       Q.   Okay. Let's look at Exhibit 189. This

93

1    appears to be an October 27, 2008, e-mail from you to

2    John Albright, Kelly Evans and James Buttram.  Did I

3    read that correctly?

4         A.   Yes.

5         Q.   The title of it is "waypoints from

6    inspections."  I assume this e-mail is included in the

7    attachment, an attachment or waypoint you were sending

8    to Mr. Buttram so he could include the waypoints in the

9    schematic we just looked at and in his report.  I

10   realize the schematic there was some errors there.  I am

11   just trying to figure out why you were sending this to

12   him.

13        A.   This does contain the NAD 83 northings and

14   westerns of the waypoints for the Widow's Creek,

15   Kingston and John Sevier Fossil Plant inspections that I

16   had participated in during the month of October, 2008,

17   as well as a description of the points.  In addition

18   there is also an attachment that contains the CorpsCon

19   software where I translated the points into a northing

20   and easting that can be used on the actual schematic.

21        Q.   Did you see an actual schematic that

22   accurately plotted your waypoints on it?

23        A.   Yes, I did.

24        Q.   What would that have been?

25        A.   What would it have been?

                              94

1      Q.   Where was this schematic?

2      A.   It was included in the final report issued in

3  2009.

4      Q.   Does this appear to be the schematic that

5  includes the correct waypoint entries or does this

6  simply depict the figures, the photographic figures from

7  the report itself?

8      A.   The sheet that is on the screen I can't see

9  the bates stamp.  Is that bates stamp ending Buttram

10  Chris depo ending 090.

11      Q.   0000090, yes.

12      A.   Yes.  What this figure shows is locations of

13  photographs that were taken, the direction that the

14  photographer was facing when taking the photo and these

15  correspond to the waypoints.  The waypoints themselves

16  are not shown directly on this schematic.

17      Q.   Why don't we look at Exhibit 192.  Let me know

18  when you are there.

19              (Exhibit No. P-192 was marked for

20              identification.)

21      Q.   This appears to be one of the drafts of the

22  report.  Let's go to the second last page of that

23  exhibit.  There appear to be several red circles

24  including one labeled 22 on bates stamp 8219, excuse me,

25  TVK 278219, Plaintiff's Trial Exhibit 192.  You see

95

1  that?

2       A.  Yes, I do.

3       Q.  Do those circles or do some of those circles

4  represent the locations of your waypoints back in

5  Exhibit 189?

6       A.  Yes, they do.

7       Q.  All right.  Which of your waypoints from

8  Plaintiff's Exhibit 189 are depicted on this particular

9  page that is up on the screen from Plaintiff's 192?

10      A.  I don't understand your question.

11      Q.  Are all of your waypoints that are listed in

12  Exhibit 189 depicted in this schematic from Plaintiff's

13  192 that is up on the screen?

14      A.  No, all of the waypoints contained in 189 are

15  not listed.  Only the waypoints that are relevant to the

16  Kingston Fossil Plant.  It appears that all of them that

17  were taken are contained on this exhibit.

18      Q.  So that would include waypoint 20?

19      A.  Yes, it would.

20      Q.  Okay.  Point to waypoint 20 on this diagram

21  that is up on the screen.  Can you touch the screen to

22  show where that is.

23      A.  I am having difficulty reading the figure.  It

24  appears that is waypoint 20.  (Indicating).

25      Q.  That is waypoint 20?

96

1    A.    Yes.

2    Q.    I am sorry.  I moved it.  Tap the screen where

3  waypoint 20 is.

4    A.    Actually I just misspoke.  Unfortunately the

5  way his Excel file was plotted, the table is broken up

6  such that when you look at the waypoint number contained

7  on the middle sheet and then you go, or, I am sorry, the

8  second sheet and you go to the third sheet the numbers

9  shift one because it shows the row number, not the

10  waypoint number.  Waypoint 20 is actually shown as

11  number 21 on the sheet ending bate stamped 918.

12    Q.    198 or 189?

13    A.    Exhibit 189, bates stamp 198, waypoint 21.

14    Q.    Where is 20?  Is 20 depicted on there at all?

15    A.    All of them are depicted on this.

16  Unfortunately, due on the poor quality of the exhibit, I

17  can't pick out number 20.

18    Q.    Well, according to the description in 189

19  bates page 198 waypoint 20 you described as a seep, is

20  that correct?

21    A.    Yes, that is the description I used.  Upon

22  further -- upon further examination it looks like this

23  is waypoint 20.

24    Q.    Okay.  All right.  So the seep that is

25  described in waypoint 20 is on the West Dike, correct?

97

1         A.    That is correct.

2         Q.    Then let's drop down to waypoint number 22.

3    That is described in Exhibit 189 or your notes in

4    Exhibit 189 as a "slough road washout."  You see that?

5         A.    Yes.  I see that.

6         Q.    Where is Exhibit 22?

7         A.    Waypoint 22?

8         Q.    On Exhibit 198, bates page 219.

9         A.    Waypoint 22 is located right here.

10        Q.    Next you have waypoint number 23.  Your notes

11   read "soft spot."  Where is the soft spot for waypoint

12   23?  Where is waypoint 23?

13        A.    (Indicating).

14        Q.    Waypoint 24 is described as "hole in bottom

15   dike."  Where is waypoint 24 on Exhibit 192, the

16   schematic?

17        A.    It appears to be this one.

18        Q.    Why don't we do this.  On your copy of the

19   192, bates page 278219, let's, I am going to get you to

20   make the circles on this.  Then we'll make this paper

21   Exhibit 192A.  Why don't we do this for the sake of

22   time.  Mr. Dotson, let's kind of go back through these

23   real quick.  When you are finished marking all those

24   points, I will come and present it on the Elmo and we

25   can confirm or I can have you confirm for the Court that

98

1  our markings are accurate here.

2         Let's go back and if you would, if you would

3  circle the waypoint number 20, the seep which I think

4  you have drawn at least up on the screen on the West

5  Dike.  Circle it on the paper.  You can circle that on

6  the paper, put an arrow to it that reads seep, s-e-e-p

7  out to the side.

8         Next, if you would mark waypoint number 22

9  with a circle with a line draw out from it and then the

10 words "slough, road washout."

11        Then if you would mark waypoint number 23

12 putting a circle around it and then draw a line to it or

13 between that and the words "soft spot."

14        By the way, on waypoints 20, 22 and 23 if you

15 can put those numbers there so that it is just legible

16 with your pen in the circle area you have made so we are

17 doubly sure what we are looking at.  If you can go back

18 to the waypoint 20 and just put "20."

19     A.   What I have done is drawn an arrow to the

20 circle shown in red and listed the description at the

21 end of my arrow.  If I try to write within the circle, I

22 am afraid you won't be able to read my writing.

23     Q.   May I approach just long enough to be sure?

24         THE COURT:  Why don't you see what he has

25 done so far.  Let Ms. Norwood hand you the document.

99

 1              MR. BYRNE:  We'll end up marking them all,

 2   but I just need to check here.

 3              Very good.  I wanted to make sure I was

 4   following what he was doing.

 5   BY MR. BYRNE:

 6      Q.   Okay, Mr. Dotson, I think that is moving along

 7   real well.  Let's plot, if we can, waypoint number 24.

 8   If you can circle that, put 24 and the descriptor is

 9   "hole in bottom dike."

10              Then if you would mark waypoint number 25 and

11   this is a little lengthier description, but what you

12   have written for that is "slough in ditch between

13   emergency dredge cell and ash pond (2 to 8 feet wide by

14   20 foot long by 2 to 8 feet deep)."

15      A.   Actually 2 to 8 inches deep.

16      Q.   I just see one apostrophe there.

17      A.   If you look at Exhibit 189, the description

18   contained on the sheet in bates stamp 69918, it

19   indicates 2 to 8 inches deep.

20      Q.   What are you referring to?

21      A.   Plaintiff's Trial Exhibit 0189.

22      Q.   2 to 8 feet wide by 20 feet long by 2 to 8

23   inches deep?

24      A.   Yes.

25      Q.   Okay.  So you are in agreement with me on

                              100

1  that.  That is what you wrote.  2 to 8 feet wide by 20

2  feet long by 2 to 8 inches deep, correct?

3      A.  Correct.

4      Q.  If you can just add that parenthetical to your

5  notes.

6          Once you have that, let's plot waypoint 26 or

7  circle that.  Mark it with a 26 and then the descriptor

8  in 189 which you wrote was "slough."

9          THE COURT:  Are you going to ask him to

10  confirm what he has written or ask him questions?

11          MR. BYRNE:  I was going to ask a few

12  questions, but I was going to present it on the Elmo.

13          THE COURT:  Why don't we do that and then

14  we'll see if you need it back.

15      A.  Okay.

16      Q.  Mr. Dotson, waypoints 22, 23, 24, and 26, all

17  of those waypoints are from the North Dike, correct?

18      A.  Would it be possible for you to shift the

19  exhibit over to screen left.

20      Q.  There?

21      A.  Yes, thank you.  It appears all of those are

22  located on the northern dike of the dredge cell.

23      Q.  To the left of 22 there is another circled

24  waypoint with an arrow running to it, but it is

25  unlabeled.  Do you happen to know what waypoint that

1  represents, as shown on 189?

2      A.   Would it be possible for me to mark on my

3  exhibit?  The reason I am asking is I mentioned

4  previously the row numbers that are shown on the sheet

5  of the exhibit I am looking at.  In addition to I

6  excluded one of the waypoints I would like to transcribe

7  over so I am sure I am looking at the right waypoint.

8      Q.   Are you saying you want Exhibit 192 back so

9  you can fill in the other waypoints?

10      A.   Would it be possible to mark on Plaintiff's

11  Trial Exhibit 189 bate stamp 691998 because there are a

12  couple of things compounding me from quickly being able

13  to determine which row number corresponds on the

14  appropriate waypoint number because there was a shift in

15  one, and I excluded waypoint 27 because it was a

16  duplicate of 28.

17          THE COURT:  Why don't we do this.  Let's

18  take our lunch break and then, Mr. Byrne, why don't you

19  along with Mr. Marquand spend a few minutes with the

20  witness and perhaps you all can -- Mr. Marquand, why

21  don't you assist.  Let's see if you can get the witness

22  to label the way you want it labeled and if he wants an

23  extra copy, he can do that the same time over the lunch

24  break.  Then we'll come back and get into the

25  questioning.  We'll recess until 1:30.

1          The Court has some criminal matters to

2    take up.  I will use another courtroom next door again.

3    If I am a little bit late, that's why.  We'll plan to

4    start at 1:30.  Thank you.

5                    (Off the record.)

6                    (Back on the record.

7    BY MR. BYRNE:

8         Q.   Mr. Dotson, just before the lunch break we

9    were discussing the schematic on Plaintiff's Exhibit

10   192A.  Do you have that testimony in mind?

11        A.   Yes, I have 192 and 189 Alpha.  I don't have a

12   192 Alpha.

13        Q.   All right.  We have 192A up on the Elmo here.

14   I believe we have marked nearly all of the pertinent

15   waypoints from trial Exhibit 189.  Would you agree with

16   that?

17        A.   It appears there are a few that are left

18   unmarked.  Would it be possible to shift it to screen

19   left.

20        Q.   Yes, I apologize.  This arrow right here leads

21   to what waypoint?

22        A.   That is waypoint number 28.

23        Q.   Okay.  I will give you back the original so

24   you can make that marking for 28.

25        A.   Would you like me to make any additional

                              103

1  notations?

2      Q.   Yes, you can.  That is 192A?

3      A.   Would you like me to write the entire

4  description or just waypoint 28?

5      Q.   You said that was 28?

6      A.   Yes, 28.

7      Q.   I think that would be helpful if you can write

8  "Dredge Cell Phase 1 and 2 interface by emergency dredge

9  cell."

10      A.   That is actually the interface by Swan Pond

11  Road.  Waypoint --

12      Q.   So this where I am pointing right here, that

13  arrow points to waypoint 27 or did I get my numbering

14  wrong?

15      A.   I think your numbering is wrong.  If you look

16  at 189 Alpha.

17      Q.   189A?

18      A.   Yes, the sheet ending in bates stamp 918.

19  That is the exhibit I marked on prior to lunch.

20  Waypoint 28 is the Dredge Cell Phase 1 and 2 interface

21  by Swan Pond Road.

22      Q.   I see.  Then if you would mark this waypoint

23  for us.  I think that may be the last one that is

24  unmarked.

25      A.   There are actually two that are remaining to

104

1    be marked.

2         Q.   All right.  If you can identify both of those

3    for us, that would be great.  What is the first numbered

4    one?  Which is this?

5         A.   That's waypoint number 21.

6         Q.   Where I am pointing here?

7         A.   That is correct.

8         Q.   That's 21?  Okay.  I think the label for that

9    from your waypoint notes would be "KGL-21."

10        A.   That is correct.

11        Q.   Once you have waypoint 21 plotted, I think you

12   said there was one more unmarked waypoint from the

13   October 2008 inspection.  If you can just orient my

14   finger to where it is in relation to where I am pointing

15   now.

16             THE COURT:  Down and to the right.

17        Q.   Here?

18        A.   If you will go up and to the left.  There.

19        Q.   There we go.  What number waypoint is that?

20        A.   That is waypoint number 29.

21        Q.   Okay.  "Dredge cell Phase 1 and 2 interface by

22   emergency dredge cell"?

23        A.   Correct.

24             MR. BYRNE:  Madam clerk, if I can get that

25   back from the witness, I will put it up here and we can

                              105

1   display the final marked --

2                    Here we have what appears to be your

3   marked copy of Exhibit 192A.  Does this fairly and

4   accurately depict all of the waypoints and waypoint

5   descriptions that are identified in Plaintiff's Exhibit

6   189 and 189A?

7        A.   Yes, it does.  Well, it does for the waypoints

8   that were taken for the Kingston Fossil Plant.  It

9   doesn't depict the waypoints for Widow's Creek or John

10  Sevier.

11       Q.   Correct.  That would be the waypoints above

12  waypoint 20, right?

13       A.   Yes.  The waypoint number 31.

14       Q.   Okay.  This area that I am pointing to here,

15  just help me get oriented.  This is the North Dike,

16  correct?

17       A.   That's correct.

18       Q.   West Dike?

19       A.   That's correct.

20       Q.   Cell 2 -- excuse me, Cell 3?

21       A.   No, that is actually, if you look in the

22  center of the cell that you were just pointing out near

23  the interface with Cell 1 is marked Dredge Cell 3 it

24  appears.  That is an old marking.  This schematic that

25  we're looking at actually shows two cells.  Formerly

106

1   before we reached this elevation Dredge Cell 1 was on

2   the south, Dredge Cell 3 was in the center and Dredge

3   Cell 2 was to the north.  For some reason the markings

4   Dredge Cell 3 still carries over on this figure.

5   Actually the cell to the north is Dredge Cell 2.

6         Q.   Okay.  This is Dredge Cell 2 this area right

7   in here?

8         A.   Correct.

9         Q.   3, 1?

10        A.   Well, with the dike configuration that is

11  currently shown and the elevation that this currently

12  represents, there is a single Dredge Cell 2 to the north

13  and a single Dredge Cell 1 to the south.

14        Q.   There used to be a divider dike between 2 and

15  3, is that right?

16        A.   That is correct.

17        Q.   And then just over time with more and more ash

18  stacking it was covered up and it is no longer there, I

19  guess?

20        A.   That's correct.

21        Q.   It is there, but not at the full elevation of

22  the stack?

23        A.   That's correct.

24        Q.   Take a look, if you would, at what has been

25  previously identified as Defendant's Exhibit number 34.

107

1  Do you have that in front of you, sir?

2      A.  Yes, I do.

3      Q.  Defendant's Exhibit Number 34 appears to be a

4  full set of the photographs that were taken during the

5  October 20, 2008 inspection.  Does that appear to be

6  what this compilation exhibit is?

7      A.  It does appear to be.  I couldn't verify that

8  all of the photos are in here without taking an

9  inventory of every sheet.  I does appear to contain all

10 of the pictures that we took.

11     Q.  Just in flipping through it would you agree

12 with me that some of these pictures are pictures that

13 you took and some were taken by Mr. Albright and Buttram

14 with a second camera?

15     A.  Yes, that is true.  The pictures that have a

16 time stamp in the lower right-hand corner were taken by

17 me.  The photos that do not have a time stamp were

18 either taken by John Albright or Chris Buttram.

19     Q.  All the photographs fairly and accurately

20 depict the condition of the dike as it appeared or at

21 least those portions of the dike shown in the photos as

22 they appeared during the inspection dated October 20,

23 2008, correct?

24     A.  Yes, they are an accurate representation of

25 areas contained in each photograph.

108

1          MR. BYRNE:  Your Honor, at this time we

2    offer Defendant's Exhibit Number 34 in its entirety.

3          MR. MARQUAND:  No objection, Your Honor.

4          THE COURT:  So admitted.

5    BY MR. BYRNE:

6    Q.    Turning back to the Elmo for just a moment, in

7    particular waypoint number 22, the slough road washout,

8    during the course of the October 20, 2008, inspection

9    did you take a photograph or a series of photographs of

10   that waypoint 22 area?

11   A.    I took multiple photographs of this area both

12   looking up and down slope and must likely laterally to

13   either side.

14   Q.    Okay.  Turn if you would, now, in Defendant's

15   Exhibit Number 34 to bates page 277812.  That is

16   TVK-000277812.  Now, is the photograph that is bate

17   stamped TVK-277812, is that a photograph of the area

18   marked as waypoint 22 on Exhibit 198A?

19   A.    Yes, it is.

20   Q.    And which side of the North Dike slope is this

21   that 812 is taken from?

22   A.    Which side of the dike slope?

23   Q.    Yes, sir, where are you standing?  Are you

24   looking upstream?

25   A.    I am looking upstream or upslope.

1      Q.   If we can go to the next slide after that,

2 813.  Pardon me, before we get past that let me go back

3 to 811, 277811, back two pages.  Is that photograph also

4 taken in the general area around waypoint 22?

5      A.   Yes, it is.

6      Q.   All right.  Let's jump over to photograph

7 277839, bates page 277839.  Is that a photograph, sir,

8 of the area in and around waypoint 29 or 25 or do you

9 know?

10      A.   I do know.

11      Q.   Which one is that?

12      A.   That is in the area of the waypoint number 25.

13      Q.   Okay.  Then the next page, 840?

14      A.   That is another shot of the same area.

15      Q.   Okay.  At waypoint 25?

16      A.   Correct.

17      Q.   Do you have any recollection of taking a photo

18 of the area marked as waypoint 24 in Exhibit 192A?

19      A.   Would it be possible for you to show the

20 figure?

21      Q.   Yes, I am sorry.  Waypoint 24 is marked as

22 this area and is described as "hole in bottom dike."  Do

23 you have any photographs within Defendant's Exhibit

24 Number 34 that depict that area or that feature?

25      A.   There should be.  I recall taking a photo of

110

1  that area.

2       Q.   Take a minute to just go through the

3  photographs.  Let me know if you come across it.

4       A.   If you will refer to bate stamp 277817, the

5  photograph that is contained at the top the page is one

6  that I took of that area.

7       Q.   Let's pull up the top photo at bates 277817,

8  is that the image that involves waypoint 24?

9       A.   Yes, I believe it is.

10      Q.   Okay.  What are you looking down into?  Is

11 that -- did you take any measurements of the depth of

12 that hole?

13      A.   No, we didn't take any measurements because it

14 wasn't anything of extreme significance.  The one reason

15 that I did take a measurement on the previous waypoint

16 that we discussed was because it was of more substance

17 and for estimating purposes I wanted to have a better

18 understanding how much material it would take to make

19 repair.  For something the size of the photo shown on

20 the screen currently, that wasn't really of much

21 significance so we didn't take any measurements.

22      Q.   If we can go back to the Elmo, the area marked

23 as waypoint 26.  Are there any photographs within

24 Defense Exhibit 34 that depict the area in and around

25 waypoint 26?

1     A.   Yes, there are.

2     Q.   Can you identify those for us.

3     A.   If you'll turn to the page that has the bate

4 stamp ending in 863. That is the first of five or six

5 photographs that are depicting that area.

6     Q.   Okay. All right. I want to switch back to

7 your regular screen and we'll go to TVK-277863. If I

8 understood you correctly, the next page, 277864, depicts

9 the waypoint 26 slough area as well?

10     A.   Yes.

11     Q.   And what about 277865?

12     A.   That's correct.

13     Q.   And then bates range 277860, that photograph?

14     A.   Excuse me did you say 867?

15     Q.   No, 860, I am sorry. What area is depicted in

16 277860?

17     A.   We didn't actually shoot a waypoint on that

18 photograph.

19     Q.   Okay. Where is it located though in terms of

20 -- I tell you what we'll do. We have 277860 up. We'll

21 switch back to the Elmo. Can you guide my pen to where

22 that was taken, approximately?

23     A.   Go about and inch to the right and about an

24 inch upward. It is in that general vicinity.

25     Q.   This general area?

1      A.   Yes.

2      Q.   Is that on that, this dike -- well, the top of

3 the dike between this dredge cell and Dredge Cell 3?

4      A.   It appears that this is on one of the lower

5 dikes in that general vicinity.

6      Q.   Okay.  Are there any photos depicting the area

7 marked as waypoint 23, "soft spot" that you know of?

8      A.   Yes, there are.

9      Q.   Where are those?  If you can find those for us

10 in Defendant's Exhibit 34, it would be a huge help.

11      A.   If you turn to the page that has the bate

12 stamp ending in 816.  I believe the photograph on the

13 bottom is of that area.

14      Q.   The bottom photo of 816?

15      A.   Yes, that's correct.

16      Q.   What does the top photo depict?

17      A.   That is the same general area.  That one is

18 not of very good resolution.  I had taken a shot of John

19 and Chris looking at the area prior to walking up to it

20 and getting a closeup.

21             MR. BYRNE:  Your Honor, can I have just a

22 moment to confer with co-counsel?

23      Q.   Okay, I think we are through with 192A for

24 now.

25             THE COURT:  Have we moved that into

113

1    evidence?

2            MR. BYRNE:  The defendant we would offer

3    192A and 189A at this time.

4            THE COURT:  So admitted, 192A and 189A at

5    this time, so admitted.

6            (Exhibit Nos. 189A, 192A were

7                received in evidence.)

8    BY MR. BYRNE:

9        Q.  Going back to the top of 189A or the first

10   page you forwarded your waypoint information to

11   Mr. Albright and Mr. Buttram and then they made whatever

12   use they made of it for purposes of preparing their

13   report, is that correct?

14       A.  That is correct.

15       Q.  Let's go to Plaintiff's Trial Exhibit 196.

16       A.  I am ready.

17       Q.  On the first page of 196 it appears to be an

18   e-mail from Bill Walton to Chris Buttram, to you, to

19   John Albright and to Mark Hastings and it appears that

20   Barry Snider and a person named Castro and a person

21   named Bill Butler were copied on this as well.  Do you

22   see that?

23       A.  I do.

24       Q.  The subject line of Mr. Walton's e-mail is

25   October 2008 inspection.

114

1     A.   Yes.

2     Q.   Who is Bill Walton?

3     A.   Bill Walton at this point in time worked for

4 AECOM.  He currently works for GEI Consultants.  Bill is

5 the person who is the lead geotechnical engineer

6 responsibile for the root cause analysis for the release

7 that took place in 2008.

8     Q.   You understand that he is a designated expert

9 for TVA in this case?

10     A.   That's true.

11     Q.   Who is Mark Hastings?

12     A.   I don't recall who Mark Hastings is.

13     Q.   Is he a TVA employee?

14     A.   I don't recall.  I recognize the name, but I

15 don't recall who he is.

16     Q.   I do too.  Is he an attorney for TVA?

17     A.   I am not certain.

18     Q.   Who is Bill Butler?

19     A.   Bill Butler is also currently with GEI,

20 formerly with AECOM.  He was one of the geotechnical

21 engineers that assisted Bill Walton with the root cause

22 analysis.

23     Q.   When did Bill Walton and AECOM produce their

24 first Root Cause Analysis Report, do you know?

25     A.   I don't recall a date.  It would have been

115

1    sometime I imagine a review of a draft took place in

2    sometime in 2009, mid to late year.

3         Q.   Okay.   Sometime around this June 20, 2009,

4    timeframe when this e-mail came out?

5         A.   I would imagine it was quite a bit later than

6    that.

7         Q.   Maybe August or September?

8         A.   That's reasonable to assume.

9              MR. BYRNE:   I think this has been

10   admitted.   To the extent it hasn't been, we'll admit it

11   at this time.

12             THE COURT:   196 is in.

13   BY MR. BYRNE:

14        Q.   Mr. Walton asked the question, he starts with

15   "Hi guys I need your help, TDEC stability committee

16   reviewers claim that there was observable subsidence on

17   dike slopes on elevated dredge cell area, as reported in

18   the October 20, 2008, inspection at Kingston.   We know

19   there were erosion gullies on the north slope of Cell 2

20   below Dike A and erosion on east dike slopes of the

21   Phase 1 dredge cell.   Furthermore, there was nominal toe

22   seepage at toe of Swan Pond Road, and seepage sitting on

23   benches of east facing dikes of the Phase 1 cell."

24             Then he asked the question here, it says,

25   "Again, we did not see from your photos and inspection

116

1 report that there was visible or spoken evidence of

2 slides, sluffs or subsidence. Please confirm this ASAP.

3 Thank you, Bill." Did I read that correctly?

4     A. It appeared that you did, yes.

5     Q. Turn, if you would, to the second page of

6 Exhibit 196, which appears to be a June 22, 2009, e-mail

7 from you to Mr. Buttram and Mr. Albright with a copy to

8 Barry Snider reading, "Did anyone respond to Bill's

9 e-mail?" Do you see that?

10     A. Yes, I do.

11     Q. You wanted to be sure, did you not, that

12 someone answered Mr. Walton's question about whether

13 there was evidence of slides, sloughs or subsidence

14 during the October 20, 2008 inspection, right?

15     A. Yes. I wanted to make sure that someone

16 addressed Bill's question.

17     Q. We turn to the next page and we see a reply

18 from Chris Buttram approximately 90 minutes later after

19 your e-mail that we just looked at and he says, "I just

20 spoke with Bill on the phone and we have discussed his

21 e-mail." Did I read that correctly?

22     A. Yes, you did.

23     Q. All right. Let's turn the page. We see Chris

24 Buttram e-mailing Bill Walton also on June 22nd and he

25 says, "Bill, per our conversation this morning, I can

1  confirm your statements below.  Also, please see the

2  attached e-mail detailing our response to TDEC's

3  question and the picture TDEC was referring to.  If you

4  have any more questions, please let me know."  Did I

5  read that correctly?

6       A.   Yes, you did.

7       Q.   Now, had you responded -- well, strike that.

8  Mr. Buttram's response to Mr. Walton didn't mention the

9  sloughs that you observed and that you noted in your

10 waypoints during the inspection, did it?

11      A.   If you will notice on the page that has the

12 bate stamp 13939 I believe it is, in the body of Bill's

13 original e-mail he spells sloughs, s-l-u-f-f.  I spelled

14 it s-l-o-u-g-h.  At the time of performing the

15 inspection I had marked areas that had eroded and that

16 the sides of the erosion ditch, if you will, had

17 sloughed inward.  I had called that an area that was

18 sloughing.

19           After the failure had occurred and we became

20 exposed to other people who used similar terminologies

21 meaning different things, I realized that what I was

22 calling a slough on my waypoints wasn't something that

23 was more widely accepted in the geotechnical world as a

24 slough.  Based on my current understanding of what a

25 slough is, the photos that we just went through and the

118

1  waypoints that I took during the October, 2008

2  inspections did not reflect any areas that were truly

3  sloughing.  They were of areas that had erosion issues.

4  After the erosion started and continued to progress the

5  sides of the bank or the sides of the ditch, if you

6  will, would tend to fall in.

7       Q.  None of the North Dike fell in on December 22,

8  2008, right?

9       A.  Yes.  At some point on December 22nd there was

10 a failure.

11      Q.  Am I to understand are you telling this Court

12 that you, a very precise man when it comes to

13 terminology, very precise that when you refer all on the

14 North Dike to "slough," "slough," here is some more

15 sloughing ditch over here, all those references to

16 slough in your waypoints that was just wrong, you got

17 that wrong at the time?

18      A.  At the point which I took these I was calling

19 something a slough that I later learned was not a

20 slough.  You are correct.

21      Q.  That begs the question.  I mean, were you just

22 not trained in how to identify sloughs prior to December

23 22, 2008?

24      A.  No, not at all.  Had I seen an area of

25 subsidence or an area where there was some sort of

119

1  surficial or veneer failure I would have referred to

2  that as a slough as well.  I have since learned that is

3  what is more widely accepted as a slough, not an area of

4  erosion.

5       Q.  You don't I think it important for the TVA to

6  have annual dike stability inspectors who know the

7  difference between a slough and something that is not a

8  slough?

9       A.  I think that regardless of what I saw or had I

10 seen in the areas of subsidence, they would have been

11 handled accordingly.  The area that we showed on I

12 believe it was waypoint number 22 was repaired at some

13 point after the inspection.

14      Q.  How do you know that?

15      A.  After the inspection I met with the person

16 that was my field supervisor who was managing the

17 facility and gave him a rundown of what we had seen and

18 areas I wanted him to repair.  That was one of the

19 areas.

20      Q.  Who is this man you are talking about?

21      A.  His name is James Settles.

22      Q.  You are saying that Mr. Settles took care of

23 all these sloughs?

24      A.  Not all of them.  I understand that he did

25 repair some, including waypoint 22, to the best of my

120

1    knowledge.  Had I seen an area that was truly what I

2    understand now to be a slough, it would have been

3    handled accordingly.

4         Q.   You went out to inspect his work after the

5    fact?

6         A.   No, I did not go out to inspect his work after

7    the fact.

8         Q.   How do you know he did it?

9         A.   As I was saying, I did not go out to inspect

10   his work after the fact.  I did visit the site more

11   after the inspection and after the inspection I do

12   recall him telling me that he had repaired some of the

13   areas of erosion we had previously identified.

14        Q.   Wouldn't Mr. Settles usually note that kind of

15   repair in this daily safety inspection reports, his

16   daily handling reports?

17        A.   I don't know if he would or not.  I wouldn't

18   find it unusual if he did make note of that.

19        Q.   You think it would be unusual if he did make

20   note of that?

21        A.   I think you misunderstood.  I don't think it

22   would be unusual.  Whether he would usually mark

23   something of that significance I don't know.

24        Q.   These type of repairs would take some time,

25   wouldn't they?  That wouldn't just be a half hour, 45

1  minute job would it?

2      A.  The repair that we are referring to for the

3  washout?

4      Q.  For all of them, all these sloughs, soft

5  spots, all that stuff?

6      A.  As I am saying, individually these wouldn't

7  take a significant amount of time.  I can't recall if

8  James repaired all them or not.  I do recall him telling

9  me at some point after the inspection prior to the

10  release that he had made some repairs to some of the

11  areas of erosion that had been pointed out during the

12  inspection.

13      Q.  At some point you tried to sit down and

14  summarize Mr. Settle's daily inspection and handling

15  reports, didn't you?

16      A.  Yes, I did.

17      Q.  You know and you can tell the Court there is

18  no mention of any repairs being made to any of these

19  areas on these daily inspection reports, are there?

20      A.  I don't recall seeing any.  When I looked at

21  his daily reports, that's not what really I was looking

22  for and attempting to summarize.  I was attempting to

23  summarize his accounts of what he had seen on the West

24  Dike where we had the prior failures in 2003 and '06.

25      Q.  Okay.  When exactly did you learn what a

122

1  slough really was?  If you didn't know what a slough was

2  in October 20, 2008, when did you gain a correct

3  knowledge of what that term meant in the geotechnical

4  field?

5      A.  It wasn't that I didn't know what it meant.  I

6  was using it for cases that weren't applicable or areas

7  that weren't truly sloughs.

8      Q.  You were being too causal about their use in

9  your official TVA documents and reports, weren't you?

10      A.  I was using it more generically than it should

11  be used.

12      Q.  I hate to keep coming back.  You are such a

13  precise man.  I am struggling with how such a precise

14  man, so precise with his wording all the time, would put

15  slough down unless he either meant what he said, he saw

16  slough or he wasn't trained well enough to know the

17  difference.

18      A.  It's not a matter of lack of training at the

19  time of the inspection.  It's the fact that I continue

20  to receive training at this date.  At some point after

21  that inspection I became aware that what I referred to

22  as a slough in the waypoint descriptions in the photos I

23  had taken of those areas indeed were not sloughs.

24      Q.  How did you learn that?  Who told you that?

25      A.  I don't recall if it was someone with AECOM,

1   Stantec, Geosyntec.  I don't recall.

2        Q.   Well, it couldn't have been Mr. Walton because

3   here Mr. Walton is six months after the fact, six months

4   to the day, asking you, not telling you, asking you did

5   you see any evidence of slides, sloughs are subsidence?

6        A.   Then he goes on to say, didn't see any in any

7   of your photographs.

8        Q.   Well, that's not exactly how he puts it.

9   "Again we did not see from your photos and inspection

10  report that there was visible or spoken evidence of

11  slides, sluffs or subsidence."  You see that?

12       A.   Yes, I do.

13       Q.   Okay.  There is no reference to sloughs in

14  Mr. Buttram's report, is there?

15       A.   That is because indeed we did not see any

16  sloughs.

17       Q.   Right.  You did and you wrote them down,

18  didn't you?

19       A.   Again you are twisting my words.

20       Q.   I am not twisting your words.  I am quoting

21  your words, sir.  Let's go back to the Elmo again.

22  These are your words here.  You have got slough

23  references all around here.  You know that is a very

24  specific term for people who inspect dikes and dams.

25  Now you are telling us that sometime after this

124

1    inspection or sometime after the December 22, 2008, ash

2    release incident you came to understand, learn,

3    appreciate or something that what you thought was a

4    slough really wasn't a slough at all.

5        A.   That's correct.  I came to understand that I

6    was using the term slough in a more generic term than

7    what it is intended to be used.

8        Q.   You don't know exactly how you came to that

9    understanding after the 12-22 ash release?

10        A.   At some point the people in my organization

11   were provided some dam safety training from Stantec.  In

12   that training I do recall they went through different

13   types of failure mode analysis and showed pictures of

14   progressive failures, things of that nature.  It's

15   possible that it came out in that training.

16        Q.   And that training was in response to the

17   December 22, 2008, ash release incident, correct?

18        A.   Yes, it was.

19        Q.   You think in that post 12-22 safety inspection

20   training class that they would have told you after all

21   you all had been through with the December 22, 2008,

22   incident to be less watchful or a little more causal

23   about your slough references or to be less strict with

24   your slough references?

25        A.   You have lost me with your --

125

1      Q.   You are not saying that somebody at Stantec

2   trained you after this 12-22 ash release that sloughs

3   like the ones depicted here aren't really sloughs, that

4   you shouldn't note them as sloughs, you just let them go

5   without a passing reference?

6      A.   I didn't say that.  Slough is not a definitive

7   term.  It's not exact.  Different people use it

8   different ways.  After the fact I found out that I was

9   using it in terms that is not generally accepted as

10  being used.

11     Q.   Going back to Plaintiff's Exhibit 196, can you

12  tell me this.  Can you tell the Court this.  Why didn't

13  you just respond to Mr. Walton and say, Mr. Walton, I

14  have to be honest with you, I did see some sloughs.  I

15  wrote it down in my notes, but please take a look see

16  and let's talk about it and you tell me if you really

17  think they are sloughs.  Why didn't you do that?

18     A.   Because by the time Bill had sent this

19  question I had come to understand that those were not

20  sloughs.

21     Q.   Okay.  Why didn't you chime in and say, Bill,

22  we didn't see any sloughs.  My notes say different, but

23  we didn't see any sloughs?

24     A.   If you notice the original date that Bill sent

25  his inquiry and the date I replied to the other members

126

1  of my TVA team, I didn't feel a need to respond, if one

2  of these guys had already done so.  I was asking them,

3  you know, in the past two days have you taken the time

4  or had the opportunity to respond to Bill's question.

5      Q.  Do you know what the difference between those

6  other two guys and you are?

7      A.  No, I do not.

8      Q.  They didn't write up any waypoint notes that

9  said sloughs on it.  You did.  That is why you had them

10  respond rather than you because you did not want to pass

11  along what you knew to be a lie to a state or

12  governmental agency, correct?

13      A.  I disagree.  They saw everything that I saw on

14  the date of that inspection.  They were privy to every

15  waypoint I took.  They saw every area I took photographs

16  of.  We discussed each thing.  We took the time for all

17  three of us to look at everything that anyone of us

18  found of any significance.  It wasn't that I felt like I

19  had to lie to anyone, nor do I feel like I need to lie

20  to you today.

21      Q.  What steps, did you take, if any, to correct

22  your entries on Exhibit 189A or did you take any steps

23  to correct that?

24      A.  I did not take any steps to resubmit or change

25  the descriptions I had provided to John and Chris.

127

1    Q.  Okay.  This conversation you say you had with

2  Mr. Settles, when did that take place, this conversation

3  about repairing things depicted on 192A?

4    A.  I don't recall when that conversation took

5  place.  I typically visited the site once every week to

6  two weeks.  I talked to James sometimes daily on the

7  phone.  If James had questions, he would call me.  If I

8  had questions, I would call James.

9    Q.  Okay.  You think that conversation took place

10  sometime between October 20, 2008, and December 22,

11  2008?

12    A.  I do think so.  James is a very proud man and

13  did a very good job maintaining the facility for me.

14  Anytime he had done something that we recommended be

15  repaired, he wanted us to be aware of that.

16    Q.  Well, whatever pride he had taken in keeping

17  the place in good repair it didn't stop you from noting

18  what you noted on the October 20th, 2008, inspection as

19  depicted here.  You thought some repairs needed to be

20  made, didn't you?

21    A.  Yes.  Some repairs were made.

22    Q.  But you thought those repairs needed to be

23  made immediately, did you not?

24    A.  I never used the word immediately.

25    Q.  You did not?

128

1    A.   No, I did not.

2    Q.   Would it surprise you to know Mr. Buttram and

3  Mr. Albright at least initially used the phrase or the

4  term "immediately" in terms of how soon these repairs

5  needed to be made?

6    A.   No, and when using that word I think they have

7  since learned that saying immediately and meaning

8  immediately are two different things.  There are some

9  repairs that need to be made at the next possible

10  convenience or some that can wait until better weather.

11  For example, the areas of erosion that I have previously

12  labeled as sloughs in my waypoints would be an area that

13  I would recommend that someone repair when weather

14  allows.  Because of the type of repair that would have

15  to be undertaken to address the issue, you obviously

16  would not want to do something like that when you are

17  expecting rain or had a lot of precipitation because you

18  disturb vegetation and it makes it more difficult to get

19  things reestablished.

20    Q.   In the two month period following your October

21  20, 2008, inspection were the two rainiest months

22  historically of the year, correct?

23    A.   I take your word for that.

24    Q.   November and December are cold rainy months,

25  right?

129

1    A.   As are January and February.

2    Q.   I understand that.  The dike had already

3 failed by January of '09.  That is why I am focusing on

4 January and December.

5    A.   You didn't ask that though.

6    Q.   You are right.  November and December, would

7 those typically be months where you would not make

8 extensive slough erosion subsidence type repairs?

9    A.   It would depend on the individual repair, the

10 weather that had been experienced prior to the possible

11 repair date and the forecasted weather after the fact.

12    Q.   Isn't it true, Mr. Dotson, that Mr. Settles

13 didn't make any note of making any repairs in this daily

14 inspection handling reports because he was going to wait

15 to make them until the weather got nicer?

16    A.   I don't recall seeing any note in his daily

17 inspection reports.  I can't say for any certainty it is

18 not listed, but I do recall James telling me that he had

19 indeed repaired some of the erosion issues that had been

20 pointed out on the inspection that took place in October

21 of 2008.

22    Q.   Uh-huh.  Repairs that you would typically wait

23 until spring to make when it's safer, less wet, less

24 cold?

25    A.   You are once again twisting my words.  What I

130

1    said is you would want to make those repairs when the

2    weather was such that you could make a repair and get

3    something in place prior to bad weather coming back.

4    For example, if you were going to make a repair such as

5    that in the fall of the year when grass seeds typically

6    won't germinate, there are man-made products that you

7    can use to provide erosion protection until the grass

8    would be reestablished.  It is not that --

9         Q.   You wouldn't be able to do that in November or

10   December, right?

11        A.   I have not said that.  I have said it is

12   weather dependent.

13        Q.   Okay.

14             THE COURT:  Are you aware of, either you

15   were involved in it or personal knowledge of repairs

16   that were done in the October, following the October

17   report?

18             THE WITNESS:  I do recall.  James had told

19   me that there was one of the areas of erosion that had

20   been noted that he made repairs on.

21             THE COURT:  That was the 22 waypoint, I

22   believe you said.

23             THE WITNESS:  I believe it was waypoint

24   22.  It could just have been waypoint 26.  It was, as I

25   recall, it was one of the areas of erosion on the

131

1  northern dike.

2            THE COURT:  Okay.

3  BY MR. BYRNE:

4        Q.   Is I understand it, Mr. Dotson, it was one or

5  the other, 22 or 26?

6        A.   As I recall.

7        Q.   But not both?

8        A.   As I recall, he made repairs to one of those

9  areas.

10       Q.   Okay.  Everything else, as you understood, he

11  was going to wait until spring to take care of or until

12  a warmer time of the year?

13       A.   Until he was able to safely make the repair.

14       Q.   Because there is some danger involved in

15  making repairs to areas that have erosion and sloughing,

16  correct, or can be?

17       A.   There is inherent danger with any type of work

18  that uses heavy equipment.  Do I think any of these

19  repairs would have involved any danger outside of the

20  ordinary?  I don't think so.  These areas weren't of

21  much significance.  It would be fairly easy to place a

22  piece of equipment on the bench and excavate, recompact

23  material into these areas given the proper weather,

24  time.

25       Q.   But according to your testimony Mr. Settles

132

1   felt like one out of these two sloughs that you

2   mentioned, 22 and 26, wasn't something he could repair

3   right away because of safety issues?

4       A.   I did not say that.  Once again, you are

5   twisting my testimony.

6       Q.   I strike that, I withdraw that.  We'll stand

7   with your previous answer, if I am recapping it

8   incorrectly.  To the best of your knowledge, the repair

9   that he made out of all these was either to 22 or 26?

10      A.   I don't think I indicated that he didn't make

11  any other repairs.  I recall he said he repaired one of

12  the areas of erosion on the north slope.

13      Q.   Okay.  You marked other areas of problem areas

14  on the north slope besides that.  I am trying to get a

15  handle on how many you think he got knocked out.  Did he

16  send you photographs of any of these repairs?

17      A.   I don't recall if he did or not.

18      Q.   You think he would have told you after the

19  December 22, 2008, ash release if he had some?

20      A.   It is neither unlikely nor likely.  If had he

21  had pictures, he may have provided those.  I don't

22  recall seeing any from James.

23      Q.   I don't either.  I am saying if you had some,

24  those would be important in your mind, wouldn't they?

25      A.   If I had those, they would have been provided

133

1  during discovery.

2      Q.   The fact that they haven't been provided

3  during discovery leads you to believe and allows us to

4  conclude that they don't exist, pictures of the repairs

5  that Mr. Settles may or may not have made?

6      A.   If I don't have them, they most likely don't

7  exist.  I have testified I don't recall receiving them,

8  but I do recall having a conversation with James where

9  he told me he made repairs on one of the areas of

10 erosion on the northern dike.

11     Q.   Okay.  All right.  Were you ever interviewed

12 by McKenna, Long, McKenna, Long folks?

13     A.   Quite honestly, I was interviewed by so many

14 people after the release I don't recall everyone I spoke

15 to.  It's likely that I was interviewed by someone from

16 McKenna, Long.

17     Q.   The date of this conversation you had with

18 Mr. Settles again was what, or do you know?

19     A.   I previously testified that I don't recall the

20 date, but it took place sometime prior to the inspection

21 -- I am sorry, after the inspection, prior to the

22 release.

23     Q.   Okay.  Because you wanted those repairs to be

24 made immediately?

25     A.   Again you are twisting my words.  I previously

134

1 testified I did not use the word immediately. We even

2 went into depth on when I would use immediately and I

3 wouldn't.

4      Q.   You knew Mr. Buttram hadn't gotten his report

5 out?

6      A.   At what point?

7      Q.   December 22, 2008.

8      A.   I was aware of that. That wasn't something

9 that was unheard of.

10      Q.   Right. So if you felt like Mr. Settles needed

11 to make some of these repairs around here prior to

12 Mr. Buttram even getting his report and recommendations

13 out to the company, wouldn't you say those were repairs

14 that needed to be made immediately?

15      A.   No, I would not. What I did was met with

16 James, told him the areas where we had found issues, and

17 said something to the effect of at your convenience when

18 weather allows, when you have some time, you can address

19 these repairs. We debrief each time we finish one of

20 these inspections. That debrief typically takes place

21 with a person from routine handling which was me, then

22 we would either include the plant manager or the PAE

23 from the plant and let them know of any findings. This

24 inspection there were no finding that required immediate

25 attention.

135

1                What I did do was show James areas and give

2    him descriptions, general ideas for repairs and told him

3    at his leisure, convenience, whatever word you would

4    like to use, that they could make those.

5         Q.   The rest you were going to wait until better

6    weather?

7         A.   I saw nothing that required immediate

8    attention.

9         Q.   So why did you talk to Mr. Settles?  Why

10   didn't you just wait for Mr. Buttram's report to come

11   out?

12        A.   Why would I?  I worked daily with Mr. Settles.

13        Q.   You weren't the inspector, sir.  Mr. Buttram,

14   you testified to the fact Mr. Buttram is the one who was

15   inspecting, Mr. Albright and he were going to write the

16   report.  You were there as an observer taking waypoints.

17   You testified to that, correct?

18        A.   I testified I wasn't an active participant and

19   was not responsible for producing the report.

20        Q.   But you were not an official inspector on

21   that, right?

22        A.   If nonofficial means I was not responsible for

23   producing the final report, I agree with that

24   characterization.

25        Q.   Why would you not wait and let Mr. Settles

136

1 read the final report?

2     A.   It's called --

3     Q.   If you didn't feel like the repairs were

4 urgent, why did you bypass Mr. Buttram, bypass

5 Mr. Albright and go straight to Mr. Settles and say fix

6 it.  Don't wait, fix it now?

7     A.   It wasn't that I bypassed anyone, nor did I go

8 up to James and say fix it, fix it now.

9     Q.   Did you tell Mr. Buttram and Mr. Albright you

10 had such a conversation with Mr. Settles?

11     A.   If I can finish.  What I did do was talk to

12 James at some point after the inspection and showed him,

13 told him about some areas that needed to be repaired,

14 repairs that were typical, repairs that were not

15 anything that required an engineering evaluation or

16 recommendation.

17     Q.   Like sloughs?

18     A.   Like erosion issues.

19     Q.   Like sloughs?

20     A.   If you would like to go back into my

21 description and reason about it, we can.

22     Q.   I would like to use your words, sir.  You are

23 very careful to cling to your words.  I am asking about

24 sloughs.  Did you tell Mr. Settles you wanted him to

25 repair sloughs?

137

1    A.   I told him there were areas that had been

2  found that once he had an opportunity could be repaired.

3    Q.   Once he had an opportunity?

4    A.   May I continue my answer?

5    Q.   Mr. Dotson --

6         THE COURT:   Go ahead and finish your

7  answer, then we'll go to the next question.

8         THE WITNESS:   At the time that the

9  inspection took place I was using the term slough to

10 represent something that I now understand it does not.

11 Can I say that I did or did not use the term slough when

12 I talked with James, since that is what I characterized

13 it when giving a waypoint description, I probably told

14 him that there are some areas of sloughing on the

15 northern dike and on the eastern dike.  Probably even

16 went into, James, it's nothing of any real significance,

17 it's something that you have repaired before.  We don't

18 need an engineering recommendation.  If we did, I am a

19 degreed engineer and could provide input.

20         What I would have done is discuss the

21 general repair that should take place, something that

22 was so routine, James had done it before.  And that,

23 James, when you get a moment, when you get some time,

24 you can make these repairs.

25 BY MR. BYRNE:

138

1      Q.   Is that your answer?

2      A.   Yes, it is.

3      Q.   All this talking with Mr. Settles did you tell

4  Mr. Albright and Mr. Buttram at any point that you

5  planned to have that conversation or had that

6  conversation with Mr. Settles prior to December 22,

7  2008?

8      A.   More than likely what would have happened is

9  once we saw each of these individuals --

10     Q.   I have listened to your answer.

11          THE COURT:  Go ahead and ask the question

12  again.

13  BY MR. BYRNE:

14     Q.   My question, again, is simply this.  Did you

15  tell Mr. Buttram or Mr. Albright that you had talked to

16  Mr. Settles about making repairs to areas identified on

17  192A prior to December 22, 2008, yes or no?

18     A.   That is not a yes or no question.

19     Q.   You either told them, sir, or you didn't.

20          THE COURT:  Do you recall if you told them

21  that?

22          THE WITNESS:  Most likely what would have

23  happened --

24          THE COURT:  In fairness to that question,

25  first do you recall if you told them or not?

139

1        THE WITNESS:  I do recall telling them

2  that I would have James address these issues.  The point

3  I was trying to make is it most likely happened when we

4  saw each of the items, not after the fact picking up the

5  phone and calling John or Chris, but when we were

6  actually there looking at it, this is something I would

7  have James address.  I understand you have to include it

8  in your report, but I will ask that James address these

9  items.

10 BY MR. BYRNE:

11      Q.   That is convenient, Mr. Dotson.  You and I

12 both know there ain't word one, there isn't boo about

13 Mr. Settles making any changes or any repairs to any of

14 these areas on 198A in that 2009 annual inspection

15 report, isn't that true?  Not a word about it?

16      A.   That is true.  In my question -- I questioned

17 why we even issued a report because at the point it was

18 issued it was a moot point.  We were issuing a report

19 that showed things that engineering was recommending to

20 be repaired that were no longer even in place.

21      Q.   Mr. Dotson, you told the Court you didn't even

22 know what Mr. Settles got to and what he didn't do.  Now

23 are you telling the Court that you understand

24 Mr. Settles corrected all these issues and all the

25 issues documented in the 2009 annual report?

140

1        A.   That is not what I said.  What I said was once

2   that report was issued, the areas that included waypoint

3   numbers 20, 28, 21, 22, 30, 23, 24 and 26, and

4   potentially even number 29, were no longer in place.

5        Q.   Give me that lineup again.  You are saying

6   what was repaired prior to December 22, 2008?

7        A.   I did not say repaired.  What I said was at

8   the time that this report was issued, the majority of

9   the items that we had noted as waypoints and taking

10  photographs of were no longer in existence.

11       Q.   Right.  They were spread out 25 miles down

12  river, right?

13       A.   I am not sure of the distance down river.  I

14  realize it was not in place.

15            MR. BYRNE:  I think that is all I have at

16  this time.  Thank you, Mr. Dotson.

17            THE COURT:  Thank you.

18                     **CROSS EXAMINATION**

19  BY MR. MARQUAND:

20       Q.   Good afternoon, Mr. Dotson.

21       A.   Good afternoon.

22       Q.   This is going sound a little disjointed, but I

23  want to show you Plaintiff's, this is Plaintiff's

24  Exhibit 192A, is that correct?

25       A.   Yes, it is.

141

1       Q.   Counsel on direct referred to this as a

2  schematic.  Is this a schematic?

3       A.   This is actually a pretty poor quality

4  reproduction of an actual drawing.  It is comprised of

5  survey information that was taken and turned into a

6  topographic map of sorts.

7       Q.   Are these areas along the dike, is that

8  shading?

9       A.   No, that is not shading.  If you actually were

10  able to open the native file and zoom in, you would see

11  these are contour lines that represent varying

12  elevations.

13       Q.   What do you mean native file?

14       A.   This is actually a copy or a printout of an

15  AutoCAD drawing so if one had a license and the AutoCAD

16  software, you could open up the AutoCAD file and zoom in

17  and see the particular things located on this drawing

18  that appear to be shading on this, but are indeed

19  contour lines.

20       Q.   This was produced from a computerized CAD

21  drawing, is that what you are saying?

22       A.   Yes, it was.

23       Q.   How is it that you were able to locate for us

24  today the location of these waypoints so readily?

25       A.   One of the things that we did was take the

142

1 waypoints and plot the X and Y or the northing and

2 easting of each point. Once you do that in AutoCAD, a

3 marker is placed in each of the areas. Having seen the

4 AutoCAD drawing, I am familiar with where each of these

5 actually fell on the drawing itself.

6     Q. For example, in this area where you have WP-30

7 there is a little mark in black and white that looks

8 like a little bullseye that says original discharge

9 structure?

10     A. That is what Chris used, when he made the

11 waypoints. If this were a better quality, you would be

12 able to see the same marker and number and appropriate

13 description for each of the waypoints.

14     Q. So this, the bullseye and the 30, original

15 discharge structure is something that Mr. Buttram put on

16 there, as a result of the plotting the waypoint?

17     A. Yes, what Chris did is took each waypoint and

18 plotted it. The symbol he used was the cross hairs

19 looking symbol and he would have inserted a text box

20 beside each of these that contained a description.

21     Q. As another example, and I am not sure you can

22 see it, but I think I can see it on the Elmo here.

23 There is another bullseye with a text box there?

24     A. Yes, you can make out the bullseye. A large

25 majority of the text is legible. The first portion on

143

1    the top line should read "dredge," but unfortunately you

2    can't read it there.  You can read "Cell Phase 1 and 2

3    interface Pond Road."

4         Q.   All this was on the computerized CAD drawing

5    that Mr. Buttram input the waypoint data to?

6         A.   Yes, it was.

7         Q.   Have you had an opportunity to review that CAD

8    drawing?

9         A.   Yes, I have.

10                   (Exhibit No. D-193A was marked for

11                   identification.)

12        Q.   I have handed you an exhibit marked

13   Defendant's Exhibit 193A.  I am going to ask you if you

14   can go through and identify for us what this first page

15   is?

16        A.   It is a little hard to see on the screen, but

17   if you have the printout of the exhibit --

18        Q.   You have the printout, right?

19        A.   Yes, I can read the printout readily.  For

20   anyone looking at the screen, they may have difficulty.

21                   MR. BYRNE:  Your Honor, if I may interpose

22   an objection.  I am not sure we have a problem with the

23   witness referring to Defendant's Exhibit 193A.  I would

24   like to give TVA's counsel acknowledgment this document

25   was never ever produced in discovery despite repeated

                            144

1    requests for colorized photographs, best quality

2    photographs available of all drawings related to the

3    dike impoundment.

4                    MR. MARQUAND:  Any specific document they

5    asked us for a better quality of, we gave it to them.

6                    MR. BYRNE:  If we knew about it, Your

7    Honor.

8                    MR. MARQUAND:  This is a blowup of

9    Plaintiff's Exhibit 192A.  I know it is hard to read on

10   the Elmo.

11                   THE COURT:  Let's go ahead for the time

12   being.  We'll take this up later, if we need to.  Go

13   ahead.

14   BY MR. MARQUAND:

15        Q.   Can you tell us what the first page of

16   defendant's 192A is, please?

17        A.   This is a screenshot I took from my laptop

18   where I actually had the native file open.  It shows the

19   waypoint number 21 and the description, KGL 21.  It

20   shows waypoints 22, 23, 24, and 30 as well as the

21   descriptions that are associated with those.

22        Q.   And how were those waypoints put on this

23   particular drawing?

24        A.   You go into the software and choose the box or

25   the command to put in a point and then you put in the

                              145

1  coordinates, the northing and easting for the point, hit

2  enter and then AutoCAD generates a rendering of the

3  point on the drawing.

4      Q.  Let me ask you to look at the second page of

5  Defendant's 193A.  What does that particular page show?

6      A.  It is similar to the first page with the

7  exception that it has excluded waypoints 21 and 30, but

8  has included waypoint 26.

9      Q.  It is a different area of the dredge cell,

10  right?

11      A.  Yes, basically what has happened here is the

12  screen has shifted to the southeast.

13      Q.  Okay.  And Page 3.

14      A.  It is the same type of exhibit.  With this one

15  we actually shifted more to the south southwest to

16  include the location of the other waypoints that we

17  took.

18      Q.  And on these first three pages is there

19  anything that would indicate to your mind that your

20  identification of the waypoints on Plaintiff's 192A was

21  inaccurate?

22      A.  No.  It looks like I was able to correctly

23  locate all those, despite the poor quality of the

24  exhibit.

25      Q.  Now, we look at the fourth page of defendant's

146

1    193A.  What is that?

2       A.   It's a similar screenshot, but includes

3    waypoint number 25 that was on the eastern edge of the

4    lateral dredge cell or lateral expansion to the dredge

5    cell and the main ash pond.

6       Q.   Now we come to the point of this exhibit.  The

7    fifth page shows what?

8       A.   The fifth page actually is a screenshot of

9    where I have zoomed in on the drawing.

10      Q.   Zoomed in even further?

11      A.   Yes, zoomed in even closer so you can actually

12   see the contour lines.  You can see the line that is

13   highlighted in blue.  When an engineer or technician

14   would hover their cursor from their mouse over one of

15   these blue dots, it would give the parameters that are

16   associated with that point, be it the northing, the

17   easting and the elevation.

18      Q.   And on that what we are looking at?  What is

19   that at that point there?

20      A.   I can't tell the elevation on this point.

21      Q.   What is it?  For those of you looking at the

22   Elmo we can't really read what is there.  What does the

23   exhibit say at that point?

24      A.   Waypoint number 23, "soft spot."

25      Q.   Does it show a contour line there?

147

1    A.   I does.  It's a shot of a contour line that

2 has been selected and that contour line is highlighted

3 in blue and it appears that waypoint number 23 is on or

4 very near that contour line.

5    Q.   The next page looks like it's zoomed in even

6 further, is that right?

7    A.   That is correct.  That is the same point where

8 I have just zoomed in a bit closer.

9    Q.   Again, we see -- is this the same thing?

10    A.   Yes, it is.  The only real difference on this

11 one is that we changed the line weight that is

12 associated with that contour line to make it more bold

13 so it would stick out and be noticed easier.

14    Q.   Did you determine the elevation of that

15 contour line?

16    A.   Yes I did.

17    Q.   How did you do that?

18    A.   As I said a moment ago, if I take the cursor

19 that is shown on the screen and hover above one of these

20 blue dots in the lower left-hand portion of the screen

21 that is open, when you are using the software, it gives

22 you the X, Y and Z or the northing, easting and

23 elevation of that point.

24    Q.   What is the elevation of this waypoint 23?

25    A.   Unfortunately this exhibit does not show the

148

1    elevation.  The screenshot has cropped out that portion

2    of the monitor.  From memory I think this was around

3    elevation 773.

4        Q.   Okay.

5                MR. MARQUAND:  Your Honor, we tender

6    Defendant's Exhibit 193A.

7                MR. BYRNE:  Your Honor, I understand the

8    witness' testimony 193A is just a prettier version of

9    the 192A.  That's the only difference.  If the witness

10   is saying there is some difference beyond that, or what

11   he plotted on 192 is inaccurate, we definitely object.

12   This was never produced to us, didn't appear on their

13   trial exhibit list.

14               THE COURT:  What about that Mr. Dotson?

15   Is 193A, what you are talking about with the TVA

16   attorney, does it have the same or identical information

17   that you wrote out on 192A?

18               THE WITNESS:  It does appear to, yes.

19               THE COURT:  Is there anything in addition

20   to that?

21               THE WITNESS:  No, there is not.

22               MR. MARQUAND:  I do believe, Your Honor,

23   it does show he was able to elicit the contour this soft

24   spot appeared at which means he can tell us what

25   elevation it appeared at by looking at this CAD drawing

149

1   that had the GPS coordinates input into it.

2               THE COURT:  I will admit 193A.  I am a

3   little perplexed why this document was not either

4   produced as part of the litigation or identified as a

5   trial exhibit by TVA.  Based on the witness'

6   explanation, I am going to introduce the document.

7               Mr. Byrne, I will give you latitude on

8   redirect and also after you look at the document if you

9   notice any differences.  I would assume you are going to

10  want this witness to remain under subpoena and certainly

11  I will give plaintiffs latitude to recall this witness,

12  if you need to, after further examination is developed.

13              MR. BYRNE:  Thank you, Your Honor.

14              (Exhibit No. D-193A was received

15              in evidence.)

16  BY MR. MARQUAND:

17      Q.   I am going to show you a picture, show you

18  Defendant's Exhibit 163.  That is the cover page.  Then

19  the second page is an aerial photograph taken on

20  December 23, 2008.  We heard some discussion or earlier

21  testimony about the lateral dredge cell expansion.

22              (Exhibit No. D-163 was marked for

23              identification.)

24      Q.   Could I have the witness show us on the

25  photograph where the lateral dredge cell is, Your Honor?

1      THE COURT:  Yes, you want him to walk over

2  there or mark the poster board or --

3      MR. MARQUAND:  I think he can do that with

4  the --

5      THE COURT:  Is that a laser pointer?

6  Okay, that is fine.

7      THE WITNESS:  The lateral expansion is

8  located in this general area with the southern most dike

9  being here, the eastern most dike in this location and

10  the northern most dike that parallels the existing Dike

11  C right there.  The western most dike of the lateral

12  expansion is actually the eastern expansion of dredge

13  Cell 2, formerly 3 and maybe a portion of number 1.

14  This area is still in tact today.

15  BY MR. MARQUAND:

16      Q.   We heard the discussion about the ash pond.

17  Is that separate from the dredge cell?

18      A.   From the lateral expansion to the dredge cell.

19      Q.   Is the ash pond part of the dredge cell?

20      A.   We refer to it as a complex.  The ash pond is

21  actually this area right here where the water is shown.

22  It is adjacent to the dredge cell.

23      Q.   Were any of the dikes around the ash pond

24  itself a casualty of the ash release?

25      A.   No.  None of the dikes associated with the ash

151

1  pond were casualties.  The extent of the casualty dikes,

2  if you will, were in this general area.  The dike that

3  runs from southwest to northeast in this general area is

4  what we refer to as Dike D.  At the point of which Dike

5  D intercepts Dike C, that was the extent of the damage

6  to the dikes.

7       Q.   Did anything happen to the lateral expansion

8  dikes, when the ash release occurred?

9       A.   No, there was no damage incurred to any of the

10  dikes that made up the lateral expansion, nor the ash

11  pond or the stilling ponds.

12       Q.   If you would pull out Plaintiff's Exhibit 248.

13       A.   I have it.

14       Q.   There was a discussion there about the levels

15  of the water in two different areas of the disposal

16  complex.  Is that correct?

17       A.   If you could direct me to a page.

18       Q.   Mr. Perry's e-mail.

19       A.   I don't readily see that.

20       Q.   I may have the wrong exhibit.  I am sorry, I

21  have got the wrong exhibit.  Plaintiff's Exhibit 254.

22       A.   Yes, I see that noted in this exhibit.

23       Q.   What two areas is Mr. Catlett referring to as

24  being nearly the same elevation?

25       A.   What Mr. Catlett is referring to is the

152

1    elevation of the ash that is contained in the lateral

2    expansion in relation to the water surface or the water

3    level within the ash pond.  He is basically -- I look at

4    this as a progress report, whereas he is saying that we

5    have made progress such that the actual ash material

6    that will ultimately be raised up to the point where we

7    install a drainage layer has been built out such that

8    the ash inside the lateral expansion is now at or near

9    the same elevation as the water within the ash pond.

10        Q.   Was he making any sort of declaration about

11   the level of the water in the dredge cells?

12        A.   No, I think everybody familiar with the

13   project understood that since the dikes at this point

14   were loosely placed material that it was neither dense

15   nor compact enough to prevent water infiltration.  I

16   think everyone understood that the water level in the

17   ash pond would have been equal to the phreatic surface

18   within the material or the ash that had been

19   hydraulically placed or sluiced into the expansion area.

20        Q.   And what was the relative level of the dredge

21   cell by comparison to either the ash pond or the lateral

22   expansion?

23        A.   The top of the dredge cell, the upper most

24   pack elevation was at anywhere from 818, 819, 820 feet.

25   If you look at the dikes that bordered the ash pond,

153

1  they were at about 765.  The water level within the ash

2  pond itself was somewhere around 760 or 761.  The

3  elevation of the material within the lateral expansion

4  would have been around 760 to 761, or roughly 60 feet

5  less than the upper most portion of the dike that

6  enclosed the dredge cell.

7      Q.   As they were dredging material for the ash

8  pond into the lateral expansion, did that have any

9  effect on the height of the dredge cell?

10      A.   No, it did not.

11      Q.   Did it have any effect on the water in the

12  dredge cell?

13      A.   No, it did not.

14      Q.   I wanted to clarify Plaintiff's Exhibit 255 is

15  the e-mail from Mr. Monsees to you and Melissa

16  Hedgecoth.  What particular dikes is he talking about

17  there?

18      A.   He is referring to the dikes of the other

19  construction lateral expansion, the horseshoe shaped

20  dikes that encompassed the northern, eastern and

21  southern edges of that planned expansion.

22      Q.   And the photographs which are Plaintiff's

23  Exhibit 1758, is that taken on or near any of the dikes

24  of the dredge cell?

25      A.   Not on the dredge cell, no.  That is photos

154

1  taken on one of the dikes of the lateral expansion which

2  were on the order of 60 feet less in height from the

3  dikes of the actual dredge cell.

4      Q.   At what level of construction were the dikes?

5      A.   These dikes were very early level of

6  construction.  We hadn't gotten to the point where we

7  were attempting to stabilize these to allow equipment to

8  operate on them.  We were still at the phase where we

9  were sluicing material in that is very loosely compacted

10  and just starting the very early stages of even getting

11  a base that the dikes would ultimately be built upon.

12      Q.   What else was going to be done to those dikes?

13      A.   Ultimately what would have happened once we

14  got to the elevation that was required, the Heavy

15  Equipment Division would have brought in bottom ash

16  material and used that as a bridging lift.  Several feet

17  of this material would be pushed out with a low ground

18  pressure bulldozer.  You do it progressively.  I hate to

19  say trial and error.  You push a little bit out at a

20  time until you get a base that starts to become more

21  solid.  You continue to work your way around.  Once the

22  actual dike -- this area that he is shown standing on I

23  think the term dike applies to that pretty loosely

24  because it is very loosely placed material.  It is

25  almost more of a base.  I don't want to use the word

155

1  foundation.  It is almost a base that once it's

2  compacted enough, the dike will be built upon that.

3  After the bottom ash has been placed at a thickness

4  sufficient to be able to bridge over this, a biaxial

5  grid, there is a man-made high density polyethylene

6  material would have been brought in and placed over that

7  and more bottom ash or fly ash mixture placed on top of

8  that.  The purpose of the grid is to help distribute the

9  load that will be applied on top of the dike.

10      Q.  I would like to turn back to your education.

11 What is your education?

12      A.  I have a Bachelor's Degree and a Master of

13 Science in Civil Engineering from Tennessee Tech

14 University.

15      Q.  When did you receive those degrees?

16      A.  I received my Bachelor's Degree in 2001 and my

17 Master's Degree in 2003.

18      Q.  How were you employed following your receipt

19 of your Master's Degree?

20      A.  Actually I worked prior to receiving my

21 degrees while at Tennessee Tech while working on my

22 Bachelor's Degree as an undergraduate research

23 assistant.  While in graduate school I was a research

24 assistant where I taught classes and managed labs and

25 did research.  Upon leaving Tennessee Tech once I

156

1    received my Master's Degree, I was employed by the

2    Tennessee Department of Transportation.  I was with TDOT

3    approximately 13 months.  During that time frame the

4    first 12 months or so I was in a program that they used

5    to train their newly hired civil engineers.  I was

6    exposed to probably nine or ten different divisions or

7    departments within the Department of Transportation.  I

8    could see areas where civil engineers were employed and

9    network with other people I would ultimately be working

10   with.  While there I was exposed to bridge inspections,

11   construction inspection, monitoring, I worked in the

12   permitting office for a short while, materials and

13   tests, I worked in the surveying group, and the

14   right-of-way organization.

15        Q.   You said this was a program to train their

16   engineers?

17        A.   Yes, it was.

18        Q.   So did you receive formal classroom type

19   training, when you were doing bridge inspection?

20        A.   No.  We received no formal technical training,

21   but TDOT did provide training for us more on human

22   performance initiatives.  As far as technical training,

23   we received on-the-job training where we went out with

24   experienced engineers or technicians and spent time with

25   them seeing how they actually perform their work.

157

1      Q.   Is that how you learned how to do bridge

2  inspections?

3      A.   Yes, I did.

4      Q.   You said construction inspection.  What kind

5  of training did you have with that?

6      A.   On-the-job training where we actually go out

7  and actually watch the materials as they are being

8  placed, be it concrete or asphalt.  We watch the

9  technicians perform the tests to make sure they are

10 performing the tests the way they are supposed to be

11 performed.

12     Q.   What did you do after you left TDOT?

13     A.   After I left TDOT, I was employed by TVA.

14     Q.   In what capacity?

15     A.   I initially hired in as an entry level

16 engineer in the Fossil Power Group, Engineering Design

17 Services, a civil site group.  As part of my tenure as

18 an entry level or what TVA refers to as an A level

19 engineer, I went through over 3,000 man hours of

20 technical training within --

21     Q.   Formal classroom type training?

22     A.   Some was, some wasn't.  A lot of the training

23 would involve on-the-job.  Those were primarily for

24 inspections.  We did receive formal training in that I

25 had to do various designs or perform various designs for

158

1    different items.  I had to perform calculations that

2    your average run of the mill civil engineer would

3    perform at any company.  We performed calculations that

4    included hydraulics, hydrology.  We performed watershed

5    analysis.  I designed roads, I designed structural

6    elements, retaining walls.

7              A large portion was actually on-the-job

8    training where we went out with experienced engineers

9    and technicians and were taught how we actually did the

10   work in the field, not the work in your cube where you

11   are running calculations.

12        Q.   How long did you remain in the Fossil Group's

13   Engineering Design organization?

14        A.   I was employed there as an A level engineer

15   just under three years then I was employed as a senior

16   engineer.  I stayed there just under four years.

17        Q.   So up until about 2008?

18        A.   Yes.

19        Q.   Okay.

20        A.   In July of 2008 -- I was hired in September of

21   2004.  I left the Engineer Design Services Group in July

22   of 2008.

23        Q.   And where did you go to then?

24        A.   I transferred to the Coal Combustion

25   Byproducts Organization under Missy Hedgecoth.

159

1    Q.    What was your responsibility there?

2    A.    The primary responsibility was to manage the

3    disposal activities at various fossil plants.

4            If you read the job description, it shows it

5    as in depth as going before the Project Approval Board

6    to get capital or O&M funding for different projects.

7            The primary focus of my job was being at the

8    sites and overseeing the contractor, be it an outside

9    contractor or Heavy Equipment Division, overseeing the

10   work they were performing as it relates to the disposing

11   of the byproduct in the various facilities.

12   Q.    Any particular facilities you were overseeing?

13   A.    Yes.  Initially I oversaw disposal at five

14   facilities.  The first was Bull Run.  Second was

15   Kingston, the next was John Sevier.  The fourth was

16   Widow's Creek Fossil Plant in northeast Alabama and the

17   last was the Gallatin Fossil Plant.

18   Q.    You say part of your job is to oversee

19   contractors?

20   A.    Yes, whether they were outside or inside TVA.

21   Q.    What type of contractors inside TVA would you

22   be overseeing?

23   A.    As far as internal contractors, I would

24   provide oversight for the Heavy Equipment Division, if

25   they were the contractor of choice to perform the

160

1  routine handling that involved the byproducts.

2           MR. DAVIS:  I would like to interpose an

3  objection.  If he is trying to qualify him as an expert

4  witness, he is not listed on TVA's expert witness list.

5  There has been no disclosure whatsoever of Mr. Dotson as

6  and expert on anything.

7           THE COURT:  I assume he is here as a fact

8  witness.

9           MR. MARQUAND:  He is a fact witness.

10           THE COURT:  Go ahead.

11           MR. DAVIS:  They have listed several

12  employees as experts, but they didn't list Mr. Dotson.

13           MR. MARQUAND:  That's true.

14           THE COURT:  Go ahead.

15  BY MR. MARQUAND:

16      Q.   You oversaw internal TVA contractors?

17      A.   Yes.  Very loosely I would provide oversight,

18  for example, the Surveying Group.  I would not

19  necessarily manage their work, but I would provide a

20  code and internal charge code for them.

21      Q.   Basically they were working for you?

22      A.   Yes, they were working for me.

23      Q.   The Heavy Equipment Division did what?

24      A.   They actually would take care of storage of

25  the byproducts once they left either the end of the

161

1  pipe, if it was a wet plant or after the byproducts left

2  the silo, if the plant as operated as a dry plant. They

3  would take the byproducts and store them in a dry

4  landfill or they would be stored in wet ponds much as

5  they had were at Kingston.

6  　　　Q.  Let's just focus on Kingston for a moment.

7  Mr. Settles, whose organization did he work in?

8  　　　A.  Mr. Settles worked for the Heavy Equipment

9  Division.

10  　　　Q.  You were responsible for overseeing that

11  contractor and Mr. Settles?

12  　　　A.  That's correct.

13  　　　Q.  Is that why you would give him directions to

14  fix erosion, if you saw it during the inspection?

15  　　　A.  Exactly.  That is exactly why I would ask

16  James to fix something.

17  　　　Q.  While you were in the Engineering Design

18  Organization did you ever do any inspections of ash

19  disposal facilities?

20  　　　A.  Yes, while working in the Engineering Design

21  Services Group I performed on the order of ten ash pond

22  inspections and then even after leaving that group I

23  participated in about five additional inspections as the

24  Byproducts representative.

25  　　　Q.  So when you say as the Byproducts

162

1    representative, why was Byproducts being represented?

2         A.   It made good sense to have me there as a

3    Byproducts representative.  That way at some point in

4    time when I see a report I know what they are talking

5    about.  I don't have to call the engineers and ask.  Or

6    even better it allowed me to be proactive in my job in

7    the capacity that such when we would see something and

8    they agree they are going to write it up, I could go

9    ahead and ask my contractor to start taking care of

10   those repairs.  Or if we saw something that indeed did

11   require immediate attention, I was there and could call

12   the contractor to redirect their operations, if need be.

13                  THE COURT:  Let me ask.  In December of

14   2007 you participated in the inspection, I believe your

15   testimony was you actually authored that report,

16   correct?

17                  THE WITNESS:  That is correct.  I actually

18   worked for Engineering Design Services in December of

19   2007.

20                  THE COURT:  It was shortly after that,

21   sometime between then and the October '08 report in

22   which you went to the other group?

23                  THE WITNESS:  Yes.  In July of 2008 I

24   switched to the Coal Combustion Byproducts Group.

25                  MR. MARQUAND:  You stole my thunder there.

1  I was going to ask you have you ever done an inspection

2  at Kingston before.

3              THE COURT:  Think it came out during his

4  direct examination.  We talked about the '07.

5  BY MR. MARQUAND:

6       Q.  Is that the first inspection you have done at

7  Kingston?

8       A.  The first inspection I performed at Kingston

9  was in December of 2007.

10      Q.  How often were these inspections done?

11      A.  The inspections we are talking about were

12 performed annually.  However, the contractors that

13 worked before me performed daily inspections anytime

14 they were operating.  If there is even where we had a

15 certain amount of rainfall on a day where they were not

16 operating, the contractor would send someone out to do

17 an erosion or storm water control type inspection.

18      Q.  What type of training did you have to learn to

19 do an inspection?

20      A.  Most of the training that I had was

21 on-the-job.  We went out with experienced engineers.

22 They showed us various features.  They would pull out an

23 old report for the facility and go through the

24 chronology or history of what happened.  Even on top of

25 that I had my technical background where I had been

164

1   trained with the calculations that go into designing a

2   feature.  On one hand historically I had the technical

3   background and know how to design such a facility.  As

4   far as actually performing the inspection, which was

5   more of a surface inspection, the training was all

6   on-the-job.

7        Q.   All right.  Were you provided with any written

8   procedures or criteria or checklists to do the

9   inspections with?

10       A.   No.  The only thing that had been provided to

11  me was copies of the previous years annual inspections.

12       Q.   Were you aware of any rules or regulations

13  that informed you how inspections should be conducted?

14       A.   No, I was not.

15       Q.   Did you consider yourself to be qualified to

16  do these annual inspections?

17       A.   Yes, I did.  I had been trained by engineers

18  who had several years of service with TVA and who looked

19  at, who had looked at and inspected these facilities for

20  years.  I felt like I was very well qualified to perform

21  these inspections.

22       Q.   What types of things were you looking for in

23  these inspections?

24       A.   We typically looked for things that would

25  require maintenance.  We looked for areas that might

165

1  have erosion taking place.  If you have an area that is

2  eroding it's indicative maybe your cross slopes along

3  your benches aren't right.  Maybe you need to do

4  regrading to redirect the water or address where it is

5  actually coming through and install some sort of

6  drainage pipe.

7          We looked for areas that needed to be mowed.

8  We looked at areas where the vegetation wasn't well

9  establish and attempted to have vegetation that is

10  established.  If you have an area that is bare, it's

11  more susceptible to erosion.  We primarily did visual

12  inspections of the surfaces to see if there was anything

13  that needed to be done to address any potential issues.

14      Q.  Had the inspections at the other facilities

15  involved aspects that had similarities to Kingston?

16      A.  Of the plants I had inspected prior to doing

17  Kingston, Kingston was the only plant that had an

18  elevated dredge cell.  All the inspections I had

19  performed prior to Kingston had wet handled bottom ash

20  much like Kingston.  One of them had a wet only option

21  like Kingston in such that the material was sluiced to a

22  pond.  Then there was were two other facilities, one of

23  which had the option, the plant could operate in a dry

24  fashion where the ash is conditioned in a silo and

25  hauled to a landfill, if you will, or we also had the

166

1   option of sluicing it to a pond like Kingston.

2       Q.   Had any of the other facilities had

3   containment dikes?

4       A.   Yes, all of them had.

5       Q.   Did you have to inspect those dikes as well?

6       A.   Yes, I did.

7       Q.   What is the purpose of the inspection

8   conducted?

9       A.   As I understood the purpose, it was to note

10  changes that had taken place from the previous year.

11  The purpose was also to assist providing input to

12  Routine Handling on things that they need to have their

13  contractor maintain, and by Routine Handling -- I am

14  sorry, that's the new name for the organization I

15  previously referred to as Coal Combustion Byproduct.  It

16  was so we could have a record of the progression of the

17  build out of the facility.

18      Q.   We heard the term earlier in this trial about

19  "legacy problems."  Were there problems that you

20  inherited that would continue from year to year?

21      A.   There were some recommendations that were made

22  from year to year.  I don't necessarily refer to them as

23  legacy problems.  They were routine recommendations.  If

24  you have trees on the dike and they are less than a

25  certain diameter, it's good to try to remove those.

167

1  Those can be handled through mowing.  All the facilities

2  where I ever worked had what I call issues such that

3  erosion would take place and the contractor would have

4  to come in and maintain those.  I have never heard it

5  referred to as a legacy issue.  There were some things

6  that just reoccur periodically.

7        Q.   In terms of legacy let me ask you to clarify.

8  Did you see problems one year and they didn't get fixed

9  and they would still be there the next year after you

10  noted them in you report?

11       A.   No, typically not.

12       Q.   How did you go about conducting an inspection?

13       A.   The first thing that I would do, when assigned

14  the responsibility of performing an inspection, was to

15  pull the previous year's report and become familiar with

16  what was there.  In the event I had never been to that

17  facility or never performed an inspection of the

18  facility, I would find the author of the previous year's

19  report or my principal engineer and spend time with him

20  getting familiar with what had been seen there

21  previously.  What areas should I pay attention to?

22  Where should I really focus my inspection?  If need be,

23  I would look at additional records for maybe some

24  ongoing projects that were going on there to see what

25  other work might be taking place so I would be aware if

168

1    I got to a particular point at the facility if I saw an

2    activity going on I wanted to know why and what was

3    taking place.

4         That was pretty much what we did.  We would

5    rely on the historical knowledge of our peers and our

6    management as well as the previous year's report.

7         Q.   Did your, when you did the inspection did you

8    carry engineering design or construction drawings with

9    you to compare it to what you saw?

10        A.   No.  The purpose of this inspection wasn't

11   construction verification.  We would carry the previous

12   year's report and we would look for areas that needed to

13   be addressed as far as maintenance, erosion, things of

14   that nature.  We weren't there to verify construction.

15        Q.   Did you conduct borings, drill samples or did

16   you take measurements of water levels?

17        A.   No, we measured no water levels.  We typically

18   -- not typically, we never carried surveying instruments

19   with us to shoot water levels or take precise shots.  We

20   simply walked the area, looked at things and even just

21   within the past year or so prior to the Kingston release

22   we had started carrying handheld GPSs so we could mark a

23   spot of particular interest.  Prior to that what we

24   would maybe do is carry pin flags with us so we could

25   poke a florescent colored flag on a wire stake and make

169

1    a note on it so it could be found later.

2         Q.   Did you take any kind of measurements, do any

3    kind of field verification?

4         A.   No, no measurements, no field surveys.

5         Q.   When you returned to the office, did you do

6    calculations or any sort of in depth engineering

7    analysis?

8         A.   No, I would not.  I mentioned earlier I might

9    have wanted to calculate the volume on the area eroded

10   between the lateral expansion, what was referred on the

11   drawing as the emergency dredge cell in the ash pond.  I

12   took some rough measurements for that so I could

13   calculate a quick volume.  As far as any detail

14   calculations, no, that was never the intent.

15        Q.   I want to show you the first page of

16   Plaintiff's Exhibit 191.  The document is entitled

17   Annual Ash Pond Dike Stability Inspection of 2009.

18        A.   Yes.

19        Q.   How do you inspect for stability?

20        A.   Actually when I was hired into TVA in 2004 and

21   had the opportunity to perform my first inspection I

22   asked why are these called stability inspections because

23   we are not inspecting for stability.  When an inspector

24   is out there walking around the perimeter or

25   circumference of these disposal areas, you cannot see

170

1    what is going on subsurface.  I was of the opinion they

2    shouldn't be entitled stability inspection.  If anything

3    it should be called a maintenance inspection.

4                    MR. BYRNE:  Your Honor, I object, unless

5    the witness can identify who it is he is speaking to and

6    making these comments to and who is giving these

7    responses, I think it is all hearsay.

8                    THE COURT:  Mr. Marquand.

9                    MR. MARQUAND:  It's not offered for the

10   truth of what he stated.  He is expressing his opinion

11   about what this means.

12                   THE COURT:  Well, we talked about he is

13   here as a fact witness.  Why don't you gear him back to

14   his personal knowledge and/or conversation.

15   BY MR. MARQUAND:

16       Q.  Can you inspect for stability?

17       A.  No.

18                   MR. DAVIS:  Again, that requires an

19   opinion, Your Honor.

20                   THE COURT:  Mr. Marquand.

21                   MR. MARQUAND:  How many lawyers are going

22   to be jumping up?

23                   THE COURT:  That's the Court's decision,

24   not counsel's.  The objection is really the same.  Go

25   ahead and ask your question again.

171

1          MR. MARQUAND:  I forgot what it was.

2   BY MR. MARQUAND:

3       Q.   Can you inspect for stability?

4       A.   Not to my knowledge, no, you cannot.

5       Q.   Can you see indicia of matters that might --

6          THE COURT:  Again, in response to the

7   initial objection from Mr. Byrne, you probably need to

8   lay a little more foundation for that, him individually.

9   BY MR. MARQUAND:

10      Q.   You, Mr. Dotson, when you are out there

11  inspecting in the field, are you looking for indicia of

12  things that might give you indication that you should

13  take a further evaluation?

14      A.   We did look at things that might indicate that

15  further evaluations were required.

16      Q.   For what purpose?

17      A.   Had I seen an area of significant subsidence I

18  won't use the term sloughing, but subsidence, had I seen

19  something like that, I would have reported back and

20  potentially had a geotechnical or drilling firm come out

21  and do some exploratory drilling in the area to try to

22  determine what might be the cause.

23      Q.   When you did these inspections and when you

24  learned how to do these inspections, what were you

25  informed that you should do about reporting of issues?

172

1        A.   The standard protocol was to report back.

2                MR. BYRNE:  Object, Your Honor.  Hearsay.

3   If the witness can give a name behind all these comments

4   he is reporting.

5                THE COURT:  I am not sure from the answer

6   I have heard so far whether it is hearsay or not.  Why

7   don't you ask a little more detail to establish whether

8   it is or not, Mr. Marquand.

9   BY MR. MARQUAND:

10       Q.   Mr. Dotson, do you recall how you learned to

11  do inspections?

12       A.   I was trained to do inspections through a

13  compilation of people.  The first person would have been

14  my principal engineer, Lynn Petty.  Also accompanied

15  senior engineers on inspection.  Some of the names of

16  these senior engineers were Sherry McKinney and John

17  Albright.

18                During the course of being trained for these

19  inspections we were told that the standard protocol was

20  to conduct an exit interview of sorts prior to leaving

21  the facility.  If you found nothing of significance you

22  called the plant manager or you called the environmental

23  contact at the plant, possibly the shift operations

24  supervisor, you contact someone and let them know, one,

25  that you are leaving the facility.  That way if

173

1    something happens, you are accounted for.  Two, to let

2    them know what you did or did not find.

3         Q.   When you went on the October, 2008, inspection

4    with Mr. Albright and Mr. Buttram they were conducting

5    on behalf of Engineering Design, correct?

6         A.   That is correct.

7         Q.   Did they inform anyone of their findings

8    before they left the plant that day?

9         A.    I can't speak to that.  Prior to their leaving

10   or prior to their completion of inspection I had wrapped

11   up the portion that involved me.  There were some

12   facilities at plants that were inspected that didn't

13   involve Coal Combustion Byproducts such as the ponds

14   that handled the stormwater runoff from the coal.  I had

15   no involvement with that portion of the inspection.

16   Once we fished inspecting the actual disposal areas I

17   checked out and they finished their inspection.

18        Q.   Were you informed by them of any issues that

19   they thought needed to be addressed?

20        A.   No, I was not.

21        Q.   During the inspection did you observe any

22   leaks or blowout or anything indicative that there might

23   be a dike failure?

24        A.   No, I did not.

25        Q.   Did you observe a wet spot in the North Dike

174

1   in December of 2007?

2        A.   Yes, in December of 2007 on the northeastern

3   dike in the approximate area of the Monitoring Wells 13,

4   14 and 15 I found an area that was wet.  That there was

5   some water and I will use the term "seeping" from the

6   slope.  Once I got up to a point where I could locate

7   the HED field supervisor, who was James Settles, I got

8   his attention, possibly called him and asked that he

9   come over to provide some assistance.  Once I told him

10  the general area of where I was he reminded me there

11  were some underdrains that actually daylighted or exited

12  the slopes of the dike in that general area.

13          James and I took a shovel and walked down to

14  the area that I found what I thought was a seep.  We dug

15  through some grass and loosely blazed soil and actually

16  found the outlet of an underdrain and the underdrain was

17  actually serving its purpose.  It was relieving the

18  water from the inside of the facility.

19       Q.   Let me show you Plaintiff's Exhibit 188, page

20  6.  Is there a reference on that page to the wet spot

21  you located that day?

22       A.   Yes.  If you look at the second paragraph to

23  the right of the photograph that is labeled figure 9.

24       Q.   Would that be it?

25       A.   Yes, that is it.  I summarize basically what

1   this says. It reads, "An area which is believed to be a

2   seep was located on the northeastern dike of Cell 2.

3   Plant personnel accompanied inspectors to the area to

4   investigate. Upon digging in the area it was determined

5   that the running water was originating from an old

6   underdrain system. The water was clear flowing, but

7   there were signs that it contained red water in the

8   past. The red water standing was due to iron leaching

9   out bottom ash contained in the dredge cell."

10      Q. Is the fact that there was water coming from

11   an underdrain a problem?

12      A. No, that is actually a good sign because it

13   let's you know that, one, that underdrain is working.

14   If one is flowing or if one is not flowing it's not

15   necessarily a bad sign. It's just indicative no water

16   is coming through at the time. It could mean it is

17   stopped up or it could mean there is no water reaching

18   it at that point. C1 flowing made the inspectors feel

19   good because we realized and recognized that the system

20   was performing as designed.

21      Q. When you did the inspection in October of 2008

22   did you find a wet spot in the same general elevation as

23   you did in 2007?

24      A. Yes, we did. We found one that was the same

25   general elevation and the same approximate location.

1  The underdrains were spaced on one to two hundred foot

2  centers.  I can't say that it was the exact underdrain

3  that I had located in 2007.  It was in the same general

4  vicinity at the same approximate location.

5      Q.  I am going to show you Page 7 of Plaintiff's

6  Exhibit 191.  You see the last sentence beginning on

7  that page "The small wet spot was noticed" and then it

8  continues to the next page.  The toe of the Cell 2 dike.

9  You see that?

10     A.  Yes.

11     Q.  Is that the photograph that plaintiff's

12  counsel showed you from Defendant's Exhibit 34 which

13  appear as the top of page 277816 and again at the bottom

14  of that page?

15     A.  Yes, it was in that general area.

16     Q.  And those were immediately down hill from the

17  water?

18     A.  The monitoring wells that were numbered 13 and

19  14 and after talking with James he indicated there were

20  underdrains in that general area and he was aware that

21  the area would tend to be wet and that water would tend

22  to flow from the slopes.  He kept an eye on those.

23          THE COURT:  We have been going a couple of

24  hours.  Why don't we take a break until 4:00.

25          (Off the record.)

177

1                    (Back on the record.

2                    THE COURT:  Mr. Marquand, you may proceed.

3                    MR. MARQUAND:  Thank you, Your Honor.

4    BY MR. MARQUAND:

5        Q.   You were asked about an assignment to track

6    water levels from various points that were measured at

7    Kingston?

8        A.   Yes.

9        Q.   I want to ask you about that.

10       A.   Okay.

11       Q.   When were you first, when did you receive that

12   assignment?

13       A.   I received the responsibility for tracking the

14   water levels when Chris Hensley left Engineering Design

15   Services at some point in June of 2008.  Subsequent to

16   receiving any data for input I had been notified that I

17   had been given another position with the Coal Combustion

18   Byproducts Group and I would be leaving Engineering

19   Design Service.

20            The manager at time sent an e-mail to Matt

21   Williams in response to Matt's question, "who do I send

22   the information to?"  Barry told Matt to continue to

23   send it to both myself and to Barry and that we would

24   perform a handoff to Chris Buttram so Chris would be

25   ultimately responsible for putting in the data upon my

                              178

1  release to the Coal Combustion Byproducts Organization.

2      Q.   Let me show you three documents and ask you if

3  they go together.  First, Plaintiff's Exhibit 241 and it

4  is an e-mail chain.  The top e-mail is August 1, 2008,

5  e-mail from Barry Kimsey to Mr. Buttram with a cc to

6  you.  What was that all about?

7      A.   If you look at the e-mail at the bottom of the

8  page, I had sent something to Chris asking to be

9  notified prior to one of the piezometer's peaking in the

10  red.  There were various levels of indication of what

11  part of the roles and responsibilities were when Chris

12  input data and saw that it was in the red that he was to

13  notify me.  I had just asked that he provide

14  notification prior to that.  Barry is looking

15  undoubtedly from his response from the upper e-mail.  It

16  is out of focus now --

17      Q.   You mentioned the terms "roles and

18  responsibilities."

19      A.   Yes.

20      Q.   Did that have anything to do with this

21  particular e-mail?

22      A.   That is what it looks like is that Barry was

23  clarifying that the EDS role -- he has him listed as

24  tech support not CS&E which was the Components and

25  Systems Engineering Group that worked in EDS.

179

1    Q.   In your e-mail at the bottom, the August 1

2  e-mail from you, you indicate, "I made a name change

3  (see attached in the highlighted area)."  Do you see

4  that?

5    A.   Yes.

6    Q.   Let me show you this document, which is

7  Plaintiff's Exhibit 186.  Can you tell us what that is?

8    A.   This is a document that was put in place for

9  the groundwater monitoring system that contained the

10  basic background information of how we had gotten to

11  where we were.  It outlined the roles and

12  responsibilities for the various organizations who were

13  responsible for either reading the piezometers and well

14  points and dewatering well points and Fossil Support or

15  Tech Support who was responsible for taking the data

16  obtained in the field and actually putting it into the

17  spreadsheet, giving it to Byproducts Disposal who was

18  responsible for reviewing the results.  And then from

19  Fossil Group or Engineering Design Services or Tech

20  Support.  Once we were notified, if we ever were, that

21  one of the piezometers had reached a threshold or a

22  trigger point, we were to make a modifications operation

23  to attempt to address the elevated --

24    Q.   There is areas that look like they were

25  highlighted.

1        A.    Yes.

2        Q.    You see those?

3        A.    Yes.

4        Q.    Are those the roles and responsibilities

5    section of that document?

6        A.    That is correct.

7        Q.    Does this document have any relationship to

8    the previous document, Plaintiff's Exhibit 241, that we

9    just saw between you, Mr. Kimsey and Mr. Buttram?

10       A.    It appears that the e-mail that we had just

11   discussed was in relation to this document.

12       Q.    And there is a reference to tech support in

13   this particular document, right?

14       A.    Yes.

15       Q.    Let's go back to Plaintiff's Exhibit 241.  Do

16   you see where Mr. Kimsey says "I added EDS after tech

17   support to clarify it was us and not somebody else."

18       A.    Yes.

19       Q.    Let me show you Plaintiff's Exhibit 1552 which

20   also has a section on roles and responsibilities.  Have

21   you ever seen this before?

22       A.    Yes, I have.

23       Q.    What is it?

24       A.    It appears to be another version of the same

25   roles and responsibilities type document that was in

181

1  place for the groundwater monitoring services.

2      Q.  And does it have an addition after tech

3  support to add EDS?

4      A.  I don' see an addition to add EDS.  I see in

5  the area that is underlined near the blue arrow that it

6  calls out Tech Support Engineering Design Services.  As

7  I recall from the previous exhibit, there were only two

8  bullets under EDS.  No, I am sorry, there were three.

9      Q.  The heading is different there isn't it?

10      A.  Yes.  Tech Support or Technical Support was

11  the larger parent organization that encompassed

12  Engineering Design Services Components and Systems

13  Engineering and possibly some other organizations I

14  wasn't familiar with.

15      Q.  Who is responsible for drafting this roles and

16  responsibilities document?

17      A.  I don't recall at this time if I had drafted

18  it or Chris Buttram had.

19      Q.  What was, why were the two of you working on

20  it?

21      A.  Just to clarify everything to make sure that

22  in the event that a threshold was met or data came in

23  that everyone was clear as to who was to provide what

24  level of support.

25      Q.  And Mr. Kimsey's e-mail, which is Plaintiff's

182

1  Exhibit 241, does he indicate the data should be shared

2  by Engineering Design with somebody else?

3      A.   Yes, I'm sorry.  It is a little blurry.  He

4  asks that we provide the summary of the findings to the

5  Kingston PAE, which is the environmental contact at the

6  plant.

7      Q.   Does he also mention putting it on the server?

8      A.   Yes, he asks that Chris get with the gentleman

9  named Patrick Johnson and let Patrick provide a link for

10  others so they can actually access the information.

11      Q.   When he says "Jamey" he's referring to you,

12  correct?

13      A.   That's correct.

14      Q.   Now, when you were first assigned this

15  monitoring responsibility, did you study up on it a

16  little bit?

17      A.   No.  I received, whenever I was first assigned

18  responsibility, opened up the spreadsheet and saw there

19  were several tabs, understood there were two sheets that

20  would be coming to me and there was yet a third sheet I

21  would use for putting the data into.  Instead of trying

22  to figure out what went on, I'm the type of person that

23  learned by doing.  Instead of having someone explain it

24  to me and then not doing it for some period of time, I

25  asked to wait until I actually received data so I could

1  sit down with somebody and have them walk me through it

2  to make notes I could use in the future to make sure I

3  was accurately transferring the data to the proper

4  locations on the spreadsheet.

5      Q.   The rules and responsibilities document that

6  we were looking at, Plaintiff's Exhibit 52, gave some

7  background on the top, is that correct?

8      A.   Yes.

9      Q.   What was the understanding of the background

10  for this monitoring system?

11      A.   I understood that due to the seepage that was

12  found in November of '06 that we had installed

13  drive-point piezometers.

14      Q.   We, what to you mean, we?

15      A.   TVA had installed drive-point piezometers, I

16  believe there were about 33 in the general area of the

17  remediation, as well as dewatering well points.  That

18  the purpose of these were, one, the piezometers were to

19  provide an indication of the water surface for the

20  phreatic surface within the dike and the purpose of the

21  dewatering well points initially was to draw down that

22  water level for construction of the repair from the '06

23  blowout, if you will.

24      Q.   When you were given this assignment to track

25  this monitoring system, was that your first involvement

184

1  with any of the issues going along the dike on the west

2  side of Kingston Ash Facility?

3      A.  It wasn't my first involvement.  My first

4  involvement was to provide the Phase 3 or the

5  construction support from the Engineering Group for the

6  implementation of some of the features that were

7  designed to him help limit water infiltration into the

8  dikes.

9      Q.  I don't understand what you are saying.  What

10  did you do?

11      A.  Basically if you were to cut a cross section

12  of the dike, as it was in 2007, you would have various

13  benches or what would appear to be a road at different

14  levels.  One of the problems that we found was that the

15  benches and the ditches associated with those had fairly

16  flat slopes.  It's hard to maintain a ditch at a flat

17  slope.  One of the problems was that water, particularly

18  rainfall, would pond on these benches.  It would just

19  sit there either until it evaporated or infiltrated into

20  the dikes.  What we were installing were some surface

21  drainage repairs where we actually went into what I

22  refer to as the roadway or the bench and we installed a

23  heavy plastic material with synthetic layers to protect

24  it.  That prevented the water from infiltrating into the

25  bench itself.

185

1    Q.   Did you have any responsibility for these

2  modifications?

3    A.   Not for the design.  I oversaw the

4  implementation of construction.

5    Q.   You were actually out there overseeing the

6  construction?

7    A.   Not daily.  We had someone who was responsible

8  from a construction manager standpoint.  I was the

9  liaison in Engineering Design Services who if the

10  constructor had questions they could come back to me and

11  I would in turn go to the engineer of record with the

12  questions.

13    Q.   I show you Plaintiff's Exhibit 59.  Using your

14  finger can you show us the area of, the general area of

15  these modifications?

16    A.   The modifications started in this corner of

17  the dredge cell -- basically parallels Swan Pond Road

18  along the western dikes up into this.  That is the

19  general area where they were located.  There was about

20  three different benches where these, this plastic was

21  installed to divert the water to catch basins and the

22  catch basins subsequently diverted the water through

23  buried pipes to the bottom of the slopes to a rip-rap

24  line ditch.

25    Q.   I would like to show you Plaintiff's Exhibit

186

1    812.

2                    (Exhibit No. P-812 was marked for

3                    identification.)

4        Q.    Now, you mentioned drive-point piezometers.

5    What area were they installed in?

6        A.    The drive-point piezometers were installed

7    initially in the primary remediation area which was at

8    the --

9        Q.    I will let you draw again.

10       A.    The primary remediation area was generally at

11   the intersection of Dredge Cell 1 and Cell 3.  Then

12   ultimately the drive-point piezometers were also

13   installed from that portion of the cell up to just past

14   where I drew the other line along the same area where

15   the surface drainage repairs were put into place.

16       Q.    So southwest to the line at the northwest?

17       A.    That would define the limits along the dike.

18       Q.    All right.  You mentioned drive-point

19   piezometers.  Just so we have an idea, let me show you a

20   photograph.  Would you look at the photograph on Page 7

21   of Plaintiff's Exhibit 812.  I believe it's Plaintiff's

22   Exhibit 812, is that right?

23                    MR. MARQUAND:  Your Honor, the only copy I

24   have is a color copy, although the Plaintiff's Exhibit

25   is black and white.

187

1          MR. BYRNE:  The black and white is the

2    version that TVA produced to us.  I didn't know until

3    now he had a color copy.

4          MR. MARQUAND:  The color copy is a

5    prettier picture.  I am happy with the black and white.

6    I don't have copies of the black and white one for

7    everyone to look at.

8          THE COURT:  You have the black and white

9    one?

10         MR. BYRNE:  Yes.

11         THE COURT:  Let's proceed.

12         MR. MARQUAND:  I have an extra copy, if

13   they would like the color one.

14         THE COURT:  Go ahead and proceed.

15         MR. MARQUAND:  I apologize.  The only copy

16   I have to show the Court is the color copy, although the

17   one in the record is black and white.  I don't believe

18   there is any difference other than coloration.

19         THE COURT:  That is fine.  Go ahead.

20   BY MR. MARQUAND:

21      Q.  Showing you Page 7 of Exhibit 812.  Can you

22   tell us what a drive-point piezometer is.  Specifically

23   when you say drive-point, what do you mean by that?

24      A.  If you look at the picture contained on the

25   bottom picture on this slide, you can see the end of the

188

1  drive-point piezometer is conical shape with a sharp

2  tip.  The way these are installed is you take the

3  typical fence post driver much like you were diving a

4  fence post out on your farm, you drive these in the

5  ground to a depth of -- these were installed at three to

6  five feet below grade.

7      Q.  If we can envision a fence post being driven,

8  that is basically what these things look like?

9      A.  They are not augered in or drilled in like

10  deeper wells or piezometers would be.  There's no

11  augering or mechanical drill.

12          MR. BYRNE:  If I may interpose an

13  objection.  I don't think there has been any showing

14  that Mr. Dotson installed a single one of those.  That

15  was Mr. Williams and his crew who did it.  Counsel chose

16  not to go into that with him last week, for whatever

17  reason.  That is the person who is the expert on what

18  was and wasn't installed, not Mr. Dotson.

19          THE COURT:  We are not having experts

20  here.  If you can lay a little bit of foundation about

21  this witness' personal knowledge about how these were

22  installed.

23  BY MR. MARQUAND:

24      Q.  Mr. Dotson, did someone under you or someone

25  you managed install these?

189

1    A.   At the point where these were installed it was

2 my understanding Geosyntec installed them with the

3 assistance of maybe some of the GUB&K contractors on

4 site.  It is not something extremely technical.  You

5 just drive them in.

6    Q.   In the picture in the upper right corner here

7 what are they doing there?

8    A.   Using the fence post driver.

9         THE COURT:  Have you personally observed

10 these being installed?

11         THE WITNESS:  I have not seen them

12 installed.  I have read installation --

13         THE COURT:  I will sustain the

14 installation.  There are others that can testify to

15 that.

16 BY MR. MARQUAND:

17    Q.   The point is, Mr. Dotson, about how long and

18 how deep are these things?

19    A.   The piezometers were installed to a depth of

20 about --

21         MR. BYRNE:  Objection, Your Honor.

22         THE COURT:  I guess the objection is --

23 see if you can establish personal knowledge.  If he has

24 seen them or measured them or something.

25 BY MR. MARQUAND:

190

1    Q.   Do you know how deep these are installed?

2    A.   I have seen records that indicate they were

3 buried to a depth of three to five feet below grade and

4 that this standpipe, if you will, was one to three feet

5 above grade.

6    Q.   Have you been out and seen the standpipes in

7 place?

8    A.   I have seen them in place multiple times.

9    Q.   I show you Page 17, bottom of Page 17,

10 Defendant's Exhibit -- the bottom of Page 17 on

11 Defendant's Exhibit 34.  Is this a photograph that you

12 took on the October 20th, inspection?

13    A.   That's one of the photographs I took.  That's

14 evident by the time stamp that is contained --

15    Q.   If you look carefully, you will see some white

16 stakes and also some flags sticking up.

17    A.   Yes, that is correct.

18    Q.   What are those?

19    A.   The flags that you see are the bicycle flags

20 that were discussed earlier in the day that Matt

21 Williams had his technician install to help delegate the

22 areas where the drive-point piezometers were located.

23 The areas that are white PVC that looks like white

24 sticks sticking out of the ground in this photo to the

25 right of some of the bicycle flags, those are actually

191

1    the drive-point piezometers.

2         Q.   Let me show you TVA Exhibit 194, Defendant's

3    Exhibit 194.  Can you tell us what that is?

4                   (Exhibit No. D-194 was marked for

5                   identification.)

6         A.   I think this is a schematic that was prepared

7    by a staff engineer at Geosyntec that is representative

8    of the area of remediation along Swan Pond Road along

9    the western dike of the dredge cell.  It is a bit hard

10   to read, but indicates the approximate locations of

11   piezometers and the dewatering well points along this

12   stretch of the dike.

13        Q.   Okay.  When and how did you learn about this

14   particular schematic?

15        A.   I don't recall when I first saw it.  Once I

16   was given the task of managing the Phase 3 construction

17   or implementation of the surface drains as well as when

18   I was told that I would be responsible for inputting the

19   data into the spreadsheet that Geosyntec had prepared, I

20   had just found some historical documents that TVA had

21   that my section had and had read through them just to

22   understand a little more of what was going on.

23        Q.   You said surface drains.  What surface drains

24   are you talking about?

25        A.   The surface trains I mentioned a moment ago

192

1    where we installed the plastic sheeting along the bench

2    of the road to direct the -- to direct the water to

3    catch basins and the catch basins subsequently directed

4    the water down to a discharge ditch and the ditch

5    paralleled Swan Pond Road.  The water flowed north,

6    northwest to a collection point which was actually a

7    pumping station.  The pumping station pumped the water a

8    short distance into yet another channel.  From that

9    channel the water gravity flowed to two culverts into

10   the ash pond.

11        Q.   Let me go back to Page 17, Defendant's Exhibit

12   34.  You mention the water flowed down a ditch.  Is that

13   the ditch?

14        A.   Yes, that is the ditch that is seen to the

15   right of the guardrail.  You can see three vertical

16   concrete riser structures.  Those riser structures are

17   right in the toe, right at the edge of that ditch.

18        Q.   And where did the water, which direction did

19   the water flow?

20        A.   The water flowed from left to right across the

21   screen.

22        Q.   To what?

23        A.   To the pump station I mentioned just a moment

24   ago.  I can't recall if the pump station is evident in

25   this picture.  It looks like this might be the edge of

193

1  the fencing that was around that pump station.  It was

2  simply a retention pond with pumps.  Once the water

3  levels inside the pond reached the design elevation, the

4  pumps kicked on and pumped the water over toward the

5  east.

6      Q.  Let me show you the bottom photograph on page

7  26, Defendant's 34.  Can you tell us what that is?

8      A.  This is the retention pond that collected the

9  water and also housed the pump station that pumped the

10  water to the drainage well that then carried it to the

11  ash pond.

12      Q.  So the water came from the ditch down the west

13  slope of the dikes down the ditch into this pond?

14      A.  That is correct.

15      Q.  And then where did it go?

16      A.  From there it was pumped -- I realize this

17  aerial photo doesn't show what the --

18      Q.  Let me show you this photo right here.  This

19  is Plaintiff's 59.

20      A.  Thank you.  The pump station that we just saw

21  is in this general area.

22      Q.  All right.

23      A.  The water was pumped from the retention pond

24  to a discharge point somewhere in that general area and

25  from there it flowed down the drainage swale to the two

194

1    culverts and into the ash pond.  I apologize.  The way I

2    have dawn the line appears it is up on the slope.  It is

3    not.  It is actually --

4         Q.    There is a swale or ditch along on the outside

5    of the North Dike up here?

6         A.    Correct.  Correct.  From the elevated dikes

7    that made up Dredge Cell 2 which would have been dikes

8    Alpha through Delta, from there over to the main dike

9    which we refer to as Dike C, there was a wide drainage

10   swale that was used to collect storm water plus the

11   water pumped into it from this retention pond.

12        Q.    It flows on the surface?

13        A.    Yes, surface water ditch.

14        Q.    One more point of clarification.  We have what

15   is called a Dike C right here.  Is that correct?

16        A.    That is correct.

17        Q.    And what is that?

18        A.    Dike C is the original containment dike that

19   was constructed at some point in time to make up the

20   outer perimeter for at that point the dredge cell

21   ultimately or at that point the ash pond, but ultimately

22   the dredge cell complex.

23        Q.    Was there a dike inside of Dike C?

24        A.    Yes, if you step inboard from Dike C there was

25   a two hundred foot lateral setback and then there was a

                                195

1  series of dikes that made up the northern, the whole

2  perimeter of the dredge cells actually.  Those were,

3  they were actually called stages; Stage A, Stage B,

4  Stage C1 through C3.

5      Q.  That could get confusing if you are talking

6  about Dike C and Stage A, B and C.

7      A.  Yes, you have to be really careful when you

8  are referring to the dikes that make up the dredge cell

9  complex that you don't refer to those as Dike C because

10  most of the people would just refer to those as the

11  northern dikes of the dredge cell complex and think that

12  you are referring to the outer most containment that is

13  there to contain all of the material in the dredge cell,

14  as well as the ash pond.

15      Q.  Now, we have heard the term -- in addition to

16  piezometers we have also heard the term "well points"?

17      A.  Yes.

18      Q.  Tell us what a well point is?

19      A.  A well point is a piezometer that is installed

20  for potentially multiple purposes.  Well points can be

21  used for groundwater compliance where samples are taken

22  periodically and checked for various metals that could

23  potentially leach from coal combustion products.  They

24  are also used for an indication of the groundwater

25  surface.

1    Q.    Let's talk about in Kingston in the context we

2  heard the term well point.

3    A.    Monitoring well.

4    Q.    Well point on the West Dike, the west side of

5  the containment facility?

6    A.    Well points that were contained along the

7  western side of the dredge cell complex were initially

8  installed to dewater the area, to help lower the

9  phreatic surface within the dikes to facilitate

10  construction.  Once the construction was complete we

11  realized that we already had something that we could

12  leave in place and for a fairly inexpensive amount of

13  money convert to something that could continue to

14  dewater on its own once the pumps were removed.  What

15  TVA did was cut off the vertical standpipe at some

16  distance below grade and install just a plastic PVC T as

17  much as you would do if you were doing plumbing at home.

18            MR. BYRNE:  He is testifying about repairs

19  and things he didn't even carry out.  The man is not

20  even a licensed professional engineer.  I don't know how

21  counsel can continue to ask him about things he didn't

22  have anything to do with, doesn't have any expertise in.

23  We just object to this whole line of questioning.  The

24  man is not even a Licensed Professional Engineer in the

25  state of Tennessee.

197

1          THE COURT:  I understand.  What is your

2    response, Mr. Marquand?

3          MR. MARQUAND:  I can lay a foundation.

4          THE COURT:  Lay a foundation.  We are not

5    asking for an expert opinion.  He's not an opinion

6    witness.

7    BY MR. MARQUAND:

8          Q.   Have you see the well points?

9          A.   Yes, I have.

10         Q.   Have you seen the drawings?

11         A.   Yes, I have.

12         Q.   Have you seen them in place?

13         A.   Yes, I have.

14         Q.   Have you seen them while they were dewatering?

15         A.   I have.

16         Q.   Let me show you Page 11 of Plaintiff's Exhibit

17    812.

18         A.   One thing I might add, those were actually

19    installed when I was performing the role as the

20    responsible engineer for the surface drainage repairs.

21    They were incorporated as under my watch as part of the

22    construction that took place along that slope of the

23    dike.

24         Q.   Tell us what this, let's look through these

25    photographs.  What are they doing in the photograph in

198

1  the upper right here?

2      A.   The upper right-hand photo shows what appears

3  to be a machine that is installing one of the dewatering

4  well points.  As I mentioned previously, those were

5  installed to depth up to about 20 feet.  A mechanical

6  machine was installed to install those, as it would have

7  been difficult to install a drive-point.

8              MR. BYRNE:  We object.  The man didn't

9  install any of these.  The testimony is he didn't review

10  the data until December 22, 2008.  I don't know how any

11  of this is relevant.

12              MR. MARQUAND:  I believe his testimony was

13  he was responsible for providing the managing

14  construction support when this was done.

15              THE COURT:  Overrule the objection.  You

16  may proceed.

17      Q.   What is the photograph to the left-hand side?

18      A.   That is a header system that was put in place

19  to allow a single pump to pull water from multiple

20  dewatering well points.  Each of the dewatering well

21  points was connected with what appears to be an orange

22  or red hose into the header.  There was a single line

23  that went into the pump.

24      Q.   Are these the well points to the right of that

25  large pipe there?

199

1    A.    Yes, they are.

2    Q.    So, they were, the purpose was to drain water?

3    A.    That's correct.

4    Q.    And what are we seeing in the bottom center

5   photograph here?

6    A.    That's a picture of the pump that was used to

7   dewater the groundwater in that area.  There's a

8   discharge pipe running to the left of the pump to the

9   collection ditch at the toe of the slope.

10    Q.    When the dewatering was completed, what did

11   you have done with these well points?

12    A.    That the point they were converted to the

13   dewatering well points they continued to dewater without

14   having pump assistance.  At that point that is where we

15   install the plastic PVC Ts and installed a lateral or

16   horizontal run of pipe subsurface from those Ts down to

17   this ditch.  We put a ball valve on the discharge end of

18   the PVC so they could be left open in the event that the

19   water from the dewatering well points reached an

20   elevation such that they flowed into the horizontal run

21   of pipe they would automatically dewater into the

22   drainage ditch.

23    Q.    How were the piezometers and well points used

24   to monitor water levels originally?

25    A.    Originally the well points were designed for

1  dewatering, not necessarily an indication of the water

2  level.  The piezometers were there solely to monitor the

3  water level.

4      Q.   You said that Geosyntec installed the

5  piezometers and the well points under contract to TVA?

6      A.   It was my understanding they were there to

7  supervise the installation.

8      Q.   Let me show you what is an unmarked page

9  following page 37 on Plaintiff's Exhibit 812.  Can you

10  tell us what that is?

11      A.   This is a graph that shows the first quarterly

12  reading dated July 26th, '07.  It shows the shallow

13  piezometer's which were the drive-point piezometers.  It

14  indicates they were used for primary monitoring.  It

15  shows that the former well points or the former

16  dewatering well points were in place and used for

17  secondary monitoring.

18      Q.   There is distance and feet at the bottom of

19  this chart.  What does that indicate?

20      A.   There was a baseline that was established

21  along the that western dike and the hand sketch or

22  schematic that you provided previously that I stated

23  that Geosyntec prepared has that approximate baseline.

24  This is representing a distance to either side of that

25  baseline, 600 feet in one direction and about 2,000 feet

201

1    in the other.

2         Q.   Where does that baseline appear,

3    approximately, on the west side wall?

4         A.   If you have a schematic I can --

5         Q.   Let's look at Plaintiff's Exhibit 59.

6         A.   As I recall, that baseline was approximately

7    in that general area (indicating).

8         Q.   And the line goes from along the -- does it go

9    along the road itself?

10        A.   Yes, it does.

11        Q.   Okay.  I am going to tender Pages 7, 11 and 38

12   of Plaintiff's Exhibit 812, Your Honor.

13             MR. BYRNE:  No objection, Your Honor.

14             THE COURT:  So admitted.

15             Let's introduce those pages only as

16   Plaintiff's Exhibit 812.  If plaintiff's want to

17   introduce additional pages --

18             MR. BYRNE:  We are just going to get a

19   clarification, Your Honor, if 38 is this page here.  It

20   says 2007 water level monitoring.

21             MR. MARQUAND:  It is the page following

22   37.  I introduced it as page 38 even though there is not

23   a page number on it.

24             MR. BYRNE:  This is the one you are

25   introducing?  No objection, Your Honor.

 1                THE COURT:  Thank you.

 2                (Exhibit No. D-812 was received in

 3                evidence.)

 4    BY MR. MARQUAND:

 5         Q.   I want to ask you where did you get the data

 6    to input into this groundwater monitoring system?

 7         A.   Data was provided by Matt Williams.

 8         Q.   Okay.  It is the same Matt Williams who sent

 9    you an e-mail on December 19th, 2008, which is marked as

10    Plaintiff's Exhibit 1711?

11         A.   That is correct.

12         Q.   When you forwarded this on -- on December 22

13    you forwarded two spreadsheets, is that correct?

14         A.   It is a bit hard to read on the screen.

15         Q.   Can you see it now?

16         A.   Yes.  When I forwarded this information to

17    Barry Snider on December 22nd, 2008, I provided the two

18    master sheets, if you will, that were sent to us from

19    Matt Williams.

20         Q.   And one of the spreadsheet says it was called

21    a KIF dredge cell piezometer master.  The other was a

22    KIF piezometers and well points master, correct?

23         A.   That is correct.  These contained the actual

24    data where Matt's technician had gone to the field and

25    read the water elevation in both the piezometers and the

                                203

1  well points.

2      Q.   Okay.  I want to show you what has been

3  admitted as Plaintiff's Exhibit 3610.  This is only the

4  first page of that document.  Can you tell me what it

5  is.  You may have a copy up there.  It is something like

6  that.

7      A.   This is a scatter plot that shows the depth to

8  water for the various piezometers that are shown over on

9  the right-hand side of the graph.

10     Q.   If you look at the second page, what do we

11  see?

12     A.   This appears to be the raw data where each

13  month -- 11-16-07 and 12-7-07 that the water level in

14  these instruments were read.

15     Q.   If we continue on, we see the subsequent

16  columns of the spreadsheet, don't we, Page 3?

17     A.   Yes, we do.

18     Q.   And on Page 4 and finally on Page 5 we see the

19  column for November 19th, 2008, correct?

20     A.   That is correct.

21     Q.   If we go over a couple of more pages, several

22  more pages to bates page ending 748, I think we see

23  another graph.  Is that correct?

24     A.   Yes.  This appears to be a plot of only the

25  dewatering well points.

1      Q.   Okay.  The well points?

2      A.   Yes.

3      Q.   And immediately following that we see a chart

4  of well points?

5      A.   That's correct.

6      Q.   And it continues on with different data point

7  dates and data points, correct?

8      A.   That is correct.

9      Q.   All right.  So that is one of the spreadsheets

10  that Mr. Williams sent to you, correct?

11      A.   That is correct.

12      Q.   Let me show you another one.  This is

13  Plaintiff's Exhibit 919.  What is shown on that

14  particular graph?

15      A.   This graph actually shows the water level data

16  for various monitoring wells at the Kingston facility as

17  well as the rainfall that had been recorded over these

18  same time periods.

19      Q.   Now, you used a different term here.

20  Monitoring wells as opposed to piezometers and well

21  points.

22      A.   Correct.

23      Q.   Would you explain at least in the terminology

24  used in these spreadsheets the difference.

25      A.   The difference is that the piezometers that we

205

1   previously discussed were in place and were the focus of

2   the monthly monitoring.  They actually contained the

3   data that Fossil Engineering Design Services were to

4   take and place into the spreadsheet that had been

5   previously provided by Geosyntec.  The data that we see

6   here is the data for various monitoring wells that were

7   located around the facility on the north, western,

8   southern slopes as well as some that were actually

9   abandoned in place within the dredge cell complex.

10         Q.   So you forwarded both of those spreadsheets,

11   which we just looked at, to Barry Snider on December

12   December 22, 2008?

13         A.   That is correct.

14         Q.   Let me show you Plaintiff's Exhibit 606.  What

15   is that?

16         A.   It's a bit fuzzy.  This is a representation of

17   information that was contained in the Geosyntec

18   spreadsheet where the data from the previously referred

19   to spreadsheets, the data for the piezometers and the

20   dewatering well points would have been transcribed into

21   this sheet and then the plot that is located at the

22   bottom of the page would have been generated and used to

23   monitor for the trigger points or the thresholds that we

24   previously discussed in the roles and responsibilities

25   sheet.

1    Q.   Did you forward this document to Mr. Snider on

2    December 22, 2008?

3    A.   No, I did not.

4    Q.   Did this particular Geosyntec, the one that

5    they created, did it include the monitoring well data?

6    A.   Did the Geosyntec spreadsheet include the

7    monitoring well data?

8    Q.   Yes.

9    A.   No, it did not.

10    Q.   Let me show you Plaintiff's, you were shown

11    this earlier, Plaintiff's Exhibit 1211.  I believe

12    counsel referred to these as the TVA higher ups that you

13    forwarded this information to on December 22, 2008?

14    A.   Yes.

15    Q.   All right.  It refers to an attachment.  What

16    is that attachment?

17    A.   This attachment appears to be the actual

18    Geosyntec spreadsheet.

19    Q.   Let me show you this.  This is the bates

20    stamped page next in order as Plaintiff's Exhibit 1212.

21    Can you tell us what that is?

22    A.   This says that piezometers are to be read and

23    recorded monthly.  It outlines who will read these, how

24    they will be read and that the data is to be sent to

25    Chris Buttram in Fossil Engineering and cc'd to Jamey

1   Dotson in Coal Combustion Byproducts.  Chris plots the

2   information in a spreadsheet that generates a

3   color-coded plot.  He's to notify CCBP, if there's a

4   problem.

5           Two sets of data are taken, both PZs and WPs

6   and then it says that there are 51 of the drive-point

7   piezometers and that they are the short ones that are

8   nested three to five feet and that they measure the

9   phreatic surface along the slope of the dredge cell.

10      Q.   What was the intent of this document?

11      A.   It looks like it is providing some history for

12  what fed into the Geosyntec spreadsheet.

13      Q.   Is this the .doc that was attached to your

14  December 22, 2008, to the TVA higher ups?

15      A.   I misspoke a moment ago.  This is not quite in

16  focus.  I didn't realize that was a .doc.  The sheet I

17  was just reading appears to be the document that was

18  sent along with the piezometer data I had previously

19  sent out that day.

20              MR. MARQUAND:  Your Honor, we tender

21  Plaintiff's Exhibit 1212.

22              MR. BYRNE:  No objection.

23              THE COURT:  So admitted.

24              (Exhibit No. P-1212 was received

25              in evidence.)

208

1   BY MR. MARQUAND:

2        Q.   We earlier heard about the interchange between

3   you and Mr. Williams about repairing piezometers, well

4   points and putting up flags.  I want to turn back to

5   that particular e-mail.  It's Plaintiff's Exhibit 245.

6   I want to ask you a question that appears early on, was

7   raised early on to me.  In Mr. Williams' August 22

8   e-mail, which is the first e-mail in the series, he has

9   got two numbered items.  The second numbered item says,

10  "Do you want us to close the valves after we have taken

11  all the measurements?"  Do you see that?

12       A.   Yes, I do.

13       Q.   What is the point of closing or opening

14  valves?

15       A.   We typically left those valves on the

16  dewatering well points open so that if the water level

17  within the standpipes reached that elevation they could

18  dewater naturally through a controlled discharge pipe

19  and not simply overflow the top of the standpipe and

20  cause potential erosion issues.  Every other valve would

21  be closed a few days to a week prior to Matt's

22  technician coming out to read the wells.  That way the

23  levels could reach some sort of equilibrium within the

24  standpipe.

25       Q.   What was the point of leaving the valves open

209

1   though?

2       A.   If we left them open, that allowed the water

3   to freely drain through a controlled discharge point

4   into the rip-rap ditch along the toe of the slope.

5       Q.   Where were the valves located?

6       A.   They were located at the very discharge end of

7   the pipe at the ditch.

8       Q.   Okay.  Now, there has been discussion about

9   well points being damaged.  If the well point, you said

10  there was a standup like a PCV pipe sticking up out of

11  the ground?

12      A.   Correct.

13      Q.   There was some discussion about those being

14  knocked down or hit by mowers?

15      A.   Correct.

16      Q.   Could those well points still serve their

17  purpose, if that stickup was knocked down?

18      A.   Yes.  They could.  As long as when the mower

19  or bush hog cut off the vertical standpipe, as long as

20  it didn't somehow --

21           MR. BYRNE:  I have to object again.  This

22  man has absolutely no background or expertise to testify

23  to these matters.  In fact, he's already testified they

24  weren't serviceable and for this very reason that they

25  didn't collect data from it, Your Honor.

1              THE COURT:  As you know, there has been

2    some testimony -- I think what you are objecting to is

3    right for redirect.  I will let him testify.  I will

4    overrule the objection.

5    BY MR. MARQUAND:

6         Q.   Let me be specific in my question.  If the

7    stickup is knocked off, could the well points still

8    function to drain the water?

9         A.   Yes, they could because the actual T

10   intersection was located subsurface.  It was beneath the

11   ground.  If the upper portion of the vertical standpipe

12   were cut or knocked over, as long as that section

13   remained in tact it could still act as a serviceable

14   dewatering well.

15        Q.   In the e-mail on page 2 of Plaintiff's Exhibit

16   245, Mr. Williams -- you see where Mr. Williams on

17   September 5 sent an e-mail to you asking you to close

18   every other valve?

19        A.   Yes, I do.

20        Q.   What was the point of closing every other

21   valve?

22        A.   There were so many of the dewatering well

23   points in place that we didn't necessarily need to get

24   the data from every one.  Therefore, we closed every

25   other valve.  That allowed every other dewatering well

                              211

1    point to reach a point of equilibrium so Matt's

2    technician could read the watering elevation, but

3    simultaneously allow the alternative every other well

4    point besides those to serve as dewatering well points.

5         Q.   In fact, if you look at Plaintiff's Exhibit

6    919 I want to direct your attention -- it would be

7    Plaintiff's Exhibit 3610.  I'm sorry.  I want to direct

8    your attention to the readings for the well points on

9    October 23, 2008, and November 19th, 2008.  There does

10   not appear to be readings for every well point.  Is that

11   correct?

12        A.   That's correct.  It appears that there are

13   readings for every other dewatering well point.  That

14   goes along with the fact that we only closed the valves

15   on every other well.  That way the intermediate wells

16   could continue to function for dewatering.

17        Q.   Thank you.  Let me ask you about Plaintiff's

18   Exhibit 1555.  Can you read that?

19        A.   Yes, it's an e-mail that I sent to Chris

20   Buttram and Ron Hall on Saturday January 3rd, 2009.

21        Q.   You were asked about this on cross

22   examination.  The first e-mail I want to ask about is

23   Mr. Buttram's January 3 e-mail to you and Mr. Dotson

24   attaching an Excel spreadsheet.

25        A.   Right.  Chris' e-mail from January 3rd is

1 saying that he is taking the Geosyntec spreadsheet

2 containing both dewatering well points and piezometers

3 and modified it, said he left the original in tact that

4 contained all the data, but yet on that version he had

5 added either a separate sheet or had copied and pasted

6 the data over and removed that data so we could remove

7 the data extraneous to the piezometers.

8     Q.  Is there any statement there that he deleted

9 data?

10     A.  No.  The bottom of the first paragraph in his

11 e-mail he states the original is still in its original

12 location.

13     Q.  Are you familiar with Microsoft Excel?

14     A.  Yes, I am.

15     Q.  And how do you create a chart like 606?

16     A.  With the version of Excel we were using, you

17 would simply go to the tab for inserting a chart and

18 then you would select the input data that feeds the

19 chart.  You would select either the column or rows that

20 had the data you wanted.  You would select information

21 for both an X and Y axis and assign properties to the

22 line weights and things of that nature.

23     Q.  You have a new tab?

24     A.  That's correct.

25     Q.  Now, we have looked at plaintiff's 1555 which

213

1   is dated January 3, 2009.

2       A.   Yes.

3       Q.   And apparently Geosyntec sent the password to

4   Mr. Buttram on January 7th, 2009, looking at Plaintiff's

5   Exhibit 1584. Would you agree?

6       A.   It's out of focus. Neil Davies and Whitney

7   Law have both provided information to Chris. Whitney is

8   actually asking Neil to send the password and it appears

9   that Neil or Whitney one have sent the password on to

10   Chris. It looks like the e-mail was generated from

11   Whitney. They provided the password so he could unlock

12   the calculation sheets that actually generate the plots.

13       Q.   Did you see any indication that Mr. Buttram

14   had destroyed data and deleted data and needed to

15   restore it?

16       A.   No, I do not.

17       Q.   What did Mr. Buttram do with the password?

18       A.   It appears that he sent it to two personnel at

19   the plant, the plant manager Ron Hall and the gentleman

20   named Rich Christensen who at the time I believe was the

21   outage or maintenance manager.

22       Q.   I want to ask you about your interview with

23   the agent or agents from TVA's Inspector General's

24   Office. Do you have Plaintiff's Exhibit 4518 there?

25       A.   4518?

1      Q.   Yes.

2      A.   I have the exhibit.

3      Q.   Is that the only time you have ever been

4  interviewed by someone from TVA's Inspector General's

5  Office?

6      A.   No, it is not.

7      Q.   Have you had a chance to review this

8  particular document?

9      A.   Yes.  I reviewed this document for the first

10  time within the last month, most likely the past few

11  weeks.

12      Q.   And did you find it to be accurate?

13      A.   No.  Actually quite the contrary.  I found

14  that they used terms that I would not have used to

15  describe various features or phenomenon.  I found they

16  did a rather poor job of outlining the organization that

17  I worked for.  In general over on I suppose it's the

18  third page, the one with the bate stamped ending in 563

19  the third, fourth, the third and fourth paragraphs, they

20  made what I call several just errors.

21      Q.   Did they give you an opportunity to review

22  this document?

23      A.   No, they did not.

24      Q.   Did they ask you to sign it?

25      A.   I don't recall signing anything.

1      Q.   As far as you know, did they tape record or

2 have the interview recorded by a stenographer?

3      A.   I recall there was not a stenographer.  I

4 don't recall if they used a tape recorder.  I don't

5 remember being informed they were recording the

6 conversation.

7      Q.   Following the dike failure, were you involved

8 in providing documents to various people?

9      A.   Yes.  Because of the opportunity that I had

10 prior to the release, I have worked in both operations

11 and engineering, I had a significant amount of knowledge

12 of what had taken place at the facility over the past

13 several years.  I was a point of contact for multiple

14 people.  Organizations from external as well as internal

15 at TVA met with me multiple times over the course of the

16 days to weeks to months asking questions, asking for

17 information, picking my brain about whatever I recall or

18 did I know where certain files were stored in

19 Chattanooga, or just various things.

20      Q.   Let me direct your attention.  I believe you

21 got a copy in front of you, Plaintiff's Exhibit 196.

22 This was the inquiry from Mr. Walton on June 20th, 2009.

23      A.   I don't have it here.  I can read it on the

24 screen.

25      Q.   You see that?

1        A.   Yes, I do.

2        Q.   Was Mr. Walton one of the individuals you

3   helped provide documents to?

4        A.   Yes, I met with Bill several times and

5   provided documents and information.

6        Q.   And before providing them to Mr. Walton were

7   you involved in gathering documents and helping to

8   provide them to both the Tennessee Department of

9   Conservation and also putting them on TVA's website?

10        A.   Yes.  As a matter of fact, the first two days

11   after the release instead of going to the plan and

12   providing support there, I actually stayed in

13   Chattanooga and provided support for the Engineering

14   Department and others as part of the document and

15   information roll-up.

16        Q.   And so you were involved in providing

17   documents to TDEC?

18        A.   I believe I was.

19        Q.   Let me show you next to the last page of

20   Plaintiff's Exhibit 196.  There is the e-mail from Glen

21   Pugh dated April 15th, 2009, to Mr. Kammeyer.  Who is

22   Mr. Kammeyer?

23        A.   John Kammeyer is currently the Vice President.

24   At that time John at that point was the Vice President

25   of the Technical Services Group which is the parent

1    organization that contained Fossil Engineering,

2    Engineering Design Services.

3         Q.   He was the supervisor several layers above

4    you?

5         A.   Yes.

6         Q.   Mr. Pugh was apparently somebody associated

7    with the state of Tennessee and TDEC?

8         A.   Yes, Mr. Pugh worked for TDEC as one of their

9    solid waste specialists.

10        Q.   Do you know if the photographs you took on

11   October 20th, 2008 have been provided to TDEC?

12        A.   They had been provided to TDEC, yes.

13        Q.   And specifically this inquiry from him

14   mentions a photograph taken at 11:22 and at 14:45.  Do

15   you see that?

16        A.   Yes, I do.

17        Q.   If you will bear with me, I will see if I can

18   locate the photograph you took at 11:22.  Let me show

19   you what is marked as Page 29 of Defendant's Exhibit 34.

20   Can you tell us what we are looking at?

21        A.   This photograph is taken from the top dike of

22   the dredge cell complex.  I am standing in the

23   northwestern corner of what was Cell 2 facing to the

24   north northeast.  What the photograph shows is --

25        Q.   Are we looking at the inside of the dredge

218

1    cell?

2        A.   Yes, we are looking at the inside of the

3    dredge cell.

4        Q.   Okay.

5        A.   The photograph actually shows some areas where

6    erosion has taken place and has eroded some of the

7    bottom ash or fly ash materials.

8        Q.   What are these areas right here that look like

9    holes?

10       A.   Those are the area of erosion I was just

11   referring to.

12       Q.   Why doesn't the erosion go down into the

13   water?

14       A.   From what I recall, this was primarily

15   constructed of bottom ash material which is more

16   granular than fly ash.  It is relatively porus.  That

17   would allow --

18             MR. BYRNE:  Your Honor, I object to this

19   line of questioning.  This gentleman has absolutely no

20   expertise in soil mechanics, certainly is not part of

21   all of the construction activity that is going on out

22   here, as depicted in this photograph.  I believe he has

23   already testified several times that he at that point in

24   time, the relevant time period, he wouldn't know a

25   slough from a subsidence much less all this information

1    he is testifying to today.

2            MR. MARQUAND:  As to the last statement

3    counsel made, I think that is a semantic game they are

4    playing.  He has made it clear --

5            THE COURT:  Let's focus on the objection,

6    his ability to testify to his personal knowledge as to

7    what is depicted in the photograph.

8            MR. MARQUAND:  He was not only present,

9    but he took the photograph.  He is an engineer.  He has

10   inspected numerous ash disposal facilities.  I think he

11   is entitled to give his opinion on what he saw both in

12   personal experience and professional experience.

13           MR. BYRNE:  Just to bring it full circle,

14   we don't mind them talking about what he photographed.

15   What we object to is him discussing construction

16   details, construction history he doesn't know a thing

17   about, hasn't any more involvement in it than the man in

18   the moon.  It is just constant trying to bolster a

19   witness and trying to make him out to be some expert

20   when prior to December 22, 2008, he didn't know a thing

21   about inspecting dikes or checking water levels or any

22   of this stuff he has testified to.

23           THE COURT:  You are both arguing somewhat

24   at this point and making arguments on the weight of the

25   evidence.  What is your response?  What do you want to

                          220

1    ask him?

2                    MR. MARQUAND:  I want to ask him what

3    these are and why he thinks that.

4                    THE COURT:  Go on with those questions.

5    You can proceed with those questions.

6    BY MR. MARQUAND:

7        Q.   What do you see in the two areas I have marked

8    with blue arrows?

9        A.   Areas of erosion.  The way the dike is

10   constructed, the road around the perimeter of the dike

11   is graded to drain inboard so any surface water that

12   comes into contact with the ash flows into the ash pond

13   through our permitted discharge.  These are photographs

14   or areas where stormwater has flowed to a concentrated

15   point and eroded out an area along the inner rim of the

16   dredge cell internal dike.

17       Q.   My question is, why do we not see this erosion

18   gully going down into the water?

19       A.   I have a couple of different opinions.  If you

20   see the areas --

21                    THE COURT:  I am going to, I think here we

22   are going from fact testimony to opinion testimony.  I

23   will sustain the objection to that question concerning

24   the objection.  Having heard the objection, I think it

25   would apply equally to that question.  I sustain that

                              221

1  objection.

2  BY MR. MARQUAND:

3      Q.  I am going to show you the top of Page 28 of

4  Defendant's Exhibit 34.  What do we see here?

5      A.  The picture is a bit dark.

6      Q.  Okay.

7      A.  It appears I am standing in the same general

8  area, and the time stamp backs that up.  What I am

9  looking at is the rim ditch operation that takes place

10  within the dredge cell.  This area of water that you see

11  around the inside parameter of the dike, that can be

12  called a moat.

13          The process that takes place is the material,

14  the solution and ash that is dredged from the lower ash

15  pond is pumped into a location in this ditch and the

16  water flows around this ditch and in this particular

17  cell it flowed in a clockwise direction to a discharge

18  point where the water flows back down to the ash ponds

19  from the discharge point.  This allows the water to

20  carry the ash particles and it places them along the

21  path, as they naturally settle out.

22      Q.  I simply wanted to contrast that with Page 29.

23  Page 29 sort of gives you the implication that there is

24  a big pond there, as opposed to the top of Page 28,

25  which as you said, was, likened it to a moat?

222

1    A.   That's correct.

2    Q.   You were asked about what appears as Page 64

3  of Defendant's Exhibit 34.  I have got a picture I want

4  to show you, the same picture I want to show you.  You

5  have heard discussion about underdrains.  Is there any

6  indication there is a drain in that photograph?

7    A.   You can barely see toward the center lower

8  portion of the picture a perforated pipe, not

9  perforated, but corrugated pipe much like what is used

10  in underdrain construction.

11    Q.   What would be the significance of a drain in

12  this picture that we are seeing here?

13    A.   Pipe that we are showing in this picture isn't

14  actually an underdrain.  It's is a piece of pipe that

15  was put in place by the Heavy Equipment Division or the

16  operators of the facility.  This is an area where we had

17  a low point along a bench.  Anytime there was any

18  significant amount of rainfall, the water would

19  concentrate in this point and flow directly down slope.

20  That's what had caused this erosion.  As a interim

21  measure the HED organization had placed this pipe in

22  that location to try to catch the water so it would

23  eliminate or reduce the potential for future erosion.

24    Q.   Let me show you page 94 of Defendant's Exhibit

25  34.  There is actually two photographs here.  The top

223

1    photograph, can you tell anything at all about that?

2         A.   The quality of the photo is pretty poor.  What

3    was the number of the exhibit?  Maybe I can look at the

4    hard copy.

5         Q.   I have another one here.  The second one is

6    the bottom of that page.  I want to show you Page 94.

7    This particular photograph, what do we see here?

8         A.   What we see here is an area that needs to be

9    revegetated.  We can also see that there are some pieces

10   of black corrugated pipe.

11        Q.   What is this right here?

12        A.   That appears to be the outlet end of an

13   underdrain, the lateral pipe connected to an underdrain

14   where it is daylighting out of the slope.

15        Q.   What do you mean daylighting?

16        A.   That's a term that is used when a pipe that's

17   buried is exposed.  That's the point at which it would

18   leave the dike itself.  That appears to be an outlet for

19   an underdrain.

20        Q.   I would like to ask you about a few more of

21   these photographs, if I could.  We talked about the

22   piezometers along the west ditch.  I want to show you

23   page 24 of Defendant's Exhibit 34.  Did you take that

24   photograph?

25        A.   Yes, I did.

224

1      Q.   What are the bicycle flags for?

2      A.   The bicycle flags are in place to delineate

3 the location of piezometers.

4      Q.   Do you see water in the ditch?

5      A.   Yes, I do.

6      Q.   Is it supposed to be there?

7      A.   Yes, the ditch was designed to transfer

8 surface water.

9      Q.   I show you the top of Page 31 of Defendant's

10 Exhibit 34.  Did you take that photograph?

11      A.   Yes, I did.

12      Q.   Where is that taken from?

13      A.   I am standing roughly in the northwestern

14 corner of the dredge cell, but I have turned and am

15 facing south.

16      Q.   Where is the northwestern corner in relation

17 to the area of the failure?

18      A.   That is the area where, as I understand it,

19 the root cause analysis and Bill Walton have determined

20 that the failure propagated in this area, as well as the

21 plaintiff's expert Dr. Marks, I understand that he

22 agreed that that the failure started in this general

23 location.

24      Q.   I am going to show you Plaintiff's 59.  Can

25 you show us about where you were standing when you took

225

1    the photograph we just talked about?

2         A.   In that general area is where I was standing

3    (indicating).  Maybe a bit more -- let me clear that

4    actually.  That is a better representation.

5         Q.   That is about where you were standing?

6         A.   In that general area.  Not in Dredge Cell 2.

7         Q.   And we see these white rows off in the

8    distance.  What are those?

9         A.   Those are the surface drainage repairs that I

10   had previously referred to as being the responsible

11   engineer for the construction.  That's actually a layer

12   of gravel that's along the benches.

13        Q.   Is this area where you were standing when you

14   took this photograph wet or dry?

15        A.   There it was actually very dry.  It is hard to

16   tell from this photo.  It's a bit dark.  If you can see

17   some of the other photos such as what is contained in

18   the hard copy of the exhibit, you can tell the

19   vegetation is dead.  There's not any green lush

20   vegetation, as you would expect to see in an area that

21   was wet.

22        Q.   I show you the bottom of page 31 of

23   Defendant's Exhibit 34.  Where was that taken?

24        A.   This was taken in the same general area, if

25   you look at the plan view I just marked, although

                              226

1  instead of being on the next to the top dike or bench, I

2  had walked down slope towards the 200 foot setback and

3  toward Dike C that we previously mentioned.

4        Q.   Which direction are you looking here?

5        A.   I am looking primarily north, a bit to the

6  northeast.

7        Q.   Do you see any trees on the inside of any of

8  the dike, any of dikes at Kingston?

9        A.   I see some woody vegetation along this 200

10  foot setback.  Then I see what appears to be trees on

11  the opposite or the northern side of Dike C.

12        Q.   The toe of Dike C?

13        A.   At the toe of Dike C.

14        Q.   Was it dry or wet where you were standing?

15        A.   Where I was standing it was actually pretty

16  dry.  Once again, you can tell from the vegetation

17  everything looks brown and dead, as opposed to the

18  vegetation that is in closer to the bench where it is

19  taller.  That's actually located in the ditch that I

20  previously testified that was used to help transfer the

21  water back to the ash pond.

22        Q.   I would like to show you, this is the top of

23  Page 32 of Defendant's Exhibit 34.  Where were you

24  standing and what are you taking a picture of here?

25        A.   If you look at the plan view that we just had

227

1    on the screen that I made a mark on, I am in that same

2    general vicinity in the northwest corner. I am looking

3    more to the west, northwest. Then the background of the

4    photograph --

5        Q.  Back here?

6        A.  Yes, the fenced in area, that is actually the

7    retention pond that was used to collect the surface

8    water runoff from the western dike. This also housed

9    the pump station that pumps the water into the drainage

10   swell or ditch that carried that water through an open

11   channel back to the ash pond.

12       Q.  I show you the bottom of Page 32, Defendant's

13   34. Again, where were you standing and what are we

14   looking at here?

15       A.  I was in the same general area. I had turned

16   clockwise 10 to 15 degrees maybe and I am standing on

17   what appears to be the Stage B dike, which would have

18   been the second lift of the internal dikes that composed

19   the dredge cell complex. What I have taken a picture of

20   here is the fact that the vegetation is dead or sparse.

21   Also to note that the facility's personnel had recently

22   mowed the vegetation at the site.

23       Q.  Did you see any evidence of slides or

24   subsidence in that photograph?

25       A.  No, I did not.

1        Q.   Let me show you the top of Page 33, from

2    Defendant's Exhibit 34.  Where were you standing and

3    what is this a photograph of?

4        A.   Would it be possible to brighten this just a

5    bit.  The general area, that is in the same general

6    area.  What I have done now is walked up to the upper

7    most dike or stage.  I think this was Delta 2.

8    Nonetheless -- actually this was not Delta 2.  This was

9    probably Stage Charlie or C.  This is one of the upper

10   dikes.  There is a picture of the perimeter road and

11   again you can see that a lot of the vegetation in this

12   area is dead.  The area appears to be dry.

13       Q.   Is this looking across the area of the dike

14   failure?

15       A.   Yes.  This is looking across the area where

16   both parties have agreed that the failure occurred.

17              MR. BYRNE:  Your Honor, I move to strike

18   that.  I don't know Mr. Dotson's statement about what

19   the parties have or haven't agreed to -- I think we are

20   in the same neighborhood as far as where it occurred.

21              THE COURT:  I understand that.  I

22   understand the objection.  I won't strike the testimony.

23   I understand your point.  It is well taken.  Let's go

24   ahead.

25              Mr. Marquand, I am under the assumption

1   that you are not quite finished with cross and under the

2   further assumption that Mr. Byrne is not going to stand

3   up afterwards and say he has no questions.  Why don't we

4   break for the day at this point.  It looks like we'll

5   have to invite this witness back tomorrow morning.  How

6   does that sound to everybody?

7             All right.  I just remind you, Mr. Dotson,

8   that, as I did on Friday, you are in the middle of your

9   testimony.  You need to continue to not discuss your

10   case with other witnesses or potential witnesses until

11   the trial is concluded.

12             Unless there is anything else to take up,

13   we'll see everyone here tomorrow morning at nine a.m.,

14   September 27th, Tuesday.  Thank you.

15             (Court was recessed.)

16      I CERTIFY THAT THE FOREGOING IS AN ACCURATE
TRANSCRIPT OF THE RECORD OF PROCEEDINGS IN THE

17   ABOVE-ENTITLED MATTER.

18

19

20

21

22

23

24

25